UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JEREMY LEE,

      Plaintiff,

v.

TROY LAWRENCE, JR., et al.,

      Defendants.

No. 23-cv-01229-SDD-SDJ

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

On January 9, 2023, officers of the Baton Rouge Police Department ("BRPD") twice strip-searched Plaintiff Jeremy Lee. It is still unclear why the officers did this. Plaintiff was only cited with "Resisting an Officer" in violation of La. R.S. 14:108. The East Baton Rouge District Attorney eventually dismissed this charge pre-trial. However, what is clear is that BRPD officers were acting in accordance with their own written policy that allows officers to strip search non-arrestees based solely on "reasonable suspicion." His claimed damages are directly linked to this unconstitutional policy.

Indeed, BRPD General Order No. 281 provides "strip searches may be conducted on non-arrestees based on individualized articuable [sic] suspicion to frisk[.]" The U.S. Supreme Court has made unambiguously clear that law enforcement officers may conduct only a "frisk," as defined in *Minnesota v. Dickerson*, 508 U.S. 366 (1993), when officers have only reasonable suspicion of criminal wrongdoing. The "reasonable suspicion" standard used by BRPD, and apparently employed by officers against Mr. Lee, runs afoul of the Supreme Court's established

1

directives. In short, this policy, practice, and custom of the BRPD was the moving force behind the strip searches of Mr. Lee, in addition to other citizens of Baton Rouge.

*This policy is still in effect*. Notwithstanding the public statements of Baton Rouge officials disavowing the practice, purportedly owning mistakes, and promising changes—despite the existence of this lawsuit and many others—BRPD has failed to change their written policy to comply with constitutionally-mandated protections. BRPD Chief Murphy Paul Jr. told *The Washington Post* in an interview approximately five months ago that "the department regularly revises its policies and that he would examine the strip-search policy after investigating the allegations in the lawsuits."[1] And, generally responding to allegations made in these other lawsuits concerning the BRAVE Cave, Chief Paul Jr. stated "We made a mistake on this one, . . . I've got to own that."[2] But nothing changes.

The heart of Plaintiff's instant motion is that, despite mountains of evidence that BRPD's policy and procedure with respect to strip searches is illegal, has severely harmed citizens, and continues to harm its citizens, the City-Parish still has not changed it. As a citizen of Baton Rouge, and as someone who has already been victimized by BRPD's unconstitutional policy, Mr. Lee requests this Court's assistance to alleviate a substantial risk that his constitutional rights will be violated again during the pendency of this lawsuit. BRPD cannot be allowed to wait out multiple federal civil rights lawsuits before changing this glaring systemic defect. It should be enjoined from continuing this policy immediately.

Below is a brief (very partial) timeline illustrating the need for an injunction:

- **March 10, 2016 -** A federal jury in the Middle District of Louisiana unanimously finds that BRPD officers illegally strip-searched a Baton Rouge citizen, and "that a

---

[1] Daniel Wu, *Louisiana police held detainees in 'torture warehouse,' lawsuits say*, The Washington Post (Sept. 20, 2023), https://www.washingtonpost.com/nation/2023/09/20/baton-rouge-police-brave-cave-lawsuits/
[2] *Id.*

2

moving force behind [the officer's] strip search of [the citizen] was a custom or policy of defendant the City of Baton Rouge, of which the City of Baton Rouge knew or should have known and was deliberately indifferent." The Chief of Police tells local newspapers that BRPD will review and fix its strip-search policy. The policy is not changed.

- **January 1, 2021** – A federal judge in the Middle District of Louisiana issues an unusual order identifying potentially criminal wrongdoing by a team of BRPD officers who strip-searched a young man and his minor brother in public. Even after video of the strip-search becomes international news, BRPD takes no action against any of the officers for the strip-search. The policy is not changed.

- **May 26, 2021** – Only after video of the aforementioned becomes public, the Mayor-President issues a strongly worded statement "stand[ing] by the federal judicial ruling in this case" and promising that "the officers involved must be held accountable." None of the officers are disciplined for the strip-search and the policy is not changed.

- **January 7, 2022** – This Court issues a lengthy ruling granting a Preliminary Injunction ordering the City-Parish to stop prosecuting undersigned counsel for sharing a video exposing the strip-search practices. The policy is not changed.

- **January 9, 2023** – Mr. Lee is illegally strip searched, twice, by BRPD officers.

- **June 10, 2023** – BRPD officers illegally strip search Mrs. Ternell Brown.

- **August / September 2023** – BRPD's strip-search policy again makes international news when a series of civil rights lawsuits are filed. Once against, BRPD Chief of Police and the Mayor-President issue a series of solemn statements promising "accountability" and insisting they take the matter "seriously." BRPD Chief of Police tells the Washington Post that he "own[s]" the "mistake[s]" that BRPD made and assures the press that the strip-search policy will be "reviewed." The policy is not changed.

- **November 27, 2023 –** The Parish Attorney files a full-throated defense of the strip-search policy insisting, "individualized reasonable suspicion is a proper standard from which a strip search can take place."

- **February 4, 2024** – The Parish Attorney and Assistant Parish Attorney ignore an inquiry as to whether the strip-search policy remains in effect.

- **February 7, 2024** – The Parish Attorney and Assistant Parish Attorney respond to a second inquiry, stating it would be improper to confirm/deny the existence of the policy and directing plaintiff to pursue an answer such questions through the Public Records Request process.

- **February 8-18, 2024** – The Parish Attorney ignores a request for consent to file an amended complaint.

- **March 2024** – The Parish Attorney pays many thousands of dollars to a so-called "stop and frisk" expert to opine that strip-searching detainees based on reasonable suspicion is a completely normal, standard, and acceptable technique used by Louisiana police.

## FACTUAL BACKGROUND

As set out in Plaintiff's Second Amended Complaint, the Baton Rouge Police Department ("BRPD") has a long-standing and unabated custom of unconstitutional strip searches. Mr. Lee experienced one such search.

On January 9, 2023, Mr. Lee was approached by BRPD officers on Cadillac Street in Baton Rouge, Louisiana. *See* Dkt. #65 at 3 ¶ 12-13. Without any reasonable suspicion or probable cause, the officers apprehended Mr. Lee and placed him into a squad car. *Id.* at 3 ¶ 13-14. Sometime thereafter, Officer Wallace commanded Lee to get out of the car. *Id.* at 4 ¶ 18. Both Officer Wallace and Lawrence, Jr. then pulled his pants down to strip-search him. *Id.* at 4 ¶ 26. As Mr. Lee questioned these practices, Officer Wallace informed Mr. Lee he was being "detained":

> Lee: What am I getting arrested for? Wallace: You're being detained. Lee: How? For what? Wallace: Because I said so. *Id.* at 6 ¶ 31.

After this first strip search and interaction, the officers transported Mr. Lee to the BRAVE Cave. *Id.* at 8 ¶ 47. This clandestine warehouse has been adapted by the BRPD Street Crimes Unit to conduct interrogations and investigatory activities without the presence of other BRPD/correctional staff. *Id.* at 2 ¶ 4-5. Once inside the BRAVE Cave, the officers strip searched Mr. Lee a *second* time. *Id.* at 8 ¶ 48. The officers then physically beat Mr. Lee, and dropped him at Our Lady of the Lake North Baton Rouge Urgent Care Department with a fractured left rib, chest pain, left facial pain, and breathing difficulties. *Id.* at 8-9 ¶ 52, 55, 60. The only charge

4

subsequently brought against him was "Resisting an Officer," which the District Attorney eventually dropped. *Id.* at 9 ¶ 61-64.

Mr. Lee's encounter with BRPD officers did not occur in isolation. It was but one more example of an unabated custom of BRPD officers exercising unconstitutional conduct pursuant to their own written policy.

For example, on January 1, 2020, Defendant Officer Lawrence Jr. illegally strip searched a minor child. *Id.* at 10 ¶ 71. The Hon. Judge Brian A. Jackson issued an unusual order suggesting the arresting officers might be prosecuted for engaging in criminal misconduct. *Id.* at 10 ¶ 72. After an internal investigation, the BRPD determined that there was no violation of BRPD policy with respect to the strip-search. *Id.* at 12 ¶ 82. And there is credible reason to believe this child and Mr. Lee were not the only victims of such ruthless and wanton behavior. In past episodes of unconstitutional conduct, such as in 2016 when a federal jury found a Baton Rouge citizen's strip search was due to BRPD's deliberately indifferent policy, the policy was never changed. *Id.* at 22 ¶ 181-182.

In fact, BRPD has continued to use an unconstitutional policy as their official procedure for strip searching those suspected of illegal conduct. According to General Order No. 281, and as described, *supra*, BRPD instructs its officers that "strip searches may be conducted on non-arrestees based on individualized articulable [sic] reasonable suspicion to frisk[.]" This was the directive followed by officers in the events involving Mr. Lee and others, and it is still being followed at the time of this filing.

Undersigned counsel recently attempted to communicate with the Parish Attorney and an Assistant Parish Attorney about this subject. *See* Dkt. #65 at 24-25 ¶ 199-200. The undersigned asked the Parish Attorney whether BRPD continues to use General Order No. 281 as its official policy. *Id.* The Parish Attorney refused to substantively respond, but BRPD confirmed that the

5

strip-search policy remains in effect. *Id.* at 25 ¶ 201-202. That is, officers are *still* being instructed that they may strip search non-arrestees based on reasonable suspicion alone. This is noteworthy for many reasons. But perhaps most significant is the continued threat citizens of Baton Rouge face from BRPD. Mr. Lee is one such citizen. He has already suffered two traumatic strip searches based on little to no articulable suspicion of illegal conduct. He continues to live in Baton Rouge. He is therefore subject to the jurisdiction of BRPD, and with it, the threat of General Order No. 281's use on her—again. This threat is substantial. It is real, and it warrants relief.

## ARGUMENT

### I. Standard of Review

A preliminary injunction is warranted if the movant demonstrates: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

### II. Analysis

#### A. Plaintiff is Likely to Succeed on the Merits Because BRPD's Strip Search Policy is Blatantly Unconstitutional

To evaluate preliminary injunction requests, courts use "a bewildering variety of formulations of the need for showing some likelihood of success." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, § 2948.3 (3d ed. 2021). Some courts require the movant to show that the likelihood of success on the merits is greater than fifty percent. *See, e.g.*, *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). The Fifth Circuit, however, recognizes that a finding of 'substantial likelihood' does not require a

finding of a fixed quantitative value. *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Rather, "a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Id.* Thus, when the other factors weigh strongly in favor of an injunction, "a showing of some likelihood of success on the merits will justify temporary injunctive relief." *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).

"To show a likelihood of success, the plaintiff must present a *prima facie* case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Further, in analyzing the first element, "the Court looks to 'standards provided by the substantive law.'" *Soudelier v. Dep't of State Louisiana*, No. CV 22-2436, 2022 WL 3686422, at *1 (E.D. La. Aug. 25, 2022) (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir.1990)).

The substantive law of strip searches proves that BRPD's policy, which is still in force today, is patently unconstitutional. "Time and again, [the Supreme] Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (cleaned up). One such exception is "[a] protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause[.]" *Id.* at 373. But this "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 26 (1968)). "Without a warrant or consent, *Terry* permits only a limited pat-down search to determine whether the suspect is carrying a weapon." *United States v. Zavala*, 541 F.3d 562, 576 (5th Cir. 2008)

7

(citing *United States v. Jenson*, 462 F.3d 399, 408 (5th Cir. 2006)). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry*[.]" *Dickerson*, 508 U.S. at 373. Fifth Circuit caselaw squarely holds that "police must have . . . probable cause to search [an individual]." *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1004 (5th Cir. 2003) (citing *Ybarra v. Illinois*, 444 U.S. 85, 88 (1979)) (emphasis added).

A frisk, as permitted in *Terry*, is "a patdown of a suspect." *Id.* Strip searches, on the other hand, can be "humiliating" and "embarrassing." *Id.* at 1013. And "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but weapons." *Ybarra*, 444 U.S. at 93–94.

The "very obvious conclusion" of *Terry* and *Dickerson* is that it does not authorize strip searches based on reasonable suspicion, "because *Terry* . . . does not license the police to engage in strip searches of criminal suspects." *United States v. Robertson*, 239 F. Supp. 3d 426, 447 (D. Conn. 2017). Even where officers have reasonable suspicion to believe that a detained citizen might possess a gun or knife in their undergarments, *Terry* and *Dickerson* do not authorize officers to order (or "request") citizens to adjust their underwear to accommodate their suspicions. *State v. Williams*, 312 S.W.3d 276, 280 (Tex. App. 2010) ("Ofc. Duncan testified that he had a reasonable basis to believe Williams possessed a steak knife, and he was concerned for his safety. Based on this information, he requested that Williams pull her bra away from her body and maneuver it in lieu of conducting a pat-down. The State would have this court conclude that based on these facts Officer Duncan's actions are permissible under *Terry v. Ohio,* 392 U.S. 1, 19–20 (1968) and its progeny. We decline to do so.").

That the Fourth Amendment allows such a humiliating invasion of privacy, or even that any officer could *reasonably think* that the Fourth Amendment allows such a humiliating invasion of privacy, is "hardly tenable." *Haliburton v. City of Ferndale*, 653 F. Supp. 3d 377, 399 (E.D.

Mich. 2023) ("To the extent that Defendants seek to justify [the officer's] shining his flashlight to view [the plaintiff's] bare crotch area as part of a lawful *Terry* frisk, such a position is hardly tenable. The *Terry* Court acknowledged that even the limited frisk it authorized—patting the outer layer of a person's clothing—was a 'serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly.'") (denying qualified immunity).

These limitations are unequivocally disregarded in BRPD's own written policy—which is still being enforced despite numerous warnings of unconstitutionality, and acknowledgements from BRPD Chief Murphy Jr. in public statements that it would be reviewed.[3] BRPD General Order No. 281 instructs officers, in no uncertain terms, that "strip searches may be conducted on non-arrestees based on individualized articulable [sic] reasonable suspicion to frisk[.]" This is directly contrary to *Terry*'s "narrow" holding and the Fifth Circuit's caselaw requiring probable cause for a search. *Ybarra*, 444 U.S. at 94; *Williams*, 352 F.3d at 1004. The first preliminary injunction factor thus weighs heavily in Plaintiff's favor.

> **B.    There is a Substantial Threat of Irreparable Harm Because Mr. Lee—Along with Other Citizens of Baton Rouge—Is Likely to be Subject to an Unconstitutional Strip Search Again.**

"It has been repeatedly recognized by the federal courts that violation[s] of constitutional rights constitute[] irreparable injury as a matter of law." *Springtree Apartments, ALPIC v. Livingston Par. Council*, 207 F. Supp. 2d 507, 515 (M.D. La. 2001). "While embarrassment or inconvenience standing alone may not rise to the level of irreparable harm, continued deprivations of one's constitutional rights unquestionably does." *Wilkerson v. Stalder*, No. CIV.A. 00-304-JJB, 2014 WL 357704, at *6 (M.D. La. Jan. 31, 2014), *rev'd sub nom. Wilkerson v. LeBlanc*, 596 F.

---

[3] Wu, *Louisiana police held detainees in 'torture warehouse,' lawsuits say*, WASHINGTON POST (Sept. 20, 2023)

9

App'x 252 (5th Cir. 2014). The constitutional freedom from invasive searches or seizures is fundamental to our system of justice. *See, e.g., Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."). Indeed, the Fifth Circuit has previously upheld a grant of equitable relief against a municipal policy of unconstitutional and unreasonable strip searches. *Stewart v. Lubbock Cnty., Tex.*, 767 F.2d 153, 157 (5th Cir. 1985).

Here, there is a substantial threat that Mr. Lee would be subject to other unconstitutional strip searches. Notwithstanding the evidence of numerous other illegal strip searches alleged by Plaintiff, the policy at force behind these violations is still in effect. Further, the situations where Mr. Lee could find himself subject to a mere "reasonable suspicion" standard for a strip search are commonplace. "Reasonable suspicion" is a low bar, one that can be met while a citizen engages in conduct that is lawful and protected by the Constitution: "[n]ervousness or suspicious actions upon the approach of police officers, combined with an individual's presence in a high-crime area" alone suffice. *State v. Martin*, 738 So. 2d 98, 102 (La. App. 5th Cir. 1999). Mr. Lee also continues to live in Baton Rouge, and he therefore must endure ongoing and justified years that he will one day be subject to another humiliating and degrading violation of his constitutional rights at the hands of BRPD officers. *See* Amend. Compl. ¶¶ 8, 28-31, 211. These contexts are inapposite to cases denying equitable relief standing, such as *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

In *Lyons*, the U.S. Supreme Court held that plaintiff Adolph Lyons, who was the victim of excessive force, did not have standing to pursue an injunction against the Los Angeles Police Department. *Id.* at 105. Part of the reason he could not meet the case in controversy requirement was because he "would have had not only to allege that he would have another encounter with the

police but also . . . that the City ordered or authorized police officers to act in such manner." *Id.* at 105-06. "[T]he possibility of repeated injury [in *Lyons*] was highly attenuated in that the petitioner would need to have . . . demonstrate[d] that all L.A.P.D. officers always used chokeholds in non-deadly situations **or the City authorized them to act in that manner**[.]" *Spector v. Norwegian Cruise Line Ltd.*, No. CIV.A. H-00-2649, 2007 WL 2900588, at *6 (S.D. Tex. Sept. 28, 2007) (emphasis added). "[W]hereas the Plaintiff[] here may likely face repeated injury" because not only did BRPD authorize officers to act in that manner, it continues to do so. *Id.* "Unlike the petitioner in *Lyons*, there is a real threat that if Plaintiff[] were to [be stopped by BRPD officers again], the same conditions would exist." *Id.* (citing *Lyons*, 461 U.S. at 107 n.8 ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry.")(emphasis in original)).

To illustrate this distinction further, some courts have "enumerated two ways in which a plaintiff can distinguish *Lyons* and properly establish standing for injunctive relief." *Sims v. City of Seattle*, No. 2:22-CV-00483-TL, 2023 WL 3619019, at *4 (W.D. Wash. May 24, 2023). "First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy. Second, the plaintiff may demonstrate that the harm is part of a pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights." *Id.* (citing *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012)).

Yet, there is even a further distinction in this case from *Lyons* that has been recognized in the Fifth Circuit as overcoming speculation as to equitable relief standing: Mr. Lee was doing nothing wrong. "We find a critical factual distinction between *Lyons* and the instant case which dictate[s] a different result. [Mr. Lee] (unlike Lyons) was engaged in an activity protected by the Constitution." *Hernandez v. Cremer*, 913 F.2d 230, 234 (5th Cir. 1990) (citing *Kent v. Dulles*, 357 U.S. 116, 126–27 (1958); *Worthy v. United States*, 328 F.2d 386, 392 (5th Cir. 1964)). *Lyons* has been used by "courts [when they] 'have been unwilling to assume that the party seeking relief will

11

repeat the type of *misconduct* that would once again place him or her at risk of that injury.'" *Id.* (quoting *Honig v. Doe*, 484 U.S. 305, 320 (1988)) (emphasis in original). "No such reluctance, however, is warranted here." *Id.* "The injury alleged to have been inflicted did not result from an individual's disobedience of official instructions and [Mr. Lee] was not engaged in any form of misconduct[.]" *Id.* at 234–35; *see also Honig*, 484 U.S. at 320 (holding *Lyons* for the proposition that "no threat that party seeking injunction barring police use of chokeholds would be stopped again for traffic violation or other offense, or would resist arrest if stopped."). Notwithstanding that Mr. Lee was cited for "Resisting an Officer," the State eventually dismissed this charge pre-trial. Further, in his Second Amended Complaint, Plaintiff alleges his detention was illegal from its inception.

Mr. Lee was simply existing on January 9, 2023, before he was improperly stopped and detained by BRPD officers. He did not resist officers at any point—a fact supported by the State's dismissal of Mr. Lee's only charge. His routine legal conduct led to police intervention which led to multiple strip searches. And the policy that led to this violation is still in force. This continued threat is not attenuated. Accordingly, the irreparable harm element is met.

### C. Balancing the Competing Claims of Injury Weighs Heavily in Mr. Lee's Favor

Third, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987).

Here, this element weighs indisputably in Mr. Lee's favor. He faces the potential of another highly invasive strip search by BRPD officers. Many reasons support this. For one, the unconstitutional policy is still in effect. Further, he continues to live in Baton Rouge. Amend. Compl, ¶ 8. He could really be stopped at any point by BRPD officers and may be subject to a

strip search based on the thinnest veil of reasonable suspicion, like what occurred in January 2023. *Cf. Lyons*, 461 U.S. at 107 n.8 ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry.").

On the other hand, Defendants would obtain little to no benefit whatsoever from continuing an unconstitutional strip search policy. In fact, Defendants may themselves benefit from the preliminary injunction. To date, this policy has led to repeated and proven degradations of constitutional protections, and perhaps a court order to cease the practice will prevent further harm to Baton Rouge citizens in the future. Thus, this element is met.

### D.   The Public Interest Supports the Entry of Preliminary Injunctive Relief

"It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F.Supp.2d 90, 105 (D.D.C. 2012) (collecting cases). Here, there is a strong and availing public interest in preventing Defendants from continuing the policy of the Baton Rouge Police Department as pronounced in General Order No. 281. Citizens of Baton Rouge have already been harmed by this policy, and the prospect of future harm is, at this point, *likely*. Strip searches are intrusive, traumatizing, and should be reserved only for the most appropriate scenarios. That is why the U.S. Supreme Court has articulated strong protections against Fourth Amendment overreach. The public relies on these protections, and they should be enforced here.

WHEREFORE, premises considered, Plaintiff respectfully requests this court issue an order enjoining Defendant City-Parish from acting on their written policy, General Order No. 281, and to cease strip searches based on reasonable suspicion alone.

Respectfully submitted,

s/ Thomas W. Frampton
Thomas W. Frampton
(La. Bar No. 35775)

13

580 Massie Road<br>
Charlottesville, VA 22903<br>
(202) 352-8341<br>
tframpton@law.virginia.edu

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of April 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/Thomas Frampton