## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

JEREMY LEE, and T'NIYA BASS

      Plaintiffs,

    v.

TROY LAWRENCE, JR., in his personal
capacity, MATTHEW WALLACE, in his
personal capacity, JOSEPH CARBONI, in his
personal capacity, TAFARI BEARD, in his
personal capacity, STEVEN NEVELS, in his
personal capacity, CITY OF BATON
ROUGE, and PARISH OF EAST BATON
ROUGE; JOHN DOE OFFICERS 1-3;
JANE DOE OFFICER 1

      Defendants.

No.    3:23-cv-01229-SDD-SDJ

## AMENDED COMPLAINT

1. Plaintiffs JEREMY LEE and T'NIYA BASS, by and through their undersigned attorneys, move to amend their complaint against Defendants, and alleges as follows:

2. This case involves a 21-year-old man who entered Baton Rouge Police Department custody on Jan. 9, 2023, healthy and intact, and left so badly beaten that the local jail refused to admit him until he was treated by a nearby hospital. There he was treated for broken bones and other injuries. The case also involves a pregnant juvenile female who came in to contact with BRPD officers at the same house on the same day.

3. The officer whose custody Mr. Lee entered, Troy Lawrence Jr., has an extensive record of injuring members of the public, disregarding their constitutional rights, and escalating routine interactions into hostile and even violent ones — all of which has cost the taxpayers

1

of Baton Rouge a significant amount of money in civil rights lawsuits and departmental investigations. His criminal conduct has already made national news, been flagged by federal judges, and is well known to BRPD Chief Murphy Paul and members of the Metropolitan Council.

4. The Officer who took Ms. Bass into custody and ultimately drove her to the site where her constitutional rights would be violated is, Tafari Beard also has a history and pattern of committing constitutional violations against citizens.

5. Time and again, BRPD has been warned in 2021 and 2022 that by keeping Ofc. Troy Lawrence Jr. on the force, they were all but guaranteeing that a Baton Rouge citizen would be killed or seriously injured. BRPD also ignored many other warning signs regarding the Street Crimes Unit that Troy Lawrence, Jr. was a part of, and the Street Crime Unit's black site known as the "BRAVE Cave." BRPD's deliberate indifference to those warnings caused Mr. Lee's injuries.

6. Mr. Lee's and Ms. Bass' injuries were inflicted at a torture warehouse known to BRPD as the "BRAVE Cave," a place where Baton Rouge citizens are taken, held incommunicado, denied counsel, and beaten. Its existence has been known to top BRPD brass since long before Mr. Lee's beating. It was shut down by the Mayor on August 29, 2023 after news of this impending lawsuit was broadcast on WAFB on August 28, 2023.


**JURISDICTION AND VENUE**

7. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution, as well as the deprivation of rights under Louisiana law.

8.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b), because the defendants reside in this judicial district and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

9.  Plaintiff JEREMY LEE is a citizen of the United States and a resident of Baton Rouge, Louisiana.

10. Plaintiff T'NIYA BASS is a citizen of the United States and a resident of Baton Rouge, Louisiana.

11. Defendants TROY LAWRENCE, JR. (P10805), JOSEPH CARBONI (P10677), MATTHEW WALLACE (P10704), TAFARI BEARD (P10195), STEVEN NEVELS, JOHN DOE OFFICERS 1-3 and JANE DOE OFFICER 1 are residents of Louisiana and are employed by the Baton Rouge Police Department. Defendant officers worked for the BATON ROUGE POLICE DEPARTMENT at the time of the incident giving rise to this suit, and thus for the CITY OF BATON ROUGE and PARISH OF EAST BATON ROUGE. Defendant CITY OF BATON ROUGE is a political subdivision of the State of Louisiana. The city's governing authority is consolidated with the government of EAST BATON ROUGE PARISH. Defendant PARISH OF EAST BATON ROUGE is a political subdivision of the State of Louisiana. The Parish's governing authority is consolidated with the government of the CITY OF BATON ROUGE.

12. BRPD CHIEF MURPHY PAUL is the final policymaker for the municipal defendants as it pertains to official policy governing use of force, arrests, searches, and respect for the First Amendment rights of Baton Rouge citizens by Baton Rouge Police Department employees.

3

## PLAINTIFF'S FACTUAL ALLEGATIONS

Initial Arrest

**13.** On January 9, 2023, police arrived in front of a house in the area of 5400 Cadillac Street, Baton Rouge, Louisiana.

## PLAINTIFF'S FACTUAL ALLEGATIONS

**Initial Arrest**

**14.** On January 9, 2023, police arrived in front of a house in the area of 5400 Cadillac Street, Baton Rouge, Louisiana.

**Facts Related to Bass**

**15.** At the same time, two African American females were sitting in front of the above-mentioned house enjoying a box of crawfish. A third female (TNiyah Bass) exited the house with no shoes on. The three females were 18, 17, and 16 years of age. The 16 year old is now known to be T'Niyah Bass who was 7 months pregnant at the time.

**16.** BRPD officer Matthew Wallace made contact with the three females and ordered them to move to and remain in front of an unmarked BRPD vehicle.

**17.** Shortly thereafter, BRPD officer Tafari Beard arrived at the scene and made contact with the three females. The females again informed Officer Beard that they were just eating crawfish in front of the house where they were initially contacted by BRPD officers.

**18.** Officer Beard then ordered Officer Steven Nevels to place the three females in the rear of his vehicle which he did. The pregnant 16 year old T'Niyah Bass informed Officer Beard that she was pregnant and needed to use the restroom. Beard replied by telling her that he would see if a female officer could assist to allow her to go to the restroom.

19. Sometime later, an unknown Black male officer [John Doe 1] ordered Ms. Bass to exit Officer Beard's vehicle and transported Ms. Bass to the 4th district precinct where they were met by an unknown white female officer.

20. The  unknown Black officer [John Doe 1] then informed Ms. Bass that she was being detained and not under arrest. Ms. Bass replied by asking, "what does that mean?" and informed both the Black male officer and the white female officer [Jane Doe 1] that she was 16 years of age and did not have any shoes.

21. John Doe 1 then pulled out leg shackles and approached Ms. Bass. Ms. Bass asked the officer, "Them going on my feet?" To which the officer replied "yes" before shackling the 16 year old at her ankles. The officer then asked Ms. Bass "Do you have any weapons on you?" To which she replied "no."

22. Jane Doe 1 then informed Ms. Bass that she was going to perform a pat-down search upon her person for T'Nyiah's and the officers. No weapons or contraband were found upon the shoeless and pregnant 16 year old Bass.

23. Ms. Bass was then escorted into the 4th district where Jane Doe 1 escorted her into the restroom.

24. While in the restroom Jane Doe 1 again informed Ms. Bass that she was detained and the restroom door would remain open, but that her body worn camera would not be recording her.

25. At no time was Ms. Bass alone while she was at the 4th district nor did she have any opportunity to pick up any contraband while being watched by BRPD officers.

26. Ms. Bass was then transported from the 4th district back to the scene of 5400 Cadillac Street where she was placed back in the rear of Officer Beard's vehicle with the other 18 and 17 year old detainees.

27. After two hours of being detained in the rear of Officer Beard's vehicle, Ms. Bass and the 17 year old detainee informed Officer Beard that they had to use the restroom. Their request was denied.

28. After over two hours of being detained, after 17 minutes following the detainees' request to use the restroom and after repeated statements to officers professing their non-involvement in any criminal activity at the target address, Officer Beard informed the 17 year old that her grandfather had arrived on the scene.

29. At this point, the girls all inquired about their release. Officer Beard's response was "we will probably let y'all out."

30. After almost three hours of being detained in the rear of Officer Beard's vehicle, Officer Beard informed the detained females and the 17 year old's mother that they were being transported to the first district to be interrogated at the behest of the lead investigative Detective Mathew Wallace. During the transport, the following conversation occurred between Officer Beard and the female detainees:

> **Juveniles:** So they just want to talk to us?
>
> **Officer Beard:** Probably so.
>
> **Ms. Bass:** We ain't got sh*^ to talk about.
>
> **Officer Beard:** Y'all ain't got to talk, y'all juveniles.

31. Despite BRPD body worn camera policy requiring BWC to be worn and activated when:

   1. Person and vehicles are being searched;

**2.** When there are physical or verbal confrontations;
**3.** Use of force incidents; or
**4.** Other legitimate law enforcement contacts[1]

BRPD officers have repeatedly concealed their criminal and unconstitutional acts inside of the BRAVE Cave by not wearing and/or activating their BWC when required. This is evident by the fact that none of the following allegation have been recorded despite the requirement to do so:

**a.** Jeremy Lee no BWC or facility footage from inside of the Black site;
**b.** Ternell Brown no BWC or facility footage from inside of the Black site;
**c.** Jason Jackson no BWC or facility footage from inside of the Black site;
**d.** Randell Williams no BWC or facility footage from inside of the Black site
**e.** Alex Woods no BWC or facility footage from inside of the Black site;
**f.** Rose Carter no BWC or facility footage from inside of the Black site;
**g.** Lawrence Mealey no BWC or facility footage from inside of the Black site;
**h.** Courteni Hayes no BWC or facility footage from inside of the Black site;
**i.** Irdielle Brown no BWC or facility footage from inside of the Black site; and
**j.** Shona Davis no BWC or facility footage from inside of the Black site.

**32.** After hours of being unreasonably detained and seized in the rear of Officer Beard's vehicle, the 7-month-pregnant minor Ms. Bass (a non-arrestee) was transported by Officer Beard to the B.R.A.V.E at the behest of lead investigative Detective Matthew Wallace. Officers Wallace, Carboni, Beard Nevel and other unknown Officers deployed the same tactics listed above on the day in question despite the sensitive situation which involved a pregnant 16 year old minor. Ms. Bass is then interrogated without a parent or counsel present in violation of the La. Children's Code.[2]

**33.** Ms. Bass' constitutional rights were further violated when the pregnant minor was subjected to an invasive and sexually humiliating strip search at the hands of an unknown white male BRPD officer. Although John Doe "?" was the one who carried

---

[1] BRPD Policy No 502/15-1.
[2] LA. Children's Code Art. 881.1.

34. Following these violations and approximately four hours of detention, Ms. Bass was ultimately released from BRPD custody without being arrested and to this date has not been formally indicted nor billed with any criminal act.

**Facts Related to Lee**

35. Mr. Lee was arrested by Det. Wallace and Ofc. Lawrence, without reasonable suspicion or probable cause.

36. He was placed in the back of a BRPD vehicle.

37. Minutes after arriving on the scene, while searching for and discussing possible evidence with Det. Matthew Wallace, Ofc. Lawrence turned off the audio on his body-worn camera.

38. Less than three minutes later, with his body-worn camera audio still off, Ofc. Lawrence and Det. Wallace approached the police car in which Mr. Lee was sitting.

39.  They began swearing at him and pushing him.

40.  Upon opening the backseat door, Ofc. Wallace commanded Mr. Lee to "get your ass over here."

41. Although his audio was on during this exchange, Det. Wallace also periodically turned his body-worn camera off and on throughout the investigation during the day and the interrogations in the evening.

42. Ofc. Lawrence also turned his camera on and off, and frequently muted his body-worn, on the afternoon and evening in question.

43. According to Mr. Lee's arrest report, Mr. Lee is 5'6", 125 pounds.

44. Both Ofc. Lawrence or Det. Wallace are substantially taller and substantially larger than Mr. Lee.

45. Throughout this interaction, the two officers repeatedly accused Mr. Lee of "resisting."

8

**46.** Mr. Lee was not resisting.

**47.** Mr. Lee stated that he was not resisting and that he would comply with whatever they wanted.

**48.** Despite Mr. Lee's cooperative words and actions, Ofc. Lawrence and Det. Wallace continued to push a handcuffed Mr. Lee, pull his arms, and force him down in the middle of a paved street, where they pulled down his pants to search him.







49. Mr. Lee repeatedly told the officers, who were shoving and throwing Mr. Lee around, that they were hurting him.

50. While Mr. Lee was handcuffed and on the ground, Ofc. Lawrence told him, "I'm about to bat the living crap out of you."

51. Frightened and seeking some kind of fairness, Mr. Lee told the officers to "turn your [body-worn] camera on" and to "bat me then."

52.  Mr. Lee continued to repeatedly inform the officers that they are hurting him even though he is trying to cooperate.

53. Ofc. Lawrence and Det. Wallace continued to act unprofessionally toward Mr. Lee. The following conversation took place shortly after the strip-search:

      Lee: What am I getting arrested for?

      Wallace: You're being detained.

      Lee: How? For what?

      Wallace: Because I said so.

54. The Louisiana Constitution provides "When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention."

55. Det. Wallace complied with the Louisiana Constitution when he responded to Mr. Lee.

   Ofc. Lawrence Nearly Provokes a Riot by Fighting with Bystanders

56. As the police presence in the area increased, a crowd gathered in the neighborhood around a local grocery store to see what was going on.

57. Ofc. Lawrence stayed in the area with several other officers, periodically cutting his body cam audio off and on.

58. Ofc. Lawrence and one woman got into a back-and-forth that consists of him telling her to "keep talking" and daring her to "show me."

59. After arresting her, Ofc. Lawrence walked away from the scene for about half an hour.

60. Instead of cooling off, Ofc. Lawrence returned to the crowd around the grocery store, which by this point had largely settled, ready to find – and if he had to, create – further conflict.

61. One woman asked an officer about the status of the search warrant for the house – the reason officers are in the area. The two had a civil back-and-forth.

62. Ofc. Lawrence, however, stepped in and started to argue with the woman. Among his comments were "how are you going to tell me what I can do at my job and what I can't?"

63. A male bystander then joined the conversation.

64. Angered, Ofc. Lawrence called the man "ignorant" and bragged about how much money he had.

**65.** The comment caught the attention of several bystanders and elicited an immediate, negative reaction from the crowd.

**66.** Sensing the sudden mood change in the crowd almost immediately following Ofc. Lawrence's arrival and provocation of bystanders, another BRPD officer had to step in to separate Ofc. Lawrence from the now-agitated crowd.

**67.** After being separated, Ofc. Lawrence tried to walk back over to the crowd to taunt them more, but two officers intervened to talk him down and walk him away.

**68.** One officer explicitly told Ofc. Lawrence to "chill out."


BRPD's "Torture Warehouse"

**69.** After the unnecessary strip search and Ofc. Lawrence's conflict with the crowd, Mr. Lee was not transported to the police station, but to a torture warehouse known to BRPD staff as "the BRAVE Cave."

**70.** There, he was against strip-searched and beaten by the named BRPD officer defendants.

**71.** When first arriving to this torture warehouse, Mr. Lee was handcuffed in a holding cell with two other arrestees.

**72.** Mr. Lee was removed from the holding cell by three officers: Troy Lawrence, Jr., Matthew Wallace, and Joseph Carboni.

**73.** Mr. Lee was alone with the three officers in a separate warehouse room.

**74.** There he was repeatedly kicked and punched by the officers without any lawful justification.

**75.** Mr. Lee's screams for help and screams in pain could be heard throughout the facility.

**76.** The officers laughed at and mocked Mr. Lee for screaming for help.

**77.** The officers beat Mr. Lee so badly that they fractured his rib and caused visible damage to his face.

**78.** Soon after the beating, Mr. Lee was interrogated by BRPD.

**79.** BRPD officers made sure their body-worn cameras were turned "off" before beating Mr. Lee.

**80.** Jeremy Lee subpoenaed BRPD for camera footage from within the warehouse, but BRPD responded that no such footage exists.

**81.**  Mr. Lee suffered physical injuries so severe, the local jail rejected his admission until he received medical help.

**82.** He was taken to Our Lady of the Lake North Baton Rouge Urgent Care Department, where they officially diagnosed him with a fractured left rib, chest pain, and left facial pain. Mr. Lee also reported trouble breathing.

Bogus Criminal Charges

**83.** Mr. Lee was not charged with any criminal wrongdoing that led to his arrival in the BRPD Torture Warehouse.

**84.** The only criminal charge he received was an alleged "Resisting an Officer" (i.e., being beaten by Defendants) in violation of La. R.S. 14:108, billed in the 19th Judicial District Court under docket number DC-23-01703.

**85.** Louisiana has long recognized the absolute right of those arrested without probable cause to use force to resist their arrest.

**86.** The charge against Mr. Lee rests on the materially false (and contradictory) allegations contained in sworn police reports authored by Wallace and Lawrence. Although these false reports initially caused the District Attorney to file meritless charges against Mr. Lee, the

District Attorney subsequently dismissed (i.e., terminated in Mr. Lee's favor) all criminal charges related to this case in late 2023. *See* Dkt. 40.

87. The pendency of the criminal charges against Mr. Lee caused him damages, including the need to post bail, retain counsel, miss opportunities for work while attending court dates, and significant emotional and psychological distress.

## II.    TROY LAWRENCE JR.'S TROUBLED HISTORY (AND POLICYMAKERS' DELIBERATE INDIFFERENCE TO THE OBVIOUS CONSEQUENCES OF HIS RECURRING MISCONDUCT).

88. During Troy Lawrence Jr.'s short tenure as a BRPD officer, his dangerous temper has led to numerous Internal Affairs investigations. Numerous incidents have involved Troy Lawrence Jr. needless escalating ordinary encounters, strip-searching young Black men, and responding to criticism with violence.

89. Troy Lawrence, Jr. is the son of BRPD Deputy Chief Troy Lawrence, Sr. After the filing of this lawsuit, Deputy Chief Troy Lawrence, Sr. was arrested and criminally charged for his role in the alleged destruction of evidence documenting civil rights violations by members of the Street Crimes Unit.

90. Apart from Chief Murphy Paul, Deputy Chief Troy Lawrence Sr., is currently the highest paid employee of BRPD.

91. No BRPD employee with Troy Lawrence Jr.'s seniority has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence Jr.

92. No BRPD employee has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence Jr. in the past two years.

14

### A.    CLARENCE GREEN INCIDENT

**93.** Shortly after joining the force, Ofc. Lawrence's misconduct made national news when he strip-searched a minor child in public; illegally searched that child's mother's apartment without a warrant; and then threated to beat a handcuffed detainee.

**94.** Judge Brian A. Jackson—even without being presented with evidence of Troy Lawrence, Jr.'s threats to beat Clarence Green—described the January 1, 2020 incident as follows: "[T]he state agents in this case demonstrated a serious and wanton disregard for Defendant's constitutional rights, first by initiating a traffic stop on the thinnest of pretext, and then by haphazardly invading Defendant's home (weapons drawn) to conduct an unjustified, warrantless search. Such an intrusion, in abject violation of the protections afforded by the Fourth Amendment of the United States Constitution, which protects citizens against unwarranted governmental intrusions in their homes, may justifiably be considered to be a trespass subject to prosecution under La. R.S. 14:63."

**95.** After the home search, when BRPD officers attempted to pressure Ms. Green into consenting to allow them to take a DNA sample from her minor child, Clarence Green (from the back of a police car) advised his mother to call a lawyer.

**96.** Troy Lawrence Jr. then threatened to beat Clarence Green while he was handcuffed and locked in the back of a police car, stating: "If you don't shut the fuck up, I'm gonna come in and I'm gonna fuck you up. You think I'm playing with you? I will fuck you up."

**97.** Despite Judge Jackson's ruling on December 29, 2020, the filing of a civil rights lawsuit on January 2, 2021, and Baton Rouge Metropolitan Council's ratification of a $35,000 settlement in April 2021, no disciplinary investigation into Ofc. Lawrence was even *started* until (at earliest) May 24, 2021.

**98.** The investigation did not begin until after BRPD was contacted by journalists who had reviewed the footage that was released by the Green Family.

**99.** The "disturbing" footage of Ofc. Lawrence's misconduct was featured on the national nightly news program CBS EVENING NEWS on May 27, 2021.

**100.** On May 28, 2021, Chief Murphy Paul convened a press conference to address the national controversy caused by Troy Lawrence, Jr. and his colleagues.

**101.** At the press conference, the first question posed by journalists was: "This happened almost 17 months ago. Would we be here talking about this today if that video had not come out?" Chief Paul responded: "Absolutely we would have. . . . We just had the last hearing, what was it, the 13th I believe? The 13th of this month was our last hearing. And we still have two other officers that we have not completed that investigative process. So yes, we still would have made that information available to the public once those administrative processes have concluded."

**102.** Chief Paul omitted that the investigation into Ofc. Lawrence was not started before May 24, 2021; in fact, no investigation of Ofc. Troy Lawrence Jr. was started as a result of Judge Jackson's ruling, the lawsuit, or the civil rights settlement.

**103.** BRPD conducted an investigation into Troy Lawrence Jr.'s role in the Green Family case and Chief Paul personally reviewed the results.

**104.** BRPD cleared Ofc. Lawrence of any violation of a "use of force" or search-and-seizure policies in connection with the initial stop of, initial search of, and threatened violence against Clarence Green and his brother.

**105.** BRPD Chief Paul personally defended the lawfulness and appropriateness of the stri-searches of Clarence Green at a public press conference.

106.    On January 19, 2023, Ofc. Lawrence testified under oath about the aforementioned incident.

107.    Ofc. Lawrence swore that he "was suspended for cursing, using profanity."

108.    Ofc. Lawrence swore that he had no idea he was one of the "John Doe" defendants named in Clarence Green's civil rights suit.

109.    Ofc. Lawrence swore that he had no recollection of being featured on a national news broadcast or that Chief Paul had convened a press conference to discuss the incident he was involved in.

110.    Ofc. Lawrence swore that he did not believe that he had assaulted Clarence Green by threatening to "fuck him up" while he was handcuffed.

111.    Ofc. Lawrence received no additional training, counseling, or anger management in connection with this incident.

### B.    SHERMANIE REED INCIDENT

112.    Ofc. Lawrence also used force and violence against another motorist, Shermanie Reed, who (correctly) told him he was acting unprofessionally on October 31, 2020.

113.    The similarities to this incident are striking: there, Ofc. Lawrence arrived on the scene, began cursing at the parties, began pushing individuals who posed no physical threat to him, ordered motorists into their cars, ripped a motorist out of their car, falsely arrested them, swore out a self-serving police report, injured the civilian, and then released her.

114.    As in this case, Ofc. Lawrence grossly misrepresented the details of the encounter in a police report (and subsequent Internal Affairs investigation).

115.    As in this case, BRPD insisted that Ofc. Lawrence's conduct was consistent with BRPD policy (apart from muting his body-worn camera).

116. BRPD conducted an investigation into the case and Chief Paul personally reviewed the results.

117. Ofc. Lawrence's interview with Internal Affairs included numerous obvious false statements.

118. The investigation cleared Ofc. Lawrence of all wrongdoing in that case apart from muting his body-worn camera.

119. In September 2021, undersigned counsel wrote Parish Attorney Andy Dotson to alert him to Ofc. Lawrence's misconduct and to highlight misrepresentations in his Internal Affairs interview. The letter sought a meeting with Chief Paul regarding the incident.

120. Andy Dotson did not respond.

121. Ms. Reed sued Ofc. Lawrence and Chief Paul for false arrest, excessive force, and First Amendment retaliation on October 30, 2021.

122. Her complaint emphasized that Ofc. Troy Lawrence already "boast[ed] a lengthy record of professional misconduct during his short career."

123. In numerous conversations in late 2021 and early 2022, BRPD's attorney was advised by undersigned counsel that Ofc. Troy Lawrence was likely to maim or seriously injure someone in a future incident if they failed to intervene.

124. At Ofc. Lawrence's deposition on January 19, 2023, he repeatedly lied about the facts of the case.

125. On January 21, 2023, BRPD's counsel was sent another letter highlighting examples of Ofc. Lawrence's perjury in his deposition and reiterating counsel's ongoing concerns: "Officer Lawrence is going to seriously injure or kill someone if he remains on the force. It is disheartening to learn that, since the filing of this lawsuit, Officer Lawrence has been

*suspended* at least three (3) additional times for on-the-job misconduct and is currently the subject of an internal investigation for additional police brutality in December 2022."

126. Within two months of Ofc. Lawrence's deposition, BRPD agreed to a $55,000 settlement to resolve the claims arising from that incident.

127. Ms. Reed was willing to settle for $40,000 and an apology, but BRPD refused to authorize the settlement.

128. BRPD still maintains that Ofc. Lawrence did nothing wrong apart from muting his body-worn camera during his encounter with Ms. Reed.

129. Ofc. Lawrence received no additional training, counseling, or anger management in connection with this incident.

130. Throughout Shermanie Reed's lawsuit against Troy Lawrence Jr. and BRPD, the Department withheld information from their own lawyers regarding Troy Lawrence's misconduct. The department even altered and redacted responsive documents to hide the names of witnesses who would have pertinent information regarding Ofc. Lawrence's violent tendencies.

131. Throughout the litigation, BRPD's counsel was repeatedly advised by Ms. Reed's counsel that Ofc. Lawrence posed an ongoing danger to the people of Baton Rouge, and that it was likely he would maim or kill someone if he wasn't removed from the force.

## C.    TROY LAWRENCE ALSO TRIES TO FIGHT HIS COLLEAGUES

132. Ofc. Lawrence has twice been the subject of Internal Affair investigations for altercations with a 20-year veteran of BRPD, Cody Gunter.

133. On July 19, 2021, Ofc. Lawrence disregarded a direct order from Sgt. Gunter, telling him, "I don't give a fuck who you are."

**134.**    Ofc. Lawrence was suspended for 25 days.

**135.**    On March 6, 2022, Ofc. Lawrence called Sgt. Gunter "a pedophile" and attempted to

fight him in public.

**136.**    Ofc. Lawrence stated, "I'll fuck you up right here in front of everybody."

**137.**    Ofc. Lawrence then took off his vest and attempted to fight Sgt. Gunter, who walked

away to deescalate the situation.

**138.**    Ofc. Lawrence then called Sgt. Gunter "a pussy" a told him that he was going to "kick

[his] ass."

**139.**    The events occurred in front of a crow of college students.

**140.**    When Sgt. Gunter returned to his car, Ofc. Lawrence followed him, yelling, "Get out

the car you pussy."

**141.**    Under oath, Sgt. Gunter explained to Internal Affairs that he believed Ofc. Lawrence

was dangerous and that he did not want to work in his presence. He expressed his fear: "I

don't know what he is capable of."

issue with me."

~Do you have any personal vendettas against Ofc. Lawrence?
█████████ replied, "No."

~Is there any reason that you feel you cannot work with or
in the presence of Ofc. Lawrence and if so, please explain?
█████████ replied, "I would not be comfortable working in
the presence of Ofc. Lawrence because I don't know what he
is capable of.  I feel that he has a lot anger towards me
and it's not going away."

**142.** Ofc. Lawrence was suspended for this latter incident, as well.

**143.** In at least one of the incidents, Ofc. Troy Lawrence Sr. was made aware of his
son's wrongdoing as the incident was happening, and was asked by other BRPD
officials to intervene with his son

**144.** Ofc. Troy Lawrence Sr. was told that his son would be arrested if he did not
promptly report to superior officers in connection with one of his altercations with
Sgt. Gunter.

**D.    ADDITIONAL INTERNAL AFFAIRS INVESTIGATIONS**

**145.** On December 22, 2022, local television station reported a story entitled "BRPD
Opens Internal Investigation after Cell Phone Video Captures Violent
Confrontation."                                      *See*
https://www.wbrz.com/news/brpd-opens-internal-investigation-after-cell-phone-vid
eo-captures-violent-confrontation/ (last accessed June 21, 2023).

146.    The video in question depicts Ofc. Troy Lawrence, Jr. repeatedly striking a handcuffed individual in the back of a police car.

147.    When questioned about the incident under oath on January 19, 2023, Ofc. Troy Lawrence Jr. claimed to have no recollection of the incident and no knowledge of any Internal Affairs investigation into the incident.

148.    During his deposition, Ofc. Lawrence also revealed that he had been suspended on at least one other occasion in 2022, although this information was never disclosed during discovery.


### E.    CHAVIS/SANDERS INCIDENT

149.    In yet another recent incident, Ofc. Lawrence publicly attacked two young Black men after they (correctly) criticized him for acting unprofessionally.

150.    On October 8, 2022, Ofc. Lawrence picked a fight with two young men—Holden Sanders and Emanuel Chavis—after BRPD officers shot their cousin, Malik Chavis.

151.    Ofc. Lawrence profanely ordered the men to leave the grounds of a hospital.

152.    When the men informed him that he was acting unprofessionally, he physically attacked them both.

153.    The assault involved grabbing Holden Sanders by the neck and hair, as Ofc. Lawrence unsuccessfully sought to rip him out of his car.

154.    Other (non-BRPD) officers witnessed the attack, but refused to join in Ofc. Lawrence's brutality, even as he screamed at them: "CAN Y'ALL FUCKING

HELP?! . . . WHAT THE FUCK ARE Y'ALL DOING?! YOU'RE NOT GOING TO HELP?!"

155. He also physically attacked their mother.

156. Ofc. Lawrence sadistically placed extremely tight handcuffs on Emanuel Chavis, and in response to his repeated requests to loosen the cuffs, responded: "Well, whenever you fight with me . . . that's what happens."

157. As in this case, Ofc. Lawrence made up false allegations that Chavis and Sanders engaged in criminal conduct justifying his brutality.

158. All criminal charges against both men were recently dropped.


### III.    BRPD'S LONG HISTORY OF RETALIATING AGAINST CRITICS AND FOSTERING A CULTURE OF IMPUNITY FOR POLICE VIOLENCE

159. Ofc. Lawrence's long standing pattern of retaliating against those who tell him he is acting unprofessionally is par for the course: it is precisely the same thing BRPD Chief Murphy Paul has done throughout his tenure.

#### A.    Clarence Green Retaliation

160. When Ofc. Lawrence's wrongdoing in the Clarence Green matter became a national news story, BRPD filed a petition in state court seeking to have the Green Family's attorney held in contempt for releasing the body-worn camera footage; the statutory penalty for the species of contempt sought by BRPD was up to six months' imprisonment.

161. In a 92-page opinion, Judge John W. deGravelles subsequently issued an injunction halting this prosecution, rejecting the applicability of "*Younger* abstention" and "find[ing] the overwhelming evidence in this case shows that the City/Parish acted in bad faith and in retaliation against Frampton for Frampton's issuance of a press release and Video which

cast BRPD in a bad light." *Frampton v. City of Baton Rouge/Par. of E. Baton Rouge*, 21-CV-362-JWD-SDJ, 2022 WL 90238, at *35 (M.D. La. Jan. 7, 2022).

162.  Baton Rouge taxpayers paid over $85,000 to settle the lawsuit.

163.  BRPD still maintains that they did nothing wrong in retaliating against the attorney who served as a whistleblower in exposing Ofc. Lawrence's misconduct.

### B.    Alton Sterling Retaliation

164.  In response to BRPD misconduct, thousands of Louisiana residents protested BRPD in 2016.

165.  BRPD responded with mass arrests of the protesters.

166.  Protestors argued the arrests were in retaliation for their exercise of their First Amendment rights to criticize BRPD, and their Fourth Amendment rights.

167.  They asserted *Monell* claims against BRPD and Baton Rouge, arguing that the wrongdoing was not just the result of individual official wrongdoing, but rather a policy or custom attributable to Baton Rouge itself.

168.  This Court rejected defendants' efforts to dismiss the protesters' *Monell* claims. *See* Ruling and Order, *Imani v. City of Baton Rouge*, Case 3:17-cv-00439-JWD-EWD, Dkt. 347 (July 14, 2022).

169.  The City of Baton Rouge settled the case mid-trial for $1,170,000.

### C.    Internal Whistleblower Retaliation

170.  After criticizing BRPD leadership, BRPD union vice president Siya Creel was unlawfully terminated by BRPD Chief Murphy Paul.

171.  The Municipal Fire & Civil Service Board unanimously decided Creel was wrongfully terminated.

**172.**    East Baton Rouge City-Parish ultimately paid $90,000 to settle Creel's claims of retaliation.

**173.**    A veteran officer in the BRPD Internal Affairs Division, John Dauthier, has also accused BRPD Chief Murphy Paul of internal wrongdoing, publicly claiming "blatantly partial doctrine for enforcing policies of the BRPD."

**174.**    Dauthier has alleged that he was retaliated against in part because he criticized BRPD leadership, whereas other officers who were well-liked by BRPD leadership were either not disciplined or less severely disciplined for similar wrongdoing.

### D.    Systemic Failings

**175.**    In April 2023, the non-profit news outlet VERITE released an extraordinary six-part expose called "In The Dark," documenting systemic BRPD violence and hostility toward those who questioned BRPD. *See* https://veritenews.org/tag/baton-rouge-police-department/ (collecting stories).

**176.**    Among other revelations, VERITE reported that the *sole* police officer investigated (let alone disciplined) for wrongdoing in connection with the 2016 protests was a BRPD officer who was investigated for questioning the legality of the police response at the protest.

**177.**    This reporting was accurate.

**178.**    VERITE reported that 100% of use-of-force complaints made in 2017 were adjudicated "exonerated" or "not sustained" by BRPD Internal Affairs.

**179.**    This reporting was accurate.

180.    The reporting also documented a department plagued by a culture of impunity, with meritorious citizen complaints regularly disregarded, including numerous cases of wrongdoing that went addressed by members of BRPD's Street Crimes Unit.

181.    Apart from minor errors that have since been included flagged as "Corrections" to the public available articles, there are no inaccuracies in the VERITE reports. This includes Chief Paul's statements that BRPD apologized "for our failure not [sic] to discipline an officer who demonstrated unprofessional behavior and violated our code of conduct consistently, escalating incidents. We're story Baton Rouge."


      **E.    Cover-Up of "the BRAVE Cave" torture warehouse, this Incident, and refusal to change BRPD's longstanding strip-search policy**

182.    On January 17, 2023, Mr. Lee's mother emailed Chief Paul to alert him that her son was kidnapped and severely beaten by the arresting officers.

183.    Chief Paul personally called her to acknowledge receipt of the complaint.

184.    Mr. Lee  then filed another Internal Affairs complaint against the arresting officers on April 18, 2023.

185.    Internal Affairs acknowledged receipt of the complaint on April 25, 2023.

186.    When local media inquired about the incident in late August 2023, BRPD representatives falsely stated that no Internal Affairs complaint had been filed.

187.    No action whatsoever in this matter was taken until a local television news station broadcast a report about the torture warehouse (and this impending lawsuit) on August 28, 2023.

188.    Indeed, despite the fact that BRPD Chief Murphy Paul was personally aware of Mr. Lee's allegations since January when they occurred (and he first received complaints), he admitted that he did not "pay attention to what's going on" until local press created a public relations nightmare of the city. Specifically he stated: "We probably would have never have gotten this far if it wasn't for [WAFB's] story because it was your story when I first paid attention to what's going on. I had never heard of the Brave Cave before . . .  I went to New Orleans and met with members of the Federal Bureau of Investigations to express my concerns that were outlined in the story that you first made us aware of and some other allegations that were very concerning to me."

189.    The City-Parish's response is consistent with a long-standing custom at BRPD: when examples of BRPD lawlessness come to light, Baton Rouge officials solemnly condemn the misconduct and promise to do better, while doing *nothing* with respect to policy.

190.    In 2016, a federal jury found that BRPD officers illegally strip-searched a Baton Rouge citizen, and "that a moving force behind [the officer's] strip search of [the citizen] was a custom or policy of defendant the City of Baton Rouge, of which the City of Baton Rouge knew or should have known and was deliberately indifferent."

191.    Following this finding, the City of Baton Rouge made no change to either its written policy regarding strip-searches or its training and/or related to strip-searches.

192.    On May 26, 2021, Mayor-President Sharon Weston Broome responded to video footage of Troy Lawrence, Jr. and four other BRPD officers illegally strip-searching a young man and his minor younger brother with the following statement:

        "Today, the very disturbing footage of an encounter between BRPD and

citizens of our community was released and has justifiably raised the eyebrows of many in our community. I stand by the federal judicial ruling in this case and the explicit and detailed judgment that was cast concerning the officers involved and their actions. While the involved individuals have received a civil remedy in this matter, the officers involved must be held accountable. . . . We take all actions of this sort very seriously. We cannot go down a path that continues to tear at the fabric of trust between law enforcement and citizens. Transparency and accountability are a must."

193.    In fact, no policy changes occurred. Three of the five officers involved in the aforementioned incident were not disciplined at all. BRPD Chief Murphy Paul ultimately agreed to reverse Ken Camallo's demotion and have it wiped from his record, and Troy Lawrence Jr. received no discipline whatsoever for engaging in an illegal search of a home without a warrant and the illegal strip-searches.

194.    Before the BRAVE Cave litigation began, city officials and BRPD recognized the need to implement a "duty to intervene" policy, but no policy was implemented.

195.    Before the BRAVE Cave litigation began, city officials and BRPD recognized the need to implement additional "duty to intervene" training, but no such training was implemented.

196.    On August 29, 2023, a press conference was called by Chief Murphy Paul of the BRPD to address community concerns regarding "the BRAVE Cave" that arose in the wake of multiple lawsuits filed regarding the conduct of BRPD officers at that facility.

197.    Shortly thereafter, Baton Rouge Mayor-President Sharon Weston Broome elected to permanently close "the BRAVE Cave" in light of the disturbing allegations regarding its

use. Further, the Street Crimes Unit was disbanded while multiple investigations remained underway into the conduct of officers at the facility.

**198.**    On September 6, 2023, Mayor Weston Broome was interviewed by a local radio talk show, LOUISIANA CONSIDERED. During this interview, Mayor Weston Broome condemned the use of Strip and Body Cavity searches as "unorthodox" and "bad" practices.

**199.**    In a statement to ABC NEWS, Mayor Weston Broome stated that her office was "committed to justice."

**200.**    On September 20, 2023, Mayor-President Weston Broome told THE WASHINGTON POST that her office was "committed to addressing the[] troubling [BRAVE Cave] accusations, ensuring that any misconduct is exposed and those responsible are held accountable."

**201.**    On September 20, 2023, Chief Paul made a statement to THE WASHINGTON POST that the BRPD "regularly revises its policies" and that he "would examine the strip-search policy after investigating the allegations in the lawsuits."

**202.**    He also stated: "We made a mistake on this one. I've got to own that."

**203.**    In fact, the strip-search policy remains in place, and the City-Parish has not "own[ed]" any wrongdoing.

**204.**    On September 26, 2023, members of the Baton Rouge Metro Council revealed BRPD officials had been made aware of Troy Lawrence Jr.'s misconduct months earlier, but that "excuses were made" to let "bad actors" stay on the force.

**205.**    Mayor-President Weston Broome wrote an opinion editorial that was published in THE ADVOCATE on September 26, 2023. In it, she lauded "lawful conduct and accountability" as essential components of policing and reiterated her commitment to face the allegations with "transparency and accountability."

**206.** In October 2023, Mayor-President Weston Broome stated: "This is time for a full-body MRI to diagnose and reveal any dysfunctions or wrongdoings."

**207.** Collectively, these statements implied that the BRPD's unconstitutional policy of Strip and Body Cavity searches had been repealed.

**208.** On February 4, 2023, plaintiff's counsel wrote to Parish Attorney Anderson Dotson and Assistant Parish Attorney Michael Schillage regarding related litigation: "Can you please provide at your earliest convenience a copy of the currently in-place search policy for BRPD (and the date that it was implemented)? Based on public statements by the Mayor and Chief, I had assumed that the strip-search policy had been repealed and replaced. But based on recent court filings from the City-Parish (offering a robust legal defense of the policy), I'm realizing that's not the case. If the policy that was in place in July 2023 remains in place (or if the City-Parish refuses to provide the current policy), I want to advise that we may seek a preliminary injunction to halt its enforcement, so I would appreciate your prompt clarification on this matter."

**209.** On February 7, 2023, plaintiff's counsel wrote to the same parties: "Dear Mr. Schillage: I am bewildered as to why it is so hard to receive an answer to our emails. Is it fair to assume that the strip-search policy is still in effect? Please understand that by refusing to communicate, you are breaching your repeated promises to the magistrates and judges that you will maintain ongoing communication with us, as well as your duties under the Civil Rules. I would appreciate an answer to these questions by the close of business today. Thanks for your cooperation.

**210.** Later that day, the Assistant Parish Attorney responded. He refused to confirm or deny whether the strip-search policy remained in effect, instructing Ms. Brown to pursue a

pending public records request.

**211.**    Moments later, BRPD attorney Deelee Morris provided a hyperlink to a website "[t]o satisfy any PRR obligation," and specifically advised counsel that General Order 281 could be found there. The strip-search policy, in relevant part, remains fully in force and unchanged. The policy, as it appears on February 20, 2023, appears below.

**BATON ROUGE POLICE DEPARTMENT**

| General Order No.281 | Effective Date 11-01-1994 | Revised Date 05-27-2022 |
|---|---|---|
| Subject:    Search of Persons | | Reviewed 02/14/22 |

**III.  Strip Search**

A.  Arrestees will not be subjected to strip searches unless the officer has articulate, reasonable suspicion that this particular arrestee may have weapons or contraband on his person. Reasonable suspicion will be based on the following factors:

1.  The nature of the offense charged.
2.  The arrestee's appearance and conduct.
3.  The circumstances of the arrest.
4.  The arrestee's prior record.

B.  Strip searches will be conducted under the following conditions. In the case that a juvenile needs to be strip searched, a supervisor will insure that the following conditions are strictly adhered too.

1.  Strip searches of arrestees will only be conducted in either a fully enclosed room that is not accessible to the public or in a fully enclosed and secure portion of a Departmental facility or other custodial facility (e.g. Including the following, but not limited to, Parish Prison, LSU Police Department, and Scotlandville Substation).
2.  Only the minimum number of individuals necessary to conduct the search will be present.
3.  Only officers of the same sex as the arrestee will conduct the search. The arrestee will not be touched by any officer unless it is necessary to counter resistance.

C.  Strip searches may be conducted on non-arrestees based on individualized articulable reasonable suspicion to frisk, probable cause to search, consent, or a court order. In the case that a juvenile needs to be strip searched, a supervisor will insure that the following conditions are strictly adhered too.

1.  Reasonable suspicion and probable cause will be based upon the same factors listed in III A.
2.  The search must be conducted in a fully enclosed room that is not accessible to the public.
3.  Only the minimum number of officers necessary to conduct the search will be present. No other persons will be present during the search.
4.  If such a location is not immediately available, the suspect may be brought to the closest departmental facility that meets the criteria set forth above.
5.  The suspect will be detained no longer than is absolutely necessary to conduct the search.
6.  Only officers of the same sex as the subject of the search will conduct the search.

3

31

212.    At a court hearing in late February 2024, the Parish Attorney announced that the review of the strip-search policy was completed. The only substantive change that would be implemented was that officers would be provided a form that they are now required to fill out each time they conduct a strip search.

213.    The U.S. Supreme Court has made it unambiguously clear that law enforcement officers may conduct only a "frisk," as defined in *Minnesota v. Dickerson*, 508 U.S. 366 (1993), when officers have only reasonable suspicion of criminal wrongdoing. Despite this, the constitutional rights of the citizens of Baton Rouge continue to be put at risk as a result of this written policy.

214.    The written BRPD policy, in place since at least 2016, violates the legal standard announced in *Minnesota v. Dickerson* for searches by police officers.

215.    On July 12, 2024, Chief Judge Shelly Dick ruled in favor of Plaintiffs Jeremy Lee and Ternell Brown relative to an injunction they filed against BRPD for the continued use of their unconditional strip search policy.[3]

216.    In that Ruling Judge Dick stated, "the issue before the Court on these motions is whether the BRPD's strip search policy regarding non-arrestees is constitutional. This policy, General Order No. 281, allows police officers to conduct strip searches based on an "individualized articulable reasonable suspicion" standard; it does not require probable cause to strip search. Because the United States Supreme Court has plainly held that probable cause is required to go beyond a frisk or pat-down of a citizen during an investigatory stop, the Court finds that General Order No. 281, Section III.C **is underlined unconstitutional on its face** and must be enjoined."

---

[3] Rec Doc. 96 of Jeremy Lee in Lee v. Lawrence Jr, et al., Case No. 23-cv-01229-SDD-SDJ.

217.    Petitioners maintain that the unconstitutional policy was one of the moving forces behind the constitutional violations suffered by the Plaintiffs. Specifically, the unconstitutional policy coupled with the statements like those made by Officer Coleman (a high ranking official within the Street Crimes Unit) whereby he acknowledge that "everyone who goes to [the BRAVE Cave] gets strip searched" put officers like Tafari Beard on notice that transporting minors like T.R. to the BRAVE Cave would subject them to unconstitutional strip and body cavity searches.

**COUNT I(a)-(b)**
**42 U.S.C. § 1983 – Fourth Amendment Excessive Force**

**A.  Lee**

218.    As more fully described above, Defendants Carboni, Wallace, and Lawrence deprived Mr. Lee of his constitutional right to be free from excessive force.

219.    **(a)** Defendants Lawrence and Wallace used excessive force when they first grabbed Mr. Lee by the arms, when they dragged him from the car, and when they forcibly arrested and strip-searched him. **(b)** Lawrence, Wallace, and Carboni again used excessive force when they fractured Mr. Lee's rib and bruised his face and body in the off-site BRPD warehouse. The force was excessive to the need (which was none, given Mr. Lee's explicit willingness to comply) and was objectively unreasonable.

220.    As a direct and proximate result of this deprivation of his constitutional right to be free from excessive force, Plaintiff suffered injuries, including, but not limited to, significant physical injuries and emotional distress.

## COUNT II(a)-(b)
### 42 U.S.C. § 1983 – Fourth Amendment Unreasonable Search

**A.  Lee**

221.    As more fully described above, Defendants Lawrence, Wallace, and Carboni deprived Plaintiff Mr. Lee of his constitutional right to be free from unreasonable searches.

222.    Lawrence and Wallace, though claiming Mr. Lee was merely "detained" at the time, performed a violent and invasive public strip-search on him, grabbing his genitals and pulling his pants to his knees. The search far exceeded the limits of a "*Terry* frisk" that would be permissible absent a full custodial arrest and was unlawful under Louisiana law, as well.

223.    Lawrence, Wallace, and Carboni then all participated in an unlawful strip-search of Mr. Lee at the torture warehouse, as well. This, too, was an unreasonable search.

224.    As a direct and proximate result of these deprivations of his constitutional right to be free from unreasonable searches, Plaintiff suffered injuries, including, but not limited to, significant physical injuries and emotional distress.

**B. Bass**

225.    As more fully described above, Defendants Wallace, Beard, Nevels,  John Doe 1, John Doe 2, and Jane Doe deprived Plaintiff Ms. Bass of her constitutional right to be free from unreasonable searches.

226.    Defendants Defendants Wallace, Beard, Nevels,  John Doe 1, John Doe 2, and Jane Doe illegally seized and conducted an invasive strip-search on her. Particularly one of the searches far exceeded the limits of a "*Terry* frisk" that would be permissible absent a full custodial arrest and was unlawful under Louisiana law, as well.

227.    As a direct and proximate result of these deprivations of her constitutional right to be free from unreasonable searches, Plaintiff suffered injuries, including, but not limited to, physical discomfort and emotional distress.

## COUNT III
## 42 U.S.C. § 1983 – Fourth Amendment Unreasonable Seizure

### A. Lee

228.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

229.    As more fully described above, Defendants Troy Lawrence, Jr., Matthew Wallace, and Joseph Carboni deprived Plaintiff Mr. Lee of his constitutional right to be free from unreasonable seizure.

230.    Defendants arrested Mr. Lee without a warrant and without probable cause to believe he committed a criminal offense, and held him incommunicado at the "BRAVE Cave" without lawful authority.

231.    As a direct and proximate result of this deprivation of his constitutional right to be free from unreasonable seizures, Plaintiff suffered injuries, including, but not limited to, significant physical injuries and emotional distress.

### B. Bass

232.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

233.    Further, as more fully described above, DefendantsDefendants Wallace, Beard, Nevels, John Doe 1, John Doe 2, and Jane Doe deprived Ms. Bass of her constitutional right to be free from unreasonable seizure.

234. Defendants Defendants Wallace, Beard, Nevels, John Doe 1, John Doe 2, and Jane Doe deprived Ms. Bass of her constitutional right to be free from unreasonable seizure when: Ms. Bass was placed in the rear of Tafari Beard's vehicle, then transported to the 4th Precinct where John Doe and Jane Doe shackled her legs and subjected her to an unreasonable search.

235. The illegal seizure continued when the minor Ms. Bass was returned to Officer Beards vehicle by John Doe 1 where she was placed in the rear of Officer Beards vehicle and illegally seized for over a two and a half hour period at the behest of lead Detective Wallace.

236. Officer Wallace then directed Officer Beard to transport the pregnant minor to the BRAVE Cave without probable cause where Officer Wallace, Beard and John Doe 2 and 3, participated in the strip and visual body cavity search of Ms. Bass despite lacking probable cause to do so.

237. As a direct and proximate result of this deprivation of her constitutional right to be free from unreasonable seizure, Plaintiff suffered injuries, including, but not limited to physical discomfort and emotional distress.


### COUNT IV
### 42 U.S.C. § 1983 - First Amendment Retaliation

238. As more fully described above, Defendants Troy Lawrence, Jr. and Matthew Wallace deprived Mr. Lee of his constitutional right to be free from retaliation under the First Amendment to the United States Constitution.

239. Specifically, Mr. Lee alleges that he was engaged in constitutionally protected activity in (correctly) criticizing Ofc. Lawrence and Det. Wallace's misconduct; Ofc. Lawrence and

Det. Wallace were substantially motivated against the plaintiff's exercise of constitutionally protected conduct when they decided to arrest him because of that criticism; and by arresting and using excessive force against Mr. Lee, they caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity.

240.    As a direct and proximate result of this deprivation of his constitutional right to be free from retaliation for First Amendment activity, Plaintiff suffered injuries, including, but not limited to, significant physical injuries and emotional distress.

**COUNT V**
**42 U.S.C. § 1983 – Malicious Prosecution**

241.    As more fully described above, Mr. Lee was subject to a meritless criminal prosecution as a result of false police reports and other false information submitted by defendants Lawrence and Wallace.

242.    The aforementioned Defendants maliciously and legally caused an original criminal proceeding to be commenced or continued against him; that proceeding was terminated in Mr. Lee's favor when prosecutors entered a *nolle prosequi* to the criminal charges, and Mr. Lee was damaged by these actions.

243.    Plaintiff Lee further alleges that his malicious prosecution was continued against him by BRPD and the City-Parish long after it became clear that the officers involved were involved in criminal wrongdoing against him; that the City-Parish was deliberately indifferent to the likelihood that his prosecution was unconstitutional; that it was approved of by the City-Parish's final policymaker regarding such matters, Chief Murphy Paul.

**COUNT VI**
**42 U.S.C. § 1983 – *Monell* Liability for Each of the Foregoing Constitutional Violations**
**(COUNTS I-V)**

244.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein against BRPD and all municipal defendants.

245.    Plaintiff further alleges that BRPD maintains and implements formal written and unwritten policies regarding use-of-force, strip-searches, and responses to citizen criticism that caused the constitutional violations alleged in this complaint. This includes the formal BRPD policy of maintaining a torture warehouse known as "the BRAVE Cave" where constitutional deprivations are commonplace .

246.    Plaintiff further alleges that there is a pattern, practice, custom, and informal policy of unreasonable seizures, false arrests, illegal searches, excessive force, and retaliation at BRPD; that this widespread recurring practice is so permanent and settled that it constitutes formal policy; and that adherence to that practice caused the constitution violations at issue in this complaint. This includes, but is not limited to, the maintenance of a torture warehouse known as "the BRAVE Cave" where constitutional deprivations are commonplace.

247.    Plaintiffs further allege that Officers Lawrence, Carboni, Wallace, Beard, Nevels, John Doe 1, John Doe 2, and Jane Doe were inadequately trained; this inadequate training caused their constitutional injuries; and that BRPD and the Parish-City were deliberately indifferent to the constitutional rights injured.

248.    Plaintiffs further allege that Officers Lawrence, Carboni, Wallace, Beard, Nevels, John Doe 1, John Doe 2, and Jane Doe were inadequately supervised; that this inadequate

supervision caused their constitutional injuries; and that BRPD and the Parish-City were deliberately indifferent to the constitutional rights injured.

249.    Plaintiffs further allege that  Officers Lawrence, Carboni, Wallace, Beard, Nevels, John Doe 1, John Doe 2, and Jane Doe were inadequately disciplined; that this inadequate discipline caused their constitutional injuries; and that BRPD and the Parish-City were deliberately indifferent to the constitutional rights injured.

250.    Plaintiffs further allege that  Officers Lawrence, Carboni, Wallace, Beard, Nevels, John Doe 1, John Doe 2, and Jane Doe conduct was authorized, approved, and ratified by Chief Murphy Paul, who yielded final policymaking authority for BRPD in the relevant fields at the time of incident.

## Count VII
## U.S.C. § 1983 :  Failure to Intervene
### A.  Lee

251.    It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement Deputies in their presence" and a police officer may be held liable under § 1983 if he "fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence." In the instant matter, BRPD officers Wallace and Carboni failed to intervene when officer Lawrence was using excessive force against Mr. Lee. Further, Officers Lawrence and Carboni failed to intervene when Officer Wallace was using excessive force against Mr. Lee. Moreover, Officers Lawrence and Wallace failed to intervene when officer Carboni was using excessive force against Mr. Lee.

**B.  Bass**

252.    "[A]n officer who is present at the scene and does not take reasonable measures to
protect a suspect from another officer's use of excessive force may be liable under section
1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citations omitted). "[A]n officer
may be liable under § 1983 under [this] theory of bystander liability where the officer '(1)
knows that a fellow officer is violating an individual's constitutional rights; (2) has a
reasonable opportunity to prevent the harm; and (3) chooses not to act.' " *Whitley v. Hanna*,
726 F.3d 631, 646 (5th Cir. 2013) (citations omitted).

253.    The defendants  Officers Lawrence, Carboni, Wallace, Beard, Nevels, John Doe 1, John
Doe 2, and Jane Doe observed their fellow officers violating the Plaintiffs' state and
constitutional rights, had a reasonable opportunity to intervene, and chose not to act.
Specifically the following act(s): The Juvenile females, specifically 16 year old pregnant
and without shoes T'Niyah Bass was detained by Officer Beard and was then transported to
the 4th precinct where John Doe 1 and Jane Doe subjected her to an unreasonable search
and seizure, by shackling  her legs and subjecting her to an unreasonable search.
Furthermore, for almost 3 hours the minor was detained in the rear of  Beards unit. After
the almost three hour detention Officer Wallace directs Officer Beard to transports Ms.
Bass to the B.R.A.V.E Cave to be unconstitutionally strip searched and interrogated by
detectives. All of this was done with Officers Lawrence, Wallace, Carboni, Beard, John
Doe 1 and John Doe 2 full knowledge and a reasonable opportunity to prevent the criminal
and unconstitutional acts.

254.    The BRPD B.R.A.V.E Team/Street Crimes Unit routinely detained and illegally seized,
strip searched, sexually assaulted and abused minors.[4]

---

[4] See Varnado et al v. Carboni et al. U.S. District Courts, Louisiana Middle District Court, 3:24-CV-00133.

**COUNTS VIII, IX, X, XI, XII, XIII, XIV, XV, XVI**
**State Law Claims - Assault, Battery, False Imprisonment, Defamation, Negligence,**
**Malicious Prosecution, Abuse of a Minor, Sexual Assault, and Intentional Infliction of**
**Emotional Distress**

**A. Lee**

**255.**    Plaintiffs repeat and reallege all of the paragraphs in this complaint as if fully set forth herein.

**256.**    As more fully described above, Plaintiff Mr. Lee asserts state law claims of assault (Count VIII), battery (COUNT IX), and false imprisonment (COUNT X) against Defendants Lawrence, Wallace, and Carboni in violation of Louisiana law. He alleges that Lawrence and Wallace defamed him (COUNT XI) when filing false police reports against him. He alleges that all three are liable for negligence that is the  proximate cause of his injuries (COUNT XII) and that Lawrence and Wallace committed the state law tort of malicious prosecution (COUNT XIII).

**B. Bass**

**257.**    Plaintiffs repeat and reallege all of the paragraphs in this complaint as if fully set forth herein.

**258.**    As more fully described above, Plaintiff Ms. Bass asserts state law claims of state law claims of **(a)** assault (Count VIII), **(b)** battery (COUNT IX) **(c)** abuse of a minor in violation of the Louisiana Children's Code[5] and La.C.C. article 3496.1[6] (Count XIV) **(d)**

---

[5]Louisiana Children's Code article 603 (2)(a) defines "abuse" of  a minor as: (2) "Abuse" means any one of the following acts that seriously endanger the physical, mental, or emotional health, welfare, and safety of the child: (a) **The infliction**, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction **or attempted infliction of physical or mental injury upon the child by** a parent or **any other person**.
[6] Louisiana Civil Code Art. 3496.1 provides "an action against a person for abuse of a minor is subject to a liberative prescriptive period of three years. This prescription commences to run from the day the minor attains majority, and this prescription, for all purposes, shall be suspended until the minor reaches the age of majority. This prescriptive period shall be subject to any exception of peremption provided by law."

sexual assault in violation of La.C.C. article 3496.2[7] (Count XV) and **(e)**Intentional Infliction of Emotional Distress (Count XVI) all in violation of Louisiana laws.

259.    Plaintiff Ms. Bass alleges that Officers  Officers Lawrence, Carboni, Wallace, Beard, Nevels, John Doe 1, John Doe 2, and Jane Doe committed the above intentional acts and deprived Ms. Bass of her constitutional rights when at the behest of Officer Wallace, Officer Beard transported the pregnant minor Ms. Bass to the BRAVE Cave without probable cause and with full knowledge that the policy of BRPD was to perform strip/cavity searches on every person who was transported to that facility including non-arrestees.

260.    Upon arrival, the pregnant minor Ms. Bass was taken inside by Officer Beard along with two other females where the minor Ms. Bass was sexually assaulted and abused by a John Doe officer, who, without probable cause to do so, performed a strip and visual body cavity search upon the minor Ms. Bass. The officer forced Bass to remove her clothing and spread her buttocks and vagina for visual inspection while inside the BRAVE Cave facility.

261.    The unconstitutional strip and body cavity search were done despite Ms. Bass being a minor and despite her having previously been patted down and cleared by a female officer to use the restroom at the Fourth District Precinct where she was found to have no contraband or weapons upon her person.  The intentional acts of the officers inflicted serious physical and mental injury upon the then minor.

262.    Officers Lawrence, Wallace, Carboni, Beard, John Doe 1 and John Doe 2 transporting the pregnant minor to the B.R.A.V.E. Cave without probable cause was the direct and

---

[7] Art. 3496.2. provides, "[a] delictual action against a person for any act of sexual assault, as defined in R.S. 46:2184, is subject to a liberative prescription of three years. This prescription commences to run from the day the injury or damage is sustained or the day the victim is notified of the identity of the offender by law enforcement or a judicial agency, whichever is later. This prescriptive period shall be subject to any exception of peremption provided by law."

proximate cause of the (sexual) abuse suffered by the pregnant minor Ms. Bass because the unconstitutionally invasive and sexually humiliating strip search she suffered would not have occurred otherwise.

## COUNT XVI
## Respondeat Superior

263.    At all relevant times, the individual defendants were acting in the course and scope of employment as Baton Rouge police officers and were under the control, direction, and supervision of their employer. Defendants BRPD and City/Parish of Baton Rouge are liable for the aforementioned state-law torts under the doctrine of respondeat superior.

264.    Plaintiffs have been injured by the foregoing, having suffered physical injuries, mental anguish, and other related injury.

WHEREFORE, Plaintiffs prays that this Court enter judgment in their favor and against Defendants. Plaintiffs pray for the awarding of declaratory relief and compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against all Defendants; that this Court maintain the previously issued injunction prohibiting all Defendants from conducting further unreasonable searches and seizures in violation of the Fourth Amendment and from implementing their unconstitutional strip search policy; and for such further and additional relief as this Court may deem appropriate and just. A jury trial is demanded on all issues.

Respectfully submitted,

/s/ Ryan K. Thompson

**Ryan K. Thompson, LA Bar #38957**
**TRIAL ATTORNEY**
660 Richland Ave
Baton Rouge, LA 70806

T: (323)271-8032
E: RKTsocialjustice@gmail.com

**Jessica F. Hawkins, LA Bar #38263**
P.O. Box 5072
Baton Rouge, LA 70802
T: (915)217-9192
E: jessicahawkins0421@gmail.com

**COUNSEL FOR PLAINTIFFS**