## Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
STATE OF LOUISIANA

NO.: 23-1229-SDD-SDJ

JEREMY LEE

VERSUS

TROY LAWRENCE, JR., ET AL

Deposition of JEREMY TRAMAINE LEE, taken on Wednesday, July 23, 2025, at the Office of the East Baton Rouge Parish Attorney, 222 St. Louis Street, Suite 902, Baton Rouge, Louisiana 70802, commencing at 10:35 AM and concluding at 7:20 PM.

REPORTED BY:

TONI T. CONNER
CERTIFIED COURT REPORTER

## Page 2

1  APPEARANCES:
2
    RYAN K. THOMPSON, ESQUIRE
3   12605 South Harrells Ferry Road
    Suite 5
4   Baton Rouge, Louisiana 70816
5       AND
6   VIA VIDEOCONFERENCING/IN PERSON:
    JESSICA F. HAWKINS, ESQUIRE
7   Post Office Box 5072
    Baton Rouge, Louisiana 70802
8
        AND
9
    VIA VIDEOCONFERENCING:
10  Ivie, McNeill, Wyatt, Purcell & Diggs
    BY: RODNEY DIGGS, ESQUIRE
11  444 South Flower Street
    Suite 3200
12  Los Angeles, California 90071
        ATTORNEYS FOR THE PLAINTIFF
13
14  Office of the Parish Attorney
    BY: MICHAEL SCHILLAGE, ESQUIRE
15      JENNA BOURGEOIS, LAW CLERK
    222 St. Louis Street
16  Suite 902
    Baton Rouge, Louisiana 70802
17      ATTORNEYS FOR THE CITY OF BATON
        ROUGE/PARISH OF EAST BATON ROUGE
18
19  Babcock Partners, LLC
    BY: CHASE TETTLETON, ESQUIRE
20  10101 Siegen Lane
    Suite 3C
21  Baton Rouge, Louisiana 70810
        ATTORNEYS FOR MATTHEW WALLACE
22
23  B. KYLE KERSHAW, ESQUIRE
    212 Laurel Street
24  Baton Rouge, Louisiana 70801
        ATTORNEY FOR JOSEPH CARBONI
25

## Page 3

1  APPEARANCES CONTINUED:
2
3  VIA VIDEOCONFERENCING:
   Blackwell & Bullman
   BY: BRIAN F. BLACKWELL, ESQUIRE
4  8322 One Calais Avenue
   Baton Rouge, Louisiana 70809
5      ATTORNEYS FOR TROY LAWRENCE, JR.
6
7
8  ALSO PRESENT:
9  MATTHEW WALLACE
10
11 AARON PALMER - VIDEOGRAPHER
   DEPO-VUE, INC.
12 3213 West Metairie Avenue North
   Metairie, Louisiana 70001
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1          EXAMINATION INDEX
2                PAGE
3
4  BY MR. SCHILLAGE ..............................  8
5  BY MR. BLACKWELL .............................. 250
6  BY MR. TETTLETON ............................. 297
7  BY MR. KERSHAW ................................ 330
8  BY MR. THOMPSON .............................. 359
9  BY MR. SCHILLAGE ............................. 415
10 BY MR. KERSHAW ................................ 431
11 BY MR. BLACKWELL .............................. 432
12
13         * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

Electronically signed by Toni Conner (501-190-381-9495)                              2f67950e-8c04-4061-959b-7823204c7c89

Page 5

```
 1              EXHIBIT INDEX
 2                                PAGE
 3
 4       PLAINTIFF'S 1 ................................ 372
 5
 6       EXHIBIT 1 ......................................  13
 7       EXHIBIT 2 ......................................  50
 8       EXHIBIT 3 ......................................  75
 9       EXHIBIT 4 ...................................... 115
10       EXHIBIT 5 ...................................... 148
11       EXHIBIT 6 ...................................... 174
12       EXHIBIT 7 ...................................... 191
13       EXHIBIT 8 ...................................... 195
14       EXHIBIT 9 ...................................... 204
15       EXHIBIT 10 .................................... 207
16       EXHIBIT 11 .................................... 221
17       EXHIBIT 12 .................................... 224
18       EXHIBIT 13 .................................... 235
19       EXHIBIT 14 .................................... 236
20       EXHIBIT 15 .................................... 314
21       EXHIBIT 16 .................................... 416
22
23              *   *   *   *   *
24
25
```

Page 6

```
 1                STIPULATION
 2         It is stipulated and agreed by and between
 3   counsel for the parties that the deposition of
 4   JEREMY TRAMAINE LEE is hereby taken for all
 5   purposes under the Federal Rules of Civil
 6   Procedure, in accordance with law, pursuant to
 7   notice, on Wednesday, July 23, 2025, at the Office
 8   of the East Baton Rouge Parish Attorney, 222 St.
 9   Louis Street, Suite 902, Baton Rouge, Louisiana
10   70802;
11         That all formalities are hereby specifically
12   waived;
13         That all objections, save those as to the form
14   of the questions and responsiveness of the answers,
15   are hereby reserved until such time as this
16   deposition, or any part thereof, may be used or
17   sought to be used in evidence.
18         TONI T. CONNER, Certified Court Reporter in
19   and for the State of Louisiana, officiated in
20   administering the oath to the above-named witness.
21
22
23
24
25
```

Page 7

```
 1      JEREMY TRAMAINE LEE, 10815 BIG SUR DRIVE, BATON
 2   ROUGE, LOUISIANA 70818, who, after having been
 3   first duly sworn by the above-named Certified Court
 4   Reporter, did testify as follows:
 5      VIDEOGRAPHER:
 6         This is the videotaped deposition of
 7      Jeremy Lee.  This deposition is being held at
 8      222 St. Louis Street, in Baton Rouge,
 9      Louisiana, on July 23, 2025.  The time
10      indicated on the video screen is 10:35.
11         Would counsel please introduce themselves
12      for the record.
13      MR. THOMPSON:
14         Attorney Ryan Thompson on behalf of Mr.
15      Jeremy Lee.
16      MR. SCHILLAGE:
17         Michael Schillage on behalf of the City of
18      Baton Rouge, Parish of East Baton Rouge.
19      MR. KERSHAW:
20         Kyle Kershaw on behalf of Joseph Carboni.
21      MR. TETTLETON:
22         Chase Tettleton for Matthew Wallace,
23      present with Matthew Wallace.
24      MR. SCHILLAGE:
25         And, I'm sorry, also present is Ms. Jenna
```

Page 8

```
 1      Bourgeois, a law clerk with my office.
 2      MR. BLACKWELL:
 3         Brian Blackwell on behalf of Troy
 4      Lawrence, Jr.
 5      MR. DIGGS:
 6         Rodney Diggs on behalf of Jeremy Lee.
 7      MS. HAWKINS:
 8         Jessica Hawkins also on behalf of Jeremy
 9      Lee.
10      VIDEOGRAPHER:
11         Will the court reporter please swear in
12      the witness.
13      JEREMY TRAMAINE LEE, 10815 BIG SUR DRIVE,
14      BATON ROUGE, LOUISIANA 70818, who, after having
15      been first duly sworn by the above-named
16      Certified Court Reporter, did testify as
17      follows:
18      VIDEOGRAPHER:
19         You may proceed.
20   EXAMINATION BY MR. SCHILLAGE:
21      Q.  All right.  Good morning, Mr. Lee.
22      A.  Good morning.
23      Q.  As you just heard, I know we all had a
24   chance round the table while you and your lawyer
25   have been here, I'm Michael Schillage.  I represent
```

Page 9

1    City of Baton Rouge, Parish of East Baton Rouge in
2    this lawsuit. I'm here to take your video
3    deposition today.
4        So with that, let me just start with this
5    preemptory question. Have you ever given a
6    deposition before?
7        A. No.
8        Q. Okay. These are the general ground rules.
9    I'm sure your lawyer's gone over these with you,
10   but this is just for assistance. You notice, Madam
11   Court Reporter is right here taking down every word
12   that we say. So, in normal conversation we would
13   be accustom to talking over each other, because we
14   know sometimes where we're going with the question
15   and an answer and it gets very conversational and
16   informal. We need to do our best to not do that.
17   Even if you know where my question is going, I need
18   you to hold off, let me finish that question, and
19   then you give your answer. And I'll give you the
20   same courtesy. I won't start another question
21   until you finish answering. That way Madam Court
22   Reporter doesn't need to throw a shoe at one of us.
23       Also, to her benefit and for the sake of
24   the transcript, we also in normal human
25   conversation do things like shaking and nodding our

Page 10

1    heads, using expressions like uh-huh and uh-uh for
2    yeses and noes. For this, we need to say those
3    yeses and noes and give affirmative verbal answers,
4    because she can't write down a shake of the head or
5    a -- the uh-huhs and uh-uhs are hard to transcribe
6    and can be miscommunicated to her. So if and when
7    you do give an answer that is less than a formal
8    yes and no, one of us will probably prompt you, "Is
9    that a yes? Is that a no?" It's nothing to be
10   rude. It's just we need to make sure she can do
11   her job. Is that fair?
12       A. That's fair.
13       Q. All right. So, also, I'm sure there's
14   going to be a lot of questions today. There are no
15   questions ever intended to be something where a
16   lawyer asking you a question wants to dive into
17   what we all call the attorney-client privilege.
18   Meaning, conversations that you had with your
19   attorneys in this case. That's not substantive of
20   what we want to know and it's not what we're asking
21   at any point. So if you don't understand a
22   question or if my question is unclear today, please
23   let me know. I'll do my best to restate it or
24   rephrase it, depending on what you need.
25       A. Got you.

Page 11

1        Q. Because if you don't ask for a
2    clarification, then we have nothing left but to
3    assume you understood the question, and the answer
4    that you're giving, it's going to be your bound
5    answer. Okay?
6        A. Got you.
7        Q. Also, this is not a marathon. So
8    typically we like to go for an hour to an hour and
9    a half before we take a break, but we want to give
10   those breaks. Restroom, you know, whatever the
11   situation may be, if you just need to stand up and
12   stretch, just let us know. The only caveat to that
13   is if there's a question on the floor to you that
14   you have not answered, we can't take a break until
15   you answer the question.
16       A. All right.
17       Q. Okay?
18       With all that, we can go ahead and just
19   get started. If you don't mind, sir, just explain
20   to me, what documents did you review to prepare for
21   your deposition?
22       A. I didn't review any documents.
23       Q. Okay. And so -- and we'll go through this
24   over time. I've got some documents that your
25   lawyers have and that --

Page 12

1        A. Uh-huh.
2        Q. -- I'll be showing you as the day goes.
3        So to prepare for today's deposition, I
4    understand you to tell me you did not look at any
5    kind of audio, video, or paper documents for the
6    sake of sitting here to better answer questions
7    today?
8        A. Just come in and tell the truth.
9        Q. Okay.
10   MR. THOMPSON:
11       You need to let him know that you did look
12   at the --
13   THE WITNESS:
14       Yeah. You're talking about YouTube?
15   MR. THOMPSON:
16       No. The body-worn camera. I'm sorry.
17   The police -- His police report.
18   THE WITNESS:
19       Yeah.
20   EXAMINATION BY MR. SCHILLAGE:
21       Q. So hold on. So understand, when I say
22   "documents," I'm talking about audio, video --
23       A. Oh, yes.
24       Q. -- or physical paper or anything else that
25   is not words coming out of your lawyers' mouths.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 13

1  Any kind of physical, tangible thing on a computer
2  screen or in physical format. Did you look at
3  anything in preparation to come here and answer
4  questions?
5      A. Yes.
6      Q. Okay. What did you look at?
7      A. I looked at the -- the police file. I
8  mean the write-up.
9      Q. Okay. The write-up. Let me just --
10     MR. THOMPSON:
11         Uh-huh.
12     MR. SCHILLAGE:
13         We can go ahead and get started with this.
14     EXAMINATION BY MR. SCHILLAGE:
15     Q. Mr. Lee, just ballpark, how many pages do
16 you think that police write-up that you described,
17 how many pages do you think it is? One or two or a
18 lot more than that?
19     A. A lot more than that.
20     Q. Sure. All right. So I'm going to mark
21 what we have here as Exhibit 1 for the deposition,
22 and this is about -- this is -- It is not about.
23 It is 50 pages. Incident Report 23-002898.
24     MR. THOMPSON:
25         (Indistinguishable.)

Page 14

1      COURT REPORTER:
2          I'm sorry?
3      MR. THOMPSON:
4          No. I was talking to myself. I'm sorry.
5  Matthew Wallace's police report.
6      EXAMINATION BY MR. SCHILLAGE:
7      Q. Okay. So, Mr. Lee, you've got Exhibit 1
8  in front of you. Is this the document that you
9  reviewed? Can you just parse through it quickly
10 and let me know if this appears to be the same
11 thing you looked at already?
12     A. No, I didn't look at all these pages,
13 because these other suspects, I'm
14 (indistinguishable).
15     COURT REPORTER:
16         "I'm" what? I'm sorry, I couldn't hear
17 you.
18     THE WITNESS:
19         These other suspects. I only looked at my
20 paperwork.
21     EXAMINATION BY MR. SCHILLAGE:
22     Q. All right. Mr. Lee, let me ask you this.
23 So what you're saying is this entire compilation of
24 50 pages you did not review? You said only your
25 paperwork, right?

Page 15

1      A. Yes.
2      Q. Is your paperwork in that?
3      A. I just semi looked. I didn't look.
4          Yes, it's in here.
5      Q. Yes, it is?
6      MR. THOMPSON:
7          Hold on. Just tell him what you reviewed.
8      EXAMINATION BY MR. SCHILLAGE:
9      Q. Okay. So what page are you on right now,
10 Mr. Lee?
11     A. Page 38.
12     Q. Page 38 of 50 in Exhibit 1?
13     A. Yes, sir.
14     Q. Okay. And how many of those pages after
15 Page 38 are a part of what you referred to as your
16 paperwork in the police write-up? And if it's just
17 Page 38, you can let us know that, too.
18     A. Yeah, at least four pages.
19     Q. It's about four pages?
20     A. Yes.
21     Q. So Page 38 through 41; is that fair and
22 accurate?
23     A. 38 through who, again?
24     Q. 41.
25     A. Correct.

Page 16

1      Q. Okay. What other documents or paperwork
2  did you look at for preparing for your deposition?
3      A. Nothing else.
4      MR. THOMPSON:
5          And just -- Ryan Thompson, for the record.
6  Just to be clear, I'm looking at this now.
7  What Jeremy Lee reviewed that probably would
8  look similar to here would be Matthew Wallace's
9  Probable Cause Form is what he reviewed, but it
10 looks like the narrative is probably the same
11 within that report.
12     MR. SCHILLAGE:
13         All right. So --
14     MR. THOMPSON:
15         I can send you a copy of it if you want,
16 but that's what he reviewed.
17     MR. SCHILLAGE:
18         I appreciate it.
19     EXAMINATION BY MR. SCHILLAGE:
20     Q. So, Mr. Lee, what your lawyer has just
21 done is, as trying to assist in your answer,
22 there's an 11-page document that he is referring to
23 as the Matthew Wallace APC for your arrest. Did
24 you look at those 11 pages?
25     A. Yes.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 17

1     Q.  Okay.  And is it because of those 11 pages
2  that you believe the four that you've already
3  referred to in Exhibit 1 is a part of that, or is
4  it something separate?
5     A.  Exhibit 1.  Can you rephrase your
6  question?
7     Q.  Sure.
8     A.  Re-ask it.
9     Q.  Pages 38 through 41 in Exhibit 1, are
10  those the same as the 11 pages your lawyer's
11  referred to or is it something in addition to?
12     A.  It's the same.  Yeah, it's the same.
13     Q.  Okay.  What other documents did you
14  review?
15     A.  These the only documents.
16  COURT REPORTER:
17     Mr. Lee, can I get you to speak up,
18  please?
19  THE WITNESS:
20     Yeah.
21     Those are the only documents.
22  EXAMINATION BY MR. SCHILLAGE:
23     Q.  All right.  I appreciate that.
24     You know, that's an instruction that I
25  really didn't give on the record.  So if you

Page 18

1  wouldn't mind, and she just let you know, make sure
2  we talk loud, because --
3     A.  All right.
4     Q.  -- we've got these microphones and she
5  needs to be able to hear you, too.
6     A.  I got you.
7     Q.  Okay.  So I know you had mentioned while
8  you were giving the original answer, you made a
9  comment about YouTube.  Did you look at YouTube to
10  prepare for your deposition?
11     A.  Yeah.  Just tips on depositions.
12     Q.  And that's fair.  Some people will do
13  things like Google and nowadays AI search and just
14  things on -- a quick online query about how to
15  answer questions or how to take a deposition, and
16  that was going to be my next question.  Did you do
17  that?
18     A.  Yes.
19     Q.  Okay.  Was it only on YouTube --
20     A.  Yes.
21     Q.  -- that your search led you to a result
22  that you actually looked into and watched?
23     A.  Nah.  I just followed up with my lawyer,
24  see if those was a good tips of coming into
25  a deposi -- depo.

Page 19

1     Q.  Okay.  And so when you say "YouTube," was
2  it a Google search that led you to that or did you
3  just go into YouTube?
4     A.  I just went on YouTube.
5     Q.  Okay.  Did you do any other online
6  searching to make that inquiry --
7     A.  I probably --
8     Q.  -- about how to take a depo?
9     A.  I probably clicked on another video.
10     Q.  On YouTube or on another platform?
11     A.  On YouTube.
12     Q.  How many videos do you think you watched?
13     A.  Ten.
14     Q.  How long do you think that took?
15     A.  It didn't take really long, because most
16  of the people uploading them was knocking out their
17  videos fast.  They chopped up about the same thing.
18     Q.  Okay.  So after about ten videos you
19  thought you had seen enough of the same repetition
20  and you --
21     A.  Yes.
22     Q.  -- had it?  Okay.
23     All right.  So the four pages in Exhibit
24  1, an 11-page Affidavit Probable Cause authored by
25  Matthew Wallace on your arrest, and ten YouTube

Page 20

1  videos on how to take a deposition.  Is that the
2  complete list of things you looked at to prepare --
3     A.  Yes.
4     Q.  -- for your depo?
5     A.  Yes.
6     Q.  Okay.  Other than your lawyers, did you
7  talk to anybody about this deposition coming up?
8     A.  No.
9     Q.  Okay.  And -- and a lot of people
10  misunderstand that question.  Did you have to talk
11  to a family member about coordination, a boss to
12  coordinate work?
13     A.  No.
14     Q.  Okay.  And we're getting close on that
15  rule.  Just please make sure I finish my question,
16  because my question might not be what you think it
17  is by the time it finishes.  Just let me finish;
18  okay?  I appreciate that.
19     All right.  So you didn't talk to anyone
20  else besides your attorneys for the purpose of this
21  deposition today.
22     For the sake of the record, can you give
23  us your full name, please.
24     A.  Jeremy Tramaine Lee.
25     Q.  Okay.  And what is your current address

Page 21

1    today?
2        A.    10815 Big Sur Drive.
3        Q.   That's in Baton Rouge?
4        A.   It's in Central, but you could say Baton
5    Rouge.
6        Q.   Okay.  What's the ZIP code on that?
7        A.    70818.
8        Q.   Okay.  And how long have you lived at the
9    Brookshire address?
10       A.   Can you rephrase that question?
11       Q.   How -- Well, probably not.  How long have
12   you lived at that address?  Does that make sense?
13       A.   Six years.
14       Q.   Okay.  Six years.  So approximately 2019
15   'til now?
16       A.   Correct.
17       Q.   Okay.  Who do you live there with, if
18   anybody?
19       A.   My mother, father, and younger brother.
20       Q.   Okay.  So at -- Obviously a lot of today's
21   questions are going to pertain to the arrest that
22   you had on January 9, 2023.  If I make a reference
23   to "on the date of your arrest," or something along
24   those lines, I'm going to be referring to January
25   9, 2023.  Okay?

Page 22

1        A.   I got you.
2        Q.   So as of the date of your arrest you were
3    living with your family, your mom, dad, and
4    brother, at the Brookshire address?
5        A.   Yes, I was living with them.
6        Q.   Okay.
7    MR. BLACKWELL:
8        Hey, Michael, I think it's Big Sur, not
9    Brookshire.
10   THE WITNESS:
11       Yeah, yeah, it's Big Sur.
12   EXAMINATION BY MR. SCHILLAGE:
13       Q.   I tell you what, can you spell it for us?
14       A.   B-I-G S-U-R D-R.  Drive.
15       Q.   Okay.  Well, you just saved me one of my
16   questions, because I saw on your paperwork it said
17   Big Sur.  So I'm like, "I've got to be mishearing
18   him."  All right.  Well, I appreciate that.
19       So I understand from the paperwork your
20   date of birth is August 9, 2001?
21       A.   Correct.
22       Q.   All right.  So your birthday's coming up.
23   You're going to be 24 years old in a couple of
24   weeks?
25       A.   Correct.

Page 23

1        Q.   Okay.  Do you pay rent to live with your
2    mom and dad right now?
3        A.   I got to pay?  No.
4        Q.   Okay.  Did you pay rent when you lived
5    with them back in 2023?
6        A.   No.
7        Q.   Okay.  Have you ever paid rent to your mom
8    and dad, say from the time you were 18 and older?
9        A.   No.
10       Q.   Okay.  Do you contribute with things like
11   the gas or water bills or, you know, financial
12   house obligations that mom and dad have at that Big
13   Sur address?
14       A.   No.
15       Q.   Okay.  And I should have asked this
16   earlier.  What's your mother's name?
17       A.   Tamara Green.
18       Q.   Green?  Okay.  And what's your father's
19   name?
20       A.   Kentrick Green.
21       Q.   Okay.  All right.  Your last name's Lee,
22   so --
23       A.   They got married.
24       Q.   -- obviously you know I have to ask a
25   couple of follow-ups on that.

Page 24

1        Is Kentrick Green your biological father,
2    adopted father, stepfather?
3        A.   Stepfather.
4        Q.   Okay.  How long has -- Is -- Is your
5    mother, Tamara Green, your biological mother?
6        A.   Yes.
7        Q.   Okay.  How long have your mother and
8    stepfather been married?  Don't embarrass them.
9        A.   Nineteen years.
10       Q.   Okay.  And your brother, what's his name?
11       A.   Jermicah Lee.
12   MR. DIGGS:
13       Go ahead.  I was going to object to the
14   extent that he's a minor.  If he could use
15   initials.  I'm not sure of his age.  If he's
16   under 18 --
17   MR. THOMPSON:
18       He is.
19   MR. DIGGS:
20       -- you would want to use his initials
21   instead of his name.
22   THE WITNESS:
23       Yeah.  That's no problem.  J.L.
24   EXAMINATION BY MR. SCHILLAGE:
25       Q.   Okay.  Well, that's my next question.  How

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 25

1  old is your brother?
2      A. Eighteen.
3      Q. You can say his age.
4      A. Eighteen.
5      Q. Okay. Well, I -- Actually, he's a major.
6  MR. DIGGS:
7      No objection. Objection withdrawn.
8  EXAMINATION BY MR. SCHILLAGE:
9      Q. Okay. So you can say your brother's name.
10     A. Jermicah Lee.
11     Q. Okay. Do you mind spelling the first
12  name?
13     A. J-E-R-M-I-C-A-H. Last name L-E-E.
14     Q. Okay. So the same last name as you. I
15  take it that -- Well, just confirm it for me. You
16  and your brother are 100 percent biological
17  brothers?
18     A. Correct.
19     Q. Okay. What's your biological father's
20  name?
21     A. Jeremy Cain.
22     Q. Say the -- Is it --
23     A. J-E-R-E-M-Y C-A-I-N.
24     Q. Okay. Where does Lee come from in your
25  name?

Page 26

1      A. Family. Family name.
2      Q. From your biological father's side?
3      A. No. My mother.
4      Q. Okay. So was your mom Tamara Green's
5  maiden name Lee?
6      A. Yes.
7      Q. Okay. Jeremy Cain, your biological
8  father, is he alive today?
9      A. Correct.
10     Q. Okay. When's the last time you saw -- or
11  let me -- I'm sorry. Let me back up. Do you see
12  and keep in touch with your father?
13     A. He works out of state.
14     Q. Okay. So we've got to do things like make
15  sure that we answer the question that's asked. And
16  it's human nature, but I have to follow up because
17  you didn't precisely answer my question. If you
18  say, "He works out of state," I still don't really
19  know --
20     A. I don't know where my father at.
21     Q. Okay. So you don't keep in contact with
22  him?
23     A. Yeah, but he's out of state.
24     Q. Okay. If you recall, what was the last
25  time you had a contact with your biological father,

Page 27

1  Jeremy Cain?
2      A. On his birthday.
3      Q. How many years ago was that?
4      A. That was this year. So that was, like,
5  three months ago. Yeah, three months ago.
6      Q. Okay. Do you have regular contact with
7  him?
8      A. Yes.
9      Q. Do you ever stay with him overnight?
10     A. Yes.
11     Q. Okay. When is the last time you did that?
12     A. January 8.
13     Q. Of 2025?
14     A. 2023.
15     Q. Okay. January 8, 2023.
16     A. Yes.
17     Q. Okay. What was your father's address at
18  that time?
19     A. 5209 Paige Street.
20     Q. Can you spell the street, please?
21     A. P-A-I-G-E S-T-R-E-E-T.
22     Q. Paige Street. Okay. And that's here in
23  Baton Rouge?
24     A. Correct.
25     Q. Okay. How often do you have overnight

Page 28

1  visits with your father?
2      A. Often.
3      Q. Okay. So am I -- am I correct to
4  understand the day before the arrest that this
5  lawsuit is about, January 9, 2023, you spent the
6  night at your dad's house the night before?
7      A. Yeah. He was there with my grandmother at
8  that time.
9      Q. Okay. So the Paige Street address is your
10  paternal grandmother's house?
11     A. Correct.
12     Q. Okay. And you stay at her house often?
13     A. Yeah. I used to live with her.
14     Q. Okay.
15     A. She's --
16     Q. Okay. When did you live with her?
17     A. 2018, '19.
18     Q. Is it just that two-year period, in 2018
19  and 2019, or is there other times?
20     A. I'm a grandma baby. I can go stay any
21  time.
22     Q. Right. But you said you lived with her
23  for roughly a two-year period. So is that the only
24  time where you lived with your grandmother as
25  opposed to your mother and stepfather?

Electronically signed by Toni Conner (501-190-381-9495)    2f67950e-8c04-4061-959b-7823204c7c89

Page 29

1    A.  Yes.
2    Q.  Okay.  Okay.  Last four digits of your
3  Social Security number, please.
4    A.  4900.
5    Q.  Okay.  And do you have a valid driver's
6  license today?
7    A.  No, sir.
8    Q.  Okay.  Have you ever held one?
9    A.  Yes, sir.
10    Q.  Okay.  When's the last time you had a
11  valid driver's license?
12    A.  Last time, I don't recall.
13    Q.  Okay.  Why is it that you do not have a
14  valid driver's license today?
15    A.  Traffic tickets.
16    Q.  Okay.  At the time of your arrest, January
17  9, 2023, did you have a driver's license that was
18  valid?
19    MR. THOMPSON:
20      Object to the form of the question.  At
21    the time of the arrest.  Go ahead.
22  EXAMINATION BY MR. SCHILLAGE:
23    Q.  You can answer.
24    A.  No, sir.
25    Q.  Okay.  Did you hold a valid driver's

Page 30

1  license at any time between January 9, 2023, and
2  today?
3    A.  No.
4    Q.  Okay.  All right.  Let's -- Let's shift
5  gears a little bit.  Let's talk about educational
6  background.  What is the highest level of education
7  you completed?
8    A.  High school.
9    Q.  Okay.  Twelfth grade?
10    A.  (Nodding head.)
11    Q.  Okay.  Where did you graduate high school
12  from?
13    A.  Christian Apostolic Academy.
14    Q.  One more time, please.
15    A.  Christian Apostolic Academy.
16    Q.  Okay.  And where is that?
17    A.  It's closed down, but it was on Plank
18  Road.  It's home school.
19    Q.  Okay.  It's a home school administrative
20  academy?
21    A.  Correct.
22    Q.  All right.  So when did you graduate from
23  Christian Apostolic Academy?
24    A.  April 2021.
25    Q.  Okay.  And because it was home school, who

Page 31

1  was your primary teacher or facilitator for the
2  academy?
3    A.  I just know him by Doc.  He passed away.
4  I forgot his name.
5    Q.  Was it a family member or someone from the
6  academy itself?
7    A.  Someone from the academy.
8    Q.  Okay.  So how was the schooling completed?
9  Meaning, did they come to your house?  Did you
10  go to a --
11    A.  Took courses online.
12    Q.  It's online?  Okay.  When did you start
13  Christian Apostolic Academy?  Month and year, as
14  best as you can recall, is fine.
15    A.  2020.  November.
16    Q.  Okay.  Where did you go to high school
17  before November 2020?
18    A.  Central.
19    Q.  Central High?
20    A.  Yes, sir.
21    Q.  Okay.  When did you start at Central High?
22    A.  2019.
23    Q.  And that would be roughly November 2020
24  when you ended there?
25    A.  You can say that.  Yes.

Page 32

1    Q.  Well, I --
2    A.  Yes, yes, yes, yes.
3    Q.  Why did you leave Central High School?
4    A.  Home school was better.
5    Q.  Okay.  And whose decision was that for
6  you?
7    A.  Me and my mother.
8    Q.  Okay.  Ms. Tamara Green?
9    A.  Correct.
10    Q.  Okay.  Where did you go to school, whether
11  another high school or an elementary school, before
12  Central High?
13    A.  How many do you want me to name?
14    Q.  I want you to go -- I appreciate that.
15  Let's do this.  Chronological order backwards.
16  You've listed Christian Apostolic Academy --
17    A.  Uh-huh.
18    Q.  -- and then Central High.
19      So let's go to the one before that.
20    A.  Okay.  So you want me to go from high
21  school to elementary?
22    Q.  To eighth grade.
23    A.  To eighth grade?
24    Q.  Yes.
25    A.  Okay.  It goes from Christian Apostolic

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 33

1    Academy, Central High, Scotlandville Magnet High,
2    Mentorship Academy.  I'm going to rephrase that.
3    Christian Apostolic Academy, Scotlandville High,
4    Thrive Academy, Mentorship Academy.
5        Q.  Okay.  So the -- the last list you gave
6    did not include Central High School.  Is it still
7    before Scotlandville?
8        A.  No.  It's -- It's before Christian
9    Apostolic Academy.
10       Q.  All right.  Give me the list one more
11   time, please.
12       A.  All right.  I can give you -- because it's
13   a lot of schools.  That's why I had asked you.
14          I'm fixing to go from high school to
15   eighth grade.  Christian Apostolic Academy,
16   Central, Scotlandville, Thrive.
17       Q.  What about Mentorship Academy?
18       A.  Yeah.  Mentorship was the -- my first
19   freshman year.
20       Q.  Okay.  So Mentorship, then Thrive?
21       A.  Mentorship, Thrive, Scotlandville.
22       Q.  Then Central?
23       A.  Yeah.  Then Christian Apostolic Academy.
24       Q.  Okay.  And was it a formal 12-grade high
25   school diploma or was it a GED through Christian

Page 34

1    Apostolic Academy?
2        A.  A diploma.
3        Q.  Okay.  Do you have any other educational
4    training, certifications, things that you went
5    under formal institutional learning after you
6    finished at Christian Apostolic Academy?
7        A.  No, sir.
8        Q.  Okay.  What about like trade programs,
9    technical colleges, community colleges, things like
10   that?
11       A.  No, sir.
12       Q.  Okay.  All right.  So after April 2021,
13   when you graduated twelfth grade, what did you do
14   as far as work or school or both?  What happened
15   next?
16       A.  I started -- My first job was at 16.
17   McDonald's.  So I was already working in high
18   school.
19       Q.  Okay.  So your -- You said your first job
20   while you were in high school was at McDonald's?
21       A.  Yes.
22       Q.  Okay.  So my -- my question was really
23   about after you finished high school.  And if it's
24   still McDonald's, that's fine.  Just let me know.
25   After you graduated high school, where did you

Page 35

1    work?
2        A.  After I graduated high school, I worked at
3    McDonald's.
4        Q.  Okay.  So how long did you work, start and
5    finish point in time, at McDonald's?
6        A.  For about six months.
7        Q.  Okay.  What did you do for work after
8    that?
9        A.  I -- I had went to Wisconsin.
10       Q.  Okay.  Why did you go to Wisconsin?
11       A.  For work.
12       Q.  Okay.  What type of work?
13       A.  Trade.
14       Q.  Okay.  Can you explain what type of trade
15   work it was?
16       A.  Buffing and grinding large aluminum
17   castirons.
18       Q.  Okay.  How did you get the job buffing and
19   grinding the castirons in Wisconsin?
20       A.  A coworker.
21       Q.  A coworker from McDonald's?
22       A.  No.  From a temp service.
23       Q.  Okay.  Tell me more about the temp
24   service.  When did you start receiving employment
25   through a temp service?

Page 36

1        A.  Temp services -- I been enrolled in temp
2    services.
3        Q.  Okay.  Since what point in time?
4        A.  After I graduated high school.
5        Q.  All right.  Is that how you got the job at
6    McDonald's?
7        A.  No.  I did the application online.
8        Q.  I'm sorry?
9        A.  I did the application online.
10       Q.  Okay.  But the temp service is how you
11   were able to procure the work in Wisconsin on the
12   buffing and grinding castirons, right?
13       A.  No.  Rephrase your question for me.
14       Q.  Earlier you said it was through a coworker
15   at the temp service that you got the job in
16   Wisconsin, right?
17       A.  I can respond?
18       Q.  Yes, please.
19       A.  You -- You said earlier I got the job from
20   a coworker?  No.  I said that I was working at
21   McDonald's while I was -- during school.  Then you
22   asked me another question, how I was working in
23   Wisconsin, and I told you it was through a temp
24   service.
25       Q.  Okay.  So it wasn't through a coworker at

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 37

1    all that you got the Wisconsin work?
2        A.  He told me, like out his mouth.  Like,
3    we --
4        Q.  Who did?
5        A.  I have to tell you a name?
6        Q.  Yes, please.
7        A.  Tyriek Stewart.
8        Q.  And is Mr. Stewart family, friend,
9    neighbor?  Is he anything to you other than a
10   coworker?  At --
11       A.  Yes.
12       Q.  -- that time.
13       A.  Yes.
14       Q.  Okay.  What was he?
15       A.  Him and my mothers are very close friends.
16   So they are sisters now.  So I look at him like a
17   brother.
18   MR. THOMPSON:
19       You guys, I'm going to go use the
20       restroom.  Just let Rodney know if he needs to
21       object or something, I went to the restroom.
22       You're good.  You're good.
23       Rodney, I'm going to the restroom; all
24       right?  Or just -- I'll be right back.
25   MR. DIGGS:

Page 38

1        Yeah.  No, I'm here.  I heard you.
2    EXAMINATION BY MR. SCHILLAGE:
3        Q.  All right, Mr. Lee.  So you said Tyriek
4    Stewart.  That's a male, right?
5        A.  Correct.
6        Q.  All right.  You said he is a friend of
7    your mother's?
8        A.  No.  I said him and my mother are close
9    friends.  They graduated to sisters, so he's like a
10   brother to me.
11       Q.  Okay.  I don't understand that.  I need
12   you to help explain.  You went from Mr. Stewart
13   to there --
14       A.  You're trying to confuse me.
15       Q.  -- being a female.
16       A.  No, I never said a female.
17       Q.  Well, who's the sisters?
18       A.  My -- I said him, his mother, and my
19   mother were close friends.  So along they became
20   sisters.
21       Q.  Okay.  So Mr. Stewart's mother and your
22   mother --
23       A.  Yes.
24       Q.  -- are friends?
25       A.  Yes.

Page 39

1        Q.  I got you.
2            All right.  How long were you in
3    Wisconsin?
4        A.  I was in Wisconsin for, like, four or five
5    months.
6        Q.  Okay.  What did you do when you left
7    Wisconsin?
8        A.  What did I do when I left Wisconsin?
9        Q.  Right.  What did you do next?
10       A.  Came back home.
11       Q.  Okay.  Did you start work again in Baton
12   Rouge when you returned home?
13       A.  Well, eventually, when I found it, yes.
14       Q.  Okay.  What's the next job you had in
15   Baton Rouge after you left Wisconsin?
16       A.  The next job that I had was Walmart.
17       Q.  Okay.  And how long did you work at
18   Walmart?
19       A.  Six, five -- Six months.
20       Q.  Okay.  What did you do for Walmart?
21       A.  Night stocker.
22       Q.  Okay.  I apologize.  I didn't ask these
23   questions when I went through these.  McDonald's,
24   what was your -- was it salary, hourly wage?  How
25   were you paid at McDonald's?

Page 40

1        A.  Hourly.
2        Q.  Okay.  What was the highest hourly wage?
3        A.  $8.50.
4        Q.  Okay.  The buffing and grinding work in
5    Wisconsin, salary or hourly?
6        A.  Hourly.
7        Q.  Okay.  What was the highest hourly wage
8    you had in Wisconsin?
9        A.  18.50.
10       Q.  What -- Do you remember the name of the
11   company that you did that buffing and grinding work
12   for?
13       A.  Tradesmen International.
14       Q.  When you say Trey's, is it T-R --
15       A.  Tradesmen International.
16       Q.  Tradesmen.
17       A.  I wasn't done talking.
18       Q.  I apologize.  Please continue.
19       A.  I -- No.  I'm done.  Like, I was -- When I
20   was saying Tradesmen International, you was, like,
21   trying to see what word I said.
22       Q.  Okay.  Walmart was the next job after
23   Tradesmen International.  Six months as a night
24   stocker.  Hourly or salary?
25       A.  Hourly.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 41

```
 1        Q.  Okay.  Highest hourly wage at Walmart?
 2        A.  Fourteen.
 3        Q.  Four dollars and ten cents?
 4        A.  Fourteen.
 5        Q.  $14.  Even, right?
 6        A.  $14.
 7        Q.  Okay.  All right.  Where did you work
 8    after Walmart?
 9        A.  I still enrolled in temp agencies.  Like,
10    they call around all the time.
11        Q.  Okay.  So give me examples of the work the
12    temp agencies gave you.
13        A.  They gave me general labor jobs.  I was
14    working at a warehouse for Best Buy.
15        Q.  When was that?
16        A.  2021.
17        Q.  Okay.  Hourly or --
18        A.  Hourly.
19        Q.  -- salary?
20            Highest hourly wage?
21        A.  Yeah.  I was getting paid $11.  They gave
22    me 13 -- started paying me 13.50 from a company
23    raise.
24        Q.  Okay.  How long were you working in the
25    Best Buy warehouse?
```

Page 42

```
 1        A.  Eight months.
 2        Q.  Okay.  What other jobs did you get through
 3    that temp service?
 4        A.  I got landscaping jobs, regular general
 5    labor jobs, such as cleaning.
 6        Q.  Landscaping, hourly?
 7        A.  (Nodding head.)  Correct.
 8        Q.  Okay.  What was the highest landscaping
 9    hourly wage you received?
10        A.  $13 an hour.
11        Q.  Okay.  And the -- you described cleaning
12    jobs.
13        A.  Correct.
14        Q.  Tell me a little more.  What do you mean
15    when you say "cleaning jobs"?
16        A.  I said "general labor."  I was explaining.
17        Q.  So was a cleaning job a part of those
18    general labor?
19        A.  Yes, sir.
20        Q.  Okay.  So what were you cleaning?
21        A.  Warehouse.
22        Q.  Was that at Best Buy or somewhere
23    else?
24        A.  That was with Best Buy.
25        Q.  Okay.  Was that the 2021 role you had at
```

Page 43

```
 1    the Best Buy warehouse or was it a different point
 2    in time for a different job at Best Buy?
 3        A.  I'm going to be honest.  You asking me
 4    about old jobs and -- and, like, the years and
 5    dates.  I was -- I been enrolled in temp services
 6    for a long time.  So, it's not based off a date.
 7    It's just I have my statements and -- bank
 8    statement and things like that.
 9        Q.  Okay.
10        A.  You --
11        Q.  So --
12        A.  So --
13        Q.  And that's helpful.
14        A.  So --
15        Q.  Go ahead.
16        A.  I can work a temp service job today and go
17    to another one tomorrow.  Landscaping today and
18    general cleaning tomorrow.  So, 2021.
19        Q.  Okay.  So the system is designed for you
20    to go to location to location from day to day?
21        A.  Yes.
22        Q.  Okay.  You've made reference to 2021.  Is
23    there any other year that you were enrolled in the
24    temp service doing work through the service?
25        A.  Yes.
```

Page 44

```
 1        Q.  Okay.  What years was that?
 2        A.  '22 --
 3        Q.  Okay.
 4        A.  -- '23, '24, '25.
 5        Q.  So through present date?
 6        A.  Yes.
 7        Q.  Okay.  Do you have a full-time job today?
 8        A.  No, sir.
 9        Q.  Okay.  What about a part-time job?
10        A.  No, sir.
11        Q.  With the understanding that the temp jobs
12    are neither full nor part, correct?
13        A.  They're daily jobs.  Daily --
14        Q.  Right.
15        A.  -- pay.
16        Q.  So I want to make sure we're on the same
17    page.
18        A.  Uh-huh.
19        Q.  And you're doing a good job.
20        A.  Right.
21        Q.  So full-time is one type of work --
22        A.  Yeah.
23        Q.  -- part-time is a second type of work --
24        A.  And --
25        Q.  -- and the temp daily jobs we're putting
```

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 45

1    in the third category?
2        A.  Yes.
3        Q.  Okay.  So you are still enrolled with the
4    temp service today?
5        A.  Correct.
6        Q.  And you have been from 2021 through
7    present date?
8        A.  Correct.
9        Q.  All right.  January 9, 2023, did you have
10   work other than through what the temp service sent
11   you?
12       A.  Savard Labor and Marine.  I worked with
13   them, like, two days before January 9.
14       Q.  And where are they located?
15       A.  They are located in Baton Rouge.
16       Q.  Okay.  What part of town?
17       A.  And I'm going to correct you.  I had my
18   driver's license around that time, because I had a
19   job for Savard Labor and Marine.  I went picked up
20   a -- a cargo van for them in Memphis, Tennessee,
21   and brought it back.
22       Q.  Okay.  So you were able to remember some
23   new information from what you said earlier.  You
24   did have a valid driver's license around January 9,
25   2023, because you know you did a job for Savard

Page 46

1    where you drove to Tennessee?
2        A.  Correct.
3        Q.  Okay.  Those two days before January 9,
4    2023, you said you worked for them two days before,
5    is that the last time you worked for the --
6        A.  Savard Labor and Marine?
7        Q.  Yes.
8        A.  Yes.
9        Q.  Okay.  Was that when you drove to
10   Tennessee or was it further --
11       A.  That's when --
12       Q.  -- before the arrest date?
13       A.  The two days prior it was -- I drove to
14   Tennessee.
15       Q.  January 7, 2023?
16       A.  Yes.
17       Q.  All right.  So you drove to Tennessee for
18   work?
19       A.  (Nodding head.)
20       Q.  You came home that --
21       A.  Same day.
22       Q.  -- that day or the next day?
23       A.  Same day.
24       Q.  Okay.
25       A.  Drove 16 hours.

Page 47

1        Q.  All right.  And you stayed with your
2    paternal grandmother on the night of January 8,
3    right?
4        A.  Uh-huh.
5        Q.  That's a yes?
6        A.  Rephrase the question.
7        Q.  Okay.  When you got back from Tennessee --
8    MR. THOMPSON:
9            When he asks you questions, it's yes or
10   noes, because --
11   THE WITNESS:
12           Okay.
13   MR. SCHILLAGE:
14           I just need you to verbalize.
15   MR. THOMPSON:
16           -- the transcript --
17   THE WITNESS:
18           All right.
19   MR. THOMPSON:
20           Yeah.  It's like "uh-huh."
21   THE WITNESS:
22           All right.
23   MR. THOMPSON:
24           You have to say yes or no.
25   EXAMINATION BY MR. SCHILLAGE:

Page 48

1        Q.  Yeah.  You did one of those uh-huhs we
2    talked about.
3        A.  All right.  I understand.
4        Q.  It's going to happen.
5        A.  It's okay.
6        Q.  All right.  So you did return from
7    Tennessee and spend the night at your grandmother's
8    house.
9        A.  On January 8.
10       Q.  That's right.  Okay.
11           What is the -- Well, let me ask you this.
12   Through present date with the temp work, is it
13   always hourly or have you ever had something
14   different, as far as the method of wage or payment?
15       A.  It's always hourly.
16       Q.  Okay.  What's the highest hourly wage rate
17   you've had on any job through the temp service?
18       A.  14.50.  In Louisiana.  Out of state it's
19   different wages.  The highest I had got I was out
20   of state.  18.50.
21       Q.  That was the Wisconsin work?
22       A.  That was the Wisconsin work.
23       Q.  Okay.
24       A.  But 14.50 in town.
25       Q.  Other than the Wisconsin work, have you

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 49

1  had any other out-of-state work?
2      A.  (Shaking head.)
3      Q.  That's a no?  You shook your head.  You
4  have to say it out loud.
5      A.  With the temp agency, yes.  It would be
6  with the same agency.
7      Q.  Okay.  Have you had any work out of state
8  other than Wisconsin by any means of --
9      A.  Yes.
10      Q.  -- employment?
11      What was that?
12      A.  Memphis, Tennessee.
13      Q.  Okay.  What did you do there?
14      A.  A chicken plant.  I was only there two
15  days.
16      Q.  Okay.  And what was the wage in Memphis,
17  Tennessee, at the chicken plant?
18      A.  $13.
19      Q.  Okay.  All right.  I saw through some of
20  the discovery paperwork that you furnished us
21  through your lawyer you listed the medical
22  providers that you've seen from Our Lady of the
23  Lake North and there's also a Dr. Brian Turner.
24      A.  Correct.
25      Q.  Do you have a primary care physician,

Page 50

1  first off?
2      A.  Yes.
3      Q.  Okay.  Who is that?
4      A.  Samaki Green.
5      Q.  Okay.  And how long have you under -- have
6  you been under the care of Dr. Green?
7      A.  For going on two years.
8      Q.  Two years?  When was the first time you
9  saw Dr. Green?
10      A.  2023.  I can remember the year.  And it
11  was January, I believe.  It was January.
12      Q.  Okay.  We can go ahead and do this now.
13  I'm going to hand you another document, Mr. Lee.
14  This was another one that was provided to us by
15  your attorney.  I'm going to mark this as Exhibit 2
16  to the deposition.  And I'm going to direct you to
17  the back of this compilation.  It actually says
18  Page 2 of 6 on the bottom right corner of the page.
19      MR. THOMPSON:
20          2 of 6?  Or 2 of 8?
21      MR. SCHILLAGE:
22          It says 2 of 6.
23  EXAMINATION BY MR. SCHILLAGE:
24      Q.  No.  Go to the back.
25      A.  Yeah, I got 2 of 6.

Page 51

1      Q.  Okay.  Do you see Samaki Green's name in
2  the top?
3      A.  Yes.
4      Q.  Okay.  She's a nurse practitioner, right?
5  Or do you know?
6      A.  Uh-huh.  Yes, I know.
7      Q.  Did you just say "yes or no"?
8      A.  I said, "Yes, I know."
9      Q.  Oh, okay.  Okay.  So is she a nurse
10  practitioner?
11      A.  Yes.
12      Q.  Okay.  This is at Our Lady of the Lake Mid
13  City Family Practice on North Foster Drive.  Is
14  that where you see Nurse Practitioner Green?
15      A.  Yes.
16      Q.  Okay.  Is there a medical physician that
17  you see when you go to Our Lady of the Lake Mid
18  City Family Practice on North Foster Drive?
19  Instead of NP at the end of the name, it would be
20  an MD, most likely.
21      A.  Can you re-ask me that question again?  I
22  was reading something.
23      Q.  Sure.  I'll try to ask you even simpler.
24  Do you see any other medical professionals at Our
25  Lady of the Lake Mid City other than Samaki Green?

Page 52

1      A.  No.
2      Q.  Okay.  She's the only medical professional
3  you've come in contact with there?
4      A.  Yes.
5      Q.  Okay.  Do you -- Did you have a primary
6  care physician prior to 2023?
7      A.  No.
8      Q.  Okay.  So still looking at this page in
9  Exhibit 2, it shows -- there's a scheduled
10  appointment Thursday, May 25, at 9:30 AM underneath
11  her name.  Do you see that?  It's on the same page.
12      A.  On 2 of 6?
13      Q.  Correct.  Up in the top left.
14      A.  Okay.
15      Q.  Do you see that Thursday, May 25, at 9:30
16  AM?
17      A.  Yeah, I have it.
18      Q.  Okay.  So is that the -- Does that sound
19  like the first time, the spring of 2023, when you
20  would have met Nurse Practitioner Samaki Green?
21      A.  You can give me a moment?
22      Q.  Sure.
23      A.  That's correct.  May 25, that's -- that's
24  the right date.
25      Q.  Okay.  All right.  Mr. Lee, did you in

Electronically signed by Toni Conner (501-190-381-9495)                                        2f67950e-8c04-4061-959b-7823204c7c89

Page 53

1  this time, 2023, did you have health insurance?
2      A. No, sir.
3      Q. Okay. I understand from one of the
4  discovery responses that at the time of the
5  response -- It was just last year, in July. You
6  explained that you were on Medicaid. Are you on
7  Medicaid today?
8      A. Yes.
9      Q. Okay. Were you on Medicaid in 2023?
10     A. Not when the incident happened.
11     Q. Not January 9 --
12     A. Right.
13     Q. -- 2023? Okay.
14     A. (Indistinguishable.)
15     Q. When did you --
16  COURT REPORTER:
17     I'm sorry, I didn't hear that last part.
18  THE WITNESS:
19     I was listening to him. I was talking to
20  myself.
21  EXAMINATION BY MR. SCHILLAGE:
22     Q. Okay. When did you first receive
23  Medicaid?
24     A. I'm going to be honest with you. I -- I
25  don't remember.

Page 54

1      Q. Okay. Just sometime after January 9,
2  2023, the arrest?
3      A. I don't remember.
4      Q. Okay. It may have been before?
5      A. No, it wasn't before.
6  MR. SCHILLAGE:
7      Okay. I want to keep to my word. We've
8  been going for almost an hour and a half, so
9  why don't we go ahead and take a five-minute to
10  stretch our legs.
11  MR. THOMPSON:
12     That was fast.
13  VIDEOGRAPHER:
14     Off the record. The time is now 11:26.
15     (OFF THE RECORD.)
16  VIDEOGRAPHER:
17     Back on the record. The time is now
18  11:35.
19  EXAMINATION BY MR. SCHILLAGE:
20     Q. All right, Mr. Lee. How many times did
21  you see Samaki Green for medical treatment?
22     A. Since 2023 or --
23     Q. In life.
24     A. Once.
25     Q. Okay. Dr. Brian Turner, who is he?

Page 55

1      A. That's my therapist.
2      Q. Okay. And when did you first see Dr.
3  Turner?
4      A. I don't recall.
5      Q. Okay. How many times have you seen him?
6      A. Numerous. More than --
7      Q. What does that mean?
8      A. More than three.
9      Q. More than three? When's the last time you
10 saw him?
11     A. Yesterday.
12     Q. All right. But you don't remember the
13 first time you became a patient of his?
14     A. I don't recall.
15     Q. Okay. What about -- When you say
16 "therapist," is he -- do you know, is he a
17 psychologist, a social worker? What is his
18 professional licensure, if you know?
19     A. He's a licensed psychologist.
20     Q. Psychologist?
21     A. Yes.
22     Q. Okay.
23     A. Dr. Brian Turner.
24     Q. All right. What's your cell phone number?
25     A. (337)356-7129.

Page 56

1      Q. Okay. Is -- Well, who's the provider on
2  that cell phone?
3      A. Straight Talk.
4      Q. Straight Talk? And is that the same phone
5  number you had on January 9, 2023?
6      A. Correct.
7      Q. Okay.
8      A. No, that's not the same number. It's not.
9  It's -- 337 area code is not the same number.
10     Q. Okay.
11     A. It's not.
12     Q. Well, I appreciate that. What is the
13 number -- your cell phone number on January 9,
14 2023?
15     A. I believe (337)716-2153.
16     Q. Who was the provider on that number?
17     A. Straight Talk.
18     Q. Okay.
19     A. I probably blocked the number. It's been
20 a little minute ago. I probably got a number
21 wrong, but it was a different number.
22     Q. Fair. Today what social media platforms
23 do you use?
24     A. I use Facebook and Instagram.
25     Q. Are those the only two or are there

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 57

1    others?
2        A.  That's the only two that I -- I be on.
3        Q.  Okay.  What is your name on Facebook?
4        A.  Jeremy Lee.
5        Q.  Okay.  And what is your name on Instagram?
6        A.  Peso Guala.
7        Q.  Could you spell that for Madam Court
8    Reporter, please?
9        A.  P-E-S-O G-U-A-L-A.
10       Q.  Okay.  How did you come up with the
11   Instagram name?
12       A.  My nickname is PeeWee.
13       Q.  Okay.
14       A.  (Indistinguishable.)
15   COURT REPORTER:
16           Wait.  What?
17   THE WITNESS:
18           I love money.  So peso equals money.  So I
19           went with that because PeeWee was getting burnt
20           out.
21   EXAMINATION BY MR. SCHILLAGE:
22       Q.  Okay.  How long have you had the nickname
23   PeeWee?
24       A.  Since I was born.
25       Q.  Do you know how you got it?

Page 58

1        A.  My grandmother.  Preemie.
2        Q.  Do most of your friends call you PeeWee?
3        A.  Most of them don't even know it.
4        Q.  Okay.  More like a family nickname?
5        A.  Yes.
6        Q.  Okay.  Do you have any nicknames with your
7    friends?
8        A.  Peso.
9        Q.  Okay.  All right.  Do you know someone
10   named Terrick Morgan?
11       A.  Correct.
12       Q.  Who is that?
13       A.  Friend.
14       Q.  How long have you known him?
15       A.  A couple of years.
16       Q.  How did you meet?
17       A.  Know -- Know of him from the neighborhood.
18       Q.  Neighborhood?
19       A.  Yeah.
20       Q.  Okay.  The Big Sur address?
21       A.  No.  The 5209.
22       Q.  Okay.  All right.  So the way I just asked
23   you that question about Terrick Morgan, I'm going
24   to go through a list of names.  Kind of be the same
25   thing --

Page 59

1        A.  All right.
2        Q.  -- okay?
3            Tory Minton.
4        A.  Yes.
5        Q.  Who is he to you?
6        A.  A friend.
7        Q.  Okay.  How do you know Mr. Minton?
8        A.  I'm going to rephrase that.  I'm going to
9    go with associate.  Associate.
10       Q.  Associate?  Okay.  I take it you mean a
11   business associate?
12       A.  No.  Just somebody that I know.
13       Q.  Okay.  So when you compare friend to
14   associate --
15       A.  Like --
16       Q.  -- a friend is closer?
17       A.  No.  Friend and associate is different.
18       Q.  Right.  So what does "associate" mean?
19       A.  Like I'll talk to you.  Like, you are an
20   associate, like I'm talking to you right now.
21       Q.  Okay.  Someone who you know of, but you
22   wouldn't call a friend?
23       A.  Yeah.
24       Q.  Okay.  How long have you known Mr. Minton?
25       A.  I've known of him, but I'm anti-social,

Page 60

1    so, still, he's an associate.
2        Q.  Okay.  But what I'm saying is how long
3    have you known who he is?
4        A.  I can't recall.
5        Q.  Okay.  Is it about the same time as Mr.
6    Morgan or longer or shorter?
7        A.  Longer.
8        Q.  Okay.  Why would you not consider Mr.
9    Minton a friend?
10       A.  He's a -- He's an associate.
11       Q.  Right.  I'm just saying why do you make
12   the distinction between friend and associate when
13   talking about Mr. Minton?
14   THE WITNESS:
15           Mr. Thompson, I can answer that?
16   MR. THOMPSON:
17           You have to.
18   THE WITNESS:
19           Re-ask it another way for me.
20   EXAMINATION BY MR. SCHILLAGE:
21       Q.  Sure.  Why would you call Mr. Minton an
22   associate rather than a friend?
23       A.  Because he's just not somebody that I hang
24   out with every day.
25       Q.  Do you hang out with Mr. Morgan every day?

Page 61

1      A.   No.
2      Q.   Okay.  So there's some other differences,
3  too, right?
4      A.   Yeah.
5      Q.   Okay.  Like what?
6      A.   They're -- They're totally different.  You
7  asking me about Tory, then going back to Morgan.
8      Q.   Well, I'm asking about Tory.
9      A.   Yeah.  Then you're going back to Morgan.
10     Q.   Well, does --
11     A.   Morgan's a friend.  Tory's an associate.
12  Morgan have showed me friend -- friendship wise.
13  Tory hasn't.
14     Q.   Okay.  So that's new information you
15  hadn't told me.  So I appreciate that.  And that's
16  what I'm asking for.
17     A.   Yeah.
18     Q.   So Mr. Minton has not done friendship
19  gestures, activities, experiences with you the way
20  you have with Mr. Morgan?
21     A.   No.  I just don't hang with Tory Minton to
22  call him a friend.
23     Q.   Okay.  What about Keimyria Mack?  Do you
24  know who that is?
25     A.   No.

Page 62

1      Q.   Okay.
2      A.   I know it's a girl, but I don't know her
3  at all.
4      Q.   Okay.  What about LaCourtney Williams?
5      A.   I know of her, but I don't know her.
6      Q.   So help me understand how you distinguish.
7  Is this similar to the associate characterization
8  for these ladies, the way you talked about Mr.
9  Minton, or is it --
10     A.   Yes.
11     Q.   -- different than an associate?
12     A.   They're associates.
13     Q.   Okay.  So you actually know who these
14  people are?  You just don't --
15     A.   I don't know them.
16     Q.   -- associate?
17     A.   I do not know them.
18  MR. THOMPSON:
19      If you can help, I guess --
20      Ryan Thompson.  I have Mr. -- Mr. Lee.
21      I think it may help -- And I know what
22  you're saying, because I have a command of -- a
23  better command of the English language and a
24  lexicon.  If you can kind of make a distinction
25  for Jeremy, in there may be other -- there

Page 63

1  may -- there may be a broad term for him in
2  terms of the term "associate" for him.  But
3  just for the record, if you can see if you can
4  make a better distinction for him or -- If you
5  can, you can.  If you can't, you can't.  But I
6  think what Mr. Schillage is getting at, is
7  that -- The way we understand "associate" is
8  that that's somebody that you would know to --
9  you may time to time hang out with.  And what
10  he's trying to clear up is, he's saying is
11  Keimyria or is LaCourtney Williams in that
12  associate --
13  THE WITNESS:
14      Oh, no.
15  MR. THOMPSON:
16      -- timeframe.
17      And he's making sure that --
18  THE WITNESS:
19      No.
20  MR. THOMPSON:
21      He understands that --
22  THE WITNESS:
23      Yeah.
24  MR. THOMPSON:
25      -- if you don't know them, then how can

Page 64

1  they be an associate.
2  THE WITNESS:
3      Right.  I don't know them.
4  MR. THOMPSON:
5      I think that's where you're going.  Right?
6  MR. SCHILLAGE:
7      Uh-huh.
8  THE WITNESS:
9      Yeah.  I don't know them.
10  EXAMINATION BY MR. SCHILLAGE:
11     Q.   You don't know them?
12     A.   No.
13  MR. THOMPSON:
14      Sorry about that, bro.
15  MR. SCHILLAGE:
16      You're okay.
17  MR. THOMPSON:
18      All right.
19  EXAMINATION BY MR. SCHILLAGE:
20     Q.   Are you able to recognize them by face and
21  know who they are by name?
22     A.   Correct.
23     Q.   So they're not total strangers?
24     A.   (Shaking head.)  Associate.
25     Q.   You have to answer out loud.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 65

```
 1      A.  No.
 2      Q.  Okay.  What about Deondrick Lucas?
 3      A.  He's an associate.
 4      Q.  How long have you known Mr. Lucas?
 5      A.  I don't recall.
 6      Q.  What about L'Bryant McNeely?
 7      A.  Associate.
 8      Q.  Okay.  How long have you known Mr.
 9  McNeely?
10      A.  I don't recall.
11      Q.  What about Seyveon Moore?
12      A.  Associate.
13      Q.  How long have you known him?
14      A.  I don't recall.
15      Q.  Okay.  What about Deondre Tate?
16      A.  Associate.
17      Q.  Okay.  And Deondre's first name is
18  D-E-O-N-D-R-E, right?
19      A.  I don't know.
20      Q.  Okay.  But he's also an associate?
21      A.  (Nodding head.)
22      Q.  Okay.  Well, let's talk about the day on
23  January 9, 2023, when you were arrested.  That was
24  the address 5450 Cadillac Street in Baton Rouge,
25  right?
```

Page 66

```
 1      A.  Correct.
 2      Q.  All right.  Before that day, had you ever
 3  been to 5450 Cadillac Street, the address, the
 4  house, before?
 5      A.  Correct.
 6      Q.  Okay.  How many times?
 7      A.  Like, two or three times.
 8      Q.  Okay.  All right.  What did you go there
 9  for?
10      A.  I went there for my cousin Dayln.
11      Q.  I'm sorry?
12      A.  I went there for my cousin Dayln.
13      Q.  Can you spell your cousin's name?
14      A.  D-A-Y-L-N.  B-A-N-K-S.
15      Q.  Is that the last name, D-A-N-K-S?
16      A.  B-A-N-K-S.  Banks.
17      Q.  Banks.  Okay.  Dayln Banks.  You said
18  that's a cousin.  From your mother's side or
19  father's side?
20      A.  Father's side.
21      Q.  Okay.  Biological father or stepfather?
22      A.  Biological father.
23      Q.  Okay.  How old is Dayln Banks?
24      A.  Nineteen.
25      Q.  And that's today?  He's 19 this year?  Not
```

Page 67

```
 1  in 2023?
 2      A.  Twenty.  He's 20 right now.
 3      Q.  Okay.  Thank you.
 4          So you would go to 5450 Cadillac two or
 5  three times before your 2023 arrest, and it was
 6  generally to see Dayln Banks?  Did I get that
 7  right?
 8      A.  No, you didn't.
 9      Q.  All right.
10      A.  I only went there --
11      Q.  Explain to me what it is.
12      A.  I only went there two or three times my
13  whole life.
14      Q.  So you're including January 9, 20 --
15      A.  Yes.
16      Q.  -- 23?
17      A.  Yes.
18      Q.  All right.  And was each of those times
19  involving you seeing your cousin Dayln Banks?
20      A.  Yes.
21      Q.  Okay.  For what purpose?
22      A.  "What's up?"
23      Q.  So to hang out?
24      A.  I don't -- I don't be over there.  It's my
25  cousin.
```

Page 68

```
 1      Q.  Okay.  So you went to see your cousin
 2  there?
 3      A.  Right.
 4      Q.  And I understand -- Well, I'll tell you
 5  what.  In your own words, just explain to us what
 6  happened from the time you left -- I think it's you
 7  left your grandmother's house.
 8      A.  Uh-huh.
 9      Q.  And you went to 5450 Cadillac on January
10  9, right?
11      A.  Yes.
12      Q.  Walk us through what happened.
13      A.  I wake up around 12:00, walk outside.  I
14  see Deondre Tate coming up the street.  He had
15  (indistinguishable).
16      COURT REPORTER:
17        "He had" what?
18      THE WITNESS:
19        He had the window down.  I asked him can
20  he take me to the store.  He said yes.  I
21  hopped down with him.  We passing by, seeing a
22  couple people outside of 50 -- of Cadillac
23  Street.  Seen a couple of people outside,
24  decided to stop by.  We was only going to be a
25  second.  Car was still running.  That's what
```

Page 69

1    happened.
2    EXAMINATION BY MR. SCHILLAGE:
3       Q.  Okay.  So what was the store y'all were
4    going to?
5       A.  The store we was going to?  The store we
6    was going to was on the back street.  I don't know
7    the name of it.
8       Q.  Okay.  It's like a Food Mart type of
9    store, a --
10      A.  No.  It's --
11      Q.  -- convenience store?
12      A.  It's a -- Yeah, convenience store.
13      Q.  Okay.  Did you go there before you went to
14   Cadillac Street house or were you intending to go
15   to that convenience store after?
16      A.  We was supposed to go, but we stopped.  We
17   was going there on the way.  We was going to the
18   store, but made a brief stop.
19      Q.  Okay.  So you -- y'all made a stop at the
20   Cadillac Street house --
21      A.  Yeah.
22      Q.  -- before you got to the convenience
23   store?
24      A.  Yeah.  We was on the way to the store.
25      Q.  Okay.  So when you saw the people, did you

Page 70

1    see your cousin Dayln there?
2       A.  No.
3       Q.  Okay.
4       A.  Not outside.
5       Q.  So was it -- I understood you said Deondre
6    Tate, he was driving you.
7       A.  Correct.
8       Q.  White Chrysler?
9       A.  Yeah.  300 Touring.
10      Q.  Was it just you and Mr. Tate in the
11   vehicle?
12      A.  Correct.
13      Q.  Okay.  Did one of you or both of you
14   decide, "Hey, let's stop at the house on Cadillac
15   Street"?
16      A.  To be honest with you, he stopped hisself.
17      Q.  Okay.  So did you ask him to stop?
18      A.  I mean, it -- it ain't bothered me that he
19   stopped.
20      Q.  Okay.  Did he tell you why y'all were
21   stopping?
22      A.  No, he didn't tell me why.
23      Q.  Okay.  And you went in the house, correct?
24      A.  Correct.
25      Q.  Okay.  Well, why did you go in the house?

Page 71

1       A.  You want me to tell you again?
2    MR. THOMPSON:
3       You have to answer the question, Jeremy.
4    THE WITNESS:
5       All right.  I had went there for my cousin
6    Dayln.
7    EXAMINATION BY MR. SCHILLAGE:
8       Q.  So --
9       A.  I didn't stop.  I got out because he
10   stopped.
11      Q.  Right.  You said earlier that from the
12   outside your cousin wasn't appearing in the yard or
13   the front area --
14      A.  They had --
15      Q.  -- right?
16      A.  -- multiple people outside.
17      Q.  Right.  But Cousin Dayln wasn't one of
18   them?
19      A.  Right.
20      Q.  All right.  You say you went in the house
21   to see your cousin Dayln?
22      A.  Right.
23      Q.  All right.  How did you know he was in the
24   house?
25      A.  As soon as I walked in, everybody was in

Page 72

1    the front, I greeted everyone, I was leaving.
2       Q.  Okay.
3       A.  He wasn't there.
4    MR. THOMPSON:
5       Jeremy, what he asked is how did you know
6    Dayln was inside the house before you walked
7    in.
8    THE WITNESS:
9       I didn't know.
10   EXAMINATION BY MR. SCHILLAGE:
11      Q.  Okay.  Why did you have a belief that he
12   might be there?
13      A.  Because it's his house.
14      Q.  Okay.  He lives there?
15      A.  Yes.
16      Q.  Okay.  Does your cousin Dayln -- I
17   understand -- If he's 20 years old today, this is
18   two and a half years ago, so he's 18, ballpark,
19   around that time?  Seventeen --
20      A.  Yeah.
21      Q.  -- eighteen?
22      A.  Yeah.
23      Q.  Okay.  Is it his parents' house?
24      A.  His mother died.  His father's dead.  They
25   left him this house.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 73

1    Q.  Okay.  So your cousin Dayln, both of his
2  parents are deceased?
3    A.  Correct.
4    Q.  Did anyone live at the house with him?
5    A.  Not that I know of.
6    Q.  Okay.  So he lived there alone?
7    A.  Not that I know of.
8    Q.  Well -- Okay.  Help me out, though.  Who
9  did he live there with, if anybody?
10    A.  His sister.
11    Q.  Okay.  Who's his sister?
12    A.  Delaysia Banks.
13    Q.  Can you spell it for Madam Court Reporter?
14  First name.
15    A.  D-E-L-A-Y-S-I-A B-A-N-K-S.
16    Q.  Appreciate that.
17      All right.  How old -- Is she older or
18  younger than Dayln?
19    A.  Younger.
20    Q.  Okay.  How old was she in 2023?
21    A.  I would say seven -- 16, 17.
22    Q.  Okay.  Did any adults live in the house
23  with them?
24    A.  Not that I know of.
25    Q.  Okay.  I think you made a reference to

Page 74

1  this, so if it's the same question, I'm sorry, but
2  how long were you in the house until you came into
3  contact with some of the police officers?
4    A.  Less than two minutes.
5    Q.  Okay.  Did you find your cousin Dayln in
6  the house before that?
7    A.  I didn't go no further than the living
8  room.
9    Q.  Okay.  And in that two minutes, all you
10  had time to do was greet people, whoever was in the
11  front of the house?
12    A.  Yep.
13    Q.  Did you have an expectation that you and
14  Deondre were going to stay at the house for a
15  little while?
16    A.  No, sir.
17    Q.  Okay.  It was just a quick pop-in?
18    A.  Yes, sir.
19    Q.  Okay.
20    A.  Not that I know of, because I don't know
21  why he stopped.  So I don't know how long we was
22  going to be there, but I know the car was still
23  running.  So I don't possibly believe that long.
24    Q.  Okay.  Have you been to 5450 Cadillac
25  Street since you were arrested on January 9?

Page 75

1    A.  No.
2    Q.  Okay.  When did you go to that house
3  before January 9?
4    A.  I don't recall.
5    Q.  Okay.  How long before the January 9,
6  2023, did Dayln's parents pass away?
7    A.  I don't recall.
8    Q.  Was it a very long time ago before or just
9  a couple of weeks before?
10    A.  A very long time before.
11    Q.  Okay.  Had you ever seen an adult in the
12  house at 5450 Cadillac Street when you were there?
13    A.  Yes.  I've seen his aunty there.
14    Q.  Okay.  Who's -- Who's the aunty?
15    A.  Oh, I don't know her name.  It was, like,
16  some years ago.  I answered your question.  You
17  asked have I seen an adult in the house.  It was
18  the aunty.
19    Q.  Okay.  She's not related to you, though?
20    A.  No.
21    Q.  All right.  So what I'm going to do right
22  now, I'm going to show you, Mr. Lee, the -- what
23  we're -- what all counsel, we've agreed, is Exhibit
24  1.  I'm sorry.  Video Number 1.  Which will be
25  Exhibit 3 for the deposition.

Page 76

1    MR. THOMPSON:
2      Video Number 1, Exhibit 3.  Got you.
3  EXAMINATION BY MR. SCHILLAGE:
4    Q.  And it's got the Serial Number
5  1552_X60A42202.
6    A.  You want to get it a little closer?
7    Q.  So, Mr. Lee, what I'm going to do, I'm
8  going to move --
9    MR. THOMPSON:
10      Yeah.
11  EXAMINATION BY MR. SCHILLAGE:
12    Q.  -- my laptop close to you.
13      And, look, if you want, you can -- Well, I
14  should stay right there.
15    MR. THOMPSON:
16      Yeah.
17  EXAMINATION BY MR. SCHILLAGE:
18    Q.  I'm going to move this close to you before
19  we get it started --
20    MR. THOMPSON:
21      Can you see?
22  EXAMINATION BY MR. SCHILLAGE:
23    Q.  -- and make sure that you can see it.
24    MR. THOMPSON:
25      It might be short, bro.  He might not be

Page 77

1     able to see it.
2     MR. SCHILLAGE:
3         You can raise that chair up.
4     THE WITNESS:
5         Yeah, I still can't see over it.
6     MR. THOMPSON:
7         Does it go a bit higher?
8     THE WITNESS:
9         No. That's the highest this one go.
10    MR. THOMPSON:
11        Look --
12    THE WITNESS:
13        Dude --
14    MR. THOMPSON:
15        -- I'm going to get out your ear.
16    THE WITNESS:
17        -- you can come on the side of me.
18    MR. THOMPSON:
19        I'm going to move.
20    THE WITNESS:
21        I ain't going to bite your head.
22    MR. THOMPSON:
23        And you put this here. He said he --
24    THE WITNESS:
25        You can come on the side of me. I ain't

Page 78

1     going to do you nothing.
2     EXAMINATION BY MR. SCHILLAGE:
3         Q. All right. So I'm going to start Exhibit
4     3, Video 1, at one minute and 10 seconds on the
5     video clip. Mr. Lee, I'm going to play this, and
6     whenever I get to a stopping point, I'm going to
7     pause it and we'll go back to doing question and
8     answer; okay?
9         A. I got you.
10        (VIDEO RECORDING BEING PLAYED.)
11    EXAMINATION BY MR. SCHILLAGE:
12        Q. All right. So I stopped the video at two
13    minutes and four seconds on the video clip. All
14    right, Mr. Lee, you were able to see and hear the
15    video as it played?
16        A. Correct.
17        Q. All right. So is this the first
18    interaction you had that day, January 9, 2023, with
19    a BRPD officer at the 5450 Cadillac Street address?
20        A. Yes.
21        Q. Okay. And you remember this interaction?
22        A. Correct.
23        Q. All right. Explain to us, as you walked
24    out the house, why did you walk out the house?
25        A. Dude, I just got here. I don't know

Page 79

1     what's going on.
2         Q. Okay. So fair. Did you -- Were you going
3     outside because you heard something outside or were
4     you going outside to leave the house?
5         A. I was going outside to leave the house,
6     because somebody said, "Police outside." I was
7     going outside. I had gotten nothing to do what's
8     going on here.
9         Q. Okay. Do you remember who said that?
10        A. Don't --
11        Q. About the police being there.
12        A. Don't recall.
13        Q. Okay. Was it someone in the house or
14    outside of the house?
15        A. Don't recall.
16        Q. Okay. Where was Deondre Tate, if you
17    know, when you were walking out of the house?
18        A. I don't recall. I was still in the living
19    room.
20        Q. Okay.
21        A. By the front door. It's a living
22    room/kitchen.
23        Q. Okay. So when you heard a message
24    announced that the police are here, you just said,
25    "I'm going to walk out the front door"?

Page 80

1         A. After someone slammed the door in front of
2     the police face, I still walked out the door.
3         Q. Okay. Well, tell me about that. What
4     happened in that event, where someone slammed the
5     door in the police officer's face?
6         A. Play the video back.
7         Q. Did you see it between --
8         A. Play the video back.
9         Q. Mr. Lee, you've got to let me finish my
10    question.
11        A. But you asking me broad questions, though.
12        Q. Well, I just want to ask one question.
13        A. Okay.
14        Q. Did you see the event you're talking
15    about, where a door was slammed in an officer's
16    face, on the clip that I showed you from --
17        A. Play the video back.
18    MR. THOMPSON:
19        You've got to let him ask his question.
20    THE WITNESS:
21        Okay, but God damn, huh.
22    EXAMINATION BY MR. SCHILLAGE:
23        Q. Between one minute and 10 seconds and two
24    minutes and four seconds. Did you see it in that
25    clip?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 81

1    A. I don't recall. Can you play the video
2  back?
3    Q. Okay. So I'm going to start it at one
4  minute and no seconds this time.
5    A. Okay.
6    Q. And at this point, the body camera footage
7  shows the officer in the front seat of the vehicle
8  exiting the vehicle coming out to the house.
9    A. Got you.
10   (VIDEO RECORDING BEING PLAYED.)
11  EXAMINATION BY MR. SCHILLAGE:
12   Q. Okay. So at one minute 16 seconds there
13  was a door slam on the video, right? Right, Mr.
14  Lee?
15   A. You're going to play the video back one
16  time for me? You could play it again, over again?
17   Q. Sure. Do you need to see it again to
18  answer the question?
19   A. No. You keep switching your timeframes up
20  try -- confusing me.
21   Q. Well, you actually just physically stopped
22  the video. Why did you stop the video?
23   A. Because you seen it the first time.
24   Q. Okay. So that was the door slam you were
25  talking about?

Page 82

1    A. Yes.
2    Q. Okay. And you stopped it at one minute --
3    A. Because you didn't --
4    A. -- and six --
5    A. -- catch it the first time, so I caught it
6  for you.
7    Q. I appreciate that. So a minute sixteen,
8  when you stopped it, you saw the door slam, you're
9  talking about where someone in the house slammed
10  the door in front of an officer?
11   A. Correct.
12   Q. Okay. Who was the officer --
13   A. Seyveon Moore said, "Police." That's who
14  opened the door and closed the door. Seyveon
15  Moore.
16   Q. Okay. Do you know where the officer was?
17   A. I ain't care where he was.
18   Q. Okay. Is he in the video that you've seen
19  that -- who had the door slammed in his face?
20   A. Yes.
21   Q. Who --
22   A. I was walking out the door and I seen
23  Detective Wallace.
24   Q. Okay. And I'll represent to you, this is
25  Matthew Wallace's body camera footage.

Page 83

1    A. Uh-huh.
2    Q. And so when you stopped the video here at
3  one sixteen, you would agree with me that he is
4  standing outside of the covered carport area of the
5  house, right?
6    A. When Seyveon Moore opened the door the
7  first time, I seen Detective Wallace. As I was
8  coming out the door, he was going out with me.
9    Q. Okay.
10   A. He slammed the door. I proceeded to walk
11  out the door, confirming it was Detective Wallace.
12   Q. Okay. So that's the officer --
13   A. The guy right there.
14   Q. That's the officer --
15   A. The guy right there.
16   Q. Mr. Lee --
17   A. I can't see him on video.
18   Q. Mr. Lee --
19  MR. THOMPSON:
20     You've got to let him ask the question.
21  EXAMINATION BY MR. SCHILLAGE:
22   Q. -- you've got to let me finish.
23     Detective Matthew Wallace is the officer
24  you believe Seyveon Moore slammed the door in the
25  face of at the time right before you decided to

Page 84

1  leave the house?
2    A. I know.
3    Q. Okay. And this video footage is what you
4  can also rely on? Besides your personal
5  recollection, you can refer to this video and the
6  timestamp we've looked at --
7    A. Yes.
8    Q. -- right?
9    A. I know by voice that's Detective Wallace.
10   Q. Okay. All right. So when you said you
11  know your rights when you began talking with
12  Detective Wallace, describe to me what it was your
13  understanding of your rights at that time.
14   A. He didn't answer the question was I being
15  detained or not.
16   Q. Okay. And that's in relation to him
17  instructing you to stand with the other group of
18  individuals?
19   A. He said, "Go over there." I re --
20  answered, "Where? Where do I supposed to stand
21  at?"
22   Q. Okay. And so what were the rights that
23  you believe you needed at that point?
24   A. He didn't Miranda me, didn't detain me.
25  He just threw me in the back of a police car.

Electronically signed by Toni Conner (501-190-381-9495)                                    2f67950e-8c04-4061-959b-7823204c7c89

Page 85

1    Q.  Okay.  I'm just going to press Play from
2  one sixteen, where we left off.
3    A.  All right.
4    (VIDEO RECORDING BEING PLAYED.)
5  EXAMINATION BY MR. SCHILLAGE:
6    Q.  Okay.  So you're walking over there right
7  now.  You understood where -- where to go?
8    A.  No.  Until he put hands on me to give me
9  directions on where to go.
10    Q.  Okay.  And so I stopped it at one minute
11  26 seconds.  Do you see that police officer that's
12  over your left shoulder?
13    A.  Correct.
14    Q.  That's not Detective Wallace obviously,
15  right?  That's --
16    A.  Yeah.
17    Q.  -- a different police officer?
18    A.  Right.
19    Q.  And there was a group of people who were
20  in plain clothes with that officer, correct?
21    A.  Yeah.  Yeah.
22    Q.  And that's the direction you're walking at
23  this point in the video, right?
24    A.  No.
25    Q.  No?  All right.  Let me press Play.

Page 86

1    (VIDEO RECORDING BEING PLAYED.)
2  THE WITNESS:
3    Pushes me over there.
4  EXAMINATION BY MR. SCHILLAGE:
5    Q.  Okay.  I saw that.  There's a hand on your
6  back.
7    A.  Yeah.
8    Q.  And you are now standing with at least
9  three civilians.
10    A.  Girls.
11    Q.  Gray sweatshirt, back shirt, and another
12  black shirt and jeans on the side.  Do you see
13  that?
14    A.  Correct.
15    Q.  Okay.  And y'all are all around a blue
16  Hyundai Accord.  I'm sorry.  Hyundai Accent.
17  Right?
18    A.  I don't --
19    Q.  That vehicle.
20    A.  Okay.  Correct.
21    Q.  Do you know whose car that is?
22    A.  I don't recall.
23    Q.  Had you ever seen it at the 5450 Cadillac
24  Street before that day?
25    A.  Don't recall.

Page 87

1    Q.  Okay.  All right.  Let's go to the next
2  part of the video.
3  THE WITNESS:
4    Do you mind if I take a break right quick?
5  MR. SCHILLAGE:
6    I'm sorry?
7  THE WITNESS:
8    I can take a break?
9  MR. SCHILLAGE:
10    Well, I tell you what.  It's 12:07 right
11  now.  Why don't we do a 30-minute lunch break
12  now, and that will give everybody a chance to
13  eat.
14  THE WITNESS:
15    We could do that.
16  VIDEOGRAPHER:
17    Okay.  Off the record.  The time is now
18  12:07.
19    (OFF THE RECORD.)
20  VIDEOGRAPHER:
21    Back on the record.  The time is now
22  12:43.
23  EXAMINATION BY MR. SCHILLAGE:
24    Q.  All right, Mr. Lee, we were able to have a
25  lunch break and we're getting back on.

Page 88

1    We left off on what we're calling Exhibit
2  3, Video 1, which is the Matthew Wallace body cam
3  footage from you coming out of the house.  And we
4  were answering ques -- or you were answering
5  questions for me about this interaction.  We had
6  gotten up to the blue Hyundai Accent.  And I think
7  the last little series of questions you explained
8  you didn't know who owned the car.
9    A.  Right.
10    Q.  Had you ever seen it before at the 5450
11  Cadillac Street when you went there?
12    A.  No.
13    Q.  Okay.  And the three individuals -- Aside
14  from yourself, there's three other people here that
15  you were able to help me identify.  These are some
16  of the females that you had called earlier
17  associates when I asked you about names of people,
18  right?
19    A.  Correct.
20    Q.  Okay.  All right.  So we're at time mark
21  one minute 29 seconds of Video 1.  I'm just going
22  to press Play, since we took that break, and let it
23  go through the point where you go back into the
24  police car for the first time.
25    A.  All right.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 89

1    Q. Looks like an IT thing. Give me one
2  second, Mr. Lee. I'm going to help us move this
3  forward.
4        All right, we're back. All right. So I'm
5  starting it at one minute and 21 seconds.
6      MR. KERSHAW:
7        This is still Video 1?
8      MR. SCHILLAGE:
9        Video 1.
10       (VIDEO RECORDING BEING PLAYED.)
11  EXAMINATION BY MR. SCHILLAGE:
12     Q. All right. I just stopped at one minute
13  36. Mr. Lee, when Officer Wallace was telling you
14  to loosen up the hands, what did you understand he
15  needed you to do with your hands?
16     A. I mean, like, he's insisting on me to do
17  that, but he's also pushing me on other people. I
18  was helping him.
19     Q. Okay. Do you recall moving your hands in
20  such a way that he couldn't put them together?
21     A. To help him.
22     Q. Okay. So you were -- you were trying to
23  move your hands away to help?
24     A. Before you --
25      MR. THOMPSON:

Page 90

1        I'm going to object. That's a misclari --
2  it was a mischaracterization --
3      MR. SCHILLAGE:
4        No.
5      MR. THOMPSON:
6        -- of what he says.
7      MR. SCHILLAGE:
8        I'm just asking --
9      THE WITNESS:
10        Before you --
11  EXAMINATION BY MR. SCHILLAGE:
12     Q. Please help.
13     A. Before you play the video --
14     Q. Sure.
15     A. -- you notice my arm is going across her,
16  her body? How can you put me in handcuffs while
17  I'm on top of somebody? You can carry on, though.
18     Q. So at one minute 36 seconds -- You're
19  wearing a wife-beater, right?
20     A. Correct.
21     Q. Okay. So your shoulder blades are on the
22  left side of the screen here? And that's your head
23  at the top left side of the screen?
24     A. Correct.
25     Q. This is -- This is you, right? And this

Page 91

1  is your right elbow?
2     A. Correct.
3     Q. Coming across the body camera --
4     A. Of her face.
5     Q. -- of visual to the right side?
6     A. Of her face.
7     Q. And you are indicating the female with the
8  earring and the black shirt?
9     A. Correct.
10     Q. Okay. All right. So I'm going to play it
11  at one minute 36 seconds.
12       (VIDEO RECORDING BEING PLAYED.)
13  EXAMINATION BY MR. SCHILLAGE:
14     Q. I just stopped it at a minute 56. What
15  was it that you said, Mr. Lee, to Officer Wallace?
16     A. I noticed -- When he turned me around,
17  he's trying to get a look at my face, like -- Like,
18  you turned me around again, like you -- I know I
19  got -- told -- I just -- I don't be over here, so
20  you have the wrong person, I'm assuming.
21     Q. Okay. At this time -- And, also, we've
22  got the military time 15:53:49. That's on the body
23  camera timestamp for the time of day whenever this
24  camera was capturing footage. You familiar 1500 is
25  three hours after 12? Or let -- Do you know

Page 92

1  military time?
2     A. No. I just -- Can you -- Can you just
3  stick to regular time? I don't have no clue of
4  military time. I don't want to get confused.
5     Q. Okay. So, like, 3:53 PM. Does that sound
6  probably correct as far as time of day on this?
7     A. I don't recall. Can you tell me 3:58 PM
8  in military time?
9     Q. Well, 3:53 PM.
10     A. Yeah. You could tell me that in military
11  time?
12     Q. 1553 military.
13     A. Okay.
14     Q. So that would be the same -- same point in
15  time. So just before 4:00 in the afternoon. Does
16  that sound about right for this period of time when
17  you were put in handcuffs by Officer Wallace?
18     A. At 1553?
19     Q. Right. Close to 4:00 PM.
20     A. That's the time of it?
21     Q. That is --
22     A. Correct.
23     Q. -- what that time shows.
24        Is that what you recall, more or less, or
25  do you believe no, it was 8:00 in the morning or

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 93

1  something like that, totally different?
2      A.  No.  It was in the evening, for sure.
3      Q.  Okay.  Had you ever known police to go to
4  5450 Cadillac Street before?
5      A.  No, sir.
6      Q.  Is this the first time you had ever seen
7  police at this address?
8      A.  Yes, sir.
9      Q.  Okay.  And is -- is this the first time
10  that you were physically present at the house when
11  police came?
12      A.  You can rephrase that question?
13      Q.  Sure.  Have you ever been at this house,
14  5450 Cadillac Street, the same time as police
15  officers before the day you were arrested?
16      A.  No, sir.
17      Q.  Okay.
18      (VIDEO RECORDING BEING PLAYED.)
19  EXAMINATION BY MR. SCHILLAGE:
20      Q.  All right.  So I just stopped it at two
21  minutes and three seconds on the video, which is
22  still 3:53:56 PM.
23          All right.  So you're in a police -- the
24  back seat of a police vehicle at this time, right?
25  You've been placed in the back of the car --

Page 94

1      A.  Okay.
2      Q.  -- and the door was shut, right?
3      A.  Slammed.
4      Q.  Sure.  The door was closed.  And you said
5  it was slammed.  Fair enough.
6      A.  Correct.
7      Q.  So you're sitting in the back of the
8  vehicle at this point.  Were you aware of where
9  Deondre Tate was going the same time that you were
10  having this interaction with Detective Wallace?
11      A.  I don't know.
12      Q.  What about Seyveon Moore?
13      A.  I don't know.
14      Q.  Okay.  Did you know where any of the other
15  people from the house were going?
16      A.  I don't know.
17      Q.  Okay.  Had you ever seen drugs in the
18  Cadillac Street -- 5450 Cadillac Street house
19  before?
20      A.  No, sir.
21      Q.  Okay.  Had you ever heard or been made
22  aware that drugs or weapons could be in the house?
23      A.  No, sir.
24      Q.  Okay.  When you and Deondre Tate were
25  riding -- he was driving, you were riding in the

Page 95

1  white Chrysler, and y'all made the pop-in at 5450
2  Cadillac on January 9, 2023, did Mr. Tate tell you
3  you needed to go make a pop-in for drugs or weapons
4  or anything of that nature?
5      A.  No.  I didn't know what we was stopping
6  for.  I just hopped out to see if my cousin Dayln
7  was there.
8      Q.  Okay.  And have you ever known your cousin
9  Dayln to allow drugs and weapons to come into his
10  house?
11      A.  Not of my knowledge.
12      Q.  Okay.  He never talked to you about that
13  kind of thing?
14      A.  No, sir.
15      Q.  Okay.  I'm going to fastforward the video
16  to five minutes and 31 seconds on the video time,
17  which the body cam realtime, for point of
18  reference, is 15:57:24.
19      A.  Uh-huh.
20      (VIDEO RECORDING BEING PLAYED.)
21  EXAMINATION BY MR. SCHILLAGE:
22      Q.  Okay.  I stopped it at five minutes 53
23  seconds on the video clip.
24          Mr. Lee, did you identify another person
25  from the house being arrested in this little clip?

Page 96

1      A.  You want me to -- I didn't see anyone.
2      Q.  Okay.  I appreciate that.  I want you to
3  answer to what you can see and understand.
4          Let me see if this helps.  I'm going to
5  play it at three minutes and 50 seconds instead.
6      (VIDEO RECORDING BEING PLAYED.)
7  THE WITNESS:
8          From the voice, I know the --
9  MR. THOMPSON:
10          He's going to ask a question.
11  THE WITNESS:
12          All right.
13  EXAMINATION BY MR. SCHILLAGE:
14      Q.  All right.  So I stopped it at four
15  minutes and 32 seconds on the video clip.  Were you
16  able to see an arrest at that point?
17      A.  I still couldn't see a person.
18      Q.  You couldn't see a person?  Okay.
19      A.  No.
20      Q.  Could you hear and see from the actions in
21  the shadow what was happening?
22      A.  Yes.
23      Q.  Okay.  Now, at this time you were in the
24  back of a police car, right?
25      A.  I don't know.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 97

1    Q.  Well, if on the video clip you were put in
2  the back of a police car roughly two minutes before
3  this point, is that fair?
4    A.  Yeah, that's fair.
5    Q.  Okay.  Did you ever hear or learn about
6  how Seyveon Moore was brought to the Street Crimes
7  processing facility with you?
8    A.  No, sir.
9    Q.  Okay.  So if -- if this is the arrest, is
10  this the first time you're learning about how that
11  particular individual was arrested and brought to
12  the Street Crimes processing facility?
13    A.  Can I correct you?
14    Q.  Go ahead.
15    A.  That's not the person name you said.
16    Q.  Oh, I'm sorry.  Who is it?
17    A.  That's Deondrick Lucas.
18    Q.  Okay.  So -- So you can see from the video
19  who --
20    A.  I know by --
21    Q.  -- it is?
22    A.  -- his voice.
23    Q.  Oh, okay.  You could hear his voice?
24    A.  Yes.
25    Q.  Okay.  So Mr. Lucas, had you ever seen or

Page 98

1  been told about information of his arrest that day,
2  January 9, 2023, from the Cadillac Street address
3  before seeing this?
4    A.  I've seen that before.
5    Q.  Okay.  Did you see it in preparation for
6  the depo or you saw it a long time ago just because
7  you saw it?
8    A.  Preparation for the depo.
9    Q.  Okay.  So this video clip is another thing
10  that you had reviewed in preparation for today?
11    A.  No, not for depo, but I seen this video
12  before.
13    Q.  Okay.  When did you see it?
14    A.  I seen it numerous times.
15    Q.  When is the last time you saw it?
16    A.  Yesterday.
17    Q.  Okay.  So you watched this yesterday for
18  the purpose of refreshing your memory about the
19  contents of the video to be here today to answer
20  questions for us?
21    A.  Correct.
22    Q.  Okay.  Is this the only video clip or was
23  it more than one video clip?
24    A.  I've seen the body cam footage of 1,
25  Exhibit 1, 2, the -- I'm just going by the body

Page 99

1  cams.  I know it's -- y'all la -- how you labeled
2  them, it's so much a -- Can you correct me?
3    Q.  Why don't we just keep going through --
4    A.  All right.
5    Q.  -- and you tell me if you've looked at
6  it --
7    A.  All right.
8    Q.  -- in preparation for today --
9    A.  We can do that.
10    Q.  -- as we go through them.
11      All right.  So still a few minutes before
12  4:00 PM, you're in the back of Officer Wallace's
13  police car.  I'm going to fastforward this video
14  clip to 12 minutes and 52 seconds.
15      (VIDEO RECORDING BEING PLAYED.)
16  EXAMINATION BY MR. SCHILLAGE:
17    Q.  Okay.  I've just stopped it at 13 08 on
18  the video clip.
19      Do you know the two officers who were
20  talking with you at that back seat?
21    A.  Yes.
22    Q.  I mean -- I guess let me ask it just to
23  confirm.  You recognize who they are from the
24  video, right?
25    A.  For sure.

Page 100

1    Q.  Who are they?
2    A.  Troy Lawrence, Jr. and Detective Wallace.
3    Q.  Okay.  And they were talking to you about
4  the cell phone that you had in the back seat,
5  right?
6    A.  You done talking?
7    Q.  Well, I just asked you a question, sir.
8    A.  When you -- I -- and -- You -- Ask it
9  again.
10    Q.  They were just having a conversation with
11  you on this footage about you having a cell phone
12  in the back of the police car, correct?
13    A.  Correct.
14    Q.  Okay.  Whose cell phone was it?
15    A.  Mine's.
16    Q.  Okay.  And so that was the cell phone by
17  the phone number of (337)71 --
18    A.  71.
19    Q.  -- 6-2930?
20    A.  Correct.
21    Q.  Okay.  What did you do with your cell
22  phone while you were in the back of the car before
23  the officers came to the door?
24    A.  Recorded.
25    Q.  Okay.  What were you recording?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 101

1    A. Me. My -- I felt scared.
2    Q. Okay. So was this -- Obviously you can do
3  something what's called a live stream or you can
4  just record like a video on your phone. Did you do
5  both or just one or the other?
6    A. I was on Instagram live. So whenever it
7  got ended, it -- Whenever it ended, it was saved.
8    Q. Okay. And you kept a copy of it?
9    A. Yeah, I have it.
10   Q. You still have it?
11   A. Yes, I have it.
12   Q. Okay. I don't believe that's been
13  produced, and I know there's been a lot of
14  production and there's some pending right now that
15  has been asked of you from June 19th.
16   MR. SCHILLAGE:
17      So, Ryan, if we could get a copy of that,
18    I'd appreciate it.
19   MR. THOMPSON:
20      I'm going to shoot a quick email. That
21    way we'll all get it as, like, a documentation.
22    That way it goes to who it needs to go to.
23   MR. SCHILLAGE:
24      I really appreciate that.
25   EXAMINATION BY MR. SCHILLAGE:

Page 102

1    Q. Okay. So this is an Instagram live saved
2  footage that, Mr. Lee, you took in the back of the
3  police car on January 9, 2023 --
4    A. Correct.
5    Q. -- on Cadillac Street?
6    A. Correct.
7    Q. Okay. How many Instagram live videos did
8  you take?
9    A. It was only one video. My phone got
10  snatched away from me.
11   Q. Okay. And that's effectively where I
12  stopped the video. So why don't we pick up where
13  I -- we left off. Thirteen minutes and eight
14  seconds on the video clip.
15    (VIDEO RECORDING BEING PLAYED.)
16  EXAMINATION BY MR. SCHILLAGE:
17   Q. Let me stop it at 12 08. I only let it
18  play for about four seconds. But you made a
19  comment, "You should have checked me, then." What
20  are you talking about?
21   A. You ain't even tell me my rights. You
22  ain't even -- I'm not a police officer. And by me
23  best off being arrested before I've get patted
24  down, searched before I even get put in a police
25  car.

Page 103

1    Q. Well, let me ask this, though. As far as
2  being patted down or searched, you hadn't been yet,
3  had you?
4    A. No.
5    Q. Okay. And when you say, "You need to
6  check me, then," that's your comment to them
7  saying, "If you didn't want me to have my phone,
8  you should have searched me to get the phone"? Is
9  that fair?
10   A. No, that's not fair.
11   Q. Okay. Explain that for me.
12   A. Because as a civilian, a phone is not
13  illegal. I don't even know if I'm under arrest or
14  detained. So it wasn't no reason for him to take
15  my phone, that I seen.
16   Q. Okay. So when the officers come in the
17  house --
18      Let me ask you this. Before or during
19  while you walked out, did you see anybody run from
20  the house?
21   A. Not that I recall. I came out the front.
22  I was interacting with Matthew Wallace.
23   Q. At the front of the driveway, right?
24   A. Yes. So I don't know what encountered
25  after.

Page 104

1    Q. Okay. And we saw Mr. Lucas in the
2  driveway of the house behind --
3    A. Yeah, you told me.
4    Q. -- the Cadillac Street? Right.
5      You -- We saw that today, just a few
6  moments ago, right?
7    A. I saw that before today, but --
8    Q. I appre -- Thank you.
9    A. Yeah.
10   Q. You're right, you saw that before today,
11  too.
12      So you had been made aware from that date
13  up to present date that other people left the
14  house, tried to get away or run --
15   A. Three --
16   Q. -- right?
17   A. -- years ago.
18   Q. Three years ago?
19   A. Yeah. It's in Exhibit 1.
20   Q. Okay. That's when you learned about it?
21   A. Yes.
22   Q. Sure.
23      All right. So with that activity going
24  on, you'd been placed in handcuffs before you were
25  put in the car, right?

26 (Pages 101 to 104)

Page 105

1    A.  Yes.
2    Q.  You did not believe you were detained at
3  that point?
4    MR. THOMPSON:
5       I'm going to object to that, that that
6    calls for a legal conclusion.
7    MR. SCHILLAGE:
8       Sure.
9    MR. THOMPSON:
10      But you can answer.
11   EXAMINATION BY MR. SCHILLAGE:
12   Q.  What did you believe?  Did you believe
13  that you were free to go?
14   A.  What you think?
15   Q.  No, sir.
16   A.  I -- I'm watching it like you.
17   Q.  You do have to answer my question.
18   A.  I am trying to.
19   Q.  Well, it's -- If you don't understand my
20  question, you let me know, but --
21   MR. THOMPSON:
22      Uh-huh.
23   EXAMINATION BY MR. SCHILLAGE:
24   Q.  -- I'm going to restate it and give --
25   A.  Okay.

Page 106

1    Q.  -- you another chance; okay?
2    A.  Okay.
3    Q.  When you had been placed in handcuffs --
4    A.  Correct.
5    Q.  -- and then placed in the back of the
6  police unit with the doors shut and the handcuffs
7  applied to you --
8    A.  Correct.
9    Q.  -- did you believe at that point that you
10 were detained by the police?
11   A.  No.
12   Q.  Okay.  What were you?
13   A.  I don't know.
14   Q.  Okay.  Did you believe you were under
15 arrest already?
16   A.  No.
17   Q.  Okay.  But you did not believe that you
18 were detained?
19   A.  No.
20   Q.  Have you frequently been placed in
21 handcuffs in the back of a police car before?
22   A.  Yes.
23   Q.  Okay.  Have you ever felt like you were
24 not detained or under arrest at that point?
25   A.  No.  I -- Immediately my rights got told

Page 107

1  to me, and this -- Yeah, my rights got told to me.
2    Q.  Okay.  So you're saying that's the
3  distinguishing point in this January 9, 2023, event
4  compared to your other history of police
5  interaction involving handcuffs?
6    A.  Correct.
7    Q.  Okay.  All right.  I'll continue the
8  video.  So we're starting at 13 12.
9       (VIDEO RECORDING BEING PLAYED.)
10   EXAMINATION BY MR. SCHILLAGE:
11   Q.  All right.  I went ahead and stopped it at
12  13 minutes 20 seconds.
13      Based on the language I just heard, fair
14  to say you're not being very nice, right?  Were you
15  upset at this time?
16   A.  Correct.
17   Q.  Okay.  One of the officers is instructing
18  you to stop, calm down?  And you did, right?
19   A.  (Indistinguishable.)
20   COURT REPORTER:
21      I'm sorry, I couldn't hear you.
22   THE WITNESS:
23      I was talking to myself.
24   EXAMINATION BY MR. SCHILLAGE:
25   Q.  Well, if it's an answer to the question, I

Page 108

1  need you to answer, please.
2    A.  No, I wasn't even say -- I didn't even say
3  anything vocally.
4    Q.  Okay.  So one of the officers was asking
5  you to stop in an effort to calm down, right?
6    A.  Correct.
7    Q.  And you did?
8    A.  Yes, I did.
9    Q.  All right.  Why were you so upset at the
10  beginning of coming out of the police car with all
11  the language and the raised voice?  You have to
12  answer my question, Mr. Lee.
13   A.  I had a question for you.  Ask me --
14   Q.  You actually can't --
15   A.  -- the question --
16   Q.  -- ask questions.  This is a deposition,
17  sir.
18   A.  Okay.
19   Q.  I know your lawyer's instructed you.
20   A.  Okay.  But you asking me too fast that I
21  can't respond.  You asking questions fast.  Can you
22  slow down for me?
23   Q.  No problem.
24   A.  Okay.  Now, can you rephrase the question
25  for me?

Page 109

1    Q.  Sure.  When you got out of the police car,
2  why were you so loud, using vulgar language, and
3  angry?
4    A.  Because I feel kidnapped.  Have you ever
5  been kidnapped before?
6    Q.  You can't ask questions, sir.  You have to
7  answer the question.
8    A.  I did answer.  I said I felt like I was
9  kidnapped.
10    Q.  Okay.  Is there anything else you'd like
11  to add to your answer?
12    A.  No, sir.
13    Q.  Okay.  So at that point you believed you
14  were kidnapped, and that's what caused you to be
15  angry.  Now, why did you calm down after that?
16    A.  Why did I -- I -- I'm not calm yet.
17    Q.  Let's keep watching.  From 13 minutes 20
18  seconds.
19    (VIDEO RECORDING BEING PLAYED.)
20  EXAMINATION BY MR. SCHILLAGE:
21    Q.  All right.  I just stopped it at 14 33 on
22  the video, which in realtime of the body camera was
23  16:06:27 military time.  So 4:06 PM.  All right,
24  Mr. Lee, at this point in your interaction with
25  police you've been taken out of the car, the phone

Page 110

1  was retrieved from you, and you sat on --
2    A.  The phone was tooken away from me first.
3    MR. THOMPSON:
4    Mr. Lee, you have to let him finish asking
5  his question and then you respond.
6  THE WITNESS:
7    Okay.
8  EXAMINATION BY MR. SCHILLAGE:
9    Q.  After the phone was taken, you sat on the
10  ground and they rolled you and they began a search
11  of your waist down in the pockets, right?
12    MR. THOMPSON:
13    I'm going to object.  That is a legal --
14  legal definition or calls for a legal
15  conclusion of search.  But you can answer the
16  question.
17  EXAMINATION BY MR. SCHILLAGE:
18    Q.  Sure.  You can answer.
19    A.  See, you -- I didn't know if you was
20  finishing talking.  You can -- Say what you said
21  again.
22    Q.  No.  I was done.  Your lawyer made an
23  objection and I said you can answer.  So go ahead,
24  if you're ready.
25    A.  I forgot the question that fast.

Page 111

1    Q.  Okay.
2    MR. THOMPSON:
3    Same objection, but go ahead.
4    MR. SCHILLAGE:
5    Sure.  Standing objection noted.
6    MR. THOMPSON:
7    Uh-huh.
8  EXAMINATION BY MR. SCHILLAGE:
9    Q.  So when you're taken out of the car and
10  the phone is taken and you're on the ground and
11  you're rolled over, and the police begin to search
12  your pockets and your pants, right?
13    A.  Correct.
14    Q.  All right.  And during that time, are you
15  of the opinion that you were compliant, orderly,
16  and obeying what the police were asking you to do?
17    A.  Yes.
18    Q.  Okay.  Do you believe that your behavior
19  during this time was reasonable for this
20  circumstance?
21    A.  I mean, I can't hurt nobody with my lips.
22  I was shackled from hands to feet.
23    Q.  Okay.  So do you believe the way you
24  handled the situation was reasonable?
25    MR. (INDISTINGUISHABLE):

Page 112

1    Calls for a legal conclusion in terms of
2  "reasonable."
3    COURT REPORTER:
4    Wait.  I'm sorry, who --
5    MR. (INDISTINGUISHABLE):
6    (Indistinguishable.)
7    COURT REPORTER:
8    Wait.  Wait.  Who's talking?
9    MR. DIGGS:
10    I'm sorry.  This is Rodney Diggs.
11    Just "reasonable" calls for a legal
12  conclusion and is vague and ambiguous as to
13  reasonable.
14    MR. SCHILLAGE:
15    And just so I understand -- That's fine.
16  He can still answer.  But we've got two
17  lawyers, one in person and one on Zoom.  The
18  rules really just allow for one person, unless
19  one needs to leave the room.  So I just need to
20  know what I'm talking about.  But that's fine.
21  Rodney, your objection's noted.
22  EXAMINATION BY MR. SCHILLAGE:
23    Q.  Mr. Lee, do you -- I'll ask it again at
24  this point.  I'm sure you need me to re-say it.
25    A.  Yeah.

Electronically signed by Toni Conner (501-190-381-9495)                                    2f67950e-8c04-4061-959b-7823204c7c89

Page 113

1    Q.  Do you believe under the circumstances of
2  the way you were acting, that you were acting
3  reasonably under the circumstances?
4    A.  Yes.
5    Q.  Okay.  Now, you had talked a lot during
6  these clips, both when you were standing up with
7  the people at the front of the driveway and then
8  after you were taken out of the car.  You were
9  talking to the officers and you were explaining to
10  them that they were hurting your arm --
11    A.  Yes, sir.
12    Q.  -- right?
13    And just parts of your body?
14    A.  Yes, sir.
15    Q.  Okay.  And you were making that known,
16  right?
17    A.  Yes.
18    Q.  And that was your goal?  You wanted to
19  tell them what you were feeling, right?
20    A.  Yes.
21    Q.  Okay.  And that included pain?
22    A.  Yes.
23    Q.  Okay.  And that is in part -- If I
24  understood your answers earlier, the pain is a part
25  of why you were angry as well; is that fair?

Page 114

1    MR. THOMPSON:
2    I'm going to --
3    THE WITNESS:
4    No.
5    MR. THOMPSON:
6    -- object to that.  He didn't say he was
7    angry earlier.
8    MR. SCHILLAGE:
9    Okay.
10    MR. THOMPSON:
11    I don't recall that.  I don't recall him
12    saying that.
13    MR. SCHILLAGE:
14    Well --
15    MR. THOMPSON:
16    I think he said --
17  EXAMINATION BY MR. SCHILLAGE:
18    Q.  And maybe I'm making an inference with
19  anger.  But you were yelling and using profanity,
20  right?
21    A.  Everyone does.
22    Q.  Okay.  And that arose out of some physical
23  pain that you believe you were feeling from the
24  officers; was it or was it not?
25    A.  Yes.

Page 115

1    Q.  Okay.  And so you verbalized the issue you
2  had with the officers, throughout this process,
3  right?
4    A.  Correct.
5    MR. SCHILLAGE:
6    Okay.  All right.  I'm going to close out
7    Video 1, Exhibit 3.  And I'm going to open up
8    Video 2, which we will mark as Exhibit 4 for
9    the deposition.
10    MR. THOMPSON:
11    Video 2, Exhibit 4, right?
12    MR. SCHILLAGE:
13    Video 2.  So this is -- Serial number on
14    the video is 1553_X60A4179A.  And just for
15    everyone's edification, this is the body camera
16    footage of Troy Lawrence, Jr. still at Cadillac
17    Street, and it bears the realtime military time
18    on the footage January 9, 2023, at 15:53:09.
19    MR. THOMPSON:
20    Where are you at, Mike?  I'm sorry?
21    MR. SCHILLAGE:
22    So I haven't said yet, but I'm going to go
23    to --
24    THE WITNESS:
25    Am I watching the video?

Page 116

1    MR. SCHILLAGE:
2    -- 11 minutes and 18 seconds.
3    (VIDEO RECORDING BEING PLAYED.)
4    THE WITNESS:
5    No audio?
6    MR. THOMPSON:
7    It will come up, brother.  Just be
8    patient.
9  EXAMINATION BY MR. SCHILLAGE:
10    Q.  All right.  I stopped the video, Video
11  Number 2, at 12 minutes 27 seconds.
12    And, Mr. Lee, do you understand --
13    A.  Mr. Lee?
14    Q.  I'm sorry?
15    A.  It sounded like you said Ms. Lee.
16    Q.  No, sir, I didn't.
17    A.  Okay.
18    Q.  If you misheard, I apologize, but --
19    A.  I'm sorry about that.
20    Q.  Mr. Lee, the body cam footage here we've
21  told you is from Troy Lawrence, Jr.
22    A.  Correct.
23    Q.  By watching this clip, is this another one
24  of the videos that you watched for preparation for
25  the deposition?

29 (Pages 113 to 116)

Page 117

1     A.  I didn't watch this one for preparation,
2  but I've seen it before.
3     Q.  Okay.  And you understand that this is the
4  body camera footage of Officer Troy Lawrence, Jr.?
5     A.  Correct.
6     Q.  Okay.  And you can hear -- Obviously we
7  just watched this from a different vantage point in
8  the prior video, right?
9     A.  Okay.
10    Q.  This is the same part of the interaction
11  you had at this --
12    A.  It's a different body cam, though.
13    Q.  Thank you.  That's perfect.  That's right.
14  Just after 4:00.
15    A.  Yes.
16    Q.  From Officer Lawrence's perspective.
17       And on this video we hear more of the
18  descriptions where you explain, "You're hurting my
19  hand."
20    A.  Uh-huh.
21    Q.  "My hand is hurt," and the arm and things
22  of that nature.  Right?
23    A.  (Nodding head.)
24    Q.  You've got to answer out loud.
25    A.  Yes.

Page 118

1     Q.  And on this video you can hear more
2  clearly commentary from you to Officer Lawrence,
3  Jr., and you two have a conversation about "our own
4  people," and he said, "I'm not with you," and you
5  said, "Well, I'm black."  Right?  Talking to Troy
6  Sr. -- Jr.?
7     A.  Junior, yes.  Correct.
8     Q.  Okay.  So did you feel more comfortable
9  with Troy Lawrence, Jr. than Officer Wallace
10  because Officer Lawrence, Jr. is black and Officer
11  Wallace is white?
12    A.  Correct.  I can -- I'm going to add this
13  one, because it will be sent to you later.  On my
14  Instagram live video you hear him.  He says, "Hey,
15  you, you mind apprehending" me, "because I don't
16  like how he treating me."  And he takes me out the
17  car and slam me.
18    Q.  Who did that?
19    A.  Troy Lawrence, Jr.
20    Q.  Be -- So, I appreciate that, and I want to
21  help understand it.  But on this video clip, had
22  that already happened or it hadn't happened yet?
23    A.  Well, most likely -- I put myself on the
24  floor.  It wasn't no slam.  I put myself on the
25  floor.

Page 119

1     Q.  Right.  I know.  You were talking about a
2  car --
3     A.  Yeah.
4     Q.  -- earlier.
5       But I want to ask about this video clip.
6     A.  Uh-huh.
7     Q.  And it's pretty clear.  You say it.  You
8  said, "I'm going to sit down if you're going to do
9  all that."
10    A.  Thank you.
11    Q.  So you go to the ground?
12    A.  Thank you.
13    Q.  And from there you and Officer Lawrence,
14  Jr. continue your conversation, right?
15    A.  Okay.
16    Q.  Well, I mean, right?  Y'all are talking?
17    A.  Yeah.
18    Q.  Okay.  At this point, on the video, did
19  you have a feeling that you were more comfortable
20  with Officer Lawrence rather than Officer Wallace?
21    A.  It was worse.
22    Q.  It was worse at that point?
23    A.  Yes.
24    Q.  Why?
25    A.  Because when Lawrence came, it was more

Page 120

1  force, more pulling on my arm.  If you will -- can
2  go back to the video we watched before.  When he
3  put the handcuffs on my back, it was -- You see my
4  arms still behind my back in the police car, and
5  he's just grabbing me, treating me any kind of way.
6     Q.  For the sake of the record, she's going to
7  write "he."  Lawrence or Wallace?
8     A.  Lawrence.
9     Q.  Okay.  So you're saying you don't -- you
10  did not feel more comfortable with Officer Lawrence
11  at this point in the video?
12    A.  Yes.
13    Q.  For the reasons you just explained?
14    A.  Yes.
15    Q.  Okay.  I'm with you.  I understand.
16       Based on the commentary that you gave
17  Officer Lawrence because you and he are both black,
18  did you feel disappointed in him?
19    A.  Majorly.
20    Q.  Would you have felt less disappointed if
21  it had been Officer Wallace?
22    A.  I would have felt less disappointed if I
23  was just placed in a police car.
24    Q.  Okay.  All right.  Let's skip forward.  I
25  understand this is a long video.  Two minutes --

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 121

1    I'm sorry.  Two hours 36 minutes and 35 seconds.
2    So on Video 2, Exhibit 4, I'm going to start the
3    video at two hours 36 minutes and 35 seconds.
4         (VIDEO RECORDING BEING PLAYED.)
5    EXAMINATION BY MR. SCHILLAGE:
6         Q.   Okay.  I'm going to stop at two minutes 38
7    seconds.  I'm sorry.  Two hours 38 minutes and two
8    seconds.  Okay.  And we can note the -- the
9    realtime military time on the body camera for
10   January 9, 2023, is at 18:31:11, or 6:31 PM.
11        Mr. Lee, those little baggies that are
12   coming up in the video, they came a couple of
13   times, and there's one here, did you know this
14   stuff was in the house?
15        A.   I did not know.
16        Q.   Okay.  And no one had talked to you about
17   those types of baggies being in the house leading
18   up to you coming into the house that day, correct?
19        A.   You done asking the question?
20        Q.   That is the question.
21        A.   Not correct.
22        Q.   Okay.  Why not?
23        A.   Ask that question again.
24        Q.   You were not aware that baggies like
25   this --

Page 122

1         A.   Yeah, I was not aware.
2         Q.   Okay.  If you go back to your Exhibit 1
3    that's in front of you --
4         A.   What page?
5         Q.   -- which is the accident -- I'm sorry.
6    The Incident Report --
7         A.   Uh-huh.
8         Q.   -- 23-2898.
9         A.   Uh-huh.
10        Q.   And if you turn --
11        A.   What page?
12        Q.   I'm getting there, Mr. Lee.
13        A.   You told me go there.
14   MR. THOMPSON:
15        Mike, can I use the bathroom real quick?
16   MR. SCHILLAGE:
17        Well, I tell you what.  Let me ask this
18   last question --
19   MR. THOMPSON:
20        Got you.
21   MR. SCHILLAGE:
22        -- so that we can kind of put a point at
23   this -- This is a great stopping point after
24   this question.
25   EXAMINATION BY MR. SCHILLAGE:

Page 123

1         Q.   Mr. Lee, why don't you hand me the
2    document, and I will put you to the right page.
3         Okay.  So this is Page 42 of 50.
4         A.   Appreciate it.
5         Q.   Okay.  Is this page in particular -- does
6    it look like one of the pages you reviewed for the
7    depo today?
8         A.   Yes, I did.
9    MR. THOMPSON:
10        Hold on.  Can you read it first?
11   MR. SCHILLAGE:
12        Right.
13   MR. THOMPSON:
14        Read it.
15   THE WITNESS:
16        Yes.
17   EXAMINATION BY MR. SCHILLAGE:
18        Q.   Okay.  So I understand in that --
19   MR. THOMPSON:
20        Stay right there.
21   EXAMINATION BY MR. SCHILLAGE:
22        Q.   Are you ready?
23        A.   Oh, I didn't say nothing.
24        Q.   So on Page 42 --
25        A.   Uh-huh.

Page 124

1         Q.   -- of 50, do you see the section that
2    itemizes totals?
3         A.   Totals.  Totals.  Totals.  Yes.
4         Q.   454 grams of marijuana, .26 grams of
5    heroin, one gram crack cocaine, one gram
6    methamphetamine, six drops or uses -- or, I'm
7    sorry, D/U Hydrocodone, and $806 U.S. currency.  Do
8    you see all that?
9         A.   Yeah.
10        Q.   Were you aware that any of that was in the
11   house while you were in the house?
12        A.   I don't know.
13        Q.   You did not know --
14        A.   Yeah --
15        Q.   -- at that time?
16        A.   -- I did not know.
17   MR. SCHILLAGE:
18        Okay.  All right.  Let's go ahead and go
19   off.  We can take our five-minute breather.
20   MR. THOMPSON:
21        Thank you.
22   VIDEOGRAPHER:
23        Off the record.  The time is now 1:25.
24        (OFF THE RECORD.)
25   VIDEOGRAPHER:

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 125

1     Back on the record. The time is now 1:30.
2  EXAMINATION BY MR. SCHILLAGE:
3     Q.  All right, Mr. Lee, we're back on. We're
4  looking at Page 42 of 50 in Exhibit 1. All right.
5  And we had just finished talking about the totals
6  that were retrieved from this Incident Report
7  event. Look at the section there above the totals.
8  Do you see for the white Chrysler?
9     A.  42, I see blue Hyundai, white Chrysler. I
10  sees.
11     Q.  Okay. It shows a pistol laser; Glock 22
12  40-caliber, noted as stolen; a Springfield XDM
13  40-caliber; three baggies of marijuana, totaling 58
14  grams; and $137 in U.S. currency. Those -- That's
15  the list of items from -- from the white Chrysler
16  on this page. Did you know that any of those
17  things, or all of them, were in the vehicle when
18  you got in the car?
19     A.  No, sir.
20     Q.  Did you know one way or another whether
21  they were in the vehicle at all?
22     A.  No, sir.
23     Q.  Okay. Did Mr. Tate or anyone else tell
24  you what was in the vehicle?
25     A.  No, sir.

Page 126

1     Q.  Okay. Did you put any of the things on
2  this list into the white Chrysler?
3     A.  No, sir.
4     Q.  Okay. Did you know of anyone going in and
5  out of the white Chrysler, other than you and Mr.
6  Tate, once you got to 5450 Cadillac Street?
7     A.  Not that I recall.
8     Q.  Sure. And I know the Incident Report
9  notes strong odors of marijuana. Did you ever --
10  or do you recall ever smelling odors of marijuana
11  in the house, 5450 Cadillac Street, in and around
12  the time you were in the house?
13     A.  No, sir.
14     Q.  What about in the white Chrysler that day?
15     A.  No, sir.
16     Q.  Okay. All right. So do you recall where
17  you were taken in the police unit after you left
18  5450 Cadillac Street or the area? Where were you
19  taken next?
20     A.  To the (indistinguishable).
21  COURT REPORTER:
22     "To" what, I'm sorry?
23  THE WITNESS:
24     The Brave Cave.
25  EXAMINATION BY MR. SCHILLAGE:

Page 127

1     Q.  Just please make sure you speak up so she
2  can hear you.
3     Now --
4     A.  You heard me.
5     Q.  -- what's your understanding of the Brave
6  Cave? What is that building?
7     A.  Torture warehouse.
8     Q.  Okay. How did it come to be that known to
9  you?
10     A.  How did it come to be that known?
11     Q.  Right. What's your understanding?
12     A.  I'm a victim.
13     Q.  Okay. Had you ever been in the building
14  that you're calling the Brave Cave before January
15  9, 2023?
16     A.  First time.
17     Q.  That was the first time, January 9?
18     A.  Yes, sir.
19     Q.  Okay. And do you recall ever being
20  brought there after January 9, 2023?
21     A.  No, sir.
22     Q.  Okay. Now, I understand you've -- you've
23  said you're a victim, and that's your understanding
24  of why you call it a torture warehouse. Is there
25  any other basis?

Page 128

1     A.  Yeah. I have experience.
2     Q.  Okay. Is your experience limited to
3  January 9, 2023?
4     A.  Yes.
5     Q.  Okay. And that is your entire basis of
6  understanding of why you call that building the
7  Brave Cave, a torture warehouse?
8     A.  It earned the name for itself.
9     Q.  Okay. So, in your own words, explain to
10  me from the time that you were driven from 5450
11  Cadillac Street, where did you go and what happened
12  once you got there?
13     A.  I ain't go nowhere. I went to the Brave
14  Cave.
15     Q.  So that is somewhere. So thank you.
16     So you were driven directly from the
17  Cadillac Street house directly to what you're
18  calling the Brave Cave?
19     A.  Yes.
20     Q.  No stops in between?
21     A.  No.
22     Q.  Okay. Who drove you, if you know?
23     A.  Lawrence.
24     Q.  Say it again.
25     A.  Lawrence. Troy Lawrence.

Electronically signed by Toni Conner (501-190-381-9495)     2f67950e-8c04-4061-959b-7823204c7c89

Page 129

1    Q.  Okay.  Troy Lawrence, Jr.?
2    A.  Yes.
3    Q.  Okay.  Was any other police officer in the
4    vehicle with the two of you?
5    A.  No.
6    Q.  Okay.  What happened after y'all arrived
7    at the building?
8    A.  When we arrived there, he assisted on me
9    to go first be -- We were the last car to arrive.
10   He assisted on me to skip the line for to be first
11   strip-searched.
12   Q.  So when you went to the Brave Cave and you
13   were -- fair to say you were escorted into the
14   building?
15   A.  Yeah.  I skipped the line.
16   Q.  Okay.  So when you say "skipped the line,"
17   how fast from the time that you first walked into
18   the building to the time that you had a
19   strip-search performed on you?  How much time do
20   you think was --
21   A.  Immediately.
22   Q.  Immediately?
23   A.  Yes.
24   Q.  Okay.  So at the time that that
25   happened -- I want to make sure I understand this

Page 130

1    to ask the question.
2    A.  Uh-huh.
3    Q.  You're taken out of the back of a police
4    car, you're walked into the building?
5    A.  Yes.
6    Q.  Officer Troy Lawrence, Jr., you said,
7    assists you to skip the line?  Meaning, there was
8    other people in line?
9    A.  Yeah.  "This nigger going to go first," is
10   what he said.
11   Q.  Okay.  And did you recognize -- Whoever --
12   The people comprising this line you're talking of,
13   is it only people from 5450 Cadillac?
14   A.  Yes.
15   Q.  Okay.  So you recognize everyone from the
16   same event that you were at?
17   A.  Yeah.  Shackled hands and feet.
18   Q.  Okay.  And so you're going to go first.
19   You said it was effectively immediately?
20   A.  Yes.
21   Q.  All right.  Where did you go for the --
22   Where did the strip-search happen?
23   A.  In the warehouse.  When you go in the
24   Brave Cave, it has another door.  It's a big
25   garage.

Page 131

1    Q.  Okay.  So when you say "when you go in,"
2    would you agree to describe it more like an office
3    space at first when you walk in?
4    A.  Yeah.  They had desks and stuff around,
5    but not --
6    Q.  Computer screens?  TV screens?
7    A.  But not where I got strip-searched at,
8    though.
9    Q.  There's a separate doorway that leads --
10   A.  Yes.
11   Q.  -- to that?
12   A.  Yes.
13   Q.  Okay.  So you were brought in through what
14   I'm calling the office space, where you said there
15   was desks and --
16   A.  Yes.
17   Q.  -- computer screens?
18   A.  Yes.
19   Q.  And there's another door you go through
20   that -- that you're calling a warehouse?
21   A.  That's on the left.
22   Q.  Okay.  Wait.  I'm sorry.  The desk is on
23   the left in which room?
24   A.  No.  The door is on the left.  On the
25   left.

Page 132

1    Q.  Thank you.
2        All right.  So the door leading to the
3    warehouse is on the left?  You go through the
4    door --
5    A.  The door leading to the warehouse is on
6    the left.  You come in.  The door leading into
7    where they strip-searched me at is on the left.
8    Q.  Okay.  So walk me through what happened
9    once you walk through the doorway into the
10   warehouse.
11   A.  Oh, once I walk in, they have a chair
12   that's presented to me, they have an officer who's
13   instructing me to strip-search.  I strip-searched
14   butt naked.
15   Q.  Okay.
16   A.  I do the cough procedure.  And he insisted
17   on me to put my clothes back on.
18   Q.  Okay.  How many people are in the room at
19   this time?
20   A.  Three.
21   Q.  Do you -- Do you know them by name right
22   now as we sit here?
23   A.  Yes.
24   Q.  Who were they?
25   A.  Sergeant Kennedy, Detective Wallace, and

33 (Pages 129 to 132)

Page 133

1    myself.
2        Q.  Okay.  So the strip-search happens at that
3    point in the warehouse with those two officers
4    present with you?
5        A.  (Nodding head.)
6        Q.  And you said after you removed every
7    article of clothing?
8        A.  I started with my shoes first, because
9    they checked my shoes.
10       Q.  Okay.  What happened after the shoes?
11       A.  I undressed.
12       Q.  Okay.  Did they give you a description of,
13   like, what to take off next?
14       A.  I undressed butt naked.
15       Q.  Okay.  Well, how did you know to do that?
16       A.  I was told to strip-search.
17       Q.  Okay.  So --
18       A.  Don't -- Don't mind me.  I -- That was the
19   worst feeling of my life when we talking about
20   something like that.  So don't mind me.
21       Q.  Okay.  Had you ever been strip-searched
22   before?
23       A.  Yes.  In prison.
24       Q.  Okay.  How many times?
25       A.  I can't recall.

Page 134

1        Q.  More than once?
2        A.  Yes.
3        Q.  Okay.  So on January 9, 2023, in the
4    warehouse section of the Brave Cave building --
5        A.  Correct.
6        Q.  -- after you removed all the articles of
7    clothing, you said you were asked to squat and
8    cough?
9        A.  Yes.
10       Q.  And then --
11       A.  Bend over and cough.  Not squat.  Bend
12   over.
13       Q.  Thank you.
14           After that, you were instructed to put
15   your clothes back on?
16       A.  Correct.
17       Q.  Then what happened after that?
18       A.  Oh, when I put my shirt on, Troy Lawrence,
19   Jr. asked me, "What's that shit you was talking
20   about?" and he charged me.
21       Q.  Describe what you mean when you say he
22   charged you.
23       A.  If I was to get up and move towards you,
24   what would you call that?
25       Q.  Well, I just want to understand what you

Page 135

1    understand.
2        A.  I'm trying to see if you understand what
3    I'm saying.  I just used a description.  We're just
4    having a conversation.  We're just having a
5    conversation.
6        MR. THOMPSON:
7            And, Mike, I know it's being recorded.  Do
8        you mind if he shows you what he means?
9        MR. SCHILLAGE:
10           Well, not right now.
11       MR. THOMPSON:
12           Okay.
13       EXAMINATION BY MR. SCHILLAGE:
14       Q.  So let me -- let me ask you this.  Officer
15   Lawrence, to use your words, charged you.  And what
16   happened after that?
17       A.  I moved.
18       Q.  Okay.  What happened after that?
19       A.  He kept coming at me.  He threw a punch.
20       Q.  Okay.  What happened after -- Well, let me
21   ask you, did he hit you?
22       A.  Yeah, he landed.
23       Q.  Where did it land?
24       A.  My left jaw.
25       Q.  Okay.  What happened after that?

Page 136

1        A.  After he proceeded to hit me some more, I
2    dodged him, backwards kind of against the wall.  I
3    ran, fell.  And as I fell, he proceeded to kick me
4    in my ribs with steel-toe boots.
5        Q.  Okay.
6        A.  And as I look up -- You asked me what
7    happened.  I'm fixing --
8        Q.  Yes.  Please --
9        A.  -- to tell you.
10       Q.  -- tell me.
11       A.  And as I look up, I see Detect -- Well,
12   he's not in here no more.  I see Detective Wallace
13   come -- comes in the room, and he's -- We're
14   walking back to the front and I'm trying to let him
15   know, he wasn't in here, what happened.  He felt
16   like I wasn't complying.  He wasn't trying to hear
17   that.  He swept me off my feet.
18       Q.  Okay.  So from the outset, it was only, to
19   your memory, Officers David Kennedy and Troy
20   Lawrence, Jr. who were present during the
21   strip-search itself, right?
22       A.  Detective Wallace came in the room.
23       Q.  Well, I'm going to get there, but earlier
24   you said --
25       A.  I'm just answering your questions.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 137

1    Q. When did Troy Lawrence, Jr. come -- I'm
2 sorry. When did Detective Wallace come in the
3 room?
4    A. Detective Wallace comes in the room after
5 I get off the floor from Troy Lawrence, Jr. kicking
6 me in my ribs.
7    Q. Okay. So that's different from the
8 strip-search itself, right? You'd already been
9 re-dressed?
10    A. Yeah, I already been re-dressed.
11    Q. Okay. So let's keep it limited to the
12 questions and we -- this will move a lot faster.
13    A. No, I mean, I'm giving you what you're
14 asking for, brah. Real talk.
15    Q. So --
16    A. Because I give you half the answer, then
17 you cut me off. You just got to -- Me being honest
18 right here. You can't do me that. You can't do me
19 that. Don't do that.
20    Q. Well, thankfully, all of this is on video
21 recording. So we'll all be able to see what this
22 is.
23    A. Okay.
24    Q. So if I understand your recollection of
25 the event, Officer Lawrence, Jr. and Officer

Page 138

1 Kennedy are in the room, the warehouse section --
2    A. Correct.
3    Q. -- with you?
4    A. Correct.
5    Q. Only the three of you?
6    A. Yes.
7    Q. The strip-search is performed and --
8    A. Immediately when I walked in the room.
9    Q. That's right. And completed?
10    A. Correct.
11    Q. And you said Officer Lawrence charged at
12 you?
13    A. Yes.
14    Q. And inevitably threw a swing at you and
15 landed a punch on your left side of your face,
16 right?
17    A. Correct.
18    Q. And after that did you swing at him?
19    A. Not at all.
20    Q. Did you swing at him before he charged at
21 you?
22    A. I didn't swing at all that night.
23    Q. Did you do -- perform any type of physical
24 act or threat of violence that precipitated the
25 events you've described?

Page 139

1    A. No. I was crying.
2    Q. Okay. And you ran to the back of the
3 warehouse, you said?
4    A. No. I was running. I fell on the floor.
5    Q. Like, so you tripped?
6    A. Yes.
7    Q. It's uneven concrete in that warehouse,
8 right?
9    A. Rocks, many things, yes.
10    Q. Okay. So you tripped and fell, but you
11 were able to stand back up?
12    A. No. I didn't get a chance to get off the
13 floor. He was on me already and --
14    Q. And that's Troy Lawrence, Jr.?
15    A. And he -- after he kicked me -- I missed
16 out some things -- he said, "Get your" B-I --
17    MR. THOMPSON:
18       No. You can say it.
19    THE WITNESS:
20       "Get your bitch-ass up."
21 EXAMINATION BY MR. SCHILLAGE:
22    Q. Okay. Is Officer -- or Detective Wallace
23 in the room at this point, to your knowledge?
24    A. No, sir.
25    Q. Okay. So you said Officer Lawrence, Jr.

Page 140

1 kicked you?
2    A. Twice.
3    Q. Okay. And what happened after that?
4    A. He told me get my bitch-ass up.
5    Q. And -- Okay. So what happened next?
6    A. I got my bitch-ass up. If that's what you
7 want to call me. I got up.
8    Q. No, sir, I don't want to call you that.
9    A. But I'm --
10    Q. I want to --
11    A. -- just letting you know.
12    Q. -- understand.
13    A. That's what he -- I got up.
14    Q. Had Detective Wallace come into the room
15 at that point?
16    A. Yeah. He was trying to walk me over back
17 to the chair.
18    Q. Okay. And what chair are you talking
19 about?
20    A. The -- The chair I was -- got investigated
21 in. The wooden chair.
22    Q. Okay. So when you say "investigated," is
23 it fair to say Detective Wallace asked you
24 questions and you answered them while you sat in
25 the chair?

35 (Pages 137 to 140)

Page 141

1    A.  Yeah.  Because he told me I was going to
2  go home after the series of questions.
3    Q.  Okay.  So this all happened at one time in
4  the warehouse section of the Brave Cave?
5    A.  Yes.
6    Q.  Okay.
7    A.  But I'm going to clean you up.  I got took
8  out the room and brought back in, then got
9  interrogated.
10    Q.  Okay.  So there was two times --
11    A.  Yes.
12    Q.  -- that you were in the warehouse section
13  of the building?
14    A.  Yes.
15    Q.  Okay.  So earlier you said Detective
16  Wallace came to you after you fell on the ground
17  and Troy Lawrence kicked you twice.
18    A.  No, I did not say that.  I did not say
19  that.  I did not.
20    Q.  Okay.  Say it -- Explain it, then.
21    A.  But I didn't say that.  I can tell you
22  what I said.
23    Q.  Tell me.
24    A.  I said Troy Lawrence was kicking me, and
25  when I got up I noticed Detective Wallace coming in

Page 142

1  the room.
2    Q.  Okay.
3    A.  That's good enough for you?  Again, we
4  clear?  Because you -- you kind of mixing my words
5  up.  I just want to make sure we're on the same
6  page.
7    Q.  So then at that point it's your testimony
8  that Detective Wallace escorted you out of the
9  warehouse and back into the office section of the
10  building?
11    A.  Yeah.  He -- In a holding cell.
12    Q.  Okay.  And how long do you think you were
13  in the holding cell?
14    A.  I don't recall.
15    Q.  Okay.  And at some point you were -- is it
16  correct that you were taken from the holding cell
17  back into the warehouse?
18    A.  Yes.  He took me into the holding cell.
19    Q.  Okay.  "He" being Detective Wallace?
20    A.  Correct.
21    Q.  Okay.  Who took you out of the holding
22  cell and into the warehouse for the second time?
23    A.  Who took me out of there?
24    Q.  Out of the holding cell and in --
25    A.  Troy Lawrence --

Page 143

1    Q.  Junior?
2    A.  -- because --
3        Yes.  When he was trying to take me out of
4  there again, I was like, "No, I'm not going back in
5  there.  Y'all did this to me," blasé, blasé.
6    Q.  Okay.  And so did you eventually get back
7  in the warehouse?
8    A.  Yes.
9    Q.  Okay.  How did that come about?
10    A.  I complied.
11    Q.  Okay.  So in the holding cell area or in
12  the office space --
13    A.  Uh-huh.
14    Q.  -- there was no physical, combative
15  between you and any of the police officers?
16    A.  Yeah.  Verbal.
17    Q.  Well -- Right.  What you just described,
18  right?
19    A.  What?
20    Q.  Verbal communication.
21    A.  Yeah.  Talking.
22    Q.  Okay.  My question was limited to
23  physical --
24    A.  No.
25    Q.  -- and combative.

Page 144

1        There was nothing like that in the holding
2  cell area or in the office space?
3    A.  No, I didn't.  No.
4    Q.  Okay.  So back in the warehouse, what
5  happens now?  This is the second time you were in
6  the warehouse.  What happened then?
7    A.  I got asked a series of questions.  And
8  before I got asked the series of questions, they
9  say, "We just got a few questions for you.  You
10  answer this and you'll go home, we'll let you go
11  home."
12    Q.  Okay.  How long do you think that took, if
13  you remember?
14    A.  To go home?
15    Q.  No, no, no.  The questions in the room.
16    A.  They got half the video up there.  So,
17  half of the video.
18    Q.  So when you say "half of the video up
19  there" --
20    A.  How long is the video?
21    Q.  Well, we'll get to the video.  I want to
22  ask off your memory.
23    A.  I don't recall.
24    Q.  Okay.  And so after that, you were then
25  transported?

Electronically signed by Toni Conner (501-190-381-9495)                                                     2f67950e-8c04-4061-959b-7823204c7c89

Page 145

1    A.  No.  We sat some more time.
2    Q.  Okay.  Explain what happened next.
3    A.  We sat for, like, seven hours.
4    Q.  In the holding cell area?
5    A.  No.  In the front.  They moved us to the
6  front.
7    Q.  The office space area?
8    A.  No.  I don't --
9    Q.  Describe to me what you mean --
10   A.  The --
11   Q.  -- "the front."
12   A.  -- police station.
13   Q.  First District?
14   A.  The real one.
15   Q.  Or -- Well, Third District.  On --
16   A.  Yeah.  The --
17   Q.  -- Plank Road?
18   A.  -- real station, where they -- where we
19  supposed to go.
20   Q.  Okay.  And so you were there for what you
21  believe to be about seven hours?
22   A.  Yeah.  We had -- We had arrived at parish
23  prison.  We was eating breakfast.  They were just
24  serving breakfast.
25   Q.  Okay.  And what happened after that,

Page 146

1  breakfast at the district?
2    A.  The nurse denied me for coming in.
3    Q.  Into where?
4    A.  The parish prison.  I had to go to the ER.
5    Q.  Okay.  And do you remember the ER you went
6  to?
7    A.  Yes.  Our Lady of the Lake.
8    Q.  Okay.  Our Lady of the Lake North Urgent
9  Care?
10   A.  Yes.
11   Q.  Does that sound about right?  Okay.
12       And you were treated there?
13   A.  Correct.
14   Q.  Okay.  And you were escorted by a police
15  officer, right?
16   A.  Correct.
17   Q.  Okay.  Was it the same police officer from
18  the arrest event on Cadillac Street?
19   A.  Correct.
20   Q.  Who was it?
21   A.  (Indicating.)
22   Q.  So for the record --
23   A.  He didn't take me there, but he did it,
24  though.  He was the one -- person who did it.
25   Q.  He -- Well, my question is, what officer

Page 147

1  was at the Our Lady of the Lake facility with you?
2    A.  I don't recall his name.
3    Q.  Was it an officer from the arrest
4  event on Cadillac Street?
5    A.  No, sir.
6    Q.  Okay.  It was someone different?
7    A.  Yes, sir.
8    Q.  Do you know him or her by name?
9    A.  No, sir.
10   Q.  Okay.  Do you know whether it was a male
11  or female?
12   A.  I don't -- It's a male.
13   Q.  Okay.  Do you recall whether he was black
14  or white?
15   A.  He was a black guy.
16   Q.  After Our Lady of the Lake, where
17  were you brought next?
18   A.  Back to the parish prison.
19   Q.  Okay.  Did you go to a place called LSU
20  Urgent Care?
21   A.  That was after I got out of jail.
22   Q.  Okay.  So you were brought back to parish
23  prison?
24   A.  (Nodding head.)
25   Q.  And you were booked into jail at that

Page 148

1  point?
2    A.  Yes.
3    Q.  Okay.  And were you strip-searched as a
4  part of the entry into the jail?
5    A.  No.
6    Q.  Either time?
7    A.  Yeah, I got strip-searched, but it wasn't
8  nobody bending over telling me to cough or anything
9  like that.
10   Q.  Okay.  And do you know how long you were
11  in parish jail?
12   A.  Yes.
13   Q.  How long?
14   A.  From like nine, ten days, or maybe more.
15   Q.  Nine or ten days?
16       Okay.  All right.  So let's take a look at
17  some video footage.  So this is going to be Exhibit
18  5, which we have called Video 3.  It's Serial
19  Number 2027_X60A45891.  And this is -- Video 3 is
20  the body cam footage of Steven Nevels.  Military
21  time, January 9, 2023, 20:27:25.  So, roughly 8:27
22  PM.  And this is of Steven Nevels.  And this is
23  right outside the Brave Cave warehouse building.
24   A.  You can -- I can barely see it.  I got --
25   Q.  We're not there yet.  I have to give a

37 (Pages 145 to 148)

Page 149

1   timestamp first.
2       A.  All right.  I was talking about the
3   brightness on the screen.
4       Q.  Okay.  So we're going to start this at
5   eight seconds.
6            Mr. Lee, zero minutes eight seconds.
7            (VIDEO RECORDING BEING PLAYED.)
8   EXAMINATION BY MR. SCHILLAGE:
9       Q.  So I paused it at 12 seconds just so we
10  can establish.  Is this the office space of the
11  facility that we talked about?
12      A   The office space of the facility, yes.
13  That's the inside before the garage.
14      Q.  Okay.  So this is not the warehouse part
15  of the building?
16      A.  No.
17      Q.  This is the office space?
18      A.  Yes.
19      Q.  Okay.  And these two doors right here, do
20  you know where they lead?
21      A.  You can press -- press the video?
22      Q.  Yeah.  We'll let it play.  So playing on
23  at 12 seconds.
24           (VIDEO RECORDING BEING PLAYED.)
25  EXAMINATION BY MR. SCHILLAGE:

Page 150

1       Q.  All right.  So I'll go ahead and stop it
2   at 34 seconds, just so we can lay out the
3   groundwork of what we've got here.
4       A.  Uh-huh.
5       Q.  So the door on the left side that I asked
6   you about a few minutes ago --
7       A.  Uh-huh.
8       Q.  -- when it was open you identified that
9   area as one of the holding cells?
10      A.  Yes.
11      Q.  Okay.  And that's you --
12      A.  Yes.
13      Q.  -- in the white, sleeveless T-shirt,
14  right?
15      A.  Right.
16      Q.  And the other two people, do you recognize
17  who they are in the holding cell with you?
18      A.  Yes.
19      Q.  Okay.  Who's the person in the middle?
20      A.  That's Brian McNeely.
21      Q.  Okay.  And who's the person on the far
22  left of the video screen?
23      A.  Deondre Tate.
24      Q.  Okay.  So the person on the far left is
25  who you rode to the house with?

Page 151

1       A.  Correct.
2       Q.  All right.  I'm going to continue playing
3   it at 34 seconds.
4            (VIDEO RECORDING BEING PLAYED.)
5   EXAMINATION BY MR. SCHILLAGE:
6       Q.  All right.  So I'm pausing the video at
7   one minute 49 seconds.
8       A.  Uh-huh.
9       Q.  All right.  So, Mr. Lee, the timestamp on
10  this section of the video is 8:29 PM.
11      A   8:29.
12      Q.  So in reference to -- to what you remember
13  and what you've testified to and explained for us
14  today, is that when you arrived at the facility --
15      A.  Uh-huh.
16      Q.  -- you were walked in, allowed to skip a
17  line, and you were the first to be strip-searched
18  in the warehouse?
19      A.  Correct.
20      Q.  And then -- So let me ask this.  This
21  portion of video --
22      A.  At 8:00.
23      Q.  At 8:30.
24      A.  Okay.
25      Q.  Had you been strip-searched at this point

Page 152

1   yet?
2       A.  I had got strip-searched.
3       Q.  Before this video?
4       A.  Yes.
5       Q.  Okay.  Had you been in the holding cell,
6   like you are here, prior to you being
7   strip-searched?
8       A.  Yeah.  So that's after everybody got done
9   strip-searched.  So I ain't go in there again yet.
10      Q.  Okay.  So I want to make sure, because --
11      A.  Yeah, I didn't -- I went in there again.
12      Q.  So this --
13      A.  I went in there again.
14      Q.  -- holding cell area --
15      A.  Uh-huh.
16      Q.  -- were you in there one time or more than
17  one time?
18      A.  I got put in there after -- I was the
19  first strip-search.  The second time, I -- they
20  called me out of there to interrogate me.  After
21  they beat me, they put me in the room and followed
22  to strip-search everybody else.
23      Q.  Okay.
24      A.  You -- You -- You got me?
25      Q.  I think so.  So --

38 (Pages 149 to 152)

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 153

1    A.   Yeah, you got me.
2    Q.   -- the question is, you were never in the
3    holding cell prior to being strip-searched --
4    A.   I got --
5    Q.   -- correct?
6    A.   No.  I went into the room before I -- they
7    put me in that room.
8    Q.   Okay.  Well, hold on, now, because that
9    doesn't make sense with what --
10   A.   I --
11   Q.   I know what you're trying --
12   A.   It do make --
13   Q.   -- to tell me.
14   A.   It does.
15   MR. THOMPSON:
16        He's going to clear it up.  Slow down.
17        Let the man ask his question.
18   EXAMINATION BY MR. SCHILLAGE:
19   Q.   You explained earlier you were
20   strip-searched in the warehouse prior to going to
21   this holding cell area, right?
22   A.   Correct.
23   Q.   Okay.  So this video footage, my question
24   was, is this the only time that you were actually
25   in the holding cell?

Page 154

1    A.   No.
2    Q.   There was two times you were in the
3    holding cell?
4    A.   Yes.
5    Q.   Okay.  So is the chain of events like
6    this?  Is it correct?  And if it's not, explain why
7    not.  Strip-search, holding cell, questioning --
8    A.   Interrogation.
9    Q.   -- at the chair, then holding cell again?
10   A.   Yes.
11   Q.   Okay.  That's the chain of events?
12   A.   I'm going to say it for you.  As soon as
13   we got to the -- through the office space, when we
14   just got there, warehouse, got put in the
15   warehouse.  As they got done strip-searching
16   everyone else, I got called back out of there to
17   get interrogated again.  There's two.
18   Q.   Okay.
19   A.   After 8:30.
20   Q.   Okay.
21   A.   You got the footage?
22   Q.   So -- I mean, you -- you may not have
23   meant -- meant to, but you said "interrogated
24   again."  Were you questioned more than once in this
25   area?

Page 155

1    A.   I mean -- No.
2    Q.   Okay.  All right.  So by the time we're
3    looking at you in the holding cell here and you're
4    talking with the Officer Nevels, whose body cam
5    this is --
6    A.   Yes.
7    Q.   -- you had already been strip-searched and
8    the testimony you gave about Officer Lawrence
9    punching you --
10   A.   Yeah.
11   Q.   -- you falling --
12   A.   That was before that.
13   Q.   I'm getting there.
14        Him kicking you twice and Officer Wallace
15   coming into the room to bring you back to the
16   holding cell.  All of that took place before the
17   footage on this video we're looking at?
18   A.   Yes.
19   Q.   Okay.  So we have had it play for roughly
20   a minute.  I'm going to play it again.  We're at
21   one minute 49 seconds.
22        (VIDEO RECORDING BEING PLAYED.)
23   THE WITNESS:
24        That's what I'm saying.
25        (VIDEO RECORDING BEING PLAYED.)

Page 156

1    THE WITNESS:
2         Oh, God.
3    MR. THOMPSON:
4         Brother.
5    EXAMINATION BY MR. SCHILLAGE:
6    Q.   All right.  So, Mr. Lee, we just went from
7    the beginning of the interaction, where the door
8    opened at the holding cell and Officer Nevels
9    started talking to you, all the way until the end
10   of the conversation, when the door shut --
11   A.   Correct.
12   Q.   -- and the conversation ended between you
13   and the officer.
14        That is -- It ran through 13 minutes 31
15   seconds on the video.  Body cam timestamp of
16   January 9, 2023, 20:27:24.  So, 8:27 PM.
17        All right.  So the conversation consisted
18   of a lot of dialogue between you and Officer
19   Nevels.  It was a different type of back-and-forth
20   than what we saw in Videos 1 and 2 between you and
21   Officers Wallace and Lawrence, Jr., right?
22   A.   Correct.
23   Q.   All right.  It's a lot more cordial?
24   A.   (Nodding head.)
25   Q.   Some -- a lot of laughing?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 157

1   A. (Nodding head.)
2   Q. Just questions, answers. Would you agree
3   it's friendly conversation?
4   A. Yeah.
5   Q. Okay. Did you appreciate how Officer
6   Nevels was talking to you?
7   A. I -- Yes.
8   Q. Okay.
9   A. Yes.
10  Q. So you talked about a lot of topics. At
11  the beginning you were explaining to them that they
12  don't want to know who you -- who your mom is,
13  because they going to be in trouble, right?
14  A. Correct.
15  Q. All right. What did you mean by that?
16  A. I just know my mother. She's -- She's a
17  child of God.
18  Q. Okay.
19  A. I'm going to leave it at that.
20  Q. Well, you're her son. I'm sure she loves
21  you very much. Right?
22  A. Yes.
23  Q. Okay. You said something in particular.
24  "I'm going to get the whole team jammed up."
25  A. Yeah.

Page 158

1   Q. What did that mean?
2   A. Because it's corrupted.
3   Q. No, no, no. I can understand what --
4   A. "Jammed" mean such as in trouble.
5   Q. Okay. And that was just before 8:30 PM.
6   And you said that and you talked about it with
7   Officer Nevels for about 11 minutes. Or, I'm
8   sorry, 13 minutes. It's the length of the video.
9   And you talked about how the police treated you,
10  and you made a comment about messing up your Gucci
11  shoes.
12  A. Uh-huh.
13  Q. What kind of shoes were you wearing that
14  night?
15  A. Gucci.
16  Q. Okay. And how did they get messed up?
17  A. From being on the ground, just being
18  like -- If the same thing would happen today in
19  these shoes, they wouldn't look the same.
20  Q. Okay. Scuffed up, dirty, torn up --
21  A. Yeah.
22  Q. -- something like that?
23  A. Yeah.
24  Q. All right. Do you have any pictures of
25  the Gucci shoes after January 9, 2023?

Page 159

1   A. No.
2   Q. Okay.
3   A. I don't wear them anymore.
4   Q. Okay. But you don't have any pictures of
5   them either?
6   A. No.
7   Q. You threw them away?
8   A. No.
9   Q. You still have them?
10  A. Yes.
11  Q. Okay. When did they get messed up?
12  A. That day.
13  Q. Okay. Out on the street, on Cadillac?
14  A. (Nodding head.) Yep.
15  Q. Okay. What about in the warehouse?
16  A. That day.
17  Q. Okay. So is that a yes or no to the
18  warehouse?
19  A. Yes.
20  Q. Okay. What's an Old School?
21  A. A car.
22  Q. What kind of car?
23  A. Any classic.
24  Q. Okay. And in the video you explained to
25  Officer Nevels not just an Old School, but a

Page 160

1   floorroom, like a showcase, right?
2   A. Off the showroom floor.
3   Q. Okay.
4   A. No flaws.
5   Q. That's it. So is that just an emphasis of
6   meaning very nice, one of the nicest available?
7   A. Yeah. For my difficulties.
8   Q. Okay. So at that point, that's you -- is
9   that you making an inference to Officer Nevels that
10  you intend on suing the police department?
11  A. Most definitely.
12  Q. Okay. You talked about being on food
13  stamps and you said that at the time you didn't
14  have a job.
15  A. Right. But I was enrolled in a temp
16  agency, though.
17  Q. And that's -- The reason you explained it
18  like that is because you did not have a job that
19  day?
20  A. Right.
21  Q. Okay. On the temp agency, did you ever
22  have a situation where once they secured a job for
23  you it was expected that you would return there and
24  work multiple days?
25  A. No.

1      Q.  It's just a one-day type of fill job?
2      A.  They tell you the instructions on the day
3  they call you for the job, how long the duration
4  will be and will you be able to meet those
5  criteria.
6      Q.  Okay.  And being enrolled in the temp
7  agency the way you've explained, that did not
8  satisfy to your explanation to say you had a job at
9  the time?
10     A.  I didn't have a job.
11     Q.  Meaning full-time or part-time?  Do you
12  remember how we distinguished --
13     A.  Yeah.  All --
14     Q.  -- the temp jobs?
15     A.  All three of them was different.
16     Q.  Right.  So you didn't have full-time or
17  part-time when you spoke to Officer Nevels that
18  night?
19     A.  No.
20     Q.  Okay.  And you didn't have the next job
21  lined up with the temp agency at that time?
22     A.  No.
23     Q.  Okay.  You talked about being on food
24  stamps.  Is that Louisiana SNAP?
25     A.  Yes.

1      Q.  Okay.  How long at that point in time had
2  you been on Louisiana SNAP?
3      A.  It was January.  I been on that since,
4  like, November, September.
5      Q.  Of what year?
6      A.  2022.
7      Q.  Okay.  And are you on them today?
8      A.  No.
9      Q.  Okay.  When did you get off Louisiana
10  SNAP?
11     A.  In -- April.
12     Q.  Of what year?
13     A.  2025.
14     Q.  Okay.  So just about two or three months
15  ago?
16     A.  I had lost gain of it and got it back.
17     Q.  Okay.  So do you have it today?
18     A.  No.
19     Q.  Well, you said you lost and got it back.
20  When did you get it back?
21     A.  I lost it in April 2025.  I got it back in
22  2024 November.  They gave me four months.
23     Q.  Okay.  So you had it from September or
24  November 20 --
25     A.  Yes.

1      Q.  -- 22 through November 2024?
2      A.  Right.
3      Q.  And then you lost it for a period of time.
4  How long did you lose it?
5      A.  Re-say that again.
6      Q.  You said you lost it and then got it back
7  in April of 2025, right?
8      A.  Right.
9      Q.  So what's the period of time between
10  November '24 and April '25 that you lost it?
11     A.  November '24 for April '25.  You said
12  what's the period of time?  What happened, again?
13     Q.  That you did not have Louisiana SNAP.
14     A.  You just told me.
15     Q.  Is it --
16     A.  I don't recall.
17     Q.  Is it November '24 through April '25?
18     A.  That I had SNAP?
19     Q.  That you did not.
20     A.  Say it again.
21     Q.  Why don't you tell me.  When did you have
22  SNAP and when did you not have it?
23     A.  I got my SNAP back this year.  No.  I got
24  my SNAP back last year in September, because they
25  asked me about what my last job I had.  I was

1  working at Amazon.  And she gave me the -- I'm
2  going to say it like this, because this is how I
3  could best remember it.  The SNAP agent gave me
4  four months and told me that they will cut my food
5  stamps off if I did not find a job.  So I did not
6  find a job.  They gave me like a month or two extra
7  and they cut me off.
8      Q.  Okay.  And so from April '25 through
9  present day you haven't had Louisiana SNAP?
10     A.  To April?
11     Q.  You have not had it.
12     A.  January, February, March, April, to --
13     Q.  Present day.
14     A.  To this present day.  Yeah, I didn't have
15  it.
16     Q.  Okay.
17     A.  March.  March.  Because March the 4th was
18  the day I got my payment.
19     Q.  Okay.  Did they explain it to you
20  effectively that if you obtain full-time or
21  part-time work you can have SNAP back?
22     A.  Yes.
23     Q.  Okay.
24     A.  I understood those instructions.  I
25  couldn't get any job.

Page 165

1      Q.  Okay.  What jobs have you applied for?
2      A.  I applied for Domino's, Raising Cane's,
3  Home Depot.  Where else?  I've applied for Hertz,
4  Enterprise.  I have my I.D. to my phone.  You want
5  to see?  It's cool.  But I -- I applied for those
6  jobs.
7      Q.  Okay.  So have you ever sold Louisiana
8  SNAP food stamps?
9      A.  No.
10      Q.  Okay.  Because you made jokes with
11  Detective Nevels about trying to sell him some.
12      A.  Yeah.  He's a police.  No.
13      Q.  Right.  All right.  So you've never sold
14  them before?
15      A.  No.
16      Q.  Okay.  When you described to him, "If I
17  would have ran, I would have burnt him" --
18      A.  If I was in a movie.  You forgot that.
19      Q.  Okay.  So what does "burnt" mean?
20      A.  Run from you.
21      Q.  So earlier when you described you
22  getting hit by Officer Lawrence --
23      A.  Uh-huh.
24      Q.  -- and then running to the back of the
25  warehouse where the back door is, where --

Page 166

1  MR. THOMPSON:
2      I'm going to object to that.  That's not
3  what he said.
4  MR. SCHILLAGE:
5      Okay.  Well --
6  MR. THOMPSON:
7      That's a mischaracterization of what he
8  said.
9  MR. SCHILLAGE:
10      I haven't finished the question yet.
11  THE WITNESS:
12      I keep hearing a lot of the stuff I did.
13  EXAMINATION BY MR. SCHILLAGE:
14      Q.  So did you not run to the back, where you
15  tripped and fell --
16      A.  Yes.
17      Q.  -- before you were kicked?
18      A.  Yeah, I ran.
19      Q.  Okay.  But that's not what you described
20  when you said, "I would have burnt him"?  That's
21  not -- That's not the same type of running?
22      A.  We was talking about running if I was in a
23  movie.  If I was in a movie, you know, it have
24  different chapters of it be -- You know what I'm
25  talking about.

Page 167

1      Q.  Okay.
2      A.  Movie's a fantasy.  It's nonbelievable.
3      Q.  Okay.  But you did run in the warehouse?
4      A.  For my life, yes.  Scared.
5      Q.  Okay.  All right.  So across 13 minutes of
6  that conversation you had with Officer Nevels you
7  talked about a lot of things, a lot of
8  back-and-forth.  Why didn't you talk to him --
9  Well, let me -- Let me ask this.  When you're
10  sitting in the holding cell talking with Officer
11  Nevels, was your head or face hurting?
12      A.  I told him.
13      Q.  Well, I'm just asking if you recall right
14  now.  Did you tell him during your recorded
15  conversation on the body camera footage, did you
16  talk to him and express that your face and/or head
17  was hurting?
18      A.  I know he heard me scream.  I shouldn't
19  have to tell anyone about what happened.
20      Q.  Okay.
21      A.  That's just my opinion.  I didn't tell
22  him.
23      Q.  And that's fine.  It's your answer.  But I
24  just want to confirm --
25      A.  Yeah, I didn't tell him.

Page 168

1      Q.  -- you did not actually tell him.
2      A.  Yeah, I didn't tell him.
3      Q.  "My face hurts, my head hurts, he
4  punched me, he kicked me --
5      A.  No.
6      Q.  -- my ribs hurt"?
7      A.  No, I didn't tell him.
8      Q.  You didn't tell him that either, right?
9      A.  No.
10      Q.  About the ribs.
11      Okay.  And we know from the Videos 1 and
12  2, when your arm and hands were hurting --
13      A.  Yeah.
14      Q.  -- you were definitely talking about
15  that --
16      A.  Yeah..
17      Q.  -- right?
18      A.  Because that's the person who doing it.
19      Q.  Okay.  So I think you just answered it
20  without having --
21      A.  You just told --
22      Q.  -- the question --
23      A.  -- me.
24      Q.  -- but I'm going to ask.
25      Is there a reason why you did not explain

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

1 those things to Officer Nevels the way you were
2 explaining it to Officer Lawrence and Wallace in
3 Videos 1 and 2?
4     A.  Because I figured he wouldn't care.
5 That's why I didn't tell him.  He come in telling
6 me about my mother and things like that.  That's
7 out of the picture.
8     Q.  Okay.  Even though it was a friendly,
9 cordial conversation?
10     A.  Right.
11     Q.  Okay.  All right.  Let's take a look at
12 the last video.  Oh, I'm sorry.  I -- Before we
13 move on to the last video, it was three minutes and
14 14 seconds in the clip when you confirmed his
15 question.  You said, "Fuck the police," and you
16 said, "City" --
17     A.  Fuck the police.
18     Q.  "City Police."
19     A.  Yes.
20     Q.  You were specific, right?
21     A.  Yeah.
22     Q.  So I take it you hold that opinion today.
23 Right or wrong?
24     A.  (Indistinguishable.)
25     Q.  To what?

1     A.  (Indistinguishable.)
2     Q.  What does that mean?
3 COURT REPORTER:
4     I'm sorry, I don't -- I'm not sure what
5 you said.
6 THE WITNESS:
7     To the bad cops.
8 EXAMINATION BY MR. SCHILLAGE:
9     Q.  Okay.
10     A.  Ones -- The bad ones.  To the bad cops.
11     Q.  Okay.  Did you feel that way before
12 January 9, 2023?
13     A.  No.
14     Q.  Okay.  So when you were expressing
15 yourself to Detective Nevels in your
16 conversation --
17     A.  Right.
18     Q.  -- on that video, am I to understand that
19 that sentiment and that feeling, that belief you
20 had and are having today, is limited to this
21 January 9, 2023, arrest?
22 THE WITNESS:
23     I could answer this?
24 MR. THOMPSON:
25     I'm sorry.  I'm sorry.  I didn't hear the

1     question, Mike.  I'm sorry.
2 MR. SCHILLAGE:
3     It's okay.
4 THE WITNESS:
5     Because I want to answer this a certain
6     way instead of one simple answer.
7 MR. THOMPSON:
8     I'm sorry.
9 MR. SCHILLAGE:
10     Can you read the question back for him?
11     That will help him.
12 COURT REPORTER:
13     "On that video, am I to understand that
14     that sentiment and that feeling, that belief
15     you had and are having today, is limited to
16     this January 9, 2023, arrest?"
17 MR. THOMPSON:
18     So what he's asking you is, that your
19     feeling of fuck the police, is that limited to
20     just that day in question?  Is your feelings
21     based around that interaction you had with law
22     enforcement that day?  You're allowed to answer
23     yes or no, and you're also able to explain to
24     him --
25 THE WITNESS:

1     Yeah.
2 MR. THOMPSON:
3     -- why you feel that way or why your
4     answer was yes or no.
5 THE WITNESS:
6     To be honest, I know just off society, it
7     don't matter if you're doing good or bad.  From
8     my knowledge, it will come across interaction
9     with a police officer.  It's just your job for
10     to stay calm and do the things, but it's still
11     going to happen, unless it shows me otherwise.
12     I didn't go crazy with that officer you asked
13     me about in the room because he didn't show me
14     or hurt me.  He just verbally talking about my
15     mother and things like that.  I know he don't
16     know my mother.  I know he's joking, even if he
17     do.  What can you -- What can we do each other?
18     I haven't hurted him.  He haven't hurted me.
19     There's no sense of me cursing at him, talking
20     to him crazy.
21 EXAMINATION BY MR. SCHILLAGE:
22     Q.  So does that mean -- I appreciate the --
23     A.  Yeah.  Yeah.
24     Q.  -- explanation, but there wasn't a --
25     A.  I could --

Page 173

1  Q. -- yes or no.
2  A. -- answer your question --
3  I could answer your question now because I
4  got out how I felt about it.
5  Q. Sure. So was it -- that belief limited to
6  your January 9, 2023, arrest?
7  A. No.
8  Q. Okay. It's beyond your arrest
9  experience --
10  A. Yes.
11  Q. -- and it's based on other things that --
12  Well, like what?
13  A. Just stuff I see on the news with the
14  corruption in my city.
15  Q. Okay. Does it have anything to do with
16  any prior arrest for you?
17  A. No.
18  Q. Okay. All right. At the -- Towards the
19  end of the clip you said you took an Adderall? You
20  called it a chill pill, right?
21  A. I was joking.
22  Q. Okay. Do you have a prescription for
23  Adderall?
24  A. Used to. But I was joking. I don't -- no
25  longer take those. I haven't took those since high

Page 174

1  school.
2  Q. Okay. All right. We can move to the
3  fourth video. It's going to be Exhibit 6 to the
4  deposition. This is Serial Number 2240_X60A42202.
5  MR. THOMPSON:
6  Do you need a break?
7  THE WITNESS:
8  Yeah. I need a bathroom break.
9  MR. THOMPSON:
10  Do you mind if he takes a bathroom break?
11  MR. SCHILLAGE:
12  No. Let's take five minutes.
13  VIDEOGRAPHER:
14  Off the record. The time is now 2:27.
15  (OFF THE RECORD.)
16  VIDEOGRAPHER:
17  Back on the record. The time is now 2:43.
18  EXAMINATION BY MR. SCHILLAGE:
19  Q. All right, Mr. Lee, we're back from a very
20  brief break, and we are going to start back with
21  Exhibit 6, Video 4. We identified it right before
22  we went off the record. So this is Matt Wallace's
23  body cam from inside the warehouse. This is the
24  questioning of you. And it is memorialized on the
25  body cam realtime of January 9, 2023, military time

Page 175

1  of 22:40:15. So that's 10:40 PM. All right. Mr.
2  Lee, I am going to show it to you and we'll play it
3  in its entirety. It's about four minutes and 45
4  seconds from start to finish. Okay?
5  A. All right.
6  (VIDEO RECORDING BEING PLAYED.)
7  THE WITNESS:
8  I can't see anything.
9  MR. THOMPSON:
10  You can't see?
11  THE WITNESS:
12  No. I can hear it.
13  MR. THOMPSON:
14  Mike, it does look like the glare --
15  I'm sorry. Ryan Thompson, for the record.
16  Can you lighten it up, like just give him
17  some more --
18  MS. HAWKINS:
19  The background light.
20  MR. THOMPSON:
21  The background light. Yeah, there it is.
22  That gave it some.
23  (VIDEO RECORDING BEING PLAYED.)
24  EXAMINATION BY MR. SCHILLAGE:
25  Q. All right. So the video just finished.

Page 176

1  It went through the 14 minutes 46 seconds. So in
2  realtime, the -- that interview ended on January 9
3  at 10:40 PM and 12 seconds.
4  All right. So, Mr. Lee, that was the
5  interview -- Well, let me ask. The video we just
6  watched, did you watch it yesterday or in
7  preparation for this depo, like you did some of the
8  others?
9  A. I ain't watched it in preparation, but I
10  seen it before.
11  Q. Okay. Is that the only interview you gave
12  in the warehouse regarding this January 9 arrest?
13  A. Yes.
14  Q. Okay. There wasn't two interviews or
15  something, right?
16  A. No.
17  Q. Okay. Now, the timestamp on the body cam
18  of when it was taken is 10:40 PM. Does that sound
19  accurate --
20  A. Yeah.
21  Q. -- based on the videos that we looked at?
22  A. Yeah.
23  Q. Okay. So around 3:50 PM, that was Video
24  1, where Matthew Wallace comes around the front
25  door, interacts with you, puts you in handcuffs and

Electronically signed by Toni Conner (501-190-381-9495)    2f67950e-8c04-4061-959b-7823204c7c89

1  puts you in a police car.  And then at 8:30 PM we
2  see Video 3, where Officer Nevels is having a
3  discussion with you in the holding cell.
4      A.  Correct.
5      Q.  Video 4 is at 10:40 PM, about two hours
6  ten minutes later --
7      A.  Correct.
8      Q.  -- roughly.
9        That's when you have your interview with
10  Matthew Wallace.
11      A.  (Nodding head.)
12      Q.  Okay.  So obviously y'all talked about a
13  few things, almost five minutes' worth of
14  information.  He went over the tattoos that you
15  have.  He inquired and you explained what
16  relationship, if any, to the groups.  He referred
17  to Vultures, 5400 Boys.  You answered the
18  questions.  There was a comment about your relation
19  to that house and the groups was limited to, you
20  know, an aunty.  Is that the same aunty we talked
21  about earlier?
22      A.  No.
23      Q.  It's a different person?
24      A.  Different person.
25      Q.  Okay.  Who is that that you're talking

1  about on this video?
2      A.  That was my daddy's sister.
3      Q.  Okay.
4      A.  Her little -- Her house was on Paige
5  Street, too, but I don't know the address by heart,
6  but --
7      Q.  Okay.
8      A.  -- she stay two houses down from my
9  grandmother.
10      Q.  On Paige Street?
11      A.  On Paige Street.
12      Q.  What's your aunt's name?
13      A.  Kenyetta Cain.
14      Q.  Can you spell it for Madam Court Reporter?
15      A.  K-E-N-Y-E-T-T-A C-A-I-N.
16      Q.  Okay.  Is she your cousin Deonte Bank's
17  deceased mother?
18      A.  No.
19      Q.  Okay.  Who is Deonte Cain's mother who
20  passed away?
21      A.  Wrong -- Who?
22      Q.  I'm asking, what is her name?
23      A.  Who?
24      Q.  We didn't cover your cousin's mother's
25  name or --

1      A.  Dayln Banks.
2      Q.  Say the first name.
3      A.  Dayln Banks.
4      Q.  No, no.  That's your cousin, right?
5      A.  Yes.
6      Q.  What's his momma's name who passed away?
7      A.  His momma's name was Pamela Banks.
8      Q.  Pamela Banks.  Okay.
9        Did you understand your aunt, Kenyetta
10  Cain, to go to 5450 Cadillac Street?
11      A.  You said what?
12      Q.  Did you ever understand your aunt,
13  Kenyetta Cain, to go to 5450 Cadillac Street?
14      MR. THOMPSON:
15        Have you ever known her to go to 5400
16  Cadillac Street?
17      THE WITNESS:
18        No.  I've never seen her there.
19  EXAMINATION BY MR. SCHILLAGE:
20      Q.  Okay.  Well, maybe I'm misunderstanding.
21  How is your aunty, who you explained is Kenyetta
22  Cain, a relationship to how you know some of the
23  people at the Cadillac Street?
24      A.  You confuse yourself.
25      Q.  Okay.  Clarify it for me.

1      A.  I told you that the only -- have -- You
2  asked me have I seen anyone else at that house as
3  an adult.  I said, "Yes.  I seen his aunty there."
4  But we established his aunty and my aunty are two
5  different people.
6      Q.  Fair.  But on the video you made a
7  reference to your aunty, who you were telling me --
8      A.  She stays in Zion City.
9      Q.  Okay.  So that's the connection you were
10  explaining to the detective on the body cam?
11      A.  Yeah.  You confused --
12      Q.  Okay.
13      A.  -- yourself.
14      Q.  Well, you never explained that.  But you
15  have now, so I appreciate it.
16        So you about getting money.  That's
17  something that you said in the video, correct?
18      A.  Y'all like money?
19      Q.  Okay.
20      MR. THOMPSON:
21        That's not how it works, brother.
22      THE WITNESS:
23        Okay.  I'm getting anxious now.  I'm ready
24  now.
25  EXAMINATION BY MR. SCHILLAGE:

Page 181

1      Q.  Was it cold in the warehouse?
2      A.  Yeah.  Majorly.
3      Q.  January 9, wintertime, right?
4      A.  Yeah.
5      Q.  You had no sleeves on the beater shirt you
6   were wearing?
7      A.  None.
8      Q.  Okay.
9      A.  It was cold in the warehouse, though.  It
10   was probably hot that day or whatever, but it was
11   cold in the warehouse.
12      Q.  Well, if you were in the holding cell at
13   roughly 8:30 and then two hours plus a little more
14   time you were in the warehouse, you had been there
15   for a considerable period of time, right?
16      A.  Right.
17      Q.  Okay.  Do you remember it being cold in
18   the warehouse?
19      A.  They got AC.
20      Q.  I'm sorry?
21      A.  They have AC.
22      Q.  Okay.  In the warehouse?
23      A.  No.  In the -- What's -- In the building.
24      Q.  Okay.  In the ware -- Well, do they have
25   heat?

Page 182

1      A.  No.
2      Q.  Okay.
3      A.  When I got strip-searched, it was cold.
4      Q.  Okay.  Obviously Matthew Wallace is the
5   one talking to you in Video 4.
6      A.  Yeah.
7      Q.  Four minutes 45 seconds worth of recorded
8   body cam where y'all were talking back --
9      A.  Excuse me.
10      Q.  -- and forth.
11         And you didn't tell him anything about
12   pain in your head, face, or ribs, but you did say
13   that Matthew Wallace was involved in some of that,
14   wasn't he?
15      A.  Correct.
16      Q.  Is there any particular reason you didn't
17   tell him during this conversation?
18      A.  He knew already.
19      Q.  He already knew?
20      A.  Yeah.
21      Q.  If he's talking to you at 10:40 in the
22   interview, how long ago at that point during the
23   interview had the punch and the kicks taken place?
24   How much time had passed between the kicks and the
25   punch versus the Video 4 interview at 10:40 PM?

Page 183

1      A.  You say what time the kicks and punches --
2      Q.  How much time?
3      A.  You tell me the time, then tell -- and
4   then ask me the time.
5      Q.  No, sir.  I'm trying to give you a point
6   of reference.
7      A.  8:00 to 10:00.  10:40.  8:30 to 10:40.
8   I'm not normally good up in my head, but I know the
9   timeframes.
10      Q.  Okay.  So at 8:30 PM you were talking with
11   Detective Nevels in the holding cell?
12      A.  Yes.
13      Q.  So it's your recollection that the punch
14   and the kicks happened shortly before?
15      A.  No, not shortly.
16      Q.  Okay.
17      A.  It happened as soon as I got there.
18   Immediately.  Yeah, immediately.
19      Q.  No, no, no.  That part I'm clear.  What
20   I'm not clear on is how much time passed between
21   the physical punch and kicks --
22      A.  Uh-huh.
23      Q.  -- and Matthew Wallace's interview at
24   10:40 PM.  Was it 15 minutes?  Was it four hours?
25   Do you see what I'm saying?  I don't need you to

Page 184

1   tell me X, Y, Z o'clock.
2      A.  Yeah.
3      Q.  If you can, please do.  But I doubt you
4   can, because that would be difficult.
5      A.  To be honest, you know it's difficult, so
6   that's why you doing that.  So I'm gonna to tell it
7   to you like this.  Whenever they announced on Video
8   3, at the end of the video, when we was leaving, it
9   took approximately five minutes to get there.  The
10   time that we arrived there, I don't remember, but
11   you tell me 8:30 is when I got questioned, so I'm
12   assuming from 3:00 to 8:00.  That's five hours.
13      Q.  Any time in there?
14      A.  Yes.
15      Q.  Okay.  And that's -- that's exactly what I
16   was trying to understand, whether that was your
17   understanding or not.
18      A.  Uh-huh.
19      Q.  So the punch and the kicks in the
20   warehouse after --
21      A.  Came before anything.
22      Q.  -- after you were strip-searched was
23   sometime before you spoke to Detective Nevels on
24   Video 3 and before you talked to Officer Wallace in
25   the interview on Video 4?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 185

1    A. Yeah. It was all before.
2    Q. Okay. But just can't -- you can't -- you
3    can't determine what time you were walked into the
4    Brave Cave for --
5    A. I was --
6    Q. -- the first time?
7    A. I was kidnapped. No phone. You can't
8    tell me what time it was if I'm in the holding cell
9    without a clock or anything. I'm going off memory.
10   Q. Sure. But you didn't go into a holding
11   cell before the strip-search?
12   A. No. I got -- went outside before in the
13   warehouse.
14   Q. Okay. So if it's between 3:00 and 8:00,
15   is that a short period of time before the
16   interview?
17   A. You tell me.
18   Q. No, sir. I have to ask you.
19   MR. THOMPSON:
20       If you know, you know.
21   THE WITNESS:
22       No, I --
23   MR. THOMPSON:
24       If you don't know, you say you don't know.
25   THE WITNESS:

Page 186

1       I don't know.
2    MR. THOMPSON:
3       Okay.
4    MS. HAWKINS:
5       That's your answer.
6    MR. THOMPSON:
7       That's your answer.
8    THE WITNESS:
9       (Indistinguishable.)
10   COURT REPORTER:
11      I'm sorry?
12   THE WITNESS:
13      I was talking to myself. I say that's
14   five hours.
15   EXAMINATION BY MR. SCHILLAGE:
16      Q. That's a long time, isn't it?
17      A. Yeah.
18      Q. Okay. So you were also asked and you
19   answered questions for Detective Wallace during
20   that questioning about you arriving at Cadillac
21   Street in the Chrysler.
22      A. Yeah. Around 10:40. Yes.
23      Q. And they asked you about the guns that
24   were found in the car.
25      A. Yes.

Page 187

1       Q. And you were at that time under a strong
2    belief they were legal?
3       A. I knew that they were.
4       Q. Okay. Now, obviously the conversation
5    continued and Detective Wallace told you,
6    "Actually, we've confirmed one is stolen from our
7    own reports." Did that change your mind on whether
8    any of the guns in the car were legal or not legal?
9       A. I did not know what to believe, because
10   they told me was FBI. And it wasn't FBI, so.
11      Q. Okay. So you didn't know what to believe?
12      A. Yeah, I didn't know what to believe.
13      Q. Okay. So to this day, do you have a
14   belief whether that gun was stolen or not that you
15   were asked about?
16      A. I don't know. They wasn't mine's.
17      Q. Okay. There was also discussion in the
18   Video 4 towards the end about the DNA swabs that
19   were taken.
20      A. Correct.
21      Q. And you gave one?
22      A. They didn't -- They didn't give me.
23      Q. No. I'm --
24      A. No. No.
25      Q. You did not give a DNA swab?

Page 188

1       A. No.
2       Q. Are you sure?
3       A. No.
4       Q. Well, yes, you're sure that you did not
5    consent or give a DNA swab?
6       A. Correct.
7       Q. Okay. And that's based on your
8    recollection, of course? Right?
9       A. I thought you -- What you said?
10      Q. I said your answer is based on your
11   personal recollection.
12      A. Yes.
13      Q. You know you did not have a DNA swab taken
14   while you were there?
15      A. Yeah, correct.
16   MR. THOMPSON:
17      If you know, you know. If you don't, you
18   don't.
19   THE WITNESS:
20      I didn't.
21   MR. THOMPSON:
22      Okay.
23   EXAMINATION BY MR. SCHILLAGE:
24      Q. You didn't. Okay. I appreciate that.
25      A. (Indistinguishable.)

Electronically signed by Toni Conner (501-190-381-9495)    2f67950e-8c04-4061-959b-7823204c7c89

Page 189

1    COURT REPORTER:
2        I can't hear.
3    MR. SCHILLAGE:
4        Just make sure you speak up so Madam Court
5    Reporter can hear you.
6    THE WITNESS:
7        I said they did it three times.
8    EXAMINATION BY MR. SCHILLAGE:
9        Q.   When you said you walked into the front of
10   the house at 5450 Cadillac, what room or rooms did
11   you actually go into once you were in the house?
12       A.   I didn't go past the front area of the
13   kitchen and the living room.  I didn't walk past
14   nowhere.
15       Q.   Okay.  But -- You did a good job
16   identifying.  Kitchen and living room were places
17   where you were?
18       A.   It's together.
19       Q.   Okay.
20       A.   You walk in the room, kitchen's straight
21   ahead, living room.
22       Q.   Okay.  I appreciate that.
23   MR. SCHILLAGE:
24       Ryan, you got Exhibit 1 next to you.
25       Would you mind furnishing it back to your

Page 190

1    client?
2    EXAMINATION BY MR. SCHILLAGE:
3        Q.   Turn to Page 41 of 50, Mr. Lee.  Okay.  Do
4    you see at the top of the page where it identifies
5    the Kitchen?
6        A.   Yes.
7        Q.   Okay.  It says two vacuum-seal bags, a
8    Smith & Wesson SD9VE nine-millimeter located in the
9    freezer, and four baggies of marijuana totaling 107
10   grams.  Do you see where I'm reading from?
11       A.   Yes.
12       Q.   Okay.  Did you see any of that when you
13   walked in the kitchen?
14       A.   No, sir.
15       Q.   Okay.  Do you see Living Room beneath it?
16       A.   I see Located, too.
17       Q.   Right.  So go to the next line, where it
18   shows Living Room.  Do you see that?
19       A.   Yeah.
20       Q.   Okay.  One digital scale.  Did you see a
21   scale while you were in that open space of kitchen
22   and living room?
23       A.   No, sir.
24       Q.   Okay.
25   MR. SCHILLAGE:

Page 191

1        Okay.  I'm going to mark this document.
2        It's the amended complaint, record Document 65
3    in the pleadings.  As Exhibit 7.
4    EXAMINATION BY MR. SCHILLAGE:
5        Q.   And I'm going to hand it to you, Mr. Lee,
6    and I'm -- It's already turned to Page 8, and I put
7    a highlight on Paragraphs 55 and 56.  Do you see
8    the highlighted areas?
9        A.   Yeah.
10       Q.   Okay.  So that's the -- the punch and the
11   kicks that you've been talking about, right?  The
12   physical Troy Lawrence punch and then the two kicks
13   that you described?
14       A.   Uh-huh.
15       Q.   Okay.  Paragraph 56, it says soon after
16   the beating you were interviewed.  So that
17   two-to-five-hour window that you referred --
18       A.   Uh-huh.
19       Q.   -- to earlier, is that -- is that still
20   what you're talking about, is like that's a --
21   that's soon, that's fast?
22   MR. THOMPSON:
23       I'm going to object to that.  That was
24       the --
25   THE WITNESS:

Page 192

1        I don't know who wrote this.
2    MR. THOMPSON:
3        Be quiet.
4        That is the pleadings that were drafted by
5    the attorneys, as you know.  Those are just
6    allegations, as you know.  Those are not
7    something that -- Those are not Mr. Lee's
8    words.
9    MR. SCHILLAGE:
10       Well -- and that's fair.  But he hasn't
11   told me one way or another, so I have to ask.
12   MR. THOMPSON:
13       I just want to make sure that you
14   characterize it correctly.
15   MR. SCHILLAGE:
16       And you didn't --
17   MR. THOMPSON:
18       Those are not his words.
19   MR. SCHILLAGE:
20       I will say you are giving instruction in
21   your objection, which is improper.
22   THE WITNESS:
23       I don't even talk --
24   MR. SCHILLAGE:
25       The objection's to form only, and you know

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

1    that. So he hasn't been able to answer and now
2    you can't unring that bell. Nevertheless, I'm
3    going to move forward.
4    EXAMINATION BY MR. SCHILLAGE:
5        Q.  Mr. Lee, is it your position that you were
6    kicked and -- I'm sorry -- punched and kicked
7    twice, and soon after that you were interviewed by
8    Detective Matthew --
9        A.  No.
10       Q.  -- Wallace?
11       A.  No.
12       Q.  Okay.
13       A.  You want this back?
14       Q.  Yes, sir. We're going to keep it for
15   Madam Court Reporter, like all the other exhibits.
16       THE WITNESS:
17          Can you reach me my cold drink, please?
18       Thank you.
19   EXAMINATION BY MR. SCHILLAGE:
20       Q.  Okay. So, Mr. Lee, you explained the
21   chain of events where after you were brought out of
22   the BRPD --
23       A.  At what time?
24       Q.  -- processing facility you were then
25   brought to that police precinct?

1        A.  Uh-huh.
2        Q.  And then from there you went to the jail?
3        A.  Correct.
4        Q.  But they couldn't accept you?
5        A.  Correct.
6        Q.  You went to Our Lady of the Lake North?
7        A.  (Nodding head.)
8        Q.  From there, you went back to the jail?
9        A.  Correct.
10       Q.  And you were received and booked in
11   general population?
12       A.  Correct.
13       Q.  Okay. And you told me earlier today you
14   were there roughly nine to ten days. I mean, it's
15   a ballpark estimate, but that's what you said
16   earlier.
17       A.  I don't recall, but it could have been --
18   it could be more days.
19       Q.  Sure. Eight days, 12 days, whatever it
20   was, you would rely on the booking records of when
21   your release was, right?
22       A.  Yeah.
23       Q.  Sure. It's not that big a deal.
24          And we can do this. I've got courtesy
25   copies. This was stuff that was --

1        A.  Excuse me.
2        Q.  I believe this was sent by your lawyers to
3    me. It was given to us as the booking records.
4    And if you turn -- Since your attorney has the
5    document, I'm going to help him out. It's the
6    ninth from the last page in the back. It's the
7    Release Information page.
8        MR. THOMPSON:
9          Ninth -- Is it labeled Number 9?
10       MR. SCHILLAGE:
11          It's -- It shows the release information.
12       MR. THOMPSON:
13          Let me see here. Ninth from the back?
14       MR. SCHILLAGE:
15          Yep.
16   EXAMINATION BY MR. SCHILLAGE:
17       Q.  All right. And I do apologize. This --
18   This should be Exhibit 8 to the deposition. I'll
19   mark it after he answers the question.
20          Mr. Lee, do you see this page, Release
21   Information?
22       A.  Yes, sir.
23       Q.  Okay. And you see it's got your name
24   listed, last name, first name?
25       A.  Yes, sir.

1        Q.  All right. And it shows a release date of
2    January 19, 2023, in the top right corner?
3        A.  Correct.
4        Q.  And a release time of 9:40 AM. Does that
5    sound about right, whenever you left the jail --
6        A.  Correct.
7        Q.  -- as a result from this arrest?
8        A.  Correct.
9        Q.  So from the -- I think you entered the
10   jail on the 10th, the next morning, and so it would
11   be the 19th. So --
12       A.  Nine days.
13       Q.  So -- You got that one. That's right.
14       A.  Correct.
15       Q.  That was a good memory.
16          All right. So that's the date you were
17   released. During the roughly nine-day period that
18   you were in jail, you called your mother a couple
19   of times, right?
20       A.  Correct.
21       Q.  Okay. And you had some substantive
22   conversations about bond information, release, an
23   attorney, for your criminal information -- or
24   criminal charges, and among other things. Like --
25       A.  Correct.

Page 197

1    Q.  You were talking to your mom, and you told
2  her that you were urinating blood at one point.
3    A.  Correct.
4    Q.  Do you remember that?
5    A.  Correct.
6    Q.  Okay.  If you don't mind, hand me that
7  back so I can mark it.
8    MR. SCHILLAGE:
9      I apologize to Madam Court Reporter that I
10     didn't do that first.
11     So Exhibit 8 is the -- what we're going to
12     call the in globo package.  It's plaintiff's
13     booking information that plaintiffs furnished
14     to us in discovery.
15   EXAMINATION BY MR. SCHILLAGE:
16     Q.  I'm going to give you it back to that same
17   page, Mr. Lee.  You should have Exhibit 2 already
18   in front of you.
19     A.  Uh-huh.
20     Q.  Okay.
21     MR. THOMPSON:
22       Mike, just for the record, I want to make
23       sure, were you -- are you referencing an
24       audio recording or jailhouse phone call?
25     MR. SCHILLAGE:

Page 198

1      No.  I just asked if he had talked to his
2    mom.  I'm sure there's audio recordings.  I
3    didn't -- I don't have one and I didn't give
4    him one to listen to, but --
5    MR. THOMPSON:
6      So --
7    MR. SCHILLAGE:
8      -- I know he spoke to his mother.
9    MR. THOMPSON:
10     How do you know that?
11   MR. SCHILLAGE:
12     Because he just told me.
13   MR. THOMPSON:
14     No.  You asked him.  You --
15   THE WITNESS:
16     I ain't respond to you.
17   MR. THOMPSON:
18     -- led the question with that and you said
19     that -- you asked him several --
20   MR. SCHILLAGE:
21     No.
22   MR. THOMPSON:
23     -- phone calls about bookings --
24   MR. SCHILLAGE:
25     Sure.

Page 199

1    MR. THOMPSON:
2      -- and about bonds.
3    MS. HAWKINS:
4      And specifically about telling her about
5      blood in his urine.
6    THE WITNESS:
7      Yeah.  I ain't tell him that.
8    MR. THOMPSON:
9      And so --
10   MR. SCHILLAGE:
11     Well, if we get to the next question,
12     you're going to understand.
13   MR. THOMPSON:
14     Okay.
15   EXAMINATION BY MR. SCHILLAGE:
16     Q.  So flip, Mr. Lee, to Exhibit 2.  So it
17   shows in the bottom right corner 7 of 8.
18     A.  Uh-huh.
19   MR. THOMPSON:
20     Where you at, brother?
21   MR. SCHILLAGE:
22     Page -- It says 7 of 8 in the bottom right
23     corner.  Are you there?
24   MR. THOMPSON:
25     Nah.  We're there.

Page 200

1    MR. SCHILLAGE:
2      And, again, these were also furnished to
3      us by your attorneys.
4    MR. THOMPSON:
5      Uh-huh.
6    EXAMINATION BY MR. SCHILLAGE:
7      Q.  All right.  So you see the upper middle
8    section labeled Chart Notes?
9      A.  Correct.
10     Q.  Okay.  The second row reflects a date
11   timestamp of January 14, 2023, at 2:24 AM.  Do you
12   see that one?
13     A.  Yeah.
14     Q.  Okay.  I'm just going to read it out loud
15   to -- to help us move it along, but it reads in the
16   chart note here for that date and time: "Urine
17   sample collected.  Dip stick completed.  No trace
18   of blood in urine.  No other abnormal findings.
19   Inmate was also educated on incentive spirometer
20   usage, and that he'll be given incentive spirometer
21   every walking hour."  Okay.  You saw where I'm
22   reading from?
23     A.  (Nodding head.)
24     Q.  I know you were looking at me most of the
25   time, but did you review it?

Page 201

1    A.  I understand it.
2    Q.  Okay.  Perfect.
3        So you had the medical staff assist you
4    and return a request on this so you could be
5    checked for that purpose, right?
6    A.  Correct.
7    Q.  Okay.  And, thankfully, there was no trace
8    of blood in the urine on this check?
9    A.  On the fourth sample.
10   Q.  Okay.  So how many samples are there?
11   A.  They took three, and they only got one on
12   here.  That breathed -- the thing you're talking
13   about, they didn't give that to me almost until the
14   last day.
15   Q.  Last day of what?
16   A.  Before I bonded out of jail.  I was making
17   phone calls, phone call after phone calls, saying,
18   "I'm peeing blood.  I'm peeing blood."  Then you go
19   back to the date that you see that -- You -- You're
20   going to get the records, to the date that you see
21   that they labeled it.  The phone call been already
22   processed.
23   Q.  Okay.  I want to understand what you're
24   saying.
25   A.  You understand.

Page 202

1    Q.  Are you saying that the phone calls
2    happened after --
3    A.  Before.
4    Q.  -- the chart note?
5    A.  Yes.  They -- I'm going to help you better
6    understand it.  I'm sorry.  I only see one label on
7    here, and I see the date.  It says on the -- Where
8    is it?  On the 14th.  I let them know that the
9    second day I was in prison.
10   Q.  The second day you were in prison would be
11   January 11, right?
12   A.  Exactly.
13   Q.  Okay.  So you -- So you told medical staff
14   on January 11 --
15   A.  Yes.
16   Q.  -- that you were urinating blood?
17   A.  I had a whole meeting with the staff
18   supervisor, the nurse supervisor.  I had a whole
19   meeting with them.
20   Q.  Okay.  And what happened as a result of
21   that?
22   A.  They said they didn't know I had blood and
23   stool in my urine.  They didn't know.  We ran a
24   couple of tests afterwards.  They said they didn't
25   see it anymore.

Page 203

1    Q.  Okay.
2    A.  But they definitely knew.
3    Q.  When you say you definitely -- "they
4    definitely knew," I want to understand that, too.
5    They definitely knew you had made reports of it or
6    they knew --
7    A.  I had --
8    Q.  -- that there was blood in your urine?
9    A.  I had a meeting with the supervisor of the
10   jail, the nurse supervisor, and whoever comes in on
11   the shift when they rotate.  I had a meeting with
12   all of those people.  They all know my -- They all
13   knew my injuries.  They all knew everything.
14   Q.  Okay.  So I understand from the lawsuit
15   and the discovery --
16   A.  I can't make you understand.
17   Q.  -- you've -- you itemized the head and the
18   ribs, and this medical record is the only thing
19   that I've seen that covers blood in the urine.  So
20   I have to ask about it.
21   A.  You good.
22   Q.  That's why it's here.
23   A.  You good.
24   Q.  And I understand you made phone calls to
25   people in the jail.  Namely, to your mother,

Page 204

1    because you lived with her.
2    A.  Uh-huh.
3    Q.  And she's the one who made the -- Well,
4    we'll just get to it.
5    A.  Well, you got it.  You must got the
6    records over there.  Got to.
7    MR. SCHILLAGE:
8        So we can mark -- This is going to be
9    Exhibit 9 to the deposition.
10   THE WITNESS:
11       You want to keep all this stuff over here
12   in front of me?
13   MR. SCHILLAGE:
14       Yes, sir.
15   MR. THOMPSON:
16       Yes, sir.
17   MR. SCHILLAGE:
18       Please keep it there for Madam Court
19   Reporter to have.
20   THE WITNESS:
21       All right.
22   EXAMINATION BY MR. SCHILLAGE:
23   Q.  All right.  So this is a one-page
24   document, Mr. Lee.  It's an email.
25   A.  Uh-huh.

51 (Pages 201 to 204)

Page 205

1    Q.  And you can see your mother's first and
2  last name on the From line.  Do you see that?
3    A.  Yes.
4    Q.  Do you know her email address?
5    A.  Yes.
6    Q.  Okay.  The email address is listed there.
7  You -- You know or you can confirm for us --
8    A.  Yes.
9    Q.  -- that's your mom's email address?
10    A.  Yes.
11    Q.  All right.  Your mom sent this email to
12  Chief Paul and Mayor's Internet Account.  Do you
13  see that?
14    A.  Uh-huh.
15    Q.  And the --
16    A.  Yes.
17    Q.  -- cc line for cpauline as well?
18    A.  Yes.
19    Q.  Okay.  And it itemizes a description by
20  her on your behalf.
21    A.  Uh-huh.
22    Q.  And it's dated January 17, 2023, right?
23    A.  Correct.
24    Q.  Okay.  You were still in jail for two more
25  days at this point, right?

Page 206

1    A.  Correct.
2    Q.  So obviously you were speaking to your mom
3  on the phone while you were in jail; is that fair?
4    A.  Correct.
5    Q.  Of course.  So let me ask you this.  Did
6  your mother come physically to jail to visit you?
7    A.  No, sir.
8    Q.  Okay.  All communications were by
9  telephone --
10    A.  Yes.
11    Q.  -- with her while you were in jail?
12    A.  Yes.
13    Q.  Okay.  So is it your understanding that
14  the information in the substance of this email
15  about your arrest is to your mother from you?
16    A.  Yes.
17    Q.  Did you ask anyone to offer any
18  information about your arrest to your mom on your
19  behalf?
20    A.  She did it on her own.
21    Q.  No, no, no.  I'm just making sure.  Did
22  your mother hear anything --
23    A.  No.
24    Q.  -- to your knowledge --
25    A.  From nobody but me.

Page 207

1    Q.  Okay.  As far as you know, right?
2    A.  Nobody but me.
3    Q.  Okay.  So did you ask your mom to send
4  this email?
5    A.  I didn't know what my mother was doing.
6    Q.  Okay.  And --
7    A.  I told you she was smart.
8  MR. THOMPSON:
9      Relax, bro.
10  MR. SCHILLAGE:
11      That's Exhibit 9.
12      I'm going to mark this next document as
13  Exhibit 10.
14  MR. THOMPSON:
15      Thank you.
16  EXAMINATION BY MR. SCHILLAGE:
17    Q.  Here you go, Mr. Lee.
18  MR. SCHILLAGE:
19      Jessica, do you want a copy of this?
20  MS. HAWKINS:
21      Thank you.
22  EXAMINATION BY MR. SCHILLAGE:
23    Q.  Okay.  Have you seen Exhibit 10 before,
24  Mr. Lee?
25    A.  First time.

Page 208

1    Q.  Okay.  But obviously the time of this --
2  Well, do you know what the date of this was?
3    A.  This my first time seeing this.
4    Q.  Okay.  You spoke to Mr. Thompson.  I don't
5  want to know the contents thereof, but did you
6  request that he submit a complaint on your behalf?
7    A.  Yes.  At the parish prison, yes.
8    Q.  Okay.  As it relates to this complaint and
9  any Internal Affairs request by the police to take
10  a statement from you, did you give a statement?
11    A.  Yes.
12    Q.  And when did you do that?
13    A.  The day of Mr. Thompson came see me.
14    Q.  Of --
15  MR. THOMPSON:
16      I think he means to --
17  MR. SCHILLAGE:
18      Right, right.
19  EXAMINATION BY MR. SCHILLAGE:
20    Q.  And, look, and that's the thing.  I don't
21  want to -- We're teetering, and I don't want that
22  to go that way.
23    A.  Okay.
24    Q.  I don't want to know what you're talking
25  about with your lawyer.  Right?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 209

1    A. All right.
2    Q. When I say statement by the -- from the
3  police, I mean when the police opened up an
4  Internal Affairs investigation on this.
5    A. Uh-huh.
6    Q. Did you give BRPD a statement?
7    A. No.
8    Q. Okay. Did you want to?
9    A. I wanted to talk about it.
10   Q. Okay. Did you want to talk about it as it
11 related to the Internal Affairs investigation on
12 the complaint lodged on your behalf?
13   A. About the Brave Cave?
14   Q. Right.
15   A. Yes.
16   Q. Okay. Is there a reason why you did not
17 meet with BRPD to give your statement on behalf of
18 your complaint?
19   A. I didn't trust them.
20   Q. Okay.
21   A. (Indistinguishable.)
22 COURT REPORTER:
23   I'm sorry?
24 MR. THOMPSON:
25   Tell her what you said.

Page 210

1  THE WITNESS:
2    Not at all.
3  EXAMINATION BY MR. SCHILLAGE:
4    Q. Okay. So I'm going to read the last
5  sentence to you.
6    A. Of Exhibit 10?
7    Q. Correct.
8    "I'm happy to cooperate fully in your
9  investigation, but because I'm facing possible
10 criminal charges related to this incident, I'm
11 requesting you direct any follow-up questions to my
12 criminal defense lawyer." All right. You saw
13 where I read from?
14   A. Uh-huh.
15   Q. Okay. And that's a yes, for the record?
16 You said uh-huh.
17   A. Yes.
18   Q. Okay. Thank you.
19   Okay. So in order to cooperate fully, did
20 you do anything to offer a statement by writing?
21   A. No.
22   Q. Okay. And you did not give a verbal
23 statement --
24   A. No.
25   Q. -- to the police?

Page 211

1    A. No.
2    Q. Okay. Okay. Let's go back to Exhibit 2.
3  It's your medical records.
4    A. Uh-huh.
5    Q. And still on that same 7 of 8, the page.
6  Go down, if you would, in the same Chart Notes
7  section.
8  MR. KERSHAW:
9    What page are you on?
10 THE WITNESS:
11   Seven.
12 EXAMINATION BY MR. SCHILLAGE:
13   Q. So it's the same page, 7 of 8, in Exhibit
14 2. In the same Chart Notes section. And it is the
15 last row, January 15, 2023, at 8:26 PM. Do you see
16 that --
17   A. Yes, I see it.
18   Q. -- last one?
19   All right. It says -- It says, "Inmate up
20 to Medical to use his incentive spirometer. Inmate
21 was able to exercise his lungs for ten minutes,
22 able to get to 2,000 milliliters on incentive
23 spirometer scale. BBS clear. Reported
24 two-out-of-ten pain to left side during the
25 breathing exercise." All right. You saw where I

Page 212

1  read, Mr. Lee?
2    A. Yes.
3    Q. Okay. Do you remember telling the medical
4  staff that after you did that breathing exercise on
5  January 15 your pain on the -- your left side had
6  gone down to a two out of ten?
7    A. No.
8    Q. Okay. Do you believe you said that?
9    A. I did not say that.
10   Q. Okay. So you believe this is false --
11   A. That's false.
12   Q. -- in the Chart Notes?
13   A. That's false.
14   Q. Okay. What do you remember the pain in
15 your left side, if it existed, was, generally
16 speaking?
17   A. Ten.
18   Q. Ten out of ten?
19   A. Even with my mother call record, because I
20 told her, like, that same thing. So it's no way
21 possible I said two, then I still got out of jail
22 and two ribs was fractured and I -- that I didn't
23 know of.
24   Q. Okay.
25   A. I didn't know my ribs was fractured until

Electronically signed by Toni Conner (501-190-381-9495)    2f67950e-8c04-4061-959b-7823204c7c89

Page 213

1  I got out of jail.
2      Q.  So -- Okay.  Well, you bring up an
3  interesting point in this medical record, Exhibit
4  2.  If you would turn -- it's three pages later,
5  Mr. Lee.  It now says 1 of 6.
6      A.  Yeah.
7      Q.  Do you see the After Visit Summary at the
8  top?
9      A.  Yeah.
10     Q.  And it reflects you're the patient in the
11  top left corner.  Do you see that?
12     A.  Yes.
13     Q.  January 10, 2023?
14     A.  Yes.
15     Q.  Okay.  And this is OLOL North?
16     A.  Uh-huh.
17     Q.  The facility?
18     A.  Uh-huh.
19     Q.  Okay.  Take a look in that top right
20  corner, where it says Today's Visit.
21     A.  Uh-huh.
22     Q.  Reason for Visit's rib injury.  Diagnosis:
23  Closed fracture of one rib of left side, initial
24  encounter.  Chest pain.  Left facial pain."  Do you
25  see that?

Page 214

1      A.  I can say something?
2      Q.  Well, I've got to ask my question first.
3      A.  All right.
4      Q.  So this medical record reflects that there
5  is a closed fracture of one rib from Our Lady of
6  the Lake North, and you've made a comment about two
7  ribs.  So my question is --
8      A.  It was 6 and 7.
9      Q.  I know we know where we think we're going
10  with the conversation, but you've got to let me
11  finish my question.
12         What information do you have or medical
13  records that suggest or confirms that you had two
14  broken ribs as opposed to one?
15     A.  I didn't even know they gave -- They
16  didn't even give the prison the paperwork.  So how
17  would I know if I have two fractured ribs?  I had
18  to get the paperwork from the urgent care when I
19  got out of jail.  My lawyer trying to get the
20  paperwork and everything.  He -- He assisted me on
21  going get it.
22     Q.  Okay.  So if I understand you, when you
23  were at OLOL North --
24     A.  Yeah.
25     Q.  -- before you were going to get booked

Page 215

1  into jail --
2      A.  Uh-huh.
3      Q.  -- and you went there --
4      A.  Yeah.
5      Q.  -- you had an x-ray or CT scan --
6      A.  But I --
7      Q.  -- performed?
8      A.  -- didn't see my paperwork.
9      Q.  Okay.  Did a doctor talk to you?
10     A.  No.
11     Q.  Ms. Samaki --
12     A.  That's not the lady that was there.
13     Q.  Okay.  She did not talk -- Ms. Samaki
14  Green did not talk to you?
15     A.  No.
16     Q.  Okay.
17     A.  And it's a hairline fracture.  So it took
18  a -- If you Google it --
19  MR. THOMPSON:
20     Jeremy.
21  THE WITNESS:
22     All right.
23  MR. THOMPSON:
24     He asks the questions, brother, and you
25     answer them.

Page 216

1  THE WITNESS:
2     All right.  I can't wait until I get the
3     chance to ask questions.
4  EXAMINATION BY MR. SCHILLAGE:
5      Q.  So --
6      A.  I can't ask nothing.
7      Q.  Mr. Lee, nobody from Our Lady of the Lake
8  spoke to you and went over discharge instructions
9  with you?
10     A.  No, sir.
11     Q.  So what happened at the OLOL North
12  facility once --
13     A.  I --
14     Q.  -- they took your x-ray scan?
15     A.  I -- Immediately after I was done with my
16  x-ray, me and the police officer left the facility.
17     Q.  Okay.  And you didn't sign a discharge
18  paper or anything along those lines?
19     A.  I would have had it.
20     Q.  And you're sure of that?
21     A.  I answered your question.
22     Q.  Okay.
23     A.  And you asked me a question, and then when
24  I don't answer, you telling me I have to answer
25  your question.  You're playing mind games with me,

54 (Pages 213 to 216)

Page 217

1    bro. Come on, now.
2        Q.   Sir, I just need you to answer the
3    questions.
4        A.   And when I do, you ask me again.
5        A.   All right. Okay. Oh, turn to the last
6    page of the document --
7        A.   On which paper?
8        Q.   -- if you will.
9        MR. THOMPSON:
10           Which exhibit, Mike?
11       MR. SCHILLAGE:
12           It's the very last page of Exhibit 2.
13       MR. THOMPSON:
14           Got you.
15   EXAMINATION BY MR. SCHILLAGE:
16       Q.   Okay. This is an OLOL North document. I
17   see a date on it February 23 of 2023. "To Whom It
18   May Concern."
19       A.   Uh-huh.
20       Q.   "Jeremy Lee was seen and treated in Our
21   Lady of the Lake North Baton Rouge Urgent Care
22   Department January 10, 2023."
23       A.   Uh-huh.
24       Q.   "He may return to work without restriction
25   on January 10, 2023. Medically clear for booking

Page 218

1    with BRPD. Sincerely, Emergency Department
2    Providers Mitchell Thomas Montelaro and Jacie
3    Bergeron." Did I read the document correctly? It
4    says what it says, right?
5        A.   Yes.
6        Q.   Okay. Did you ever receive this document?
7        A.   First time seeing this.
8        Q.   Okay. Did you request a work or school
9    excuse letter from OLOL North like it shows at the
10   top line?
11       A.   Why would I do that? I'm in jail.
12       Q.   Well, my question is, sir --
13       A.   No.
14       Q.   -- after you got out of jail did you ask
15   for it?
16       A.   Yes. With my lawyer.
17       Q.   Okay. Because you see the date, February
18   23, 2023, right?
19       A.   Yeah.
20       Q.   We've already established you got out of
21   jail on January 19 --
22       A.   Yeah.
23       Q.   -- 2023.
24       A.   Yeah.
25       Q.   So at some point --

Page 219

1        A.   Right.
2        Q.   -- whether in jail, but especially --
3        A.   Yeah.
4        Q.   -- in consideration --
5        A.   Yeah.
6        Q.   -- after you're out of jail --
7        A.   Yeah.
8        Q.   -- did you ask for this document?
9        A.   Yes.
10       Q.   Okay. And this is what you received?
11       A.   Yes, I received that. On February 23rd I
12   received this.
13       Q.   Okay.
14       MR. THOMPSON:
15           That wasn't the question. Clear this up.
16   Earlier -- Just to make sure. Have you seen
17   that?
18       THE WITNESS:
19           I thought that was a different paper.
20       MR. THOMPSON:
21           Have you seen that document before?
22       THE WITNESS:
23           Yes, I seen it. I thought this was a
24   paper that was given to me while I was
25   incarcerated.

Page 220

1        MR. THOMPSON:
2            Okay.
3    EXAMINATION BY MR. SCHILLAGE:
4        Q.   All right. Mr. Lee, if -- at any point in
5    time during your life, but with consideration of
6    January 9, 2023 --
7        A.   All right.
8        Q.   -- have you ever considered yourself to be
9    a member of a group known as the 5400 Boys with the
10   True Bleedas or Bleedas?
11       A.   I'm going to answer your question again.
12   No.
13       Q.   Okay. What about the Vultures?
14       A.   No.
15       Q.   Those are rival groups?
16       A.   I don't know.
17       Q.   Okay. Do you own any guns?
18       A.   No.
19       Q.   Okay. You've taken pictures with guns,
20   right?
21       A.   Mine's.
22       Q.   Any kind of gun.
23       A.   Mine's.
24       Q.   Sure, yours.
25       A.   Yeah.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 221

1    Q.  Okay.  I'm going to hand you a doc -- Oh,
2  I need to mark it.  I'm sorry.  And I'll have to
3  mark it on the back because of the ink.
4    A.  Yeah, that's not even the same gun.
5  MR. THOMPSON:
6      He's asking -- Just answer the question.
7  MR. SCHILLAGE:
8      We're on Exhibit 11 now?
9  COURT REPORTER:
10     Eleven, yes.
11 EXAMINATION BY MR. SCHILLAGE:
12    Q.  Okay.  All right.  So Exhibit 11, it's a
13  one-page photo.  All right.  Mr. Lee, do you see
14  yourself in the picture?
15    A.  Correct.
16    Q.  That is you second from the right?  You've
17  got your hands up?
18    A.  Yeah.
19    Q.  Okay.  And it shows on the bottom of this
20  page, it's got your name with the date July 8,
21  2022.
22    A.  Correct.
23    Q.  This is a social media photo, right?
24    A.  Correct.
25    Q.  Facebook?

Page 222

1    A.  Correct.
2    Q.  Okay.  Who's the person on the right?
3    A.  On the right of me?
4    Q.  Well, the rightmost in the photo.
5    A.  His name is Alexander Spiro.
6    Q.  Okay.  Do you know what kind of gun he's
7  holding?
8    A.  Yes.
9    Q.  What is that?
10    A.  An AR pistol.
11    Q.  Okay.  Is that yours?
12    A.  No.
13    Q.  Okay.  Then if we just move person by
14  person from right to left, that's you next,
15  correct?
16    A.  Yeah.
17    Q.  You've got the medallion necklace on?
18    A.  For sure.
19    Q.  All right.  Who's next to you, next person
20  to the left?
21    A.  Deondre Tate.
22    Q.  Okay.  And the person farthest left in the
23  photo?
24    A.  That's Dayln.
25    Q.  I'm sorry?

Page 223

1    A.  That's Dayln.
2    Q.  That's your cousin?
3    A.  Yeah.
4    Q.  Okay.  Is that your money he's holding or
5  his, or you don't know?
6    A.  That's Dayln money.
7    Q.  Okay.  You don't share?
8    A.  I'm a grown man.  Why would I let somebody
9  else hold my money?
10    Q.  Okay.
11 MR. THOMPSON:
12     Yes or no.
13 EXAMINATION BY MR. SCHILLAGE:
14    Q.  Did you post this photo?
15    A.  Yeah.
16    Q.  Okay.  Is there a difference between the
17  posting date and when it was taken, or is that the
18  same thing, July 8, 2022?
19    A.  Yeah.  This picture was taken on July '22.
20    Q.  Okay.
21    A.  July 8, 2022.
22 MR. SCHILLAGE:
23     That was 11?
24 COURT REPORTER:
25     (Nodding head.)

Page 224

1  EXAMINATION BY MR. SCHILLAGE:
2    Q.  All right.  Exhibit 12.  There you go, Mr.
3  Lee.
4    A.  That's my AK.  For real.
5  MR. THOMPSON:
6      Let him ask the questions and you answer
7   the question.
8  EXAMINATION BY MR. SCHILLAGE:
9    Q.  All right, Mr. Lee, this is Exhibit 12,
10  and it -- it's similar at the bottom format, where
11  it's got your name and the date with the same, you
12  know, font and image of the little earth and the
13  ability to have likes down there.  So that's your
14  name, Jeremy Lee, dated November 26, 2020.  Do you
15  see that?
16    A.  Correct.
17    Q.  All right.  Same question that I asked you
18  before.  Is this picture -- Was it posted around
19  the same date that it was taken or was it taken and
20  then later posted on November 26?
21    A.  Posted on the same day I took it.
22    Q.  So that's your gun that you're holding?
23    A.  Correct.
24    Q.  And what kind of gun is that?
25    A.  AK-47.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 225

1  Q.  Okay.  And the money in a semi-circle on
2  the ground, is that all yours?
3  A.  Correct.
4  Q.  That's not your cousin Dayln's?
5  A.  No.  That's my money.
6  Q.  Okay.  He don't let you hold his either?
7  A.  Why would I ask?
8  Q.  The car in the background, is that your
9  vehicle?
10  A.  Correct.
11  Q.  Is that what you drove to Tennessee?
12  A.  That was in 2020.
13  Q.  Well, I understand there's a little
14  three-year gap here, but is -- was that your car
15  in 2020 in this photo?
16  A.  Yes.
17  Q.  Okay.  Was it your car in 2023?
18  A.  No.
19  Q.  Okay.  Did you sell it?
20  A.  Yes.
21  Q.  Okay.  Who did you sell it to?
22  A.  I don't recall the gentleman name.
23  Q.  Okay.  Do you have a car today?
24  A.  No, sir.
25  Q.  Okay.  If we go back to Exhibit 11, the

Page 226

1  vehicle in the background behind you, your cousin,
2  and your -- I believe -- Well --
3  A.  It wasn't mine.
4  Q.  You said Deondre Tate's an associate.  The
5  gentleman on the far right, what's his name again?
6  A.  Alexander Spiro.
7  Q.  Friend, associate, or something else?
8  A.  That's my friend.
9  Q.  Okay.  Whose car did that belong to in
10  2022?
11  A.  I don't know.
12  Q.  Wasn't yours?
13  A.  (Shaking head.)
14  Q.  Okay.  That's a no?  You have to answer
15  out loud.
16  A.  I say I don't know.  You asked me who car
17  it was for.  I said I don't know.  So it's no.
18  Q.  Okay.  Just remember, if you shake your
19  head, you have to --
20  A.  I answered.
21  Q.  -- do her the courtesy --
22  A.  I answered.  I didn't shake my head.
23  Q.  All right.
24  A.  You need any of this back?
25  Q.  No, sir.

Page 227

1  A.  Because --
2  MR. THOMPSON:
3       Just keep it right there.
4  MR. SCHILLAGE:
5       Please hold it all.
6  EXAMINATION BY MR. SCHILLAGE:
7  Q.  Okay.  Was January 10, 2023, the first
8  time that you had gone to East Baton Rouge Parish
9  jail?
10  A.  Tell me again.
11  Q.  Was January 10, 2023, the first time you
12  had been at East Baton Rouge Parish jail?
13  A.  No, sir.
14  Q.  Okay.  When was the first time?
15  A.  The first time was in 2019, I believe.
16  Q.  Okay.  Was it related to your presence at
17  5450 Cadillac Street?
18  A.  No, sir.
19  Q.  Okay.  What -- Well, it would be a lot
20  faster to just ask it this way.  What were you --
21  What was the purpose of you being there?
22  A.  Bank fraud.
23  Q.  Okay.  Is that the only other time you've
24  been in East Baton Rouge Parish jail, other than
25  January 2023?

Page 228

1  A.  Correct.
2  Q.  Okay.  And it's not a hard-nosed type of
3  test of your memory on years, but if there are
4  court records that reflect July of 2020 for that
5  issue of bank fraud, do you have any reason to
6  disagree with 2020 versus 2019?
7  A.  It was 2020.
8  Q.  Okay.  Were you strip-searched in 2020
9  when you went in the jail?
10  A.  Yeah.
11  Q.  Okay.
12  THE WITNESS:
13       I have to use the bathroom again.
14  MR. THOMPSON:
15       You got to go to the bathroom again?
16  THE WITNESS:
17       Yeah.
18  MR. THOMPSON:
19       All right.
20  MR. SCHILLAGE:
21       That's a good stopping point.  Let's take
22  a five-minute break.
23  VIDEOGRAPHER:
24       Off the record.  The time is now 3:38.
25  (OFF THE RECORD.)

Page 229

1     VIDEOGRAPHER:
2         Back on the record.  The time is 3:49.
3     EXAMINATION BY MR. SCHILLAGE:
4     Q.  All right.  Mr. Lee, do you belong to a
5  church parish?
6     A.  Do I belong to a church parish?
7     Q.  Uh-huh.
8     A.  Like a church home?
9     Q.  Or just a -- a church.
10    A.  Yes.
11    Q.  Okay.  What church is that?
12    A.  I don't know the name by heart, because I
13 haven't been in a minute, but I have a church home.
14    Q.  Okay.  You don't remember the name?
15    A.  My childhood is Family Agape.  But the new
16 church that I started going to, I don't know the
17 name of it.
18    Q.  When did you start going to that church?
19    A.  I start going to that church -- I been,
20 like, twice.  Like, a couple -- six, seven months.
21    Q.  Okay.
22    A.  It's a -- It's a newly-opened church, so
23 it's -- I just forgot the name.
24    Q.  What denomination of religion is it?
25    A.  Christian.

Page 230

1     Q.  Christian.  It's like non-denominational
2  Christian?
3     A.  Uh-huh.
4     Q.  Is it Baptist, Methodist, of a specific?
5     A.  Baptist.
6     Q.  Okay.  And you said you've been two times
7  in the last six or seven months?
8     A.  Yes.
9     Q.  Okay.  Do you do any kind of volunteer
10 work?
11    A.  No.
12    Q.  Okay.  When your brother was in high
13 school, did you drive him back and forth,
14 chauffeur?
15    A.  No.
16    Q.  Okay.
17    A.  My brother was in middle school.
18    Q.  I understand you explained twelfth grade
19 was the highest education that you've completed.
20 What I didn't ask, and I should have, was did you
21 start any other education that you didn't finish?
22    A.  No.
23    Q.  Okay.  So no professional schools, like
24 law school or things like that, right?
25    A.  No.

Page 231

1     Q.  No.  Have you ever gone to any kind of
2  seminars or open meetings about topics of, like,
3  know your rights when dealing with a police
4  officer --
5     A.  No.
6     Q.  -- or things about how to interact in a
7  traffic stop environment with a police officer?
8     A.  No.
9     Q.  Okay.  So when you were on the body cam of
10 Video 1 talking to Detective Wallace as he was
11 handcuffing you and you said, "I know my rights,"
12 what's the basis of knowledge about what your
13 rights were?  How did you know what your rights
14 were I guess is the better way to say?
15    A.  School.
16    Q.  And that is from high school down?
17    A.  No.  From -- What you mean by "high school
18 down"?  You're going down.
19    Q.  Well, if you said twelfth grade is the
20 highest, then --
21    A.  Yes.
22    Q.  -- you mean --
23    A.  Yeah.
24    Q.  -- sometime during your schooling --
25    A.  Yeah.

Page 232

1     Q.  -- up to twelfth grade?
2     A.  Yeah.
3     Q.  Okay.  Okay.  The booking records, I
4  believe it's Exhibit 8.  Do you still have that in
5  front of you?  The first page, Mr. Lee, has the EBR
6  Sheriff's Office insignia and title on it.
7     A.  I got Exhibit 8 right here.  This one?
8     Q.  Yes, sir.  Turn to the eighth page from
9  the front.
10    A.  Got you.
11    Q.  They don't have a Bates page or a page
12 reference, but it shows in the top left Committing
13 Jailer Reads To Prisoner."
14    A.  I see.
15    Q.  And it's a faded page.
16    A.  This one?
17    Q.  Yes, sir.  Do you see where it says
18 Prisoner's Signature with the X next to it?
19    A.  Yes.
20    Q.  Is that your signature?
21    A.  Yes.
22    Q.  Is that your handwriting next to it that
23 says 1-9-23 for the date?
24    A.  No.
25    Q.  Okay.  But you do know that's your

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 233

1  signature?
2      A.  Yes.
3      Q.  All right.  If you would, there's another
4  page in this packet that your attorney provided us,
5  and it's eight more pages from that.  And I'll hold
6  it up, my copy, Mr. Lee.  Take a look at that.
7      A.  This?
8      Q.  No, sir.  It's --
9      A.  What is this?
10     Q.  Turn one more.
11     A.  This is me?
12     Q.  I can see it in that -- through the next
13  page.
14         Okay.  Do you see where it says Prisoner's
15  Signature with a star next to it?
16     A.  Uh-huh.
17  MR. THOMPSON:
18         Mike, just for the record real fast.
19  MR. SCHILLAGE:
20         Sure.
21  MR. THOMPSON:
22         Talking to Ms. Hawkins here and Rodney,
23     can you tell us the date on which we turned
24     this over to you?  This pen pack.
25  MR. SCHILLAGE:

Page 234

1      I think it was Lawr -- Well, it was either
2  Lawrence or Wallace's requests for production,
3  whichever one had substantive documents.  You
4  had one production that had records attached,
5  and it was labeled either J. Lee or Jeremy Lee
6  Booking Records.
7  MR. THOMPSON:
8      Check that.
9      Go ahead.  Just go ahead, brother.
10  MR. SCHILLAGE:
11     Sure.
12  EXAMINATION BY MR. SCHILLAGE:
13     Q.  The signature -- prisoner signature with
14  the big handwritten star next to it --
15     A.  Uh-huh.
16     Q.  -- is that your signature --
17     A.  Yes.
18     Q.  -- next to it?
19     A.  Yes.
20     Q.  Okay.  Is that how you've always signed
21  your name?
22     A.  Yes.
23     Q.  Okay.  All right.  Mr. Lee, I'll hand you
24  this next document.
25  MR. SCHILLAGE:

Page 235

1          Next exhibit is 13?
2  COURT REPORTER:
3          Yes.
4  EXAMINATION BY MR. SCHILLAGE:
5      Q.  All right.  And Exhibit 13, it's your
6  discovery responses to Troy Lawrence, Jr.'s First
7  Set of Interrogatories.  And if you turn the page
8  where it says -- Yeah.  I'm sorry, these aren't
9  numbered pages.  Interrogatory Number 10.  It's the
10  fifth page in the document.
11     A.  I'm on it.
12     Q.  Okay.  So here the question was basically
13  list all the doctors and all the other healthcare
14  professionals, et cetera, that you have treated
15  with in the past five years, and you list TurnKey
16  Health.  Now, that's the medical provider in the
17  jail, as you identify.  Right there.  Do you see
18  that?
19     A.  On Number 10?
20     Q.  Right.
21     A.  Okay.
22     Q.  Response to Interrogatory Number 10.  Do
23  you see that?
24     A.  Yes.
25     Q.  Okay.  Dr. Mitchell Montelaro from Our

Page 236

1  Lady of the Lake North.  And we saw his name
2  earlier.
3      A.  That's on Number 10?
4      Q.  Yes, sir.  Response B.
5      A.  Ten.  This what I see.  Right page?  I go
6  up or -- You say Interrogation Number 10, right?
7      Q.  Yes, sir.
8      A.  Yeah, they got --
9      Q.  Do me the benefit, show me the front page.
10     A.  (Complies.)
11     Q.  Oh, that's why.  I handed you the wrong
12  document.  Let's keep it marked.  It's okay.  We're
13  going to use it anyways.
14         Exhibit 14, Plaintiff's Response is --
15  MR. THOMPSON:
16         Nah.  You said --
17  MR. SCHILLAGE:
18         Yeah.  You know what it is.
19  EXAMINATION BY MR. SCHILLAGE:
20     Q.  Plaintiff's Responses to Officer Troy
21  Lawrence's request.  So same thing, Interrogatory
22  Number 10, the fifth page, now that we've corrected
23  the page error, or the document error.  You list
24  four providers.  Right?
25     A.  Okay.

59 (Pages 233 to 236)

Page 237

1      Q.  There's TurnKey.  There's Dr. Montelaro.
2  What's the next name, under C?
3      A.  Janice.
4      Q.  I'm sorry?
5      A.  Jani -- Dr. Janice.
6      Q.  Yes.  Okay.  And, then, the last one,
7  Dr. --
8      A.  Brian Turner.
9      Q.  -- Turner.  Okay.
10        You said you've seen him more than three
11  times, the last time yesterday, right?
12     A.  Okay.
13     Q.  Okay.  Well, I mean, that's what you said
14  earlier, right?
15     A.  I said okay.
16     Q.  Okay.  So when was the first time that you
17  were referred to Dr. Turner?
18     A.  I don't recall.
19     Q.  Okay.  Do you remember who referred you to
20  Dr. Turner?
21     A.  Yes.
22     Q.  Who was that?
23     A.  My lawyer.
24     Q.  Okay.  Had you ever met Dr. Turner before
25  you had the referral by your attorney after this

Page 238

1  arrest event?
2      A.  No, sir.
3      Q.  Okay.  Do you remember how far in time
4  from your release of January 19, 2023 --
5      A.  Uh-huh.
6      Q.  -- how much time passed before you were
7  referred to him?
8      A.  At least like -- Let me think about it.
9      Q.  Yes, sir.
10     A.  Like, at least -- It's been, like, at
11  least nine, eight months.  Nine, eight months.
12     Q.  Okay.
13     A.  From the incident.
14     Q.  So maybe in the fall or winter of 2023?
15     A.  Correct.
16     Q.  Okay.  Do you remember how much time
17  passed from when you were referred to Dr. Turner to
18  the time you actually met Dr. Turner?
19     A.  I don't recall.
20     Q.  Okay.  Do you have meetings -- When you --
21  When you see him as a patient, is it in person or
22  is it by Zoom or, you know, telemedicine?
23     A.  In person.
24     Q.  It's always in person?
25     A.  (Nodding head.)

Page 239

1      Q.  Okay.  Where is his office located?
2      A.  In New Orleans.
3      Q.  Okay.  So you have to drive to New Orleans
4  to go see him?
5      A.  Correct.
6      Q.  He does not have a Baton Rouge clinic?
7      A.  No, sir.
8      Q.  Okay.  Did you seek out any Baton Rouge
9  healthcare providers that do the same type of
10  medical care as Dr. Turner?
11     A.  No, I didn't seek out.
12     Q.  Okay.  Do you like Dr. Turner?
13     A.  Yes.
14     Q.  Okay.
15     A.  That's an odd question to ask somebody.
16  MR. THOMPSON:
17        It's cool.
18  EXAMINATION BY MR. SCHILLAGE:
19     Q.  So I guess let me clarify to make sure
20  you're on the same page.  When I ask you do you
21  like him, I mean do you like him as a healthcare
22  professional for you.  Some people don't like their
23  doctors.  Do you understand that?
24     A.  Yeah, I like him.
25     Q.  Okay.  All right.  So if you could, go

Page 240

1  back now to Exhibit 13.
2      A.  I had lost count which one it is.
3      Q.  I know.  If you turn to the first page, it
4  ought to tell you.
5      A.  I got it.  I have it.  On the first page.
6      Q.  All right.  Take a look at Question --
7  It's called Interrogatory 12.
8      A.  On the first page?
9      Q.  No, sir.  It's going to be around the
10  sixth or seventh page.
11  MR. KERSHAW:
12        Whose discovery is this?
13  MR. SCHILLAGE:
14        I'm sorry?
15  MR. KERSHAW:
16        Whose discovery is this?
17  MR. SCHILLAGE:
18        Exhibit --
19  MR. THOMPSON:
20        I think it's Lawrence, huh?
21  MR. SCHILLAGE:
22        -- 13.  It should be Lawrence.
23  THE WITNESS:
24        You say 6?  Page 6?
25  EXAMINATION BY MR. SCHILLAGE:

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 241

1  Q. Exhibit Num -- I'm sorry. Interrogatory
2  Number 12. Do you see Number 12 --
3  A. Yeah, I --
4  Q. -- on this?
5  A. -- got it. I got it.
6  Q. You there?
7  A. Yes, sir.
8  Q. Okay. Do you see in your response on
9  Number 12 where it explains you gave a statement to
10 attorneys with the Department of Justice?
11 A. Ask me that again.
12 Q. Sure. Well, just do you see it on the
13 document where you -- you say in that document you
14 gave a statement to attorneys for the Department of
15 Justice?
16 A. You say in 12?
17 Q. It should be Number 12.
18 A. It say, "Describe any interactions you had
19 with members of law enforcement." That's what my
20 12 say.
21 Q. Oh, okay. Well, then --
22 MR. THOMPSON:
23   That's the wrong one, bro?
24 MR. SCHILLAGE:
25   I tell you what. Hand them back --

Page 242

1  THE WITNESS:
2    I know you reaching me the wrong paper.
3  MR. SCHILLAGE:
4    Yeah. I --
5  MR. THOMPSON:
6    So this one is Troy -- Hold on. This is
7  Wallace's.
8  MR. SCHILLAGE:
9    That's why.
10 MR. THOMPSON:
11   Okay.
12 MR. SCHILLAGE:
13   Okay.
14 MR. THOMPSON:
15   So Wallace is 13.
16 MR. SCHILLAGE:
17   Wallace is 13.
18 MR. THOMPSON:
19   Yeah. And --
20 MR. SCHILLAGE:
21   Lawrence is 14.
22 MR. THOMPSON:
23   -- Junior's is 14.
24   What page you on? Twelve? Number 12?
25 MR. SCHILLAGE:

Page 243

1    Is Interrogatory Number 12.
2  MR. THOMPSON:
3    Yeah. There you go.
4  MR. SCHILLAGE:
5    I should have set these up as for
6  different number exhibits so we wouldn't get
7  them confused.
8  EXAMINATION BY MR. SCHILLAGE:
9    Q. All right. So Exhibit 14, Interrogatory
10 Number 12, do you see it now?
11 A. Yeah.
12 Q. Okay. When did you give a statement to
13 the Department of Justice attorneys?
14 A. I don't recall.
15 Q. Okay. Where did -- Like, what city did
16 you go to, if it was in Baton Rouge or somewhere
17 else?
18 A. For what?
19 Q. For the statement to the attorneys for the
20 Department of Justice.
21 A. I don't remember. I don't recall me doing
22 it.
23 Q. Did you do it?
24 A. No.
25 Q. Okay.

Page 244

1  MR. THOMPSON:
2    Michael, explain to him what a statement
3  is, what you mean by statement. Written or
4  oral?
5  EXAMINATION BY MR. SCHILLAGE:
6    Q. Let me ask you this, Mr. Lee. Did you
7  have a verbal sit-down with attorneys who are not
8  your attorneys in this case, they are attorneys
9  for -- if -- they represented themselves as the
10 Department of Justice attorneys?
11 A. Okay.
12 Q. Did you sit down and talk to them and give
13 a statement --
14 A. No.
15 Q. -- about your arrest event?
16 A. No.
17 Q. Okay. So the second way to -- that I want
18 to ask you this is, did you provide a written
19 statement and have it sent to attorneys for the
20 Department of Justice?
21 A. No.
22 Q. Okay. Have you ever communicated, to your
23 knowledge, through your lawyers or through yourself
24 with attorneys from the Department of Justice?
25 A. My lawyer's the only person I have gave a

61 (Pages 241 to 244)

## Page 245

1  statement to.
2      Q.  Okay.  And, then, whether and how they
3  took that statement and did something with it, you
4  don't know, right, as we sit here today?
5      A.  Of course.
6      Q.  Okay.  If you move to Interrogatory Number
7  18 -- It's probably the next page there.  Do you
8  see Number 18?
9      A.  Uh-huh.
10     Q.  Who is Greenlight Solar Company?
11     A.  That's a company I used to work for.
12     Q.  Full-time, part-time, or temp?
13     A.  Full-time.
14     Q.  Okay.  When was that?
15     A.  This was in 2021.  No.  2022.  2022.
16     Q.  Okay.  And what did you do?
17     A.  I put solar panels on roofs.  I was a roof
18  tech.
19     Q.  And how long did you do that?
20     A.  For a year.  Until I got injured.
21     Q.  And how did you get injured?
22     A.  I had got a hernia.
23     Q.  Tell me about that.
24     A.  I was free walking solar panels up a -- up
25  the ladder.  You know how big a solar panel is.

## Page 246

1  It's probably bigger than me.  And just by working,
2  labor, I had got a hernia over here working with
3  them.
4      Q.  Okay.  Did you go see a doctor for it?
5      A.  Yes.
6      Q.  Who did you go see?
7      A.  I went seen their -- their urgent care.
8  The Greenlight Solar had a doctor they go see.
9      Q.  So Greenlight Solar had --
10     A.  Their own.
11     Q.  -- kind of like their own --
12     A.  Yeah.
13     Q.  -- physician --
14     A.  Yes.
15     Q.  -- in-house?
16     A.  Yes.
17     Q.  Do you remember his or her name?
18     A.  No.
19     Q.  Okay.  How many times did you see that
20  physician?
21     A.  One time.
22     Q.  Okay.  And where is Greenlight Solar
23  Company located?
24     A.  On George O'Neal.
25     Q.  Okay.  So you worked for them for roughly

## Page 247

1  a year and you stopped working for them after you
2  got the hernia?
3      A.  Correct.
4      Q.  Okay.  Is it basically like a
5  physically-unable-to-do-the-task kind of situation?
6      A.  I got a hernia.
7      Q.  Well --
8      A.  Above my belly button.
9      Q.  Okay.  But did the hernia heal?
10     A.  No.  It comes back.  Any time bad weather,
11  it comes back.
12     Q.  Okay.  Did Greenlight Solar tell you that
13  you could take time off to heal and then come back?
14     A.  No.
15     Q.  Okay.  They just said, "Sorry to hear it.
16  Goodbye" --
17     A.  No.
18     Q.  -- more or less?
19     A.  No.  They wanted me to do a different type
20  of work.  Instead of being on the roof, they wanted
21  me to drive countless hours to different cities and
22  parishes.
23     Q.  As a salesman?
24     A.  Yes.
25     Q.  Okay.  And you did not want to do that, I

## Page 248

1  take it?
2      A.  No.
3      Q.  Okay.  Why not?
4      A.  I just got injured with a hernia.  I --
5  You see how I'm sitting down?  That hernia would
6  have been hurting.  If I'm driving countless hours
7  in a car, tension builds up.  You have to really
8  lay down.
9      Q.  When's the last time the hernia gave you
10  any trouble?
11     A.  Four days ago.
12     Q.  Okay.
13     A.  It was storming really, really bad.
14     Q.  Okay.  January 9, 2023, that was after the
15  hernia had happened and you stopped working for
16  Greenlight Solar Company, right?
17     A.  Correct.
18     Q.  About how much time do you think came
19  about from the -- when you got the hernia to
20  whenever the January 9 arrest event took place?
21     A.  You said what, now?
22     Q.  How much time in between the hernia and
23  you being arrested in January '23?
24     A.  I don't know.  I'd have to think about it.
25     Q.  Okay.  If you think about it, do you --

Electronically signed by Toni Conner (501-190-381-9495)     2f67950e-8c04-4061-959b-7823204c7c89

Page 249

1  can you come up with an answer for us?
2      A.  Yes.
3      Q.  Okay.
4      A.  Not that long.  Probably five, six months.
5      Q.  Okay.
6      A.  Excuse me.
7      Q.  All right.  Mr. Lee, turn to the last page
8  of that Exhibit 14.
9      A.  The Wallace?
10     Q.  No.  The other one.  Yes.
11     A.  You said last page?
12     Q.  Very last page.  Can I see that?
13     A.  Yeah.
14     Q.  I want to make sure it's the right thing.
15     A.  I understand.
16     Q.  That's right.  Go ahead.  Is that your
17 signature?
18     A.  Correct.
19     Q.  Okay.
20     MR. SCHILLAGE:
21         All right.  I'm going to tender you to
22     other lawyers in case they have other
23     questions.  That's all I have right now, Mr.
24     Lee.  I appreciate your time today.
25     THE WITNESS:

Page 250

1      Thank you.
2      MR. BLACKWELL:
3         Hey, do y'all mind if I go next?
4      MR. KERSHAW:
5         No.
6      EXAMINATION BY MR. BLACKWELL:
7      Q.  Mr. Lee, good afternoon.  My name is Brian
8  Blackwell.
9      A.  Good afternoon, Mr. Blackwell.
10     Q.  I represent Mr. -- Officer Lawrence, or
11 former Officer Lawrence.  I've -- I've got a few
12 questions for you, and it's not going to take
13 anywhere near as long as -- as this did, but -- If
14 you have a problem hearing me because I'm --
15     A.  I hear --
16     Q.  -- on Zoom --
17     A.  I hear you good.
18     Q.  All right.  Great.
19         So when you -- when you got hurt at
20 Greenlight Solar, the -- with the hernia, did you
21 file a worker's comp claim?
22     A.  Yes, sir.
23     Q.  Okay.  Did you settle that worker's comp
24 claim?
25     A.  No, I didn't -- I didn't -- It didn't

Page 251

1  proceed because I had drugs in my system.
2      Q.  What kind of drugs did you have in your
3  system?
4      A.  Marijuana.
5      Q.  So you were -- you were tested following
6  the incident that led to the hernia?
7      A.  Yeah.
8      Q.  And you tested positive for marijuana?
9      A.  Correct.
10     Q.  And so your -- your claim was rejected
11 because of that?
12     A.  Correct.
13     Q.  Okay.  So I want to understand from you,
14 and Mr. Schillage talked to you about this earlier
15 on this morning, I want to talk to you about the
16 schools that you went to.  And I guess, you know,
17 it's kind of unusual for somebody to have gone to
18 five different high schools.  So I know the first
19 one you said you went to was the Mentorship
20 Academy.  Is that right?
21     A.  Correct.
22     Q.  What was the reason for you leaving
23 Mentorship?
24     A.  The reasons for me leaving Mentorship, I
25 wanted to be at a school closer to home.

Page 252

1      Q.  Okay.  Mentorship -- Mentorship is the one
2  that at least used to be downtown, right?
3      A.  Yeah, that's the school.
4      Q.  Okay.  In an old bank building down there,
5  right?
6      A.  Yeah, that's the school.
7      Q.  Okay.  And, then, so you transferred to --
8  to Thrive?  Where is Thrive located?
9      A.  Thrive is located on Brightside Drive.
10     Q.  That's closer to your home in Central than
11 downtown?
12     A.  No.  This school, I stayed there.
13     Q.  Okay.  So you lived on the campus?
14     A.  Yeah, I lived on campus.  Came home on
15 weekends.
16     Q.  All right.  And why did you leave Thrive?
17     A.  Because I wanted to play on the basketball
18 team for Scotlandville.
19     Q.  Okay.  About how -- Let's back up just for
20 a second.  About how long did you stay at
21 Mentorship?
22     A.  I stayed at Men -- I stayed at Mentorship
23 the whole school year.
24     Q.  So your whole ninth grade year?
25     A.  Yes.

Page 253

1     Q.  Okay.  And, then, how long did you stay at
2   Thrive?
3     A.  I stayed at Thrive -- I went to Thrive two
4   times.
5     Q.  Okay.  What -- What about the first time?
6     A.  I stayed at Thrive for about at least
7   seven months.
8     Q.  Okay.  So that was when you were in the
9   tenth grade?
10    A.  Correct.  I failed a grade.
11    Q.  Okay.
12    A.  I was -- I'm still in ninth.
13    Q.  Okay.  So you were still in ninth grade at
14  the time?
15    A.  Correct.
16    Q.  Stayed there about nine months.  And,
17  then, is that -- is that when you went to
18  Scotlandville?
19    A.  Yes.  Scotlandville put me in my right
20  grade.
21    Q.  So it would have been tenth?
22    A.  Correct.
23    Q.  Was that because of some testing that you
24  had taken or something?
25    A.  No.  It was -- had something called --

Page 254

1   Like, if you was in ninth grade and you failed, you
2   would be in something called 9.5.  It was courses
3   and stuff that you would take for to get put in
4   your right grade.
5     Q.  Also called -- Would it also be called
6   Credit Recovery or --
7     A.  Yes.
8     Q.  -- something like that?
9     A.  Yes, yes, yes, yes.
10    Q.  Okay.  All right.  How long did you stay
11  in Scotlandville and played basketball?
12    A.  I stayed at Scotlandville not that long,
13  because I didn't make the team.  The coach wanted
14  more taller basketball player.  So I went back to
15  Thrive and hooped.
16    Q.  Okay.
17    A.  The next -- The next school year.
18    Q.  All right.  So you were at Thrive.  Part
19  of the year you were in ninth grade, but when you
20  transferred, it sounds like in the spring, they --
21  to Scotlandville, they put you in the tenth grade?
22    A.  Correct.
23    Q.  And, then, for the following school year,
24  when you went back to Thrive, did they put you in
25  the eleventh grade?

Page 255

1     A.  No.  I was still in tenth.
2     Q.  What happened?
3     A.  I was still in tenth.
4     Q.  Okay.
5     A.  I completed the year out --
6     Q.  Did --
7     A.  You can go.  You can go.  You can go.
8     Q.  I'm sorry.  How long on the second time
9   that you were at Thrive were you there?
10    A.  I finished out the whole school year.
11    Q.  So you finished the -- your tenth grade
12  year --
13    A.  Right.
14    Q.  -- there?
15    A.  Right.
16    Q.  Okay.  And --
17    A.  I start --
18    Q.  Does that mean that for your eleventh
19  grade year you went to Central?
20    A.  Yes.  Yes.
21    Q.  And it sounded like part of your twelfth
22  grade year as well, right?
23    A.  I told you, like, I didn't get put in
24  my right grade.  It was credited to me.  So once I
25  got in home school, I was still already a grade

Page 256

1   behind.  My instructor and I did the work.  I
2   graduated.
3     Q.  Okay.  But how long were you at -- at
4   Central?  For --
5     A.  I was at --
6     Q.  -- about a year and a -- year and a half
7   that looks like, right?
8     A.  Of course.
9     Q.  And maybe I missed this because I'm old
10  and tired at this point in the day, but I know Mr.
11  Schillage asked you about how many times that
12  you -- were you in the East Baton Rouge Parish jail
13  other than the one on the January 9 incident, and I
14  wrote down you said 2019 you were booked for bank
15  fraud.  Is that right?
16    A.  Correct.
17    Q.  And then I -- I heard and I missed
18  something about 2020.  Did you also get arrested in
19  2020, or did I just make a mistake?
20    A.  That's the same incident.
21    Q.  Okay.  So what -- what was the disposition
22  of the bank fraud charge?
23    A.  It's just -- You said was it -- what was
24  the deposition?
25    Q.  Yeah.  What -- What happened?

Electronically signed by Toni Conner (501-190-381-9495)     2f67950e-8c04-4061-959b-7823204c7c89

1    A.  The class -- The case is closed.
2    Q.  Based upon what?
3    A.  Based upon me paying back the actions.
4    Q.  Okay.  So you made restitution?
5    A.  Yes.
6    Q.  Did you enter any kind of a plea?
7    A.  No.
8    Q.  How much -- What was the nature of the
9   bank fraud that you were arrested for?  What did
10  they say you did?
11     MR. DIGGS:
12        Well, hold on.  Hold on.  Object to the
13     line of questioning.  Unless there was a
14     conviction that resulted in the arrest
15     regarding this, I would instruct him not to
16     answer.  This is not discoverable and it's not
17     admissible.
18     MR. BLACKWELL:
19        Certainly it's -- Certainly it's
20     discoverable, because it may lead to the
21     discovery of relevant information.
22     MR. DIGGS:
23        I mean, arrests -- You can ask if he's
24     arrested, but the nature and everything
25     regarding the arrest are not admissible, unless

1   there's a conviction and it's a felony, but
2   misdemeanor arrest can't come in.
3    MR. BLACKWELL:
4        Okay.  Well, we're not talking about
5     admissibility.  We're talking about discovery
6     and whether or not it could lead to the
7     discovery of admissible evidence.  You're
8     welcome to direct him not to answer, and I'm
9     welcome to file a motion and have you
10     sanctioned for that.
11     MR. DIGGS:
12        No, I -- I understand.  But on -- on this
13     one, I'm -- I'm very -- I'm very clear on it.
14     I instruct him -- You can ask, you know,
15     certain things, but you're asking him the --
16     THE WITNESS:
17        Yeah.
18     MR. DIGGS:
19        -- nature of -- of -- of --
20     MR. BLACKWELL:
21        I'm asking him the factual basis for his
22     arrest, is what I'm asking him.
23     MR. DIGGS:
24        And I think he told you it was a fraud,
25     but you want him to get into the facts of it.

1   That's a very different question.  You want him
2   to get into the facts and give a narrative in
3   terms of everything that happened.  I think
4   he -- He can tell --
5    MR. BLACKWELL:
6        No.  No.
7     MR. DIGGS:
8        -- you the crime.
9     MR. BLACKWELL:
10        I want -- I want him to tell me why he
11     understood -- stands he was arrested.
12     THE WITNESS:
13        I said --
14     MR. THOMPSON:
15        Hold on.  Let your attorney talk.
16     THE WITNESS:
17        All right.  All right.
18     MR. BLACKWELL:
19        I'm sorry?
20     THE WITNESS:
21        Yeah, I'm go -- let my attorney talk.
22     MR. DIGGS:
23        No.  No.  I believe you can -- You can --
24     Mr. Jeremy, you can tell him what the -- what
25     the -- what the crime was.  I believe you told

1   him that.
2    THE WITNESS:
3        Yeah.
4     MR. DIGGS:
5        That was the reason why he was arrested.
6     But to go into specific details or facts
7     related to it, that's a different -- that's a
8     different question.
9   EXAMINATION BY MR. BLACKWELL:
10    Q.  So where was the prosecution?  Was the
11  prosecution in East Baton Rouge Parish?
12    A.  Correct.
13     MR. BLACKWELL:
14        And I understand, Mr. Diggs, you're
15     instructing him not to answer the questions
16     that I previously asked him?
17     MR. DIGGS:
18        I mean, you can ask -- I just want to make
19     sure if you're asking him what the
20     misunderstanding of the nature of his arrest,
21     which he told the crime, I believe that
22     answered it.  But if you're going into the
23     facts related to the arrest and going -- and
24     asking for a narrative, that part I'm
25     instructing him not to answer.  But if you're

Page 261

```
 1    asking him, you know, what was the nature of
 2    the arrest just as to the crime, I don't have a
 3    problem with him answering that question, but
 4    going into all the facts and everything like
 5    that, that is a little different and that part
 6    I will instruct him not to answer.
 7         MR. BLACKWELL:
 8         I'm simply asking him to tell me what
 9         happened, why did you get arrested, what did
10         they say you did wrong.
11         THE WITNESS:
12         Accepted monetary bank frauds.
13         MR. THOMPSON:
14         You're good.
15    EXAMINATION BY MR. BLACKWELL:
16         Q.  In what amount?
17         A.  1,400.
18         Q.  And you accept -- you received those from
19    who?
20         A.  I don't remember.  I don't recall.
21         Q.  Okay.  Other than the arrest for bank
22    fraud that landed you in the East Baton Rouge
23    Parish prison when you were arrested, have you ever
24    been arrested any other time?
25         A.  Yes.
```

Page 262

```
 1         Q.  What -- When -- Describe for me, how many
 2    other times have you been arrested?  Other than the
 3    one we're talking about on the case today.  We know
 4    about that one.
 5         A.  It's two more other times.  We just spoke
 6    on one of them.  Bank fraud.  And the other one is
 7    in possession of stolen items.
 8         Q.  Where did you -- Where were you arrested
 9    for that?
10         A.  In Wisconsin.
11         Q.  So that was when you were working in
12    Wisconsin?
13         A.  Correct.
14         Q.  Were you working in Sheboygan?
15         A.  Yes.
16         Q.  And that -- was that where you were
17    arrested?
18         A.  Yeah.  You got -- You got it.
19         Q.  And were you also arrested for theft of a
20    credit card?
21         A.  It was all under the same thing.
22         Q.  Did you -- When did you leave Wisconsin?
23    It looks like you were arrested somewhere in the
24    spring of 2022 and posted bond on -- in March --
25    March 11, March 12 of '22.  When did you leave
```

Page 263

```
 1    Wisconsin?  Around that time?
 2         A.  I don't recall.  Because I was still --
 3         Q.  Did you ever appear --
 4         A.  I was still working.
 5         Q.  Did you ever appear in court on those
 6    charges?
 7         A.  No, sir.
 8         Q.  Do you realize that there is a warrant out
 9    for your arrest on those charges?
10         A.  I know now.
11         MR. DIGGS:
12         Assumes facts not in evidence.  Calls for
13    speculation, conjecture.  Lacks foundation
14    based on his response.
15         MR. BLACKWELL:
16         I asked him if he was aware.
17         MR. DIGGS:
18         No.  I said based on his response that he
19    just -- that he just gave.
20    EXAMINATION BY MR. BLACKWELL:
21         Q.  But you never made a -- You received
22    paperwork when you bonded out of jail, right?
23         A.  Yes.
24         Q.  The paperwork had a date for you to appear
25    in court; did it not?
```

Page 264

```
 1         A.  I don't remember the date.
 2         Q.  No, I'm not asking you for the date.  I'm
 3    just asking you that the paperwork told you you had
 4    to go to court on the -- on the specific date; did
 5    it not?
 6         A.  You know that.  You know that.
 7         Q.  I've got to ask you the questions, sir.
 8         MR. THOMPSON:
 9         And you've got to answer.
10    EXAMINATION BY MR. BLACKWELL:
11         Q.  So please answer.
12         A.  Okay.  Yes.
13         Q.  And you never went?
14         A.  No.
15         Q.  Any other arrests other than --
16         A.  No, sir.
17         Q.  -- the one -- the one in Wisconsin and the
18    one --
19         A.  No, sir.
20         MS. HAWKINS:
21         Jeremy, let him finish the question.
22         COURT REPORTER:
23         I didn't hear the end of the answer.
24         THE WITNESS:
25         He asked me was there no more other
```

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 265

1    arrests. I said no.
2    MR. THOMPSON:
3        That's all you've got to say, is no. If
4    he asks the same question again, you say no
5    again.
6    COURT REPORTER:
7        Okay. I did not hear the end of the
8    question, though.
9    MR. SCHILLAGE:
10       That's all right.
11       You need to instruct --
12   MR. BLACKWELL:
13       I'm sorry?
14   MR. SCHILLAGE:
15       -- your client to make sure he allows the
16   question to be answered fully.
17   THE WITNESS:
18       He asked the same question.
19   MR. THOMPSON:
20       Just -- Brian, just ask your question
21   again, bro. Sir.
22   EXAMINATION BY MR. BLACKWELL:
23       Q. My question was simply, other than what
24   we've already talked about, have you ever been
25   arrested on any other occasion?

Page 266

1        A. No.
2        Q. Thank you.
3            You've described working for temps -- a
4    temp service or temp services. And I know you
5    described one of those as being Savard Temp in
6    Lorraine. Is that the only temporary service that
7    you've ever worked for?
8        A. No, sir.
9        Q. What are the other temp services that
10   you've worked for?
11       A. Express Employment.
12       Q. Okay. Any others?
13       A. Tradesmen International.
14       Q. Any others?
15       A. PeopleReady.
16       Q. Any others?
17       A. That's all of them.
18       Q. Have you ever worked for companies like
19   Jean Simpson or Manpower?
20       A. I would have told you. I'm answering your
21   questions.
22       Q. Sir, I'm just trying to help you remember
23   if there are others, and so bear with me. I'm not
24   trying to --
25       A. I'm not trying to be ugly. I'm answering

Page 267

1    your question.
2            No.
3        Q. Where did you work for Express Employment?
4        A. Best Buy warehouse. I worked there
5    through 2020, 2021.
6        Q. Is that the only temp job you had for
7    Express Employment, is at Best Buy?
8        A. No, sir. I worked with Cal's Lawn
9    Service.
10       Q. Any others?
11       A. That one, that's -- that's just about it,
12   with Best Buy warehouse, because I kept that one
13   for a little minute.
14       Q. Okay. When you did work for Tradesmen
15   International, what -- where did they send you to
16   work?
17       A. Wisconsin.
18       Q. Okay. Any -- Anyplace other than the job
19   you described in Wisconsin earlier that you worked
20   for Tradesmen?
21       A. No. Just Wisconsin. Sheboygan.
22       Q. What about PeopleReady, where did they
23   send you to work?
24       A. That's a in -- in -- in-city jobs. I
25   worked at the River Center.

Page 268

1        Q. Any others that you can remember?
2        A. No, sir. That's all -- That's all of
3    them. That's all the ones I remember.
4        Q. Okay. I know you said you started working
5    at McDonald's when you were in high school.
6        A. When I was 16.
7        Q. Okay. And that you've worked through --
8    through these different companies pretty much since
9    then. In each of the years since you've graduated
10   from high school, have you filed tax returns?
11       A. Yes.
12       Q. Do you have those available?
13       A. My mother do. My mother files me on her
14   taxes. She carry me.
15       Q. But do you personally --
16       A. File taxes?
17       Q. -- file tax --
18           Yes, sir.
19       A. No.
20       Q. But your mother carries you as a dependent
21   on her tax return?
22       A. Correct.
23       Q. And that's because you live with her?
24       A. Correct.
25       Q. I think you said earlier in the day

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 269

1  that -- that you had some documentation concerning
2  the work that you did for the temporary services.
3  Is that right?  Did I hear you correctly?
4      A.  You heard me say that?
5      Q.  I -- I thought that I heard you say that
6  you had documentation on where you worked for the
7  temp services.
8      A.  Yes.
9      Q.  What kind of documentation do you have?
10     A.  Time sheets.  Payroll.
11     Q.  Okay.  So you have -- you still have all
12 of those in your possession?
13     A.  Correct.
14     Q.  Okay.  And I assume you kept up with them
15 so you made sure you got paid right?
16     A.  Not even that.  It's just -- It's just
17 there.
18     Q.  Okay.  Are they -- How do you maintain
19 those?  Do you have them in a folder somewhere or
20 something?
21     A.  I have them in my phone.
22     Q.  Okay.  The -- We talked earlier about a
23 strip-search that occurred.  I just want to make
24 sure that I understand.  I know you took your shoes
25 and your clothes off and those things.  During the

Page 270

1  strip-search itself, nobody made contact with you,
2  did they?  No physical contact occurred?
3      A.  No.
4      Q.  They were several feet away from you
5  observing whether you had any kind of contraband on
6  your body?
7      A.  My back was turned.  I don't know.
8      Q.  Okay.
9      A.  ...how close they was.
10     Q.  Okay.  But nobody touched you?
11     A.  No.
12     Q.  And I -- I was a little confused about the
13 sequence, and so just let me try to clear this up,
14 because I think it's -- it's important to
15 understand.  And so I'm going to -- I'm going to
16 try to describe kind of from the time that you went
17 to that warehouse to the time that you left,
18 because I heard a couple of different things and I
19 want to make sure that we're --
20     A.  I got to --
21     Q.  -- on the same page.
22 THE WITNESS:
23        I got to use the bathroom.  I have to use
24    the bathroom again.  It's very cold in here.
25 MR. BLACKWELL:

Page 271

1         All right.  Well, that's fine.  Take a
2     few-minute break.
3  VIDEOGRAPHER:
4         Off the record.  The time is now 4:29.
5     (OFF THE RECORD.)
6  VIDEOGRAPHER:
7         Back on the record.  The time is now 4:36.
8  EXAMINATION BY MR. BLACKWELL:
9      Q.  Mr. Lee, before we took a little, short
10 break I was asking you or telling you that I was
11 going to ask you about the sequence of events that
12 occurred at that ware -- from the time you got to
13 that warehouse until the time you got booked in
14 parish prison, because I wanted to -- I was a
15 little confused about and it sounded like there
16 were some differences in it, so I want to make sure
17 that I understand.  So let me -- let me get this
18 all out and ask you whether what I'm saying is
19 correct or not.  Okay?
20     A.  Okay.
21     Q.  It's my understanding that when you first
22 got there, that you went into the warehouse area
23 and that's when you were strip-searched.
24     A.  Correct.
25     Q.  Second, you went to the holding cell,

Page 272

1  where you -- where you stayed for a good while, it
2  sounded like.
3      A.  Correct.
4      Q.  Then you went back into the warehouse,
5  where you were interviewed.
6      A.  Correct.
7      Q.  Then you went back into the holding cell,
8  where you stayed for a little while.
9      A.  Correct.
10     Q.  Then you went to the district police
11 office that's down the alley I guess.
12     A.  Correct.
13     Q.  For a while.
14     A.  Correct.
15     Q.  Then you went to the parish prison.
16     A.  Correct.
17     Q.  Then you went to Our Lady of the Lake
18 North.
19     A.  Correct.
20     Q.  Then you went back to the parish prison.
21     A.  Correct.
22     Q.  Is that --
23     A.  That's correct.
24     Q.  -- sequence of events --
25     A.  Yeah, that's correct.

68 (Pages 269 to 272)

Page 273

1    Q.  All right.  That's what I wanted to make
2  sure of.
3        The -- You testified that Officer Lawrence
4  threw a punch and the punch landed on your left
5  jaw.  Did you bleed in any way?
6     A.  I didn't say I was bleeding.  No, I did
7  not bleed.
8     Q.  No, I'm --
9  MS. HAWKINS:
10       Jeremy, answer --
11  EXAMINATION BY MR. BLACKWELL:
12    Q.  I'm not saying you did.
13    A.  No.
14    Q.  I'm --
15    A.  No.
16    Q.  -- asking you, did you bleed?
17    A.  No.  But I was bleeding from the scrapes
18  from me falling and stuff, though.  On my hands.
19    Q.  But when you -- But when you were hit in
20  the jaw, you didn't -- you didn't have any blood in
21  your mouth or anything like that?
22    A.  No.  But I had an abrasion on my face.
23    Q.  And is -- Have you seen that noted
24  anywhere in your medical records, that you had an
25  abrasion on your face?

Page 274

1    A.  Yes.
2    Q.  Where is that noted at?
3    A.  Give me a second.  Can I find it?
4    Q.  Sure.
5  THE WITNESS:
6       Where them pictures at?
7  MS. HAWKINS:
8       What picture, honey?
9  THE WITNESS:
10       Huh?
11  MS. HAWKINS:
12       What picture?
13  THE WITNESS:
14       Where I have a knot on my forehead.
15  EXAMINATION BY MR. BLACKWELL:
16    Q.  You got hit in the forehead, too?
17  THE WITNESS:
18       Where is the pictures at?  The pictures.
19  MS. HAWKINS:
20       I don't know what picture you're talking
21  about.
22  THE WITNESS:
23       The jail photos.  Jail photos.  Jail
24  photos.
25       Mr. Mike, I know you showed me some photos

Page 275

1  earlier that was in a packet.  Can you assist
2  me on how can I find those?  I know you gave me
3  a lot of things, so it's kind of lost over
4  here.
5  MR. SCHILLAGE:
6       Check Exhibit 8.
7  THE WITNESS:
8       Exhibit 8?  Eight?
9  MS. HAWKINS:
10       (Indistinguishable.)
11  MR. SCHILLAGE:
12       Exhibit 8's got to be facial photographs.
13  MS. HAWKINS:
14       (Indistinguishable.)
15  COURT REPORTER:
16       I can't hear you, Ms. Hawkins.
17  THE WITNESS:
18       But they are -- they're black-and-white.
19  I can't -- I can't see them.
20  MS. HAWKINS:
21       (Indistinguishable.)
22  COURT REPORTER:
23       Do you want this on the record?
24  MS. HAWKINS:
25       No.  Thank you.

Page 276

1  THE WITNESS:
2       He asked did I --
3  MS. HAWKINS:
4       So, Jeremy --
5  THE WITNESS:
6       -- document --
7  MS. HAWKINS:
8       -- he asked you if you saw in your medical
9  records anywhere where you had a facial
10  abrasion.  Did you?  Just yes-or-no question.
11  THE WITNESS:
12       Yes, I seen it, but the photos are
13  black-and-white.  I cannot tell.
14  MS. HAWKINS:
15       Okay.
16  EXAMINATION BY MR. BLACKWELL:
17    Q.  Okay.  So when you went to the Lady of the
18  Lake on the day that you were arrested, did they
19  take pictures of your face?
20    A.  No.  The parish prison did in booking.
21  THE WITNESS:
22       Where the booking papers at?
23  EXAMINATION BY MR. BLACKWELL:
24    Q.  But nobody at the --
25  MS. HAWKINS:

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 277

1        Jeremy, it's black-and-white.
2    EXAMINATION BY MR. BLACKWELL:
3        Q.   -- at the urgent care --
4    COURT REPORTER:
5        I'm sorry, I couldn't hear your question.
6    EXAMINATION BY MR. BLACKWELL:
7        Q.   I said, no one at the urgent care took
8    pictures --
9        A.   No.
10       Q.   -- of your face --
11       A.   No.
12       Q.   -- did they?
13       A.   No.
14       Q.   There are some pictures when you were
15    booked.
16       A.   Yes.
17       Q.   Explain to me the -- I know you said you
18    had a fractured rib.  How were you treated for
19    that?
20       A.   You cannot treat a hairline fracture.  It
21    gets better on its own.
22       Q.   Did they give you any kind of binding to
23    put around your --
24       A.   (Shaking head.)
25       Q.   -- your chest or anything like that?

Page 278

1        A.   In prison or the doctor?
2        Q.   Any -- Any doctor.
3        A.   You have to be specific for me.  You have
4    to be specific for me, because I don't know if
5    you're talking about in prison or when I got out of
6    jail.
7        Q.   Well, let me -- let me ask you this.  Did
8    anybody ever give you any binding to -- for your
9    chest as a result of the fracture of your rib?
10       A.   Yeah.  I got a breathing spirometer.
11    That's what I did get.
12       Q.   And do you know what I'm talking about
13    when I say binding?
14       A.   Like, to put on me?
15       Q.   Yeah.  To go around --
16       A.   No.
17       Q.   -- your chest.
18       A.   No.  You -- A hairline fracture have to
19    heal on its own.  There's nothing you can do to fix
20    it.
21       Q.   Okay.  You were asked about some telephone
22    calls with your -- with your mother.  Did you --
23    Did you speak with her by phone pretty much every
24    day when you were in jail?
25       A.   Correct.

Page 279

1        Q.   So I'm going to ask you the next question
2    in a very general way.  I want you to help me
3    describe all of the injuries that you claim to have
4    sustained for which you're seeking money in this
5    case.  Okay.  So let's start -- We're going to
6    number them one through however many.  And so I
7    want you to -- to describe for me, you know,
8    every -- every item of damage that you suffered
9    that -- that you're seeking money for in the case.
10       A.   Okay.  I know I was humiliated.  I know --
11       Q.   Hold on.  Let me -- Let me -- I'm going to
12    write these down.
13       A.   All right.
14       Q.   All right.
15       A.   I was vi --
16       Q.   Humiliation.
17       A.   I was violated.  My rights was broken.  My
18    ribs, hairline fracture.  I had abrasions to my
19    face.  Hands are scarred.  It's messing me up
20    publicity of people.  I go in public, people notice
21    me from TV.  I --
22       Q.   What else?
23       A.   I get scared when I see the police.  I get
24    terrified.  Never was like that until the January 9
25    encounter.

Page 280

1        Q.   What else?
2        A.   I stress about it sometimes.  I have
3    emotional breakdowns.  And that's -- that's --
4    that's it.
5        Q.   Okay.  Are you -- I know for the ribs you
6    said there could -- there wasn't any treatment for
7    it, but you only went to the doctor one time to be
8    x-rayed, correct?
9        A.   Because -- Yes.  I'm going to answer your
10    question.  But the doctors have described to me
11    that this type of injury, it has to -- it's, like,
12    no medicine.  They gave me medicine, which was
13    Ibuprofen, but it have to heal on its own.
14       Q.   Okay.  And I understand that, but -- but
15    it only required you to go see a doctor once; is
16    that fair?
17       A.   It doesn't matter if I went one time.  The
18    reason I was going -- I would have got the same
19    response every time I went.  Because I went more
20    than one time.  They told me to get with me a
21    primary care doctor.  Which is Samaki Green.  I
22    went to Samaki Green on February 10 to see her
23    about it.  And after I followed up with Samaki
24    Green to see her again for the incident, she didn't
25    see me.  That's why it's only one visit.  I left.

Page 281

1    She didn't see me. I was waiting on her. She
2    never came. I was at the office. She never came,
3    so I left.
4        Q. Understood. My question stands. You only
5    saw a doctor once for that injury, right?
6        MS. HAWKINS:
7            Yes or no, Jeremy.
8        THE WITNESS:
9            I saw the doctor once, yes.
10       MR. BLACKWELL:
11           Thank you. Thank you.
12   EXAMINATION BY MR. BLACKWELL:
13       Q. I understand you went to go see --
14       A. Her again.
15       Q. -- Ms. Green, who's a -- who's a nurse --
16   or who's a nurse practitioner --
17       A. Yeah.
18       Q. -- once, but you actually never saw her
19   because she never showed up to the appointment?
20       A. No. She was there. She just -- I don't
21   know if she was by herself. But I got impatiently
22   and left, because I was already waiting.
23       Q. Did you ever -- Were you ever required to
24   see a doctor for the abrasions to your face?
25       A. No, sir. But I did x-rays and stuff on my

Page 282

1    jaws and things like that, though.
2        Q. Where did you do those at?
3        A. I did them at the Our Lady of the Lake.
4        Q. On the same day that you were x-rayed for
5    your ribs?
6        A. Yes, sir.
7        Q. So they took -- In addition to x-raying
8    your chest, they also x-rayed your head?
9        A. Yes. But they didn't see nothing on the
10   x-ray.
11       Q. I couldn't understand, and it's partly
12   because of this Zoom call, and I apologize for not
13   being there in the same room with you. That's part
14   of the issue.
15           The doctor that you're seeing in New
16   Orleans, is his name Brian, like mine, or is it
17   Bryant?
18       A. Dr. Brian, B-R-I-A-N, Turner.
19       Q. Okay. And I think you said that -- that
20   Dr. Turner was a psychologist?
21       A. Yes.
22       Q. And that you -- you've seen him a total of
23   three times?
24       A. I seen him four.
25       Q. Four times?

Page 283

1        A. Yes.
2        Q. The fourth one being yesterday?
3        A. Yes.
4        Q. And has he talked to you about the two
5    things that you described, being afraid of police
6    and the stress and emotional breakdowns that you
7    say you're having?
8        A. No.
9        Q. What -- What -- What is he treating you
10   for?
11       A. Right now we -- we on a -- we -- he treat
12   me based off -- It's just therapy. It's steps
13   first of getting to know me, things like that.
14       Q. But what -- what condition do you have
15   that he is treating you or trying to get better?
16       A. He's -- I don't know yet.
17       MR. DIGGS:
18           Calls for -- Calls for expert opinion.
19           But to the extent that you know, you can
20           answer.
21       MR. BLACKWELL:
22           Yeah.
23   EXAMINATION BY MR. BLACKWELL:
24       Q. I mean, Mr. Lee, why are you going to the
25   doctor?

Page 284

1        A. Because I need help.
2        Q. With what?
3        A. What you mean what I need help with? I
4    supposed to tell you what I talk to him --
5        Q. I mean --
6        A. -- or that?
7        Q. Well, I mean, if I broke my arm, I know I
8    need help getting my arm fixed.
9        MS. HAWKINS:
10           (Indistinguishable.)
11   EXAMINATION BY MR. BLACKWELL:
12       Q. I'm trying to understand what the -- what
13   Dr. Turner is going to fix for you.
14       COURT REPORTER:
15           Excuse me. Wait. I cannot hear you at
16           all. So if you want it on the record --
17       MS. HAWKINS:
18           I don't.
19       COURT REPORTER:
20           -- I need you to speak up.
21       MS. HAWKINS:
22           I don't want it on the record.
23       THE WITNESS:
24           What I was fixing to say?
25       MS. HAWKINS:

71 (Pages 281 to 284)

Page 285

1    I'm speaking to the client directly.
2    THE WITNESS:
3        Repeat yourself.
4    MR. SCHILLAGE:
5        Wait. Well, wait a minute. If you're
6    speaking to the client directly, then it does
7    need to be on the record.
8    MR. TETTLETON:
9        Absolutely.
10   MR. SCHILLAGE:
11       And if you're giving instructions, it
12   has --
13   MS. HAWKINS:
14       I told him --
15   MR. SCHILLAGE:
16       -- to be memorialized.
17   MS. HAWKINS:
18       -- to answer the questions.
19   EXAMINATION BY MR. BLACKWELL:
20       Q.  I'm simply asking you, why are you going
21   to Dr. Turner when --
22       A.  Because I need help. I just told you that
23   I have the problems. Post-Trauma Stress Disorder.
24   I can't sleep. I feel humiliated when I go out in
25   public. People see me and know that I've been a

Page 286

1    victim of things. But it's so much going on and I
2    need therapy. Everyone needs therapy.
3        Q.  Okay. And the -- and did you need therapy
4    before your lawyer suggested that you go to Dr.
5    Turner?
6        A.  No. My --
7    MR. DIGGS:
8        Objection. Assumes facts not in evidence.
9    Argumentative as phrased. You can answer that
10   question.
11   THE WITNESS:
12       No, I didn't need it.
13   EXAMINATION BY MR. BLACKWELL:
14       Q.  Okay. So you only -- you only needed it
15   after they recommended it to you?
16       A.  No. I -- I -- My life experiences, I
17   needed therapy, because whatever happened to me in
18   that warehouse that I'm telling y'all what
19   happened, no one believes me and it messes with my
20   head for, like, everything I say. It's
21   unbelievable. So, yes, I have problems. Sleeping,
22   having dreams about the police beating me again.
23   It's -- It's more so on, if you want me to get in
24   detail.
25       Q.  Who's paying Dr. Turner?

Page 287

1        A.  Who's paying Dr. Turner?
2        Q.  Uh-huh. I assume he's not treating you
3    for free.
4        A.  Through me.
5        Q.  You're paying him?
6        A.  Yes.
7        Q.  How much have you paid for the four visits
8    you've had?
9        A.  How much have I paid him?
10       Q.  Yes, sir.
11       A.  I have to go in my -- my tallies.
12       Q.  So, I mean, he doesn't have a set price
13   for visiting, you know, the visit?
14       A.  No.
15       Q.  How -- How does he charge you? Is it
16   dependent upon how much time you spend with him on
17   a visit?
18       A.  It's in my lawyer fees.
19       Q.  That's what I'm -- So you're -- The
20   lawyer's paying Dr. Turner? Is that what you're
21   saying?
22       A.  No.
23   MR. DIGGS:
24       Misstates the witness' testimony.
25   EXAMINATION BY MR. BLACKWELL:

Page 288

1        Q.  I'm trying to understand. Did you -- Do
2    you -- Did you pay Dr. Turner with a check, cash,
3    credit card, Venmo?
4        A.  I owe him money.
5        Q.  How much do you owe him?
6        A.  I'm going to keep that to myself.
7        Q.  Well, sir, you can't keep it to yourself.
8        A.  But you're asking me my personal business.
9        Q.  Well, when you file a lawsuit, you kind of
10   open yourself up to people finding out about your
11   personal business, and so --
12       A.  Okay. Based off that, I -- I pay Dr.
13   Turner -- it's -- it's like a -- not that much.
14       Q.  I need you to tell me what the amount is.
15       A.  I don't know the amount. I just told you
16   it's coming off my fees and you --
17       Q.  Has -- Did Medicaid pay for any of your
18   treatment relative to what happened to you in
19   January of 2023?
20       A.  No.
21       Q.  When -- When you left Dr. Turner's office
22   in New Orleans yesterday, did he schedule a next or
23   follow-up appointment for you?
24       A.  The call on yesterday, we was -- it was a
25   Zoom call. That was our only Zoom call. I'm going

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 289

1   to let you know that. That was our only Zoom call.
2   Every one was three trips to New Orleans. And no.
3       Q. What I'm saying --
4       A. And Mr. Turner say he's going to follow up
5   with me every day. But I've been in court today.
6   I haven't talked to him today.
7       Q. Every day that you're in court?
8       A. I say I'm in court today. I haven't
9   talked to him today. But I -- We supposed to be
10  reaching out today.
11      Q. All right. And when you say "we," who --
12  who does that include?
13      A. I say I haven't talked to him today. I'm
14  going to --
15      Q. Who --
16      A. -- rephrase that.
17      Q. Who all was -- Who all was on the Zoom
18  call with Dr. Turner yesterday?
19      A. Just me and Dr. Turner was in the Zoom
20  call.
21      Q. And so you're supposed to have a Zoom call
22  with him when you finish today?
23      A. No. I don't know. I told you -- You
24  asked me when I supposed to be speaking with him.
25  Me and Dr. Turner speaks every day. I have an

Page 290

1   assignment that I have to do for him, so I have to
2   text him every day.
3       Q. So let me maybe be more specific with you.
4       A. Yes, please do.
5       Q. The -- You described four appointments.
6   Three that you went to New Orleans --
7       A. Yes.
8       Q. -- and one that you had on Zoom?
9       A. Yes.
10      Q. My question to you was simply, is do you
11  have another regularly-scheduled appointment to see
12  Dr. Turner for treatment?
13      A. No. We haven't scheduled a date yet.
14      Q. Okay.
15      A. But I know it's every month on the 10th.
16      Q. What's every month on the 10th?
17      A. Man, stop asking me the same questions.
18  You asked me --
19      MS. HAWKINS:
20          Jeremy --
21      THE WITNESS:
22          -- what's going on. Like, I know this,
23  but it's go getting kind of aggravating now.
24      MS. HAWKINS:
25          Answer the question he's asking. Yes or

Page 291

1   no.
2   EXAMINATION BY MR. BLACKWELL:
3       Q. So yesterday was the 22nd. So you --
4       MS. HAWKINS:
5           That's it.
6   EXAMINATION BY MR. BLACKWELL:
7       Q. You Have to understand my confusion.
8   Yesterday was the 22nd, so that's --
9       A. Oh --
10      Q. -- not every month --
11      A. -- my God.
12      Q. -- on the 10th, right?
13      A. Duh. Because it wasn't in person. We
14  meet in person.
15      Q. So you are saying that you have a standing
16  appointment every month on the 10th with Dr.
17  Turner?
18      A. Yes. That's how Dr. Turner was doing it.
19  Every month on the 10th I go out there and see him.
20  Knowing I had this coming up.
21      THE WITNESS:
22          How much longer is this?
23      MS. HAWKINS:
24          Probably another hour and a half, Jeremy.
25      THE WITNESS:

Page 292

1           Thank you. Because he said he wasn't
2   going to take that many questions. I could
3   have dumped a load. I'm just being honest.
4       MS. HAWKINS:
5           Jeremy --
6       THE WITNESS:
7           My stomach is starting to hurt.
8       MS. HAWKINS:
9           Do you need a break?
10      THE WITNESS:
11          Yes, I do.
12      MS. HAWKINS:
13          Do you need a five-minute bathroom break?
14      THE WITNESS:
15          Yes, I do.
16      MS. HAWKINS:
17          Brian, could we have a five-minute break,
18  please?
19      MR. BLACKWELL:
20          Sure.
21      VIDEOGRAPHER:
22          Off the record. The time is now 4:57.
23          (OFF THE RECORD.)
24      VIDEOGRAPHER:
25          Back on the record. The time is now

Page 293

1    5:08.
2    EXAMINATION BY MR. BLACKWELL:
3        Q.   Mr. Lee, it's not my intention to upset
4    you in any way, but please understand that I've got
5    a job to do and - and so --
6        A.   Yes, sir.
7        Q.   The easier we can get through this, it's
8    going to be better for everybody; okay?
9        A.   Yes, sir.
10       Q.   I want to make sure that I understand.
11   Earlier in the deposition you talked about -- you
12   said you saw Samaki Green on one occasion, and I'm
13   trying to understand whether that's the same time
14   you said that she didn't show up for the
15   appointment or whether you actually saw her one
16   time.
17       A.   Yeah, that's -- I actually saw her one
18   time.
19       Q.   Okay.  What -- What was she treating you
20   for on that occasion?
21       A.   She was treating me for -- Then, again, I
22   just got my Medicaid back.  I needed a primary care
23   doctor.  So she was basically running every test
24   runs on me, test results for diseases and things
25   like that.

Page 294

1        Q.   Okay.  So, like, doing a -- an annual
2    physical type thing?
3        A.   Yes.  But I looked for a physical care
4    doctor based off the in -- the incident of January
5    9, 2023.
6        Q.   So when -- Was the one time that you saw
7    Nurse Practitioner Green related to that incident?
8        A.   Yes.
9        Q.   Okay.  And did Medicaid pay her for your
10   treatment on that date?
11       A.   Yes.
12       Q.   Okay.  And, again, I'm just trying to
13   clear some things up.  Initially when you indicated
14   you went into the warehouse when you got over
15   there, I wrote down that you said that the people
16   who were present inside of the warehouse area
17   were -- were Kennedy, Wallace, and yourself.  And
18   then I thought you said -- you changed that and
19   said it was Kennedy, Lawrence, and yourself.  Can
20   you -- Which -- Which was it?
21       A.   Kennedy, Lawrence, and me.
22       Q.   Okay.  And you also said in response to a
23   question that Mr. Schillage asked you, that you had
24   been strip-searched in prison more than once.
25       A.   Correct.

Page 295

1        Q.   So when you were arrested up in Wisconsin,
2    did they strip-search you?
3        A.   Not at all.
4        Q.   Okay.  When you were arrested on the bank
5    fraud charge, did they strip-search you?
6        A.   Not at all.
7        Q.   So I understood when you went to the
8    parish prison for the January 2023 incident that
9    they didn't strip-search you then either.
10       A.   Yeah, they strip-searched me for when I
11   changed out clothes.
12       Q.   Okay.  So when you went in -- you got in
13   with the prison guard was when they --
14       A.   Yeah.
15       Q.   -- strip-searched?
16       A.   Yes.
17       Q.   And did they -- They only did that once or
18   they did that more than once while you were there?
19       A.   I did that once in central booking and
20   once when I got -- was destination to, like, lines.
21   I don't know if you know, they call it lines.
22   Going to population.
23       Q.   Okay.  So once when got there and once
24   before you went into the general --
25       A.   Yes.

Page 296

1        Q.   -- population?
2        A.   Yes.
3        Q.   And those -- Other than at the warehouse,
4    those are the only other two times that you've been
5    strip-searched?
6        A.   Correct.
7        Q.   Okay.  I've got to ask you this, because I
8    think even Nevels asked you this.  How much in SNAP
9    benefits do you receive every month?
10       A.   I was receiving 180.
11       Q.   And if I understand what you said
12   correctly, you lost those benefits because you
13   hadn't worked in a while?
14       A.   No.  The first benefits of SNAP, that
15   application has nothing to do with the second one
16   that it got closed.
17       Q.   Tell me what caused you to lose those
18   benefits.
19       A.   Not following up with my application.  The
20   application expired.
21       Q.   Okay.  So you didn't -- you didn't
22   complete the process?
23       A.   Right.
24       Q.   Is that fair?
25       A.   Correct.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 297

1    MR. BLACKWELL:
2        Sir, I think those are all the questions
3    that I have. I'm going to let the couple other
4    people that are there in the room, I'm going to
5    let them ask you any other questions they might
6    have. Thank you.
7    THE WITNESS:
8        Thank you so much, Mr. Brian.
9    EXAMINATION BY MR. TETTLETON:
10   Q.  Mr. Lee, I've got a couple of questions
11   for you.
12   A.  Yes, sir.
13   Q.  Okay. My name is Chase Tettleton. I
14   represent Matthew Wallace. I apologize. I'm going
15   to bounce around a little bit. It's kind of the
16   nature of being third in line.
17   A.  Uh-huh.
18   Q.  You told us earlier you're not affiliated
19   with the Bleedas; is that correct?
20   A.  Correct.
21   Q.  Have you ever been affiliated with the
22   Bleedas?
23   A.  No.
24   Q.  Have you ever claimed to be affiliated
25   with the Bleedas?

Page 298

1    A.  No.
2    Q.  How about the 5400 Boys?
3    A.  No.
4    Q.  We looked at this picture. I don't
5    remember the number.
6    MR. TETTLETON:
7        Eight?
8    MR. SCHILLAGE:
9        It's either 11 --
10   MR. KERSHAW:
11       Eleven.
12   MR. TETTLETON:
13       Eleven. Okay.
14   EXAMINATION BY MR. TETTLETON:
15   Q.  Do you have a copy of this in front of
16   you?
17   A.  Yes, I do
18   Q.  All right. Starting from the left --
19   MR. DIGGS:
20       I'm sorry. Real quick. Counsel --
21   Counsel, is there -- I'm not sure. Is there a
22   microphone in there? Because I can -- I can
23   hardly hear. I can't hear any of the
24   questions.
25   MR. TETTLETON:

Page 299

1        Oh, the Zoom.
2    MS. HAWKINS:
3        Chase, can you move it up maybe? Or can
4    we --
5    MR. TETTLETON:
6        Is the Zoom link --
7    MS. HAWKINS:
8        -- move the Zoom?
9    MR. TETTLETON:
10       -- the problem?
11   VIDEOGRAPHER:
12       It's the Zoom. Yeah. You're just far
13   away from the computer.
14   MR. TETTLETON:
15       Okay.
16   VIDEOGRAPHER:
17       You can either move --
18   MR. TETTLETON:
19       Is that better?
20   MR. DIGGS:
21       I'll try to turn it better from my end.
22   MR. TETTLETON:
23       I'm wearing a mike, and I didn't realize
24   that there's a separate microphone --
25   MR. DIGGS:

Page 300

1        Yeah.
2    MR. TETTLETON:
3        -- on the computer. Okay.
4    MR. DIGGS:
5        Oh, okay. No worries.
6    MR. TETTLETON:
7        Is this a little bit better? I'll speak
8    up, too.
9    MR. DIGGS:
10       Yeah.
11   MR. TETTLETON:
12       All right.
13   MR. DIGGS:
14       You're good now.
15   EXAMINATION BY MR. TETTLETON:
16   Q.  Left to right. Dayln -- Oh, you've got it
17   in front of you. Dayln Banks, is that his name?
18   A.  Yes.
19   Q.  Is he affiliated with 5400 Boys?
20   A.  No, sir.
21   Q.  Next is Deondre Tate? Is that who is next
22   in line?
23   A.  Yes.
24   Q.  Is he affiliated with the 5400 Boys?
25   A.  No, sir.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

| Page 301 | Page 302 |
|---|---|

**Page 301**

1    Q.  Do you know his Instagram tag or handle?

2    A.  (Indistinguishable.)

3    Q.  Do you know what it is?

4    COURT REPORTER:

5        I'm sorry, I didn't understand you.

6    THE WITNESS:

7        He was asking me a question.

8    EXAMINATION BY MR. TETTLETON:

9    Q.  Yes.  Do you know what --

10   A.  I said no.

11   Q.  -- Deondre's -- Do you know Deondre's

12   Instagram name?

13   A.  No.

14   Q.  Okay.  Do you know it's 5400 Stunna?  It's

15   5400 Steppa.

16   A.  No.  I don't follow him.

17   Q.  Okay.  You don't follow him on Instagram?

18   A.  No.

19   Q.  What's your Instagram name, again?

20   A.  Peso Guala.

21   Q.  Is that the only Instagram account you

22   have?

23   A.  Yes.

24   Q.  Have you ever had another Instagram

25   account?

**Page 302**

1    A.  No.  I have another name.

2    Q.  What's your other name?

3    A.  Peso.J.

4    Q.  Dot J?

5    A.  Yeah.

6    Q.  Do you use both of them?

7    A.  Yeah.

8    Q.  What's Guala, the brand?

9    A.  That's my clothing brand.

10   Q.  Do you sell them -- Where do you sell the

11   clothes?

12   A.  Oh, I haven't got it off ground yet.  I

13   just have samples.

14   Q.  Is it like -- Like, what kind of clothes?

15   A.  Streetwear.

16   Q.  Okay.

17   A.  Gear.

18   Q.  I understand.

19        You told us earlier that you go by Peso?

20   A.  (Nodding head.)

21   Q.  That's correct?

22   A.  Yes, sir.

23   Q.  How long have you gone by Peso?

24   A.  I've been Peso for, like, three or four

25   years.

| Page 303 | Page 304 |
|---|---|

**Page 303**

1    Q.  Okay.  And that came -- That's kind of a

2    draw off of PeeWee?  Is that what I understood

3    earlier?

4    A.  Yeah.

5    Q.  Okay.  Do you go by any other names

6    besides Peso?

7    A.  Jeremy.

8    Q.  Thank you.

9        I've seen Peso Paid In Full somewhere.  Is

10   that you?

11   A.  That's probably an old TikTok account I no

12   longer have access to.

13   Q.  Okay.

14   A.  That's the only thing.

15   Q.  Do you have any other social media

16   accounts that you no longer have access to besides

17   that TikTok account?

18   A.  (Shaking head.)

19   MS. HAWKINS:

20       Out loud, Jeremy.

21   THE WITNESS:

22       No.

23   EXAMINATION BY MR. TETTLETON:

24   Q.  Have you ever had a Snapchat account?

25   A.  I haven't had a Snapchat.

**Page 304**

1    Q.  Okay.  I understand from your discovery

2    responses that your -- you record music?

3    A.  Yes.

4    Q.  What do you -- Do you perform under a name

5    besides Jeremy Lee?

6    A.  Peso Guala.

7    Q.  From your discovery responses, I

8    understand you published a song called Corruption?

9    A.  Yeah.

10   Q.  Tell me about that song.

11   A.  It's just about how I felt.

12   Q.  Okay.  I've never recorded a song.

13   A.  Yeah.

14   Q.  Tell me how that goes.  I don't know what

15   you do.

16   A.  Basically -- I can -- I can rap it for you

17   if you want to hear it.

18   MS. HAWKINS:

19       He's asking --

20   MR. TETTLETON:

21       Okay.

22   MS. HAWKINS:

23       -- the process of recording the song,

24   Jeremy.

25   THE WITNESS:

Electronically signed by Toni Conner (501-190-381-9495)     2f67950e-8c04-4061-959b-7823204c7c89

Page 305

1    All right.
2    EXAMINATION BY MR. TETTLETON:
3       Q.  First of all, do you have a recording of
4    the entire Corruption song?  Do you have it
5    somewhere?
6       A.  Yeah.  On the Internet.
7       Q.  Okay.  Where is it on the Internet right
8    now?
9       A.  It's on YouTube.
10      Q.  How would I find it on YouTube?
11      A.  You type in "Peso Paid In Full."
12      Q.  Okay.  And the account -- Is that the
13   account name on YouTube?
14      A.  YouTube?  Yes.
15      Q.  And that's a publicly-available account?
16      A.  Yes.
17      Q.  And I would be able to find the Corruption
18   song on there?
19      A.  Correct.
20      Q.  Do you -- Is the topic or the subject
21   matter of Corruption your arrest in January 2023?
22      A.  What you said?
23      Q.  Is that the subject matter of the song?
24   Is that what you're singing about?
25      A.  No.  I'm just saying the system is

Page 306

1    (indistinguishable) and --
2    COURT REPORTER:
3       "I'm just saying" what?  "The system" --
4    THE WITNESS:
5       The system is corrupted.  It was just a
6    song.
7    EXAMINATION BY MR. TETTLETON:
8       Q.  And I -- Obviously I haven't listened to
9    it yet.  Do you describe any specific incidents in
10   the song that relate to your arrest of January
11   2023?
12      A.  Yes.
13      Q.  What do you refer to in the song?
14      A.  Them bitches broke my ribs.
15      Q.  Anything else about the arrest besides the
16   ribs?
17      A.  (Shaking head.)
18      Q.  That's no?
19   MS. HAWKINS:
20      Out loud, Jeremy.
21   THE WITNESS:
22      No.
23   EXAMINATION BY MR. TETTLETON:
24      Q.  You're doing good.  Thank you.
25      Other than Peso Paid In Full, have you

Page 307

1    published any music under any other names?
2       A.  Peso Guala.
3       Q.  Oh.  Thank you.  Peso Guala.
4       Peso Paid In full is the --
5       A.  First name.
6       Q.  -- account name?
7       A.  Yeah.
8       Q.  I'm getting it together now.
9       Okay.  Let's jump back to 5450 Cadillac
10   before the arrest.  You arrive at that -- Well,
11   first of all, Deondre Tate picked you up from your
12   grandmother's house?
13      A.  I seen him going up the street.
14      Q.  Okay.
15      A.  I asked him can he take me to the store.
16      Q.  All right.  And you got into his
17   Chrysler --
18      A.  I got in Terrick Chrysler.
19      Q.  Who?
20      A.  Terrick Morgan Chrysler.
21      Q.  Thank you.  The vehicle that Mr. Tate was
22   driving?
23      A.  Yes.
24      Q.  When you got into the car, did you smell
25   marijuana?

Page 308

1       A.  No, sir.
2       Q.  Do you know what marijuana smells like?
3       A.  I'm nose blind to it.
4       Q.  What does that mean?
5       A.  Like, I done been in an encounter of a
6    police pull me over saying my car smell like
7    marijuana.  I didn't smell it.
8       Q.  Right.
9       A.  I'm nose blind to it.
10      Q.  So if I had a marijuana joint in here, you
11   wouldn't be able to smell it?
12      A.  Yeah, I would be able to smell it.
13      Q.  Okay.  When you got into the car with
14   Deondre, did you smell marijuana?
15      A.  No.
16      Q.  Okay.  When you got to the house at 5450
17   Cadillac, did you smell marijuana?
18      A.  No.
19      Q.  All right.  Did you have any idea when you
20   went to 5450 there would be -- 54 -- Yeah.  40 --
21   5450 Cadillac.  Get the number right.  When you
22   went there, did you know that there would be drugs
23   there?
24      A.  No, sir.
25      Q.  Did you suspect there would be drugs

Page 309

there?
1
2     A.  No, sir.
3     Q.  Had you ever seen the people at that house
4  with drugs?
5     A.  No, sir.
6     Q.  Was it a shock to you when they discovered
7  the drugs there?
8     A.  Yes.
9     Q.  Was it a shock to you when they discovered
10  the guns there?
11     A.  Yes.
12     Q.  You asked -- were asked earlier about your
13  guns.
14     A.  Uh-huh.
15     Q.  Do you own a gun now?
16     A.  No, sir.
17     Q.  Have you ever owned a gun?
18     A.  Yes, sir.
19     Q.  How many guns have you owned in your
20  lifetime?
21     A.  Two.
22     Q.  Tell me what they were.
23     A.  A Glock and an AK-47.
24     Q.  Like, a Glock pistol?
25     A.  Yeah.

Page 310

1     Q.  Okay.  Where did you purchase the Glock
2  from?
3     A.  I purchased the Glock from a friend.
4     Q.  All right.  What happened to it?
5     A.  Who knows.  I got rid of it.  Who knows.
6     Q.  What do you mean?
7     A.  You say -- I know the gun is not legal.
8  You're going to ask me how old I was when I
9  purchased the gun.  So I wasn't old enough to legal
10  carry a gun.
11     Q.  Okay.
12     A.  So I got rid of it.
13     Q.  Throw it away?
14     A.  No.  I just sold it.
15     Q.  Okay.  Sold it to somebody you knew?
16     A.  Yes.
17     Q.  All right.  And, then, the AK-47, when did
18  you -- where -- where did you purchase the AK-47?
19     A.  When I got legal for 18, I bought it from
20  Baker Gun Range.
21     Q.  From Baker Range?
22     A.  Yes, sir.
23     Q.  Do you still own that gun?
24     A.  No, sir.
25     Q.  What happened to it?

Page 311

1     A.  It got picked up.  I had sold it.
2     Q.  What do you mean "picked up"?
3     A.  I had -- was in a drug raid.
4     Q.  Where?
5     A.  It was in a raid ring.
6     Q.  The gun was?
7     A.  Yes.
8     Q.  What do you mean?
9     A.  You asking me about my gun that I had at
10  18 years old.
11     Q.  Right.
12     A.  I told you I sold it.  It got picked up in
13  a gun raid.  I mean in a -- in a -- in a house
14  raid.
15     Q.  The Glock or the AK-47?
16     A.  The AK-47.
17     Q.  Okay.  Was it your house that was raided?
18     A.  No, sir.
19     Q.  Whose house was raided?
20     A.  I don't remember, but I know it was in a
21  raid.
22     Q.  Who had your gun?
23     A.  I don't remember --
24     Q.  You don't --
25     A.  -- the person's name.

Page 312

1     Q.  You don't remember who had --
2     A.  I just remember seeing my Milk Anus strap
3  on there.  I put that strap on there.
4     COURT REPORTER:
5        The what "on there"?
6     THE WITNESS:
7        It say Milk Anus.  The picture -- Where is
8  it?
9     EXAMINATION BY MR. TETTLETON:
10     Q.  The picture with the money on the ground?
11     A.  Yes.  I have a shoulder strap on it.
12  Right here.
13     Q.  Yep.
14     A.  And I have -- The stickers say Milk Anus.
15     Q.  Okay.  So that gun got seized by the
16  police in some raid?
17     A.  Yes.
18     Q.  And you don't remember who had your gun?
19     A.  No, sir.
20     Q.  Did you loan your assault rifle out to a
21  lot of people?
22     A.  No, sir.
23     Q.  Who did you loan it out to?
24     A.  I sold it.  I didn't loan it out.
25     Q.  Okay.  I understand.  I -- I misunderstood

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 313

1  that.
2      It was -- You sold it and then it was
3  seized in a raid?
4      A.  Yes.
5      Q.  How did you know it got seized in a raid?
6      A.  I seen it on the photo of WMV.
7      Q.  Oh, you recognized it because of the
8  strap?
9      A.  Yes.
10     Q.  All right.  Now I'm following.  Okay.
11     A.  Yeah.
12     Q.  Thank you.  I appreciate you filling that
13  in.
14         Okay.  You have talked a lot about your
15  injuries today.  I do want to show a document to
16  you that I don't think we've looked at.  It is in
17  the medical records.  And if we looked at it, I
18  really apologize.  It is a Sick Call Request Form.
19  Have you looked at this yet?
20     MR. SCHILLAGE:
21         It's in Exhibit 2.
22     MR. TETTLETON:
23         Okay.
24     MR. SCHILLAGE:
25         But no.

Page 314

1      MR. TETTLETON:
2          I want to make this a new exhibit.  What
3  are we at, Toni?
4      COURT REPORTER:
5          Fifteen.
6      THE WITNESS:
7          Which --
8      MS. HAWKINS:
9          No.  He's making a new one, Jeremy.
10     MR. TETTLETON:
11         I'll bring it down to you.
12     MS. HAWKINS:
13         Okay.
14  EXAMINATION BY MR. TETTLETON:
15     Q.  Take a look at the document first.  Do
16  you -- Do you recognize that?
17     A.  Yes.
18     Q.  I see -- Is that your signature on this
19  page?
20     A.  Yes.
21     Q.  Other than your signature, is any of that
22  other writing your handwriting?
23     A.  Not the "23," the date, but this --
24     Q.  How about at the top of the page, the
25  information about your name --

Page 315

1      A.  Yes.
2      Q.  -- the dates?
3      A.  My name.  The date.
4      Q.  Right.
5      A.  I ain't write the parish facility.  I
6  ain't write the inmate number.  I ain't write the
7  location.  I wrote the date of birth and I wrote
8  the reason for request.
9      Q.  Okay.  I noticed that you -- the date on
10  there.  You have a unique way that you write your
11  ones, it looks like.
12     A.  Yes.
13     Q.  The date that you signed this is what
14  date?
15     A.  It say 23rd.  I mean the 10th --
16     Q.  Okay.
17     A.  -- of the 23rd.
18     Q.  Do you remember --
19     A.  Yeah.
20     Q.  -- at what point in the process that you
21  signed this document?  Where were you?
22     A.  To be honest, when I was filling out this,
23  this for to get medicine, so by my third or fourth
24  day.
25     Q.  All right.  Well, you -- The 10th would

Page 316

1  have been the first day.
2      A.  Yeah, but I wasn't getting no medicine on
3  the first day, though.
4      Q.  Okay.  Would you have signed it the 10th
5  on a later date?
6      A.  It could be -- I still didn't get no
7  medicine.
8      Q.  Okay.
9      A.  The date you could say that, but I didn't
10  get no medicine.
11     Q.  You wrote in there the reasons why you
12  were seeking medicine.  You put, "Two fractured
13  ribs."
14     A.  Yes.
15     Q.  So by the time you signed this, you knew
16  that you had been diagnosed with fractured ribs?
17     A.  Yes.
18     Q.  So you told us earlier that you didn't
19  know that you had fractured ribs until you were out
20  of jail.  Right?  Do you remember that?
21     A.  Yes.
22     Q.  All right.  Does -- Now that you look at
23  this, does that refresh your recollection?
24     A.  But you're talking about a form that I --
25  that I put a signature and say, "Two fractured

Page 317

1    ribs --
2        Q.  Right.
3        A.  -- hard time breathe -- hard time
4    coughing."
5        Q.  Right.  But you knew that you had two
6    fractured ribs when you filled this out, right?
7        A.  No, I didn't know this.  This why it's
8    confusing, y'all.  The parish prison, their dates
9    on how they move for me, it is not -- it's not the
10   same.  It's not the same.
11       Q.  All right.
12       A.  Like, they didn't even have my -- I
13   didn't -- Like, going get the paperworks and things
14   like that for to show y'all that I had fractured
15   ribs, I didn't know my ribs was fractured.
16       Q.  How did you not know your ribs were
17   fractured when you wrote in "two fractured ribs"?
18       A.  You say how did I know my ribs was
19   fractured?
20       Q.  You just told me that you didn't know your
21   ribs were fractured, but yet, you still wrote the
22   reason you were going to see Sick Call was because
23   you had two fractured ribs.
24       A.  Because I know something was wrong.
25       Q.  You didn't say hurt ribs.

Page 318

1        A.  Fractured.
2        Q.  Pretty specific, right?
3        A.  I ain't say hairline either.
4        Q.  True.
5        Okay.  I want to make sure I've understood
6    when these injuries happened.
7        A.  All right.
8        Q.  Did you suffer any physical injuries on
9    Cadillac Street?
10       A.  No.
11       Q.  The physical injuries that you're claiming
12   all happened at the Brave Cave?
13       A.  Correct.
14       Q.  And you told us earlier that Troy
15   Lawrence, Jr. kicked you two times?
16       A.  Correct.
17       Q.  In the ribs?
18       A.  Correct.
19       Q.  Did Matthew Wallace ever kick you in the
20   ribs?
21       A.  No.  He swept me off my feet, though.
22       Q.  Okay.
23   MS. HAWKINS:
24       Just for the record, y'all, Page 9 of
25   Exhibit 2 is the same TurnKey Request Form that

Page 319

1    we just marked as 15.
2    MR. TETTLETON:
3        Thank you.
4    EXAMINATION BY MR. TETTLETON:
5        Q.  Have you ever performed -- I'm going back
6    to the song Corruption earlier.  I wanted to ask
7    you about this.  Have you ever performed that song
8    publicly?
9        A.  No.
10       Q.  Other than the -- the -- the rap song
11   Corruption, have you ever spoken publicly about
12   your experience with the Baton Rouge Police
13   Department?
14       A.  No.
15       Q.  Have you ever given a press conference
16   where you were interviewed on camera?
17       A.  Yes.
18       Q.  Okay.  How many times have you done that?
19       A.  No.  I take that back.  No.  No.  No.  I
20   was trying to count Metro Council.  I didn't give
21   one, no.
22       Q.  Have you been to Baton Rouge -- East Baton
23   Rouge Parish Metro Council meetings?
24       A.  Yes.
25       Q.  Have you spoken at those meetings?

Page 320

1        A.  One or two.
2        Q.  Okay.  What did you want to speak about?
3        A.  On this behalf.
4        Q.  Say -- I'm sorry?
5        A.  The inc -- The -- Hold on.  Yes, I wanted
6    to speak on the -- What is that word?  In -- The
7    incident with --
8        Q.  This scenario?  This --
9        A.  Yes.
10       Q.  -- whole thing?
11       A.  Yes.
12       Q.  Did you physically go to the Metro Council
13   meeting?
14       A.  Yes.
15       Q.  In this building, right?
16       A.  Yes.
17       Q.  Did -- Why did you not speak?
18       A.  I told -- I asked my attorney to.  It
19   wasn't a good time.
20       Q.  I understand.
21       Have you ever spoken to anyone on the
22   Metro Council -- any members of the Metro Council
23   about the January 2023 incident?
24       A.  No, sir.
25       Q.  Have you ever spoken to the former mayor,

Page 321

1    Sharon Weston Broome, about this incident?
2        A.  No, sir.
3        Q.  Other than your experience, have you ever
4    spoken about, like, civil rights or criminal
5    justice issues --
6        A.  (Shaking head.)
7        Q.  -- in general?
8        A.  No.
9        Q.  Okay.  Have you ever been involved with
10    any kind of civil rights organizations?
11        A.  No, sir.
12        Q.  Okay.  I think what I understood earlier,
13    your exchange with Mr. Blackwell about the therapy
14    bills, is that it sounds like that's being taken
15    care of by your lawyer?
16        A.  Yes.
17        Q.  Okay.  Just so I make sure I understand
18    what the bottom line of that is, you haven't had to
19    pay any money yet?
20        A.  Not yet.
21        Q.  Okay.  Have you received any litigation
22    financing loans from any third parties in this
23    lawsuit?
24        A.  No, sir.
25        Q.  All right.  Have -- I -- As I appreciate

Page 322

1    your -- the complaints you filed here, you feel
2    like you were falsely arrested on January 9, 2023?
3        A.  Yes.
4        Q.  Have you ever been falsely arrested
5    before?
6        A.  No.
7        Q.  Have you ever been falsely accused of a
8    crime before?
9        A.  Yes.
10        Q.  How many times?
11        A.  Once.
12        Q.  What -- When was the other time you were
13    falsely accused of a crime?
14        A.  There is no other time.
15        Q.  Just this one time?  That's correct?
16        A.  (Indistinguishable.)
17    COURT REPORTER:
18        I'm sorry?
19    THE WITNESS:
20        I said hold on.  I'm scratching my leg.
21    MS. HAWKINS:
22        Are you okay?
23    THE WITNESS:
24        Yeah.
25        You can ask me that question again?

Page 323

1    EXAMINATION BY MR. TETTLETON:
2        Q.  Sure.  It sounds like this is the only
3    time, January 9, 2023, that you have been falsely
4    accused of a crime.  Is that correct?
5        A.  Correct.  Not on -- I have -- Like I say,
6    I haven't been back to Wisconsin.  I was falsely
7    accused there, too.
8        Q.  Okay.  The -- What they accused you of in
9    Wisconsin, you did not do?
10        A.  Correct.
11        Q.  You were -- You were not in possession of
12    stolen goods?
13        A.  It was in my room.
14    MR. DIGGS:
15        Hold on.  I'm instructing him not to
16        answer anything about that based on Mr.
17        Blackwell's representation that there's still a
18        pending or open case or whatnot.  I'm not aware
19        of that, but we can confer later on.  But if
20        that is the case, then I'm going to instruct
21        Mr. Lee not to answer any questions about
22        anything that is still open regarding his
23        criminal charges.
24    MR. KERSHAW:
25        Is that based on his Fifth Amendment right

Page 324

1        against self-incrimination?
2    MR. DIGGS:
3        That is correct.
4    MR. KERSHAW:
5        Okay.
6    EXAMINATION BY MR. TETTLETON:
7        Q.  You described earlier the 2020 arrest in
8    Baton Rouge.  I think I heard you say it was over
9    $1,400?
10        A.  I say it was 14.
11        Q.  Fourteen?
12        A.  (Nodding head.)  1,400.  I never said it
13    was over 1,400.
14    MS. HAWKINS:
15        Not over the amount, Jeremy.
16    THE WITNESS:
17        Yeah.
18    MS. HAWKINS:
19        He's saying --
20    THE WITNESS:
21        Yeah.  Yeah.
22    MS. HAWKINS:
23        -- what the situation was.
24    THE WITNESS:
25        Yeah.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 325

1    EXAMINATION BY MR. TETTLETON:
2        Q.  The situation concerned $1,400?
3        A.  Yes.
4        Q.  You paid restitution to the victim?
5        A.  Yes.
6        Q.  I understand you paid $1,900 in
7    restitution.
8        A.  Yes.
9        Q.  Okay.  Since January 10th, 2023, have you
10   deleted any social media posts?
11       A.  Have I deleted it?
12       Q.  Yes.
13       A.  No, sir.
14       Q.  Okay.  Everything that you've posted on
15   social media since January 10, 2023, is still
16   available on social media?
17       A.  It's on archive.
18       Q.  What does that mean?
19       A.  It's not deleted.  It's just you can't see
20   it.
21       Q.  Who can't see it?
22       A.  Whoever come to view my page.
23       Q.  You can see it, though, right?
24       A.  I can see it.
25       Q.  Okay.

Page 326

1        A.  But I -- No, I can't see it.  I can go --
2    the -- in the archive to see it, but I have to
3    press Show On Profile for you to see it.
4        Q.  But any post that you put up is still
5    available to you?
6        A.  Yes.
7        Q.  Did you post anything on any social media
8    about the incident with Baton Rouge Police?
9        A.  No.
10       Q.  Have you ever posted anything on your
11   social media to the effect of "fuck the police"?
12       A.  It's saying "F the police"?
13       Q.  Yeah.
14       A.  No.
15       Q.  And that means verbally, like a video,
16   where you were saying "fuck the police"?
17       A.  Oh, yeah, I did.  I said -- I said it.
18       Q.  Okay.  How many videos have you posted
19   with that --
20       A.  It ain't --
21       Q.  -- kind of content?
22       A.  -- no video.
23       Q.  What was it?
24       A.  It probably was just like I re --
25   reposting a video of police doing bad stuff to

Page 327

1    people.  I probably said, "Sorry-ass pigs," or
2    something like that.
3        Q.  Right.  One more question.  Back to 5450
4    Cadillac.  Mr. Tate and you arrive at the house.
5    First question:  Where did Mr. Tate park that
6    Chrysler 300?
7        A.  He parked in front of the Hyundai Accent.
8        Q.  So we were looking at those videos earlier
9    where you first made contact with Matthew Wallace
10   and he's guiding you over to that Hyundai.  The
11   Chrysler was in front of the Hyundai?
12       A.  Yes.  Still running.
13       Q.  The -- You said that you were on the way
14   to a store.  That was the original destination?
15       A.  Yeah.
16       Q.  Was the store that you were going to right
17   up the corner?
18       A.  No.
19       Q.  What store?
20       A.  The store we was going to was another
21   store.
22       Q.  Where?
23       A.  On the back street.  It's a convenience
24   store.
25       Q.  Do you know what it's called?

Page 328

1        A.  No.
2        Q.  Do you know what street it's on?
3        A.  Yes.
4        Q.  Okay.  What street?
5        A.  It's on the corner of Hooper and I
6    think -- What that is?  I just know it's on the
7    corner of Hooper.  They got a fire station across
8    the street.
9        Q.  Okay.  I think I know where that is.
10       A.  Yeah.
11       Q.  And y'all had not made it there?
12       A.  No.
13       Q.  Okay.  You got out of the car and went
14   inside?
15       A.  Yes.
16       Q.  And you were inside about three to four
17   minutes, I think you said, before everything went
18   down?
19       A.  No longer than three minutes.
20       Q.  Okay.  Did Mr. Tate go in the house with
21   you?
22       A.  Yes.
23       Q.  Was he in front of you or behind you?
24       A.  He was in front of me.
25       Q.  When he went in the house, did he stay

82 (Pages 325 to 328)

Electronically signed by Toni Conner (501-190-381-9495)                                        2f67950e-8c04-4061-959b-7823204c7c89

Page 329

1 with you in the living room/kitchen?
2     A. I mean, we both walked in the house. I
3 greeted everyone. What he was doing, I don't know.
4     Q. Was he in the same room as you the whole
5 time?
6     A. I never went in the room. I never made it
7 further past than the kitchen.
8     Q. Was Mr. Tate in the kitchen and the living
9 room area the whole time with you?
10    A. I know when he -- when I left out the
11 door, he was still in there.
12    Q. Was he still in the living room/kitchen
13 area?
14    A. Yes.
15    Q. Okay. Did you ever see him go to the back
16 bedrooms?
17    A. No.
18 MR. TETTLETON:
19        Thank you. I appreciate it. That's all
20    the questions I've got.
21 THE WITNESS:
22        No problem.
23 MR. SCHILLAGE:
24        Jessica, do you have any follow-up?
25 MR. KERSHAW:

Page 330

1        I've got some.
2 MR. SCHILLAGE:
3        Oh, I'm sorry.
4 MR. KERSHAW:
5        What about me?
6 MR. SCHILLAGE:
7        I don't like you.
8 THE WITNESS:
9        I'm going to get a chance to ask -- ask
10    the questions?
11 MR. KERSHAW:
12        You can ask whatever you want.
13 THE WITNESS:
14        No, I know.
15 EXAMINATION BY MR. KERSHAW:
16    Q. Okay, Mr. Lee. Just real quick about --
17 some about your employment history.
18 MS. HAWKINS:
19        Would you mind introducing yourself and
20    tell everybody who you represent?
21 MR. KERSHAW:
22        What?
23 MS. HAWKINS:
24        Do you mind introducing yourself and
25    telling everybody --

Page 331

1 MR. KERSHAW:
2        My name is Kyle.
3 THE WITNESS:
4        Okay.
5 EXAMINATION BY MR. KERSHAW:
6    Q. Back to your employment history.
7    A. Who you represent?
8    Q. I represent Joseph Carboni.
9    A. Okay.
10    Q. So, the -- my question is employment
11 history. We go back. You were working up in
12 Wisconsin.
13    A. Yeah.
14    Q. You previously said. And that was in
15 2022?
16    A. No.
17    Q. It wasn't?
18    A. That me working at Wisconsin?
19    Q. Yes.
20    A. Yes, it was in 2022.
21    Q. In 2022?
22    A. Yes.
23    Q. And I believe we previously --
24    A. The beginning of 2022, yes.
25    Q. The beginning of 2022?

Page 332

1    A. Yes. Yes.
2    Q. And I believe Mr. Blackwell asked you some
3 questions concerning you were arrested up in
4 Sheboygan, Wisconsin?
5    A. All right.
6    Q. While you were working there, correct?
7    A. All right.
8    Q. Okay. And I believe it was established
9 that was in the spring of 2022. Is that right?
10    A. I mean, I'd been -- I'd been there since
11 January.
12    Q. Okay. So you started in January --
13    A. Yes.
14    Q. -- in Wisconsin?
15    A. Yes.
16    Q. I'm sure it's pretty cold, huh?
17    A. Yes.
18    Q. All right. So sometime within the next
19 few months is whenever you were arrested; is that
20 right?
21    A. Yes.
22    Q. Okay. Is your arrest the reason why you
23 came home?
24    A. No. My arrest was because we lost
25 transportation in Chicago in the wreck. That was

83 (Pages 329 to 332)

Page 333

1   the -- where we lost -- Well, I -- Then, on the
2   other hand, the job was almost over.  It was a temp
3   job.
4       Q.  Okay.  When did that happen?
5       A.  What you mean when did it happen?
6       Q.  When did the job end?
7       A.  I know around the time we wrecked, the job
8   was fixing to end.  So I said the job was -- It was
9   supposed to be six to eight months.  I'd been up
10  there four to five.  Production got low.
11      Q.  So you were out there until mid -- mid --
12      A.  Uh-huh.
13      Q.  -- say June --
14      A.  Right.
15      Q.  -- 2022?
16      A.  Right.  And the wreck happened around May.
17  Because I tried to stay it out a little bit after
18  we had the wreck, but paying for transportation and
19  hotel at the same time, it was too much.  And just
20  bonded out of jail.  It was too much.
21      Q.  All right.  So then you come home?
22      A.  Yes.
23      Q.  Okay.  Did you have another job lined up?
24      A.  I was on the search for one.
25      Q.  I'm sorry?

Page 334

1       A.  I was on the search for one.
2       Q.  Okay.  How long were you unemployed
3   since -- when you came back?
4       A.  I don't remember.
5       Q.  Okay.  Would you say it was at least a
6   couple months?
7       A.  I don't remember.
8       Q.  Okay.  So you have no idea?  It could have
9   been an hour?  It could have been --
10      A.  I don't remember.
11      Q.  -- a year?
12      A.  I don't remember.
13      Q.  Okay.  So I noticed in your -- previously
14  you were asked about you got hurt on the job with
15  the solar panels.
16      A.  Correct.
17      Q.  Okay.  And that also was in 2022; is that
18  right?
19      A.  Let me check.
20      MS. HAWKINS:
21          Jeremy, do you recall from your memory
22      what year it was?
23      THE WITNESS:
24          No, I don't recall.
25      MS. HAWKINS:

Page 335

1           Okay.  Then, don't look at the --
2       THE WITNESS:
3           All right.
4       MR. KERSHAW:
5           Okay.
6       MS. HAWKINS:
7           That's it.
8       EXAMINATION BY MR. KERSHAW:
9       Q.  So, I mean, you previously testified to
10  all of this, but we can look at your discovery
11  responses, and in the responses you stated that in
12  2022 you had a worker's comp claim against the
13  solar panel company you were working for.  Do you
14  remember that?
15      A.  Well, I'm trying to see what you're
16  getting at.  Yes.
17      Q.  Okay.  And, I mean, your testimony was
18  that you'd been working for that solar panel
19  company for a year.  So explain that one to me.
20      A.  What you mean explain that to you?
21      Q.  Well, how'd you work there for a year,
22  when --
23      A.  I was working --
24      Q.  -- you were working in Wisconsin?
25      A.  -- in Wisconsin and working in Greenlight

Page 336

1   Solar.  You hollering at me.
2       Q.  Oh, you were doing both of them at the
3   same time?
4       A.  No.  It's two different years.
5       Q.  No.  You said 2022.
6       A.  Okay.  So you --
7       Q.  So I'm trying to figure out the math on
8   that.
9       A.  Okay.  It's what you're trying to
10  understand, though.  You're trying to see if I'm
11  working or not.
12      Q.  Yeah.  How did you work there for a
13  year --
14      A.  I didn't say --
15      Q.  -- in 2022 when you were working in
16  Wisconsin in 2022?
17      A.  I was working in Wisconsin early in the
18  year.  It's 12 months in a year, right?
19      Q.  Thank you for that.
20      A.  Okay?  So during that time, I don't recall
21  when I started working with Greenlight Solar, but I
22  started to work with them.
23      Q.  When did you make your worker's comp
24  claim?  What --
25      A.  I made --

Electronically signed by Toni Conner (501-190-381-9495)     2f67950e-8c04-4061-959b-7823204c7c89

Page 337

1      Q.  -- month of that 12-month year?
2      A.  I don't remember.
3      Q.  Okay.  But I'm sure we got --
4      A.  Yeah.
5      Q.  Did you have an attorney represent you?
6      A.  No.
7      Q.  You just did it your own?
8      A.  I did.  I went -- What it's called?
9  Louisiana Workforce Commission?
10     Q.  You filed your own claim?
11     A.  Yes.
12     Q.  With the Louisiana Workforce Commission?
13     A.  Yes.
14     Q.  So you filed a 1008 claim for
15  compensation?
16     A.  Yes.
17     Q.  Okay.  And it was kicked out by The Court?
18     A.  No.  They called me.
19     Q.  Who's "they"?
20     A.  The Louisiana Workforce Commission called
21  me, and they questioned me, too.
22     Q.  Okay.
23     A.  And I wasn't able to get it.
24     Q.  Okay.  Because your drug test came back?
25     A.  Yes.

Page 338

1      Q.  Okay.  So all this occurs in 2022,
2  correct?
3      A.  Correct.
4      Q.  Okay.  The solar panel company, your
5  injury on the job, and previous to that Wisconsin,
6  working in Wisconsin, all that happens in 2022?
7      A.  Correct.
8      Q.  Okay.  So once you got hurt on the job, at
9  the solar panel job, where did you go work?
10     A.  I didn't work at all.  The next job I had
11  was Walmart.
12     Q.  When was that?
13     A.  2023.
14     Q.  Okay.  At what point in 2023?
15     A.  I started around my birthday.  So July,
16  August.
17     Q.  Okay.  So that was your -- your next job
18  after --
19     A.  Yeah.
20     Q.  -- the solar panel?
21     A.  Yeah.
22     Q.  Okay.  Any reason why that was your next
23  employment?
24     A.  Yeah.  I needed a job.
25     Q.  Okay.  Why didn't you get a job sooner

Page 339

1  than that?
2      A.  I did get a --
3      Q.  Were you not applying for jobs?
4      A.  I did get a job 2023.
5      Q.  Before Walmart, you said, and --
6      A.  It was Greenlight Solar, then Walmart.  I
7  worked at Walmart twice.
8      Q.  Okay.  So in 2023 --
9      A.  You should have asked me how many jobs I
10  had instead of how many schools I went to.  We
11  wouldn't be having this problem.
12     Q.  I didn't ask you about any schools.  So --
13     A.  I'm just letting --
14     Q.  -- thank you for that.
15     A.  -- you know.
16     Q.  I'll get you to get my questions together
17  next time.
18     A.  I'm letting you know.
19     Q.  So right now I'm asking --
20  MS. HAWKINS:
21        Jeremy.
22  EXAMINATION BY MR. KERSHAW:
23     Q.  -- you, you stated that Walmart was your
24  next job after Solar Energy?
25     A.  Can you talk to me in a -- in a different

Page 340

1  manner?  Because now you're talking to me in force.
2      Q.  Walmart was your next job --
3      A.  Correct.
4      Q.  -- after Solar Energy?
5      A.  Correct.
6      Q.  That's correct?
7      A.  Yes, it was.
8      Q.  And that was at what month of 2023?
9      A.  I don't recall.
10     Q.  Okay.  But I believe you said it was like
11  mid 2023?
12     A.  But you're -- I gave you two months' time
13  span, and you didn't take it.  So I don't --
14     Q.  What is --
15     A.  -- recall.
16     Q.  -- it?  Remind me.  I'm old.
17     A.  I told you.  You just said it.
18     Q.  What?  Mid?
19     A.  July or August.
20     Q.  Okay.  July or August.  And is it the
21  delay between the solar panel and Walmart
22  employments was because you just weren't hired
23  somewhere?
24     A.  No.
25     Q.  What was it?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 341

1    A.  I was waiting on employment.
2    Q.  Okay.
3    A.  A new job application doesn't mean they're
4  going to hire you.
5    Q.  I understand that.  What I'm saying is,
6  you just didn't get a job?  You were applying for
7  jobs --
8    A.  Right.
9    Q.  -- up until you finally got the job at
10  Walmart?
11    A.  Right.
12    Q.  Okay.  But you -- After the solar panel
13  job and after your worker's comp claim gets
14  denied --
15    A.  Yeah.
16    Q.  -- you consistently applied for jobs up
17  until you finally got employed for Walmart?
18    A.  Yes.
19    Q.  Okay.  So let me turn to Exhibit 14, which
20  is your responses to discovery.  In the
21  responses -- You got Exhibit 14 in front of you?
22    A.  Yes.
23    Q.  Look at Response to Interrogatory Number
24  6.
25    A.  I'm looking at it.

Page 342

1    Q.  Oops.  I'm sorry.  It's Number 9.
2  Response to Interrogatory Number 9.  So do you or
3  do you not claim that you were unable to work
4  because you couldn't sit for long periods of time?
5    A.  Okay.
6    Q.  So which is it?  Were you applying for
7  jobs or were you not because you were hurt?
8    A.  I was still applying for jobs.
9    Q.  Okay.
10    A.  I even --
11    Q.  So --
12    A.  -- was applying -- I had to put in a
13  Louisiana First Commission every job that I applied
14  for, for to get the compensation of the worker's
15  comp, but it didn't go through.
16    Q.  Okay.  So let's talk about this, your --
17  you couldn't sit for long periods of time.  Why was
18  that?
19    A.  I didn't say I couldn't sit --
20  MR. DIGGS:
21    Calls for --
22  THE WITNESS:
23    -- for long periods of time.
24  MR. DIGGS:
25    -- an expert opinion.

Page 343

1  THE WITNESS:
2    I said I couldn't drive sitting for long
3  periods of time, because I was going city to
4  city doing -- What you call it?  Site surveys.
5  Which I got to get on top of the roof, draw --
6  draw a layout of the solar panels on top of the
7  roof.  I could not do that with a hernia.
8  EXAMINATION BY MR. KERSHAW:
9    Q.  Okay.  So basically all that's related to
10  the hernia, which predates this?
11    A.  A site survey, which my job consisted me
12  on doing.
13    Q.  Right.  So that has nothing to do with the
14  January 9, 2023, incident?
15    A.  No.
16    Q.  So you missed zero employment because of
17  the January 9, 2023, incident, why we're here
18  today?
19    A.  I had jobs (indistinguishable).
20  COURT REPORTER:
21    "I had jobs" what?
22  EXAMINATION BY MR. KERSHAW:
23    Q.  You were searching for jobs?
24    A.  Yes.
25    Q.  But you didn't -- you couldn't take any of

Page 344

1  the jobs because of this?
2    A.  I had jobs.
3    Q.  Which ones?
4    A.  I just told you I was working at Walmart.
5    Q.  In mid 2023?
6    A.  Yes.  I worked at Walmart twice.
7    Q.  So was it --
8    A.  Neighborhood Walmart and the supermarket.
9    Q.  Okay.
10    A.  A Neighborhood and a supermarket.
11    Q.  Got you.  So were you unable to sit for
12  long periods of time?
13    A.  It's a hernia.  They --
14    Q.  Okay.
15    A.  -- goes down.
16    Q.  Okay.  So that was because a hernia --
17    A.  Yes.
18    Q.  -- has to do with your sitting?
19    Okay.  Once again, not because of this
20  incident why --
21    A.  No.
22    Q.  -- we're here for today?
23    A.  No.
24    Q.  Okay.  Unable to lift heavy objects,
25  that's due to the hernia, right?

Page 345

1    A. Yes.
2    Q. Okay. Nothing to do with the January 2023
3    incident?
4    A. Yes.
5    Q. Okay.
6    A. I had a paper from the doctor, from the
7    employee doctor, that I couldn't lift 50 pounds,
8    that I couldn't do those things.
9    Q. Okay. But all that predates this
10   incident, right?
11   A. It's not for this incident, though.
12   Q. Okay. You -- Your Response to
13   Interrogatory Number 6, you state that you had a
14   fractured rib and a head con -- constution --
15   constitution, I guess that means contusion, when
16   you're alleging that Troy Lawrence, Jr. did that to
17   you?
18   A. You could say that again?
19   Q. The --
20   A. In a -- In anoth -- You can use "allege"
21   with another word?
22   Q. The rib injury you're claiming that you
23   suffered was caused by Officer Lawrence?
24   A. Yes.
25   Q. Okay. And you're alleging that he's the

Page 346

1    one that actually struck you in the face, correct?
2    A. Yes.
3    Q. And he's the one that actually kicked you
4    when you were on the ground?
5    A. Yes.
6    Q. Okay. And then you stated at some point
7    Officer Wallace swept your feet out?
8    A. Yes.
9    Q. Okay. So when you first gave your
10   rendition of events earlier today, you didn't
11   mention that about Officer Wallace, so --
12   A. I mentioned it in my federal case.
13   Q. This is a federal case.
14   A. But I mentioned that -- that he swept me
15   off my feet.
16   Q. Okay. At what --
17   A. I ain't --
18   Q. -- point?
19   A. I ain't mentioned that -- I did mention
20   that today. I did mention that.
21   Q. You did?
22   A. Yeah.
23   Q. Just not when you first gave a rendition
24   of this event.
25        So my question is --

Page 347

1    A. Because that question was --
2    Q. -- at what point --
3    A. -- about Troy Lawrence. It wasn't
4    retaining to Detective -- him.
5    Q. Okay. So --
6    A. It was for Troy Lawrence.
7    Q. After you are brought from 5450
8    Cadillac --
9    A. Uh-huh
10   Q. -- you're brought to the facility that you
11   refer to as the Brave Cave?
12   A. Yes.
13   Q. Correct?
14        And according to your testimony, Troy
15   Lawrence, Officer Lawrence, skipped through the
16   line and y'all went straight to the garage --
17   A. Correct.
18   Q. Correct?
19   A. Yeah.
20   Q. And at that point in time it's Officer
21   Lawrence and Kennedy in there?
22   A. Correct.
23   Q. And that's when your interaction, the --
24   what you allege to be a violent interaction with
25   Officer Lawrence occurred?

Page 348

1    A. No. I got strip-searched first.
2    Q. Correct. But in that garage with just
3    those two there, correct?
4    A. Yes.
5    Q. Okay. And then at some point Officer
6    Wallace --
7    A. Walked in.
8    Q. Walked in.
9    A. Yeah.
10   Q. But that's after you were kicked?
11   A. Getting up off the ground.
12   Q. What's that?
13   A. Walking towards the door. I seen
14   Detective Wallace walking in. He was actually the
15   one who was trying to get me to come back on the
16   other -- opposite side of the room.
17   Q. Okay. So at what point does he sweep your
18   feet out from under you?
19   A. I was trying to tell him that he just -- I
20   just got my ass whooped. And he was like, "Well,
21   go over there. Go over there." I wasn't complying
22   because I had done just got my ass whooped and the
23   shit feel like a dream. So I didn't comply. He
24   swept me off my feet, and I started complying after
25   that.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 349

1    Q.  Okay.  So those are the only two alleged
2  violent interactions that took place with you,
3  correct?
4    A.  Yes.
5    Q.  The one with Lawrence, where it involved
6  a -- a punch and two kicks; is that right?
7    A.  Yeah.
8    Q.  With the second one being when you got
9  your feet swept out from under you by Wallace; is
10  that right?
11    A.  Yes.
12    Q.  Okay.  When do you think you hurt your
13  rib?
14    A.  I -- My rib got -- I immediately felt the
15  pain from when he kicked me.  Like, I embraced
16  myself for the second one after he hit me.
17    Q.  And he kicked you in the ribs?
18    A.  Yes.
19    Q.  I mean, that hurt, huh?
20    A.  No shit.
21    Q.  Well, it's a question.  Yes or no?  It
22  hurt pretty bad?
23    A.  Yeah, it hurt.  It hurt.
24    Q.  Okay.  I mean, it hurt you for a long
25  time?

Page 350

1    A.  Yeah.  I still feel it sometimes.  It
2  hurt.
3    Q.  Okay.  But, like, even when you went and
4  got booked in the prison, I mean, you're still in
5  pain, because you got -- you got kicked in the
6  ribs, right?
7    A.  Correct.
8    Q.  Okay.  And, I mean, in fact, so bad that
9  you're calling your mom --
10    A.  Yeah.
11    Q.  -- saying, "Mom, I got my ribs hurt"?
12    A.  Yeah, that's what happened.  It
13  happened --
14    Q.  Right.  Right.
15    A.  -- like that.  It happened like that.
16    Q.  So why are you joking around, not
17  complaining about your ribs, whenever Officer
18  Nevels is talking to you?
19    A.  It's a serious matter right now.  I've
20  been joking since I stepped in the building.
21  That's my sense of humor.  You can't take that from
22  me.
23    Q.  But your sense of humor takes the pain
24  away from you, I guess?
25    A.  It still feel it.

Page 351

1    Q.  Huh?
2    A.  You see the pain in my voice.  I'm smiling
3  and you still see it.
4    Q.  Uh-huh.  So after --
5    A.  Talk to me.
6    Q.  After the event with Officer Lawrence,
7  where he kicked you and punched you --
8    A.  What -- What -- What would you call an
9  "event"?
10    Q.  I mean, the event that you've made up.
11    A.  What -- What event did I made up?
12    MS. HAWKINS:
13      Objection.
14    EXAMINATION BY MR. KERSHAW:
15    Q.  The one we're here today for.
16    A.  Okay.
17    MS. HAWKINS:
18      To the characterization that --
19    THE WITNESS:
20      I can take --
21    MS. HAWKINS:
22      -- he made it up.
23    THE WITNESS:
24      -- another bathroom break?  I can take
25      another bathroom --

Page 352

1    MR. KERSHAW:
2      Go for it.
3    THE WITNESS:
4      I can take a bathroom break?
5    VIDEOGRAPHER:
6      Off the record.  The time is 5:53.
7      (OFF THE RECORD.)
8    VIDEOGRAPHER:
9      Back on the record.  The time is now 6:01.
10    EXAMINATION BY MR. KERSHAW:
11    Q.  We've established that your first visit to
12  that garage part of this facility you got hurt; is
13  that right?
14    MS. HAWKINS:
15      Yes or no, Jeremy.
16    THE WITNESS:
17      Could you rephrase that question for me?
18    EXAMINATION BY MR. KERSHAW:
19    Q.  Something you don't understand about it?
20    A.  Yes.
21    Q.  Were you hurt the first time you went into
22  the garage part of that facility?
23    A.  No, I wasn't hurt.  I got injured in the
24  garage.
25    Q.  Okay.  You weren't hurt, but you were

Electronically signed by Toni Conner (501-190-381-9495)                     2f67950e-8c04-4061-959b-7823204c7c89

Page 353

1   injured?
2       A.  I -- I got -- You -- You know what you're
3   trying to do, so I'm -- I'm going to say it the
4   best way so you can understand what I'm saying.
5   The incident on January 9th --
6       Q.  Uh-huh.
7       A.  -- with Troy Lawrence, Jr. and Matthew
8   Wallace caused the incident for me to go on Our
9   Lady of the Lake and to see Samaki Green on
10  February 23rd.
11      Q.  Okay.  And that injury occurred on your
12  first visit to that garage part of the facility,
13  correct?
14      A.  Yes.  My first time through the building,
15  I went immediately to the warehouse.
16      Q.  Okay.  And it was on that visit is
17  whenever you injured yourself?
18      A.  I didn't injure myself.
19      Q.  Okay.  And I would assume that during that
20  process you're screaming and yelling.  Is that
21  right?
22      A.  Yeah.  That's right.
23      Q.  Okay.  And that was because you were hurt?
24      A.  Yes.
25      Q.  Okay.  And I saw in one of the complaints

Page 354

1   they then drug you out of the room.  Is that right?
2       A.  No, they didn't drag me out the room.
3   I -- I walked out the room.
4       Q.  You walked out of the room that first
5   time?
6       A.  Yes.
7       Q.  Okay.  And then they walked you back to
8   that little holding cell?
9       A.  Yeah.
10      Q.  Right.
11      A.  That's my first time being in there.
12      Q.  Okay.  That was your first time in the
13  holding cell?
14      A.  Yes.
15      Q.  And that's when we saw that video that was
16  previously played to you?
17      A.  Yes.
18      Q.  When you were talking to Officer Nevels;
19  is that right?
20      A.  Yes.
21      Q.  Okay.  And then it was -- you -- How long
22  would you say you were in that holding cell before
23  you got brought back into the garage?
24      A.  I think the timeframes went from 8:30 to
25  10:40.

Page 355

1       Q.  Okay.  And then when you walk back into
2   that garage part, you're fully compliant; is that
3   right?
4       A.  No, I didn't want to comply at first, but
5   they, "No, it's not going to happen.  We're not
6   going to do anything to you."  I went in and I
7   complied.
8       Q.  Okay.  So referring back to your responses
9   to discovery, on your Response to Interrogatory
10  Number 8.  And that's on Exhibit 14?
11      A.  Yeah.
12      Q.  You list out four providers.  And I know
13  this has been -- you -- they've gone over this with
14  you prior to me.  But four of them are listed; is
15  that right?
16      A.  Correct.
17      Q.  Okay.  And that being TurnKey Health,
18  which we established is parish prison.
19      A.  (Nodding head.)
20      Q.  Then Montelaro, who is at Our Lady of
21  the -- Our Lady of the Lake.  And we have Dr.
22  Janeese -- or Janice Bergeron, and then NP.  So I
23  think she was a nurse at Our Lady of the Lake.  Is
24  that right?
25      A.  Correct.

Page 356

1       Q.  Okay.  And then Turner.  And that's who
2   you're seeing I guess for what you're claiming to
3   be your mental injury; is that right?
4       A.  Correct.
5       Q.  Okay.  Anybody else we need to know about?
6       A.  No, sir.
7       Q.  Okay.  Just those four?
8       A.  Just those four.
9       Q.  I see in your Response to Interrogatory
10  Number 16 you had a previous lawsuit.  Looks like
11  you must have been involved in a car accident with
12  your mother.  Is that right?
13      A.  Correct.
14      Q.  When was that?
15      A.  I was going to Thrive Academy.  So I was
16  still in high school.  I was still a minor.
17      Q.  Okay.  Going back to the warehouse, after
18  your first visit into the garage part when your
19  injury occurred.  You walk out.  Who's sitting
20  right there?
21      A.  When I walk out --
22      Q.  Tell me all --
23      A.  -- it was --
24      Q.  -- the non-law enforcement that was --
25      A.  That was --

Page 357

1  Q. -- sitting right there.
2  A. I can't tell you law enforcement, because
3  the same law enforcement officers was still outside
4  the door, because they had other people to attend
5  to as they did the -- what they were supposed to
6  do, but every -- They was walking out -- Seyveon
7  Moore was walking in --
8  Q. Walking in --
9  A. -- as I -- as I was walking out of the
10 warehouse room, and I seen everybody else and all
11 the other officers --
12 Q. Right.
13 A. -- still by the door.
14 Q. The door going outside or the door going
15 into the garage?
16 A. The door going into the garage. They was
17 lined up. In shackles.
18 Q. Okay. How many people?
19 A. No more than seven.
20 MR. KERSHAW:
21    Well, I think that might be all I have.
22 THE WITNESS:
23    What's your name again?
24 MR. KERSHAW:
25    Kyle.

Page 358

1  THE WITNESS:
2     What's your last name?
3  MR. KERSHAW:
4     Kershaw.
5  THE WITNESS:
6     Thank you, Mr. Kyle Kershaw.
7  MR. KERSHAW:
8     You're welcome.
9  MS. HAWKINS:
10    Thompson, are you ready?
11 MR. THOMPSON:
12    Give me five minutes. I'm parking. Okay?
13 Thank you, guys, for being accommodating to me,
14 man. I really appreciate it.
15 VIDEOGRAPHER:
16    Do you want to go off for five minutes and
17 let him --
18 MS. HAWKINS:
19    He's -- Yeah. He's just parking to get
20 everything done.
21 MR. SCHILLAGE:
22    Sure.
23 VIDEOGRAPHER:
24    Off the record. The time is 6:08.
25    (OFF THE RECORD.)

Page 359

1  VIDEOGRAPHER:
2     Back on the record. The time is now
3  6:10.
4  MR. THOMPSON:
5     This is Ryan Thompson, appearing on behalf
6  of Mr. Jeremy Lee. Can everyone hear me?
7  MR. TETTLETON:
8     Yes.
9  THE WITNESS:
10    I can hear you.
11 MR. THOMPSON:
12    Got you.
13 EXAMINATION BY MR. THOMPSON:
14    Q. Mr. Lee, you understand this is a yes or
15 no -- yes or no answers? If you need to elaborate,
16 just let Ms. Hawkins know; okay?
17    A. Yes, sir.
18    Q. Okay.
19 MR. THOMPSON:
20    Can you guys hear me?
21 MS. HAWKINS:
22    Yep.
23 EXAMINATION BY MR. THOMPSON:
24    Q. All right. Mr. Lee, you recall when you
25 were talking to Mr. Schillage earlier, correct?

Page 360

1     A. Who is that?
2  MS. HAWKINS:
3     Michael.
4  EXAMINATION BY MR. THOMPSON:
5     Q. That would be the guy to your -- That
6  would be the guy to your left.
7     A. Okay. Yes.
8     Q. Okay. And there was talks about Adderall.
9  Do you recall that?
10    A. Yes.
11    Q. Okay. Do you recall you ever being
12 diagnosed with any type of disabilities or anything
13 like that when you were growing up?
14    A. Yes.
15    Q. Okay. What were -- What was that
16 disability?
17    A. ADHD.
18    Q. Okay. And so if someone's watching this
19 video now and they're watching you and you can't --
20 it appears that you possibly can't keep still,
21 that's -- would you think that's because of your
22 ADHD diagnosis?
23 MR. BLACKWELL:
24    Objection.
25 THE WITNESS:

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 361

1      Correct.
2    MR. BLACKWELL:
3      Leading.
4    THE WITNESS:
5      Correct.
6    MR. THOMPSON:
7      No problem.
8    EXAMINATION BY MR. THOMPSON:
9      Q.  Is it your intent to come off in this
10   video in any way, shape, form, or fashion as being
11   hostile or being rude in any way?
12     A.  No.
13     Q.  Okay.  The fact that you're not sitting
14   still completely all the time, is that any way to
15   be -- to -- to -- to be evasive or avoid the
16   questions or any of the answers?
17     A.  No.
18     Q.  Okay.  No problem.
19        Let's go back to what occurred at fif --
20   at the 5400 block of Cadillac Street.  Are you with
21   me?
22     A.  Yes.
23     Q.  Okay.  Earlier when the attorneys were
24   asking you about exiting the house, do you recall
25   that?

Page 362

1      A.  Yes.
2      Q.  All right.  When you were exiting the
3    house, where were you going?  What was your intent
4    to go?
5      A.  My intent to go back in the Chrysler.
6      Q.  Okay.  All right.  Let me ask you this.
7    Have you ever had any legal training?
8      A.  No.
9      Q.  Do you understand the legal definition of
10   an arrest?
11     A.  No.
12     Q.  Do you understand the legal definition of
13   the detention?
14     A.  No.
15     Q.  All right.  But you -- it is your opinion,
16   I believe you testified earlier, that you believe
17   that you were kidnapped?
18     A.  Yes.
19     Q.  Okay.  Let's talk about when you were
20   placed in the car the second time.  Do you recall
21   being placed in Troy Lawrence, Jr.'s car the second
22   time?
23     A.  Yes.
24     Q.  Okay.  How long were you in that car?
25     A.  For hours.

Page 363

1      Q.  When you say "hours," more than one?
2      A.  Yes.  More than two.
3      Q.  More than -- More than two hours?  How
4    about more than three?
5      A.  Could be.  Possibly.
6      Q.  Okay.  Were you handcuffed the entire time
7    in the car?
8      A.  Hands and feet.
9      Q.  Your hands and feet were both handcuffed.
10   Okay.
11        When you were in the rear of the car, did
12   Troy Lawrence, Jr. ever come over and ask or did
13   any officers ever ask you were you okay?
14     A.  No.
15     Q.  Did anyone offer you any water?
16     A.  No.
17     Q.  Was it hot out there that day?
18     A.  No.  It was cold.
19     Q.  So the AC was on for you?
20     A.  Yeah.
21     Q.  Okay.  While -- When Troy Lawrence, Jr.
22   came back to the car to leave, did he say anything
23   to you?
24     A.  Yeah.
25     Q.  What did he say to you?

Page 364

1      A.  He said, "We see you have a warrant in
2    Wisconsin.  We're going to check that out, then
3    we're going to let you go."
4      Q.  Okay.  So it was your understanding that
5    you were being -- that you -- that he was going to
6    let you go?
7      A.  Correct.
8      Q.  Okay.  And then y'all proceeded to leave
9    the 5400 block of Cadillac?
10     A.  Yes.
11     Q.  Okay.  Was there any conversation between
12   you and Officer Lawrence, Jr. on the way to the
13   Brave Cave?
14     A.  Yes.
15     Q.  What was that conversation about?
16     A.  That conversation was about he asked me
17   why was I over here and my license say Central,
18   Louisiana.  He asked me where my car was.  And in
19   the midst of him asking me all those questions, I
20   asked him why he was treating me like that, we
21   supposed to be -- like, follow-up from earlier.
22   And I asked him why was he playing Meg Thee
23   Stallion in the car, and it triggered him.
24     Q.  Okay.  Let's go here.  Let's go back to
25   the beginning real quick.  Just pause right there.

91 (Pages 361 to 364)

Page 365

1    A. All right.
2    Q. Do you ever recall any -- anyone reading
3  you your Miranda rights?
4    A. No, sir.
5    Q. Do you know what your Miranda rights are?
6    A. Yes.
7    Q. What are your Miranda rights? To the best
8  of your ability.
9    A. The best of my ability, my Miranda rights
10  is anything I could be used -- It's really
11  detaining me, putting me under arrest.
12    Q. Okay. Okay. Does it -- So does it sound
13  something like, "You have the right to remain
14  silent"?
15    A. Yes. Yes.
16    Q. "Anything you say can and will" --
17    A. "Will be used --
18    Q. Do you recall --
19    A. -- against you."
20    Q. -- anyone --
21    That is correct. Just do you recall
22  anyone ever giving you your Miranda rights?
23    A. Not to this day, no, sir.
24    Q. Okay. There's an officer in the room with
25  you right now. Officer Wallace. Do you see him

Page 366

1  there?
2    A. Yeah. I'm looking dead at him.
3    Q. Okay. Did -- Do you recall Officer
4  Wallace ever reading you your Miranda rights?
5    A. No, sir. I never recall Mr. Wallace
6  reading me my rights.
7    Q. Do you ever recall Officer Troy -- former
8  Officer Troy Lawrence, Jr. reading your Miranda
9  rights?
10    A. No, sir, I never recall Troy Lawrence, Jr.
11  reading me my rights.
12    Q. Okay. Now, let's go back to you arriving
13  at the Brave -- to the Brave Cave. Well, what they
14  call the processing center. Earlier the Attorney
15  Schillage talked to you about this being an office.
16  Was "office" your words that you used or was that
17  the words of the attorney?
18    A. The words of the --
19    Q. The term "office."
20    A. The words of the attorney.
21    Q. Okay. How would you describe that place
22  that you went to?
23    A. A warehouse.
24    Q. Okay. And earlier there was talk -- there
25  were talks about your previous interactions with

Page 367

1  law enforcement. I believe being arrested. Do you
2  recall those conversations?
3    A. Yes.
4    Q. Okay. Does that warehouse that you went
5  to, does it look like anything you've ever been to
6  before that resembles a police station?
7    A. Never in my life. Felt like a movie.
8    Q. Okay. Now, let's go to when you walk into
9  the -- to the what we now know the Brave Cave. Are
10  you with me?
11    A. I'm with you.
12    Q. Okay. When you walk in, what -- repeat to
13  me -- I think earlier you said that Troy Lawrence,
14  Jr. made a comment towards you --
15    A. Yeah. "This nigger go" --
16    Q. -- or about you.
17    A. "This nigger go first."
18    Q. Okay. So he said, "He's going first." Do
19  you know what he meant by "going first," or do you
20  not know?
21    A. I -- From the conversation we had in the
22  car and the -- how he was driving and he's like --
23  he -- he look like he was already on one. But I
24  didn't know what I was going first. I didn't know.
25    Q. Okay. When you say "he was on one," what

Page 368

1  do you mean by that? Describe what you mean by
2  that.
3    A. He was already driving reckless and
4  playing loud music when we left Zion City.
5    Q. When you say --
6    A. Cadillac Street. When we left --
7    Q. When you say --
8    A. -- Cadillac Street.
9    Q. -- driving reck --
10    When you say "driving reckless," what do
11  you mean by driving reckless?
12    A. He was snatching wheels. He was turning
13  corners. I was sliding around the car, the back
14  seat of the vehicle.
15    Q. Okay. Did you injure yourself at that
16  time?
17    A. No, sir.
18    Q. Okay. So when he said that "This nigger's
19  going fir -- this nigger's going first," let's
20  pause right there. Do you recall seeing anyone
21  else non-law enforcement in that room at that time?
22    A. Nope.
23    Q. Okay. So when you went -- So, then, you
24  then -- you were then taken into the room by Troy
25  Lawrence, Jr. or someone else?

Electronically signed by Toni Conner (501-190-381-9495)    2f67950e-8c04-4061-959b-7823204c7c89

Page 369

1    A.  I was in his deputy car, so he walked me
2  in.  So I was with him.  Him and Mr. Kennedy.
3    Q.  Okay.  So I've heard you talk about this
4  Mr. Kennedy person.  When you were taken into the
5  room, who took you into the bay area to be
6  strip-searched?
7    A.  Troy Lawrence, Jr.
8    Q.  Okay.  And when he walked you in that
9  room, who was in that room?
10    A.  Sergeant Kennedy was already standing in
11  the room.
12    Q.  Okay.  Who else was in that room?
13    A.  It was only us.  They closed the door.
14    Q.  They closed the door.
15  MR. THOMPSON:
16      At this time, Ms. Hawkins, can you pull up
17    a picture of Officer Joseph Carboni for me,
18    please?
19  MS. HAWKINS:
20      I can try to find one.
21  MR. THOMPSON:
22      He should be in there if you put in -- You
23    can Google it.  You can hit Image.  BRPD.
24  MS. HAWKINS:
25      Is everybody okay with the image to the

Page 370

1  left?
2  MR. KERSHAW:
3      Sure.
4  MR. SCHILLAGE:
5      (Nodding head.)
6  MS. HAWKINS:
7      All right.
8  MR. THOMPSON:
9      Okay.
10  MS. HAWKINS:
11      Ryan, for reference, it's the one to the
12    left.
13  MR. THOMPSON:
14      Okay.
15  EXAMINATION BY MR. THOMPSON:
16    Q.  Mr. Lee, do you see the image to the left?
17    A.  Yes.
18    Q.  Is that the officer that was inside the
19  room at the time with Troy Lawrence, Jr.?
20    A.  No, sir.
21    Q.  Okay.  Are you absolutely positive?
22    A.  I'm absolutely positive, because that --
23    Q.  Okay.  Mr. Lee, I want to make you aware
24  of something.  We've had depositions before where
25  an Officer Joseph Carboni, then officer, testified

Page 371

1  that he was in the room with you at the time of the
2  strip-search.  Would that be true?
3    A.  No, that's not true.
4    Q.  Okay.  Next question.  If I showed you a
5  picture of -- of Officer -- Forgive me.  What's the
6  brother's name?  The officer.  Officer -- Officer
7  Kennedy.  If I showed you a picture of Officer
8  Kennedy, would you be able to identify him?
9    A.  Correct.
10    Q.  Okay.
11  MR. THOMPSON:
12      You guys, just for record purposes, at
13    this time I'll show him a picture of Officer
14    Kennedy.
15  MS. HAWKINS:
16      And for reference, Ryan, I'm showing him a
17    screenshot of the body-worn camera from earlier
18    in the day from Cadillac Street.
19  MR. THOMPSON:
20      Okay.
21  THE WITNESS:
22      Yeah, that's him.  That's the per --
23  EXAMINATION BY MR. THOMPSON:
24    Q.  That is him?  That is -- That is --
25    A.  That's the pervert.

Page 372

1  MR. THOMPSON:
2      If we could mark this as Exhibit --
3    Defense Exhibit Number 1, we'll put that
4    into -- by evidence before it -- for exhibit
5    purposes for depositions.
6  MS. HAWKINS:
7      Madam Court Reporter, do you have --
8  MR. BLACKWELL:
9      You're going to --
10  MS. HAWKINS:
11      -- a preferred email?
12  MR. BLACKWELL:
13      You're going to put defense exhibits in?
14    You've --
15  COURT REPORTER:
16      Wait, wait, wait.  Who's talking?
17  MR. BLACKWELL:
18      -- been a defense lawyer too long.
19  MR. THOMPSON:
20      Thank you, Brian.  I appreciate you, man.
21    I appreciate you.  Plaintiff's Exhibit Number
22    1.  Thank you, Brian.
23  EXAMINATION BY MR. THOMPSON:
24    Q.  Okay.  You got it now there, Mr. -- You
25  guys got it?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 373

1      A.  Yeah, I got -- I -- I think so.
2      Q.  Okay.  All right.  Good to go.  So if I
3   voided it, my apologies.
4          So when you walk in the room, who begins
5   to talk to you?
6      A.  When I walk in the room, I was -- Sergeant
7   Kennedy instructed on me with the strip-search.
8      Q.  Okay.  Let's pause real quick.  Do you
9   recall what Officer Kennedy was wearing?
10     A.  Yeah.  He was wearing body cam -- He was
11  wearing his vest and things like that.
12     Q.  Okay.  So you recall him wearing --
13  wearing a vest at the time that he was instructing
14  you to strip, correct?
15     A.  Yeah.  With the cough procedure, too.
16     Q.  Okay.  Did he tell you why you were being
17  strip-searched?
18     A.  No.
19     Q.  Okay.  Did Officer Lawrence tell you why
20  you were being strip-searched?
21     A.  No.  They just told me start strip-search
22  and --
23     Q.  Okay.  Okay.  My next question to you is,
24  is that you said he had a vest on, correct?
25     A.  Correct.

Page 374

1      Q.  Do you recall seeing any body-worn camera
2   on that vest?
3      A.  Yes.
4      Q.  Do you know if that body-worn camera was
5   on or not?
6      A.  I don't know.
7      Q.  Okay.  And so at the time he tells you to
8   strip-search, describe for the record what you then
9   did.
10     MS. HAWKINS:
11         He said describe, honey.  Not show him.
12  EXAMINATION BY MR. THOMPSON:
13     Q.  Describe.  Describe.  Just describe,
14  Jeremy.  Don't take your clothes off.
15     A.  No, I wasn't fixing to take my clothes
16  off.
17     MS. HAWKINS:
18         No, but -- I think -- Just verbally
19  describe it, honey.
20     THE WITNESS:
21         Oh.  He told me to bend over, cough.  But
22         he told me do it numerous times.  Like, I
23         been -- it was uncomfortable.
24  EXAMINATION BY MR. THOMPSON:
25     Q.  Okay.  Let's pause right there real quick,

Page 375

1   just to go back.  Let's go back to Cadillac Street.
2      A.  Okay.
3      Q.  Were you pat -- Were you patted down at
4   Cadillac Street by any of the officers there?
5      A.  Yes, sir.
6      Q.  Did they find any money on you?
7      A.  Yes.
8      Q.  More than $100?
9      A.  More than $1.  $2.
10     Q.  Okay.  Did they find any drugs on you?
11     A.  No, sir.
12     Q.  Did they find any weapons on you?
13     A.  No, sir.
14     Q.  Okay.  Let's go back to -- now to the bay
15  area.  When they performed the strip-search on you,
16  did they pat you down again before you were --
17  before you did the strip-search?
18     A.  No.  They told me take my clothes off.
19     Q.  Okay.  Did they go inside your pockets?
20     A.  No.
21     Q.  Okay.  Did they -- Did they find any
22  contraband on you when you did the strip-search for
23  them?
24     A.  No, sir.
25     Q.  You didn't have anything in your buttocks?

Page 376

1      A.  No, sir.
2      Q.  You weren't hiding anything under your
3   genitals?
4      A.  No, sir.
5      Q.  Okay.  So at that point, up to this point
6   Officer Kennedy is the one who is directing to you
7   participate in the strip-search, correct?
8      A.  Yes, sir.
9      Q.  What is Troy Lawrence, Jr. doing during
10  this time while you're being -- while you're
11  doing -- while you're taking your clothes off?
12     A.  He's pacing back and forth.
13     Q.  Okay.  When you say "pacing back and
14  forth," what do you mean?  Describe that so we can
15  have a very -- a very detailed description for the
16  record.
17     A.  (Demonstrating.)
18     Q.  Okay.  And, in your opinion, did he
19  look -- did he appear to be annoyed or angry?
20     A.  Yeah, he looked pissed off.
21     Q.  I can't hear you.  I'm sorry.
22     A.  Yes, sir.  He looked pissed off.
23     Q.  Okay.  Did he have in his -- Did he have
24  his body-worn camera on?
25     A.  No.  He didn't even have a vest on.  He --

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 377

1   I seen a compression shirt.
2       Q.  Okay.  He had a compression shirt on.
3   Okay.
4           Now, once you get dressed, what then
5   happens?
6       A.  After I put my tanktop on, he asked me,
7   "Yeah, what's that shit you was talking about?"  I
8   said, "Man, I ain't even -- I -- I ain't do
9   nothing."  He insisted on charging me.
10      Q.  Okay.  So when you say he charged you, do
11  you mean he ran at you or he walked aggressively --
12      A.  He walked --
13      Q.  -- towards you?
14      A.  He walked up, but I'm not fixing to let
15  nobody -- I didn't know what he was on.  I wasn't
16  fixing to let no one hit me.  He seemed riled up to
17  the point to where I felt like I was in danger, so
18  I moved.
19      Q.  Okay.  Do you mind standing up for the --
20  for the video camera, please?
21      A.  Yes.
22      Q.  Can you show me how you moved?
23      A.  Yes.
24      Q.  No.  Leave that on.  That's fine.  Show me
25  how you moved.

Page 378

1       A.  I was moving like this.
2       Q.  Okay.  Okay.  Did you ever threaten
3   Officer Lawrence?
4       A.  No, sir.
5       Q.  Why did -- Why did you believe he was
6   going to cause you harm?
7       A.  Because I said that he was gay because he
8   was listening to a female artist in his unit.
9       Q.  Okay.  And how do you know that annoyed
10  him?
11      A.  Because he put on a -- a rapper that I
12  know of.  He turned the music up blasting loud.  He
13  was driving crazy before we got there.
14      Q.  Okay.  Have a seat, Mr. Lee.
15          Okay.  And so at some point Officer
16  Lawrence struck you, correct?
17      A.  Yes, sir.
18      Q.  Okay.  And did he strike you with an open
19  hand or a closed hand?
20      A.  He punched --
21      Q.  If you don't know, that's fine.
22      A.  He punched me.
23      Q.  He punched you?
24      A.  He punched me.
25      Q.  Did he attempt to punch -- Did he attempt

Page 379

1   to punch you more than once?
2       A.  Yeah.  He missed me, though.  I dodged
3   him.
4       Q.  Okay.  So earlier when you were talking to
5   the attorneys in the room, do you remember that?
6   Just --
7       A.  Yes.
8       Q.  -- hours ago.
9       A.  Yes.
10      Q.  All right.  There was lots about you
11  running.  Did you run towards any door to try to
12  escape?
13      A.  No.  The only thing --
14      Q.  Okay.  Now, you know what running is.
15  Were you in a full, all-out sprint running away
16  from Troy Lawrence, Jr.?
17      A.  Yes.
18      Q.  Okay.  How far did you run inside of that
19  building, inside of that bay area?  How far did you
20  get?
21      A.  Against the wall.
22      Q.  Okay.  So you ran up against the wall.  So
23  there was nowhere for you to go, correct?
24      A.  Yeah, there was nowhere for me to go.
25      Q.  Okay.  What did happen when you ran up

Page 380

1   against the wall to protect yourself or to get away
2   from Troy Lawrence?
3       A.  I fell -- I fell while I was running.  So
4   the wall is the cover spot.  I'm on the ground like
5   this.
6       Q.  Okay.  So you are on the ground.
7       A.  Yes.
8       Q.  Let me ask you this.  Did you trip and
9   fall on the ground or do you believe someone
10  performed a leg sweep on you?
11      A.  He performed a leg sweep on me.
12      Q.  Do you think that someone performed a leg
13  sweep on you?
14      A.  Yes.
15      Q.  I said, why do you believe that to be
16  true?
17      A.  Because I fell.  I'd been running.
18      Q.  Okay.
19      A.  I just don't fall.
20      Q.  Okay.  So earlier during your testimony,
21  you recall speaking to the attorneys in there and
22  you stated that you fell.  Would that be accurate
23  or did you make -- or was that a mistake?
24      A.  It was a mistake.
25      Q.  Okay.  So --

Electronically signed by Toni Conner (501-190-381-9495)                                      2f67950e-8c04-4061-959b-7823204c7c89

Page 381

1    MR. BLACKWELL:
2        Are you trying -- Wait. Can -- Let me
3    interpose an objection. I mean, are you trying
4    to impeach your own client? I mean, is that
5    the purpose of -- of you --
6    MR. THOMPSON:
7        No, that's not the purpose of it. The
8    purpose of this is to get a better
9    understanding, to make sure that he understands
10   the question. I think there was confusion
11   about the questions last time. Thanks, Brian.
12   EXAMINATION BY MR. THOMPSON:
13   Q. So continuing on. When you then fell on
14   the ground, how do you know that Troy Lawrence, Jr.
15   kicked you?
16   A. Because I'm on the ground in an angle that
17   I know that I'm balled up in. I see him coming
18   towards me. And, like, I --
19   Q. Okay.
20   A. I know his boots, the shoes. I know it's
21   them.
22   Q. Okay. Now, at the -- the entire time that
23   you are on -- I mean from the punch to you being on
24   the ground, did Officer Kennedy intervene at all?
25   A. No. He never moved.

Page 382

1    Q. Did he say anything to tell -- to try
2    to -- to protect you or to tell anyone to stop?
3    A. No. All he did was tell me stop moving
4    before I ran from Troy Lawrence, Jr.
5    Q. He told you to stop moving?
6    A. Yeah. He told me don't move.
7    Q. Okay. Well, stop moving when you're about
8    to be punched?
9    A. Well, let me clean this up. It was --
10   MR. BLACKWELL:
11       Let me -- Let me, first of all, object to
12       the form of the question.
13   EXAMINATION BY MR. THOMPSON:
14   Q. Okay. Answer the question.
15   A. Yeah. He told me don't move. Even with
16   Troy Lawrence, Jr. right there, he told me don't
17   move, told me stop moving.
18   Q. Okay. So when you get up -- When Troy
19   Lawrence, Jr. kicks you in your ribs -- You said
20   twice, correct?
21   A. Yes.
22   Q. And then what happens after the kicks to
23   your -- to your ribs twice?
24   A. I get up on my feet and I walk, and
25   that's -- like, I'm struggling to walk. And

Page 383

1    Detective Wallace, I see his face now, he comes in.
2    He's telling me to go over there, go over there,
3    because --
4    Q. Let's stop -- Let's stop right there. So
5    Officer -- Detective Wallace comes in the room at
6    this point, correct?
7    A. Yes.
8    Q. All right. Is Officer Carboni in that
9    room at that time?
10   A. He's still in the room. No. No. No.
11   Q. Is Officer --
12   A. No.
13   Q. Okay.
14   A. No. Officer Carboni's never in the room.
15   Q. Okay. It's Officer --
16   A. Kennedy. Sergeant Kennedy is the name.
17   Q. Oh, sergeant. He's in there?
18   A. Yeah.
19   Q. Okay.
20   A. He's still in there.
21   Q. Okay. Understood.
22       So at the time that Detective Wallace
23   tells you to go over there, why didn't you move at
24   that point in time to go back where he was pointing
25   to?

Page 384

1    A. Because I -- I -- Like, I felt unsafe,
2    untrustworthy, and I didn't know if Matthew Wallace
3    knew what happened or what encounter took place.
4    So I was trying to -- So I was trying to tell him,
5    but --
6    Q. Okay. So when he told you move twice,
7    what did he then do?
8    A. He performed a leg sweep.
9    Q. How many seconds between him telling you
10   to move those two times and the leg sweep? How
11   many seconds was it between them, the him giving
12   you verbal commands and the leg sweep?
13   A. I mean, he had a short temper.
14   Q. That's -- That's not my question, Jeremy.
15   My question to you is, how many seconds was it
16   between Officer Wallace telling you to move over
17   there --
18   A. Ten.
19   Q. -- and him performing a leg sweep?
20   A. Ten. I wasn't complying --
21   Q. About?
22   A. -- at first.
23       Yeah, about ten.
24   Q. But you were not compliant because of
25   what? Why were you not compliant?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 385

1    A.  Because of what just happened, what
2  encounter.
3    Q.  Okay.  So he performs a leg sweep on you.
4    A.  Yes.
5    Q.  How did you fall?
6    A.  To be honest, I caught it.  I didn't fall.
7  Like, the catch -- The leg sweep was so strong,
8  that I -- I didn't all the way fall on the ground.
9    Q.  Okay.  What did you do when you fell --
10  when you almost fell to the ground?  Did you -- Did
11  you get back up?
12    A.  Yeah.  I started complying.
13    Q.  Okay.  Why did you decide to comply then?
14    A.  Because I was outnumbered by then.
15    Q.  Okay.  At any point be -- during that
16  time, after you get up, did you ever attempt to run
17  out the back door after that incident?
18    A.  No, sir.
19    Q.  Okay.  Did you tell Matthew Wallace what
20  happened to you?
21    A.  I was trying to.  I -- I -- He -- I was
22  talking about they beating me, so I'm questioned
23  over here, but I didn't tell him.
24    Q.  Okay.  Now, during the time you're in that
25  room with -- and when you -- before Officer Wallace

Page 386

1  coming in, were you screaming for help?
2    A.  Yes.
3    Q.  How many times did you yell for help?
4    A.  More than once.
5    Q.  Do you think it was loud enough for other
6  people to hear it?
7    A.  Yes.
8    Q.  Do you know if anyone else heard it?
9    A.  Yes.
10    Q.  How do you know other people heard it?
11    A.  I was loud, like a movie loud.  I was
12  screaming so they could hear me.
13    Q.  Okay.  Did any -- Did anyone tell you that
14  they heard you scream?
15    A.  Yes.
16    Q.  Who told you that they heard you scream?
17    A.  When I walked out, I seen, like, the looks
18  on people's faces and things like that.  Seyveon
19  Moore said, "Them bitches not fixing to beat me.  I
20  already know what up with them."
21    Q.  Okay.  Great.  Now, let's go back to
22  you're now -- you -- you comply with Officer
23  Wallace.  Did -- Were you then exited out the room?
24  Who took you out the room?
25    A.  Detective Wallace.

Page 387

1    Q.  I'm sorry?  Go ahead.
2    A.  I don't remember.  I don't remember.  I
3  don't remember.
4    Q.  That's -- That's fine.
5    A.  I don't remember.
6    Q.  Now, what was Officer Wallace doing then?
7  I'm sorry.  Officer Troy Lawrence, Jr.  Officer
8  Troy.  What was he doing after Detective Wallace
9  performed the leg sweep on you?
10    A.  Most -- Most likely probably going put his
11  body cam and vest back on, because he didn't have
12  it on when the door opened.  So that's why I
13  figured --
14    MR. BLACKWELL:
15      Let me -- Let me object to the
16    nonresponsiveness of the answer.
17    MR. THOMPSON:
18      That's fair.
19  EXAMINATION BY MR. THOMPSON:
20    Q.  Now, so now you're taken out of the room.
21  You don't recall who took you out of the room.
22  When you walk out the room, who is in the room at
23  the time?
24    A.  When I --
25    Q.  When you were walking in the room.

Page 388

1    A.  When I walked out the room?
2    Q.  Yes.
3    A.  Sergeant Kennedy, Troy Lawrence, Jr., and
4  Detective Wallace.
5    Q.  Okay.  They were on the outside of that
6  room where you were strip-searched?
7    A.  Yes.
8    Q.  Okay.  Were there any non-police officers
9  in that room?
10    A.  No.
11    Q.  Okay.  Do you ever recall -- Are you
12  familiar with a person by the name of Tyniah Banks?
13    A.  Yes.
14    Q.  Okay.  Do you recall seeing her in what we
15  call the Brave Cave?
16    A.  No, I didn't see Tyniah go in there,
17  because I was in the holding cell.
18    Q.  Okay.  Do you know if she was taken there
19  or not?
20    A.  I don't know.
21    Q.  Understood.  Now, when you're now -- when
22  you're at -- when you -- when they -- when you are
23  exited out of the area where you were
24  strip-searched, did they place you into a holding
25  cell?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 389

1     A.  Yes.
2     Q.  Okay.  Did they handcuff you in that
3 holding cell?
4     A.  Yes.
5     Q.  How did they handcuff you?
6     A.  My -- My left arm onto the bars.
7     Q.  Okay.  Was it uncomfortable?
8     A.  Yes.
9     Q.  Did you notify them that it was
10 uncomfortable?
11     A.  Yes.
12     Q.  And what did they -- What did -- What did
13 they tell you?
14     A.  I had to tell them things like I had to go
15 to the bathroom, things like that.  So everything
16 was basically on their time of when -- what they
17 wanted to hear, what they wanted to do.
18     Q.  Okay.  Great.  Now, there's been much talk
19 about this video with Officer Nevels.  Do you
20 recall that video when you watched it earlier?
21     A.  Yes.
22     Q.  Okay.  There's -- They were talking to you
23 about your demeanor.  Did you observe your demeanor
24 on that video?
25     A.  Yes.

Page 390

1     Q.  And did you appear to be happy in that
2 video?
3     A.  No.
4     Q.  You don't think that you were -- You
5 weren't smiling in that video?
6     A.  Yeah, I was.
7     Q.  Okay.  But were you injured in that video?
8     A.  Most definitely.
9     Q.  Okay.  And why were you smiling during
10 the -- during the time of that video?
11     A.  To keep from crying.
12     Q.  Okay.  So you were pretty upset about
13 that?
14     A.  Yes.
15     Q.  Okay.  When you were talking about your
16 mother, why were you referencing your mother?
17     A.  Because my mother is -- You say why was I
18 referencing my mother when I was talking about her?
19     Q.  Yes.  Yes.
20     A.  Re-ask me the question.
21     Q.  Why were you talking about -- Why did you
22 bring -- Why were -- Why were you talking about
23 your mother when you said, "You're going to find
24 out who my mother is"?
25     MR. SCHILLAGE:

Page 391

1     Object to the form.
2     EXAMINATION BY MR. THOMPSON:
3     Q.  Why were you reference -- Why were you
4 talking about your mother at the Brave Cave?
5     A.  Because I know my mother is a very smart,
6 intelligent woman.
7     Q.  Okay.  There was also talks about you
8 purchasing a certain type of vehicle.  Why were you
9 talking about that?
10     A.  Because I know they had did one of the
11 worst mistakes of their life.
12     Q.  And what was -- And what -- what do you
13 feel those mistakes were?
14     A.  Fucking with Tamara Green son.
15     Q.  Okay.  And do -- And was the reference and
16 the car just because you were trying to get rich --
17     A.  No.
18     Q.  -- off of false allegations?
19     A.  No.  The reference was to be, like,
20 credit, like, for pain and suffering.
21     Q.  Okay.  So just to make the record clear.
22 Why did you not tell Officer Nevels what happened
23 to you?
24     A.  Because I felt like he didn't care.  He
25 was talking more so about my mother and things like

Page 392

1 that.  So I really felt like he
2 ain't -- he ain't care.
3     Q.  Okay.
4     MR. THOMPSON:
5     Ms. Hawkins, can you pull up the video --
6     the interrogation of Mr. -- of Mr. Lee, please?
7     EXAMINATION BY MR. THOMPSON:
8     Q.  Mr. Lee, we're going to show you a video,
9 and there is a moment in the video that I want you
10 to -- to watch.
11     A.  Okay.
12     MR. THOMPSON:
13     Ms. Hawkins, let me know when you plan to
14     slow it down for Mr. Lee to those exact points,
15     please.
16     MS. HAWKINS:
17     To what exact point, Ryan?
18     MR. THOMPSON:
19     It's the points where he winces.  It
20     should be around the time he sits down or kind
21     of re-adjusts himself.
22     MR. SCHILLAGE:
23     Object to the form to the extent this is
24     testimony offered to the deponent.
25     MR. BLACKWELL:

Page 393

1    I join in that objection. It's kind of
2    leading to the extreme.
3    EXAMINATION BY MR. THOMPSON:
4        Q. Mr. Lee, while she pulls it up, I have
5    another question for you.
6        A. Yes, sir.
7        Q. Do you know what -- Do you know what the
8    letters or the meaning of DOJ means?
9        A. No, sir.
10       Q. You don't know what DOJ means?
11       A. DOJ?
12       Q. Yes. Do you know what those acronyms
13   stand for?
14       A. No, sir. Department of --
15       Q. Okay. Do you recall --
16       A. -- Justice.
17       Q. That is correct --
18       A. Okay.
19       Q. -- Mr. Lee. Good job.
20       Do you recall myself, Professor Frampton,
21   and your mother going to meet with some people from
22   Washington, D.C.?
23       A. Yes.
24       Q. In a room where Mr. Frampton was on the
25   video and you said, "This is the first time I'm

Page 394

1    meeting you"? Do you recall that?
2        A. Yes.
3        Q. Okay. Do you recall telling your story
4    that day?
5        A. Yes.
6        Q. Okay. Do you remember who all was in the
7    room? Like, were there three males, one male, one
8    female? Can -- Do you recall that?
9        A. Yeah.
10       Q. Okay. So when Mr. Schillage asked you if
11   you provided a statement to the DOJ, did you
12   understand what he meant?
13       A. No, sir.
14       Q. Okay. So now that I've explained that to
15   you, do you recall talking to people from
16   Washington, D.C.?
17       A. Yes, sir.
18       Q. Okay. And everything that you told them
19   that day is the same thing you told -- you're
20   telling us today, correct?
21       A. Yes, sir.
22   MR. BLACKWELL:
23       Object to the form.
24   MR. SCHILLAGE:
25       Join.

Page 395

1    EXAMINATION BY MR. THOMPSON:
2        Q. You can answer. You can answer the
3    question, Mr. Lee.
4        A. Yes, sir.
5        Q. Okay.
6    MR. THOMPSON:
7        Ms. Hawkins, do you got it up?
8    MS. HAWKINS:
9        It's not loading. Give me two seconds,
10   Ryan.
11   MR. THOMPSON:
12       No problem.
13   EXAMINATION BY MR. THOMPSON:
14       Q. Mr. Lee, let me ask you some more
15   questions. There were talks about the phone calls
16   that you made to your mother. Were you being
17   honest and truthful to your mother over the phone?
18       A. A hundred percent.
19       Q. Okay. Were you urinating blood at any
20   time during parish prison?
21       A. Yes, sir.
22       Q. Okay. Let's also talk about the time that
23   you were -- that you were taken to the hospital by
24   a BRPD officer. Do you recall what he looks like?
25       A. I don't remember.

Page 396

1        Q. Did you tell him what happened to you?
2        A. Yes, sir.
3        Q. Do you recall him having his body-worn --
4    I mean, did he have a vest on?
5        A. Yes, sir.
6        Q. Did he have his body-worn cam -- Was his
7    body-worn camera attached to that vest?
8        A. Yes, sir.
9        Q. Do you know if that body-worn camera was
10   on or not?
11       A. I don't know.
12       Q. Okay. Did he ever Mirandize you?
13       A. No, sir.
14       Q. Okay. And he's the same officer that
15   brought you back to parish prison?
16       A. Yes, sir.
17       Q. Okay. Let's talk earlier. During your
18   deposition there was made -- there were references
19   to the 5400 block. Do you recall that?
20       A. Yes.
21       Q. Okay. And during your deposition you
22   talked about that you just know the older guys.
23   Is -- Is the --
24       A. Older people. Older people.
25       Q. Older people from the neighborhood; would

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 397

1    that be fair to say?
2        A.  Yes.
3        Q.  Okay.  And in no way are you -- are you
4    related to -- I mean are you involved in any gang
5    membership?
6        A.  No, I'm not related to any gang.
7        Q.  Okay.  Let me ask you this.  Earlier there
8    was talks from Mr. Schillage about different -- I
9    mean about the different types of people that you
10   would know, friends, associates.  Do you recall
11   that -- those conversations?
12       A.  Yes.
13       Q.  Okay.  Is there another type of level
14   of -- Would there -- Is there another term that you
15   would -- that you would use for someone lower than
16   an association?  And then you can explain.  So if
17   you had to rank your levels of association with
18   people, is there anything that's lower than an
19   associate?
20       MR. SCHILLAGE:
21           Object to the form.  You can answer.
22       THE WITNESS:
23           Ask me -- Ask me that again.
24       EXAMINATION BY MR. THOMPSON:
25       Q.  Is there any other class -- Here's a

Page 398

1    better question.
2        A.  Yeah.
3        Q.  Is there any -- Did he ask you about some
4    of the females that were there?  Do you remember
5    those questions?  Ms. LaCourtney and some other
6    young ladies that they were referencing.  Do you
7    recall those questions?
8        A.  Correct.  Yeah, I remember.
9        Q.  Okay.  You remember.
10       A.  (Nodding head.)
11       Q.  Okay.  When you say that they are your
12   associates, is that because you've hung around them
13   for an extended period of time or just because
14   you've interacted with them --
15       A.  Just because --
16       Q.  -- briefly?
17       A.  Just because I interacted with them
18   briefly.
19       Q.  Okay.  And so anyone that you interact
20   with briefly, do you consider them an associate?
21       A.  Yes.
22       Q.  All right.  So you've asked those
23   gentlemen there, some of the attorneys in there,
24   their first and last names, and now you know them
25   by first.  Would you consider them associates now?

Page 399

1        A.  Yes.
2        Q.  Okay.  So the term "associates" is not
3    because you've had some longstanding relationship
4    with someone, correct?
5        A.  Correct.
6        Q.  Okay.
7        MR. THOMPSON:
8            Ms. Hawkins?
9        MS. HAWKINS:
10           Yeah.  It's pulled up.
11       EXAMINATION BY MR. THOMPSON:
12       Q.  Okay.  Mr. Lee, I want you to watch this
13   video.
14       MR. THOMPSON:
15           And, Ms. Hawkins, stop it when you find
16       the point that we need to discuss with Mr. Lee.
17       EXAMINATION BY MR. THOMPSON:
18       Q.  Pay attention, Jeremy; okay?
19       A.  Yes, sir.
20       MS. HAWKINS:
21           I'm sorry, y'all.  For the record, I'm
22       starting the Axon body camera marked as
23       X60842202.  The timestamp is 22:40:12.  It's
24       the Matthew Wallace interview of Jeremy Lee
25       taking place inside of the warehouse portion of

Page 400

1    the Brave Cave.  It's four minutes and 46
2    seconds long.
3        (VIDEO RECORDING BEING PLAYED.)
4        MS. HAWKINS:
5            Jeremy -- Okay.
6            Ryan, I just stopped it at 33 seconds.
7        EXAMINATION BY MR. THOMPSON:
8        Q.  All right.  Mr. Lee, did you see yourself
9    here?
10       A.  Yes.
11       Q.  Describe for the -- for the record what
12   you just did.
13       MR. SCHILLAGE:
14           Wait.  I'm sorry.  For the sake of the
15       record, the video that's being used is Exhibit
16       6 Video 4 that we've been referencing today
17       for -- So that way when we read this --
18       MR. THOMPSON:
19           Yeah.
20       MR. SCHILLAGE:
21           -- transcript later we have a clear
22       identity of what this exhibit and video is.
23       MR. THOMPSON:
24           Okay.  Thank you, Michael.
25           (VIDEO RECORDING BEING PLAYED.)

Electronically signed by Toni Conner (501-190-381-9495)                2f67950e-8c04-4061-959b-7823204c7c89

Page 401

1    MS. HAWKINS:
2        And I just stopped it again at 33 seconds.
3    EXAMINATION BY MR. THOMPSON:
4        Q.  Jeremy, did you see yourself there?
5        A.  Yeah.
6        Q.  Are you making any type of facial
7    expressions?
8        A.  Yeah.
9        Q.  Why are you making those facial
10   expressions?
11       A.  'Cause at this point, like, my ribs are
12   banging.
13       Q.  When you say "banging," tell everybody
14   what you mean by banging.
15       A.  Like, hurting tremendously.
16       Q.  Okay.  My next question to you is, at any
17   point in this dep -- in these depositions when
18   people asked you about your injuries, did you make
19   any of this up?
20       A.  Not at all.
21       Q.  Let me ask you -- Let me ask you this
22   question.  Is it possible that you injured your
23   ribs when you fell, to the best of your knowledge?
24       A.  Injured my wrist?
25   MS. HAWKINS:

Page 402

1        Ribs.
2    EXAMINATION BY MR. THOMPSON:
3        Q.  Your ribs.
4        A.  No.
5        Q.  Why do you believe that your ribs were
6    injured from the kick of Troy Lawrence, Jr.?
7        A.  Because I never ran and -- I never broke a
8    bone in my body until I encountered with him.
9        Q.  Okay.  All right.
10   MR. THOMPSON:
11       So just for the record, you guys, I'm --
12   I've got -- I think this is, like, going to be
13   my last question.  I just want to make the
14   record clear that the testimony of the
15   plaintiff here, my client, Jeremy Lee, is that
16   it was Officer Kennedy, Sergeant Kennedy, that
17   was in the room with him and not Sergeant
18   Carboni.  It is the testimony of my client,
19   Jeremy Lee, that he believes that Officer
20   Kennedy was wearing a vest and a body-worn
21   camera.  And, for the record today, myself,
22   Attorney Hawkins went through the discovery
23   that was provided by the City Parish of East
24   Baton Rouge Parish, City of Baton Rouge, and
25   there was no body-worn camera associated with

Page 403

1        Sergeant Kennedy inside of the discovery that
2        was provided to us.
3    EXAMINATION BY MR. THOMPSON:
4        Q.  So, Jeremy, my -- my last question that I
5    have --
6    MR. BLACKWELL:
7        Let me -- Let me -- First of all, Ryan,
8    let me -- let me object to the sidebar.  I
9    don't -- I don't know the purpose of -- of it
10   and I object to the sidebar.
11   MR. SCHILLAGE:
12       I'll join.
13   MR. THOMPSON:
14       Ms. Hawkins --
15       Noted.
16       Ms. Hawkins, do you mind pulling out the
17   APC that I -- that -- that me and Jer -- that I
18   had ref -- Jeremy reference to earlier?
19   MS. HAWKINS:
20       Yes.
21   MR. THOMPSON:
22       It goes directly to the part of where
23   Detective Wallace talks about the interaction
24   or what happened to Mr. Lee inside of the bay
25   area.

Page 404

1    MS. HAWKINS:
2        Okay.  For the purpose of the record, this
3    is the 11-page report that was referenced
4    earlier as being written by Officer Matthew
5    Wallace.  This is Page 8 of 11.  This is the
6    one, two, three, third paragraph down.
7        "Detective J. Carboni and Detective
8    Lawrence took Jeremy Lee into the rear room to
9    conduct a further search of his person.  Upon
10   removing the handcuffs from Lee, he immediately
11   clinched his fist tightly and attempted to
12   strike Detective Lawrence in an aggressive
13   manner.  Detective Lawrence then performed an
14   open-palm strike to create distance and prevent
15   Lee from striking him.  Detective Wallace
16   entered the room at this time and observed Lee
17   fleeing toward the rear exit door of the rear
18   room.  Detective Wallace quickly went toward
19   the exit door to prevent Lee from fleeing the
20   building.  Lee then fell to the ground just
21   prior to the exit door, that Detective Matt
22   Wallace blocked the doorway.  Detectives
23   instructed Lee to walk to the other side, where
24   they were prior to the incident.  Lee stood up
25   while clinching his fist tightly and approached

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 405

1    Detective Wallace, quickly jerking his right
2    shoulder forward as Lee brought his right elbow
3    back while raising his tightly-clinched fist.
4    This is a motion performed telegraphing a punch
5    which was going to be thrown towards Detective
6    Wallace with the intent of causing bodily
7    damage.  Detective Wallace quickly performed a
8    leg strike to the lower thigh area of Lee,
9    causing Lee to fall.  This prevented Lee from
10   being able to throw the punch properly to
11   strike Detective Wallace.  Lee then stated he
12   will comply.  Lee then complied with all
13   instructions.  Lee was found to have nothing on
14   his person, which allowed detectives to begin
15   processing him."
16   MR. BLACKWELL:
17       You're muted.
18   MR. THOMPSON:
19       Thanks, Brian.
20   EXAMINATION BY MR. THOMPSON:
21   Q.  Mr. Lee, did you hear that?
22   A.  Yes.
23   Q.  We're going to take this line by line,
24   sentence by sentence.
25   MR. BLACKWELL:

Page 406

1       Objection.
2    MR. THOMPSON:
3       Please read the first sentence to me.  To
4    Mr. Lee.
5    MR. BLACKWELL:
6       Again?
7    MS. HAWKINS:
8       Again.
9    MR. THOMPSON:
10      Again.  Again, Mr. Blackwell, yes.
11   MR. BLACKWELL:
12      Come on.  Come on, man.  We're going to
13   read the report --
14   THE WITNESS:
15      I've been getting -- answering
16   questions --
17   MR. THOMPSON:
18      Yes.
19   THE WITNESS:
20      -- all day.
21   MS. HAWKINS:
22      Brian --
23   THE WITNESS:
24      All day.
25   MS. HAWKINS:

Page 407

1       Read --
2    MR. THOMPSON:
3       No, no, no, no.
4    MS. HAWKINS:
5       Re-read all --
6    MR. THOMPSON:
7       Jeremy.  Mr. Lee.
8    MS. HAWKINS:
9       You're fine.
10   MR. THOMPSON:
11      Mr. Lee.  Mr. Lee, you're fine.  Jere --
12      Ms. Hawkins, please read the first
13   sentence of that paragraph, please, for me.
14   MS. HAWKINS:
15      "Detective Carboni and Detective Lawrence
16   took Jeremy Lee into the rear room to conduct a
17   further search of his person."
18   EXAMINATION BY MR. THOMPSON:
19   Q.  Mr. Lee, did -- did those two -- were
20   those -- Did Officer Carboni take you into the room
21   with Officer Lawrence?
22   A.  No, sir.
23   MR. THOMPSON:
24      Next sentence.
25   MS. HAWKINS:

Page 408

1       "Upon removing the handcuffs from Lee, he
2    immediately clinched his fist tightly and
3    attempted to strike Detective Lawrence in an
4    aggressive manner."
5    EXAMINATION BY MR. THOMPSON:
6    Q.  Mr. -- Mr. Lee, is that accurate?
7    A.  Not at all.  No, sir.
8    Q.  That's a yes or a no.
9    A.  No, sir.
10   MR. THOMPSON:
11      Next sentence.  Next sentence.
12   MS. HAWKINS:
13      "Detective Lawrence then performed an
14   open-palm strike to create distance and prevent
15   Lee from striking him."
16   EXAMINATION BY MR. THOMPSON:
17   Q.  Mr. Lee, did Mr. -- did -- did at any
18   point you try to strike Officer Lawrence?
19   A.  No, sir.
20   Q.  So that sentence would be untrue?
21   A.  Yes, sir.
22   MR. THOMPSON:
23      Next sentence.
24   MS. HAWKINS:
25      "Detective Wallace entered the room at

Electronically signed by Toni Conner (501-190-381-9495)    2f67950e-8c04-4061-959b-7823204c7c89

Page 409

1    this time and observed Lee fleeing towards the
2    rear exit door of the rear room."
3  EXAMINATION BY MR. THOMPSON:
4      Q.  Mr. Lee, were you fleeing toward the exit
5  door?
6      A.  No.  When I got --
7  MR. THOMPSON:
8      Okay.  Next sentence.
9  MS. HAWKINS:
10     "Detective Wallace quickly went towards
11  the exit door to prevent Lee from fleeing the
12  building."
13 EXAMINATION BY MR. THOMPSON:
14     Q.  Mr. -- Mr. Lee, do you recall Detective
15  Wallace going towards the door to cut you off from
16  the door?
17     A.  No.  He came to me, my body.
18     Q.  So that would be untrue?
19     A.  That would be untrue.
20 MR. THOMPSON:
21     Next sentence.
22 MS. HAWKINS:
23     "Lee then fell to the ground --
24 THE WITNESS:
25     Facts

Page 410

1  MS. HAWKINS:
2      -- just prior to the exit door --
3  THE WITNESS:
4      Facts.
5  MS. HAWKINS:
6      -- being Detective Matt Wallace blocked
7  the doorway."
8  EXAMINATION BY MR. THOMPSON:
9      Q.  Mr. Lee, what part of that -- that
10 sentence is true?
11     A.  None.
12 MR. THOMPSON:
13     Okay.  Next sentence, Jess.
14 MS. HAWKINS:
15     "Detectives instructed Lee to walk to the
16  other side, where they were just prior to the
17  incident."
18 EXAMINATION BY MR. THOMPSON:
19     Q.  Mr. Lee?
20     A.  Yes, he instructed me to.
21     Q.  Okay.  So that would be true?
22     A.  Yeah, that's true.  He instructed me to
23  move.
24     Q.  Okay.
25 MR. THOMPSON:

Page 411

1      Ms. Hawkins.
2  MS. HAWKINS:
3      "Lee then stood up while clinching his
4  fist tightly and approached Detective Wallace
5  and quickly jerked his right shoulder forward
6  as Lee brought his right elbow back" -- I'll
7  start from the top.
8      "Lee then stood up while clinching his
9  fist tightly and approached Detective Wallace
10  and quickly jerked his right shoulder forward
11  as Lee brought his right elbow back while
12  raising his tightly-clinched fist."
13 EXAMINATION BY MR. THOMPSON:
14     Q.  Mr. Lee, is that true?
15     A.  No, sir.
16 MR. THOMPSON:
17     Next.
18 MS. HAWKINS:
19     "This is a motion performed telegraphing a
20  punch which was going to be thrown towards
21  Detective Wallace with the intent to cause
22  bodily damage."
23 EXAMINATION BY MR. THOMPSON:
24     Q.  Mr. Lee, were you in -- were you intending
25  to hit Officer -- Officer Wallace?

Page 412

1      A.  No, sir.  I was not intending to hurt or
2  hit --
3      Q.  Okay.
4      A.  -- Officer Wallace.
5      Q.  Were you intending to hit or cause great
6  bodily injury upon any of the officers in that room
7  that day?
8      A.  No, sir.  I was already sustaining
9  injuries.
10 MR. THOMPSON:
11     Next question -- I mean next sentence,
12  Jess.
13 MS. HAWKINS:
14     "Detective Wallace quickly performed a leg
15  strike to the lower thigh area of Lee, causing
16  Lee to fall to the ground."
17 EXAMINATION BY MR. THOMPSON:
18     Q.  Would that be accurate, Mr. Lee?
19     A.  That happened.
20 MR. THOMPSON:
21     Next sentence.
22 MS. HAWKINS:
23     "This prevented Lee from being able to
24  throw the punch properly to strike Detective
25  Wallace."

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 413

1  EXAMINATION BY MR. THOMPSON:
2      Q.  Again, Mr. Lee, were you attempting to
3  throw a punch at Mr. Wallace?
4      A.  No, sir.  I was trying to
5  (indistinguishable).
6      COURT REPORTER:
7          "Trying to" what, I'm sorry?
8      THE WITNESS:
9          Talk to him.
10     MR. THOMPSON:
11         Next sentence.
12     MS. HAWKINS:
13         "This prevented Lee from being" -- What?
14     I'm sorry.
15         "Lee then stated he will comply."
16     EXAMINATION BY MR. THOMPSON:
17     Q.  Is that accurate, Mr. Lee?
18     A.  Yes, that's accurate.
19     MS. HAWKINS:
20         "Lee then" --
21     MR. THOMPSON:
22         Next, Ms. Hawkins.
23     MS. HAWKINS:
24         "Lee then complied with all instructions."
25     EXAMINATION BY MR. THOMPSON:

Page 414

1      Q.  Okay.  Is that accurate, Mr. Lee?
2      A.  Yes, sir.
3      MR. THOMPSON:
4          I have no further questions, you guys.
5      Thank you.
6      MR. SCHILLAGE:
7          All right.  I've got some follow-ups.
8      Let's see.  What's the last number that we're
9      on?
10     COURT REPORTER:
11         Fifteen was the last number.  Sixteen is
12     next.
13     MR. SCHILLAGE:
14         Okay.  Sixteen is next.
15     THE WITNESS:
16         I could take a break?
17     MR. SCHILLAGE:
18         No, sir, because I'm not going to be very
19     long.
20     THE WITNESS:
21         All right.  How long will that be?
22     Because I'm not going to be very long either
23     for the bathroom break.  I've been here sitting
24     still for hours and it's cold.
25     MR. SCHILLAGE:

Page 415

1          All right.
2      THE WITNESS:
3          You going to treat me like the police or
4      you're going to let me go to the bathroom?
5      It's a free country.
6      MR. SCHILLAGE:
7          Let's take a five-minute break.
8      THE WITNESS:
9          Thank you, sir.
10     VIDEOGRAPHER:
11         Off the record.  The time is 6:54.
12         (OFF THE RECORD.)
13     VIDEOGRAPHER:
14         Back on the record.  The time is now 6:59.
15     EXAMINATION BY MR. SCHILLAGE:
16     Q.  All right, Mr. Lee, I get to end the day
17     with the last round of little follow-up questions.
18         So just to confirm.  And I've spoken to
19     your attorneys on this off the record.  Just to put
20     it on the record.  I gave it to Mr. Thompson while
21     he was here in person and Ms. Hawkins is holding
22     it.  I've got these authorizations that we sent to
23     you on June 19th of this year, and we just ask that
24     these can be signed while we're all here together
25     before we leave for the day to save you another

Page 416

1      trip.  And we can do it when we're off the record,
2      but just -- So that that's done.  I just don't want
3      you to forget whenever we all start packing up and
4      leaving.  Is that fair and understood?
5      A.  I understand.
6      Q.  I appreciate it.
7          All right.  Mr. Thompson at one point
8      asked you a question about whether it's your
9      intention to get rich from this.
10     A.  Correct.
11     Q.  I took this to be the lawsuit.  Right?  So
12     I'm going to hand you a document that has been
13     marked as Exhibit 16.  It's the Jeremy Lee Initial
14     Disclosures.  Just as a preliminary question, Mr.
15     Lee -- And it's -- it's four pages long.  And it's,
16     you know, electronically signed by your lawyers and
17     it's on your behalf, as you can see the title of
18     the document.  Have you ever seen this document
19     before?
20     A.  First time.
21     Q.  This is the first time?
22     A.  (Nodding head.)
23     Q.  Okay.  If you'd just turn to the third
24     page.  Do you have a -- And look -- look at the
25     section at the very bottom, second to last line.

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 417

1    It's in bold. It says Total Damages. Do you hold
2    a personal belief or opinion one way or another
3    that your claims are equated to a value of $6.8
4    million in this case?
5        A. If my mem -- every -- my
6    (indistinguishable) was broke?
7    COURT REPORTER:
8        "My" what, I'm sorry?
9    THE WITNESS:
10       What -- You know what I'm trying to say?
11   MS. HAWKINS:
12       I don't, Jeremy.
13   THE WITNESS:
14       All right. I know they had a -- a list
15   of -- I'd seen something. The charges and the
16   wage depend on -- I -- It's -- Yeah, this is --
17   MS. HAWKINS:
18       It's a yes or no, Jeremy.
19   THE WITNESS:
20       Yes.
21   EXAMINATION BY MR. SCHILLAGE:
22       Q. Okay. Okay. Because I understand that,
23   you know --
24       A. Six million eight hundred thousand, right?
25       Q. Six million eight hundred thousand is

Page 418

1    what's on that document, correct.
2        A. Right.
3        Q. Okay. And you have a personal opinion or
4    belief to stand by a number that's on that
5    document?
6        A. Yes.
7        Q. Okay. All right. Because obviously I
8    don't get to talk to you, other than right now in a
9    deposition setting and then at trial itself.
10       A. Right, right, right.
11       Q. And so I have to check all that, because
12   the next time we talk -- Unless new information
13   reveals itself that we would all have to talk about
14   for a second deposition, the next time I talk to
15   you is in a trial setting. And so I have to know
16   if something's going to change from now to then as
17   far as your medical condition, your treatment, and
18   any other new information that doesn't exist today
19   but it may exist between now and trial.
20       A. Right.
21       Q. I have to know about it; okay?
22       A. You're good.
23       Q. All right. Do you know someone named
24   Clarence Green?
25       A. No, sir.

Page 419

1        Q. Have you ever heard the name?
2        A. No, sir.
3        Q. Do you know anybody named Shermanie Reed?
4        A. (Shaking head.) No, sir. Not --
5        Q. Have you ever heard the name before?
6        A. (Shaking head.)
7        Q. You have to answer out loud.
8        A. No.
9        Q. Thank you.
10       Do you know someone by the name of Holden
11   Sanders?
12       A. No.
13       Q. Have you ever heard that name before?
14       A. No.
15       Q. Okay. Do you know someone by the name of
16   Emanuel "Chayvis" or Chavis?
17       A. Emanuel Chavis. No.
18       Q. Okay. Have you ever heard the name
19   before?
20       A. No.
21       Q. Okay. What about the -- Do you know a
22   person named Syra Creel?
23       A. No.
24       Q. Have you ever heard the name before?
25       A. No.

Page 420

1        Q. Okay. What about the person Alton
2    Sterling? Did you know Mr. Sterling?
3        A. I knew of him.
4        Q. Okay. So --
5        A. From what happened.
6        Q. Fair enough. And you understood from my
7    questions, that's the follow-up?
8        A. Yeah.
9        Q. If you didn't know him personally, did you
10   know -- you know the name?
11       A. Yes.
12       Q. Okay. Okay. The Exhibit 7, which I -- we
13   talked about earlier. And, actually, your
14   attorney, Mr. Thompson, made a condition as I was
15   referencing, if you remember, Paragraph 56 that was
16   highlighted, and you disagreed with the paragraph.
17   And at the time when we talked about that your,
18   attorney conditioned or, you know, made a comment
19   during that line of questions that this is a
20   pleading drafted by the attorneys, it's not signed
21   by you, and so that's their words and not yours. I
22   just need to corroborate that. Do you agree with
23   the representation that your attorney made, that
24   the information in this is not from or verified by
25   you, but rather, it's by your attorneys?

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 421

1    A. Yeah, it's by my attorneys. It wasn't me.
2    Q. Okay. And so the information contained
3  within that lawsuit that identifies the names
4  Clarence Green, Shermanie Reed, Syra Creel, Holden
5  Sanders, and Eman -- Emanuel Chavis, the
6  information in that lawsuit about those people, you
7  don't personally have information about that?
8    A. No.
9    Q. Okay. Do you have any information about
10  anybody that was detained or arrested by the Street
11  Crimes officers for BRPD, whether it is the three
12  officers that you sued in this case or any of the
13  other Street Crimes officers, and brought them to
14  that narcotics processing facility you called the
15  Brave Cave --
16    A. You asking so many questions. You can go
17  by one for me?
18    Q. I mean --
19    A. Ask one at a time.
20    Q. That's fair. I, actually -- I'm trying to
21  ask all of this because it hasn't gotten to a
22  question yet. I'm just giving you all the
23  information to answer the question. I'm sorry.
24  Let me try and rephrase this.
25      Do you know anyone else that was detained

Page 422

1  or arrested and brought to the Brave Cave, other
2  than the group you went with on January 9, 2023?
3    A. You're saying do I know anyone else?
4    Q. Yes.
5    A. You said, like, do I know anyone else who
6  was a victim of the Brave Cave?
7    Q. Correct.
8    A. Yes.
9    Q. Okay. Who do you know?
10    A. Ternell Brown.
11    Q. Ternell. And how do you know Ms. Brown?
12    A. Of a victim of the Brave Cave.
13    Q. No, no, no. I understand that. But how
14  did you know -- To use your words, you called her a
15  victim of the Brave Cave.
16    A. Yes.
17    Q. How do you know --
18    A. I seen it on the news.
19    Q. Oh, okay. You saw her on the news.
20      Do you know who her attorneys are?
21    A. Yes.
22    Q. Who are they?
23    A. Ryan K. Thompson, Jessica Hawkins.
24    Q. And?
25    A. Diggs. Diggs. Rodney Diggs.

Page 423

1    Q. Okay. So the three lawyers representing
2  you are also the three lawyers representing Ternell
3  Brown, and you are aware of that, right?
4    A. Yes, I know.
5    Q. Okay. Anybody else that you know who
6  would have been detained or arrested and brought to
7  that Brave Cave facility?
8    A. No, sir.
9    Q. So Ms. Brown is the only other person that
10  you know personally?
11    A. Yeah. I have --
12    Q. I'm sorry. I shouldn't have asked it like
13  that. Do you know Ms. Brown personally?
14    A. No, I don't know her.
15    Q. Okay. So it's the news -- It was a news
16  story that you saw?
17    A. Yes.
18    Q. TV, newspaper --
19    A. Yes.
20    Q. -- something else?
21    A. Yes. I don't know her personally.
22    Q. Okay. Was it by TV or newspaper, though,
23  that you saw the news story?
24    A. TV.
25    Q. Okay. Have you heard of anyone else being

Page 424

1  detained or arrested similar to -- to what you have
2  explained to us about your arrest event and brought
3  to the Brave Cave Street Crimes processing
4  facility?
5    A. No.
6    Q. Okay. Mr. Thompson asked you questions
7  about whether you know the legal definitions of
8  arrest and detention, and you said no, right?
9    A. Correct.
10    Q. Okay. Is that information that you need
11  to understand what your rights are during an
12  interaction with a police officer?
13    A. Yes.
14    Q. Okay. And you don't know those
15  definitions of arrest and detention as we sit here
16  today?
17    A. Right.
18    Q. Did you know them on January 9, 2023?
19    A. No.
20    Q. Okay. Is it fair to say, then, you may
21  not have known your rights whenever you were
22  talking?
23    A. I was asking them, "What are you arresting
24  me for?"
25    Q. Okay. Mr. Thompson asked you a question

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 425

1    with information about whether or not somebody, an
2    unknown person, could have performed a leg sweep on
3    you as you were running away from Troy Lawrence,
4    Jr. in the warehouse portion of the building. Do
5    you remember that?
6        A.  Yes.
7        Q.  Because earlier today, hours ago, you
8    explained to me candidly that you were running
9    away.
10       A.  Uh-huh.
11       Q.  Later you described it as a full sprint.
12   And you had said you had tripped because the
13   concrete on the ground was uneven.
14       A.  Yeah. I cleared that up.
15       Q.  Okay. So you disagree and you are
16   changing that answer?
17       A.  I didn't change it. I told you -- You
18   asked as we was talking and you went on and
19   proceeded to the next question.
20       Q.  So instead of uneven concrete, it's your
21   position at this point in the deposition that
22   somebody, being an officer, performed a leg sweep
23   from behind you while you were in the way?
24       A.  I know what a leg sweep feel like.
25       Q.  Okay. So that would mean there were two

Page 426

1    leg sweeps now.
2        A.  It was one leg sweep. I already corrected
3    that I was running and fell. I corrected that.
4        Q.  Okay. So let's finish correcting it,
5    then.
6        A.  It's corrected --
7        Q.  Earlier --
8        A.  -- already.
9        Q.  Earlier today you said Matthew Wallace
10   performed the leg sweep, right?
11       A.  He did.
12       Q.  And so is it Matthew Wallace now in the
13   chain of events you've described while you were
14   running away from Troy Lawrence --
15       A.  No.
16       Q.  -- Jr.?
17       A.  He was not in the building. He was not in
18   the warehouse yet.
19       Q.  So who performed the leg sweep?
20       A.  I fell. I told you that.
21       Q.  So you -- Okay.
22       A.  I was --
23       Q.  So it was --
24       A.  -- running and fell.
25       Q.  -- a trip-and-fall?

Page 427

1        A.  I was running and I fell. I was running
2    for my life.
3        Q.  Okay. So there was no leg sweep at that
4    point?
5        A.  I got leg swept after I got up. I did
6    get leg sweeped.
7        Q.  By Matthew Wallace later?
8        A.  Yes.
9        Q.  But the trip-and-fall on uneven concrete
10   while you were running away --
11       A.  Yes.
12       Q.  -- from Troy Lawrence, Jr., you are
13   confirming with us it was a trip-and-fall on the
14   uneven concrete?
15       A.  Yes.
16       Q.  So there was no two different leg sweeps?
17   There was only the one?
18       A.  Yes. And I cleaned it up for you.
19       Q.  I appreciate that.
20           Officer -- I'm sorry. Mr. Thompson asked
21   you about your car ride with Officer Lawrence, Jr.
22   from the arrest site to the Brave Cave narcotics
23   processing facility, and you and Officer Lawrence,
24   Jr. had a conversation about the music --
25       A.  (Nodding head.)

Page 428

1        Q.  -- that he was listening to?
2        A.  Yes.
3        Q.  And it's your testimony and recollection
4    in that conversation you called Officer Lawrence,
5    Jr. gay because he was listening to a female
6    rapper?
7        A.  Meg Thee Stallion, yes.
8        Q.  Okay. And was it your intention to mean
9    that in a derogatory fashion?
10       A.  Yes, because he showed me how he feel
11   about a human being.
12       Q.  So to you, it is derogatory to be gay?
13       A.  It's not derogatory. I just know, like,
14   you got to be some type of, like, to want to beat
15   up on someone not your size or -- You see what I'm
16   saying?
17       Q.  Well, not really, because I thought you
18   used the term to Officer Lee [sic] in reference to
19   the music he was listening to. Isn't that what it
20   was about?
21       A.  I say, "You -- You here listening to Meg
22   Thee Stallion." Yeah.
23       Q.  Okay. And you -- you intended it to
24   Officer Lawrence as an insult?
25       A.  Yes.

Electronically signed by Toni Conner (501-190-381-9495)                2f67950e-8c04-4061-959b-7823204c7c89

Page 429

1     Q.  Okay.  That lawsuit, Exhibit 7, that
2  you're looking at, another thing in it, it does not
3  make reference to David Kennedy, but to Joseph
4  Carboni, as being that other person with Troy
5  Lawrence, Jr. in the warehouse section with you.
6     A.  I don't need to look at it.  He wasn't in
7  there.
8     Q.  Okay.  So did you have a chance to review
9  that Exhibit 7 before it was filed in Federal Court
10  to confirm accuracies or inaccuracies in it?
11     A.  It was so much twists and turns, no.
12     Q.  Okay.
13     A.  But learning that it wasn't him in there
14  is a lie.
15     Q.  Can you tell me what you mean by that?
16     A.  Seeing that they had Carboni as being a
17  witness in there, he was never in there.
18     Q.  Okay.
19     A.  Any more of that stuff you don't
20  understand?
21     Q.  So you've had two pictures that one of
22  your attorneys showed you on the computer screen.
23  One picture represented as Officer Carboni.  One
24  officer represented as Officer Kennedy.  And you
25  confirmed from just your recollection of looking at

Page 430

1  the photo of the two officers you don't remember
2  seeing Carboni in the warehouse area --
3     A.  No.
4     Q.  -- but you do remember seeing --
5     A.  That's the only person that had was --
6  wasn't in a white Ford truck.  Carboni, he smokes
7  cigarettes, he's like 50 something years old.
8  Yeah, I remember everything he said.
9     Q.  Okay.  You also made a reference to
10  Officer Kennedy.  You made the comment that he's a
11  pervert.  You called him a pervert.
12     A.  Yeah.
13     Q.  Do you remember that?
14     A.  Yeah, I did.
15     Q.  Why did you say that about Officer
16  Kennedy?
17     A.  Because he was the person who allowed me
18  to strip-search, who wanted me to strip-search for
19  him, and it was very uncomfortable.  It was longer
20  than any strip-search that I ever got encountered
21  with and it was uncomfortable.
22  MR. SCHILLAGE:
23     Okay.  I don't have anything further, Mr.
24  Lee.
25  THE WITNESS:

Page 431

1     What you laughing and pointing at?  Like,
2  what -- what's wrong?
3  MR. KERSHAW:
4     Well, I have a question for you.  How
5  about that?
6  THE WITNESS:
7     I'm ready for it.
8  MR. KERSHAW:
9     So --
10  VIDEOGRAPHER:
11     There is a microphone for you.
12  THE WITNESS:
13     I'm ready for it.
14  MS. HAWKINS:
15     Jeremy.
16  EXAMINATION BY MR. KERSHAW:
17     Q.  He just asked --
18  MR. BLACKWELL:
19     Hey, I've got a couple more questions.
20  EXAMINATION BY MR. KERSHAW:
21     Q.  He just asked you about being
22  strip-searched, and you said that strip-search was
23  like no other that you had had before.
24     A.  Yeah.
25     Q.  So you were strip-searched before January

Page 432

1  9?
2     A.  I told you I was strip-searched in parish
3  prison.
4     Q.  Yeah.  That came later on in the evening.
5     A.  And I was also strip-searched in 2020,
6  when I went to jail and bonded out for bank fraud.
7     Q.  Well, previously you said you weren't
8  strip-searched.
9     A.  I said I was strip-searched twice.  Never
10  said I was not previously strip-searched.  Get your
11  budgets --
12     Q.  Okay.  The record will bear it out.
13     A.  Get your budgets ready.  Get your budgets
14  ready.  You're wrong.
15     Q.  Okay.
16     A.  Yeah.
17     A.  We'll see.
18     A.  Yeah.  You is wrong.
19  MR. KERSHAW:
20     All right.  That's all I got.
21  EXAMINATION BY MR. BLACKWELL:
22     Q.  Mr. Lee, I've just got a couple of
23  questions for you.
24     A.  Yeah.  Come on up.
25     Q.  Do you remember at the beginning of the

Electronically signed by Toni Conner (501-190-381-9495)                                2f67950e-8c04-4061-959b-7823204c7c89

Page 433

1  deposition raising your hand and swearing to tell
2  the truth, the whole truth, and nothing but the
3  truth?
4      A.  Yeah, I remember like you remember.
5      Q.  Were all the answers that you provided to
6  Mr. Schillage's questions truthful?
7      A.  Yes, sir.  After I had a talk with my
8  lawyer that some of the --
9      Q.  No, sir.  That's not my question.
10     A.  Well, I'm talking, though.  You not -- You
11 got to finish letting me talk, though.
12     Q.  No.  You've got to answer --
13     A.  How can I --
14     Q.  -- the question --
15     A.  -- explain myself?
16     MS. HAWKINS:
17         Jeremy.
18 EXAMINATION BY MR. BLACKWELL:
19     Q.  -- first.  You can --
20     MS. HAWKINS:
21         Jeremy.
22 EXAMINATION BY MR. BLACKWELL:
23     Q.  You can explain your --
24     THE WITNESS:
25         But I cannot --

Page 434

1      MS. HAWKINS:
2          Jeremy.
3      THE WITNESS:
4          -- say nothing but just no --
5      MS. HAWKINS:
6          Jeremy.
7      THE WITNESS:
8          -- and yes.
9      MS. HAWKINS:
10         Look at me in my face.
11 EXAMINATION BY MR. BLACKWELL:
12     Q.  You can explain your answer, but answer --
13 I want you to answer yes or no.
14     MS. HAWKINS:
15         (Indistinguishable.)
16     COURT REPORTER:
17         Do you want that on the record?
18     MS. HAWKINS:
19         I said, "Answer the question.  We are
20     almost home."
21 EXAMINATION BY MR. BLACKWELL:
22     Q.  Were -- Were all of the answers to the
23 questions posed to you by Mr. Schillage truthful
24 and accurate?
25     A.  No.

Page 435

1      Q.  Were all of the answers to the questions
2  posed to you by Mr. Tettleton truthful and
3  accurate?
4      MS. HAWKINS:
5          So you're telling him that you did not --
6      THE WITNESS:
7          No.  No.  Listen.  But he's not letting
8      me --
9      MS. HAWKINS:
10         He's asking you if every answer you gave
11     was truthful.
12     THE WITNESS:
13         Yes, it's true.  It's true.  But the only
14     thing I didn't say true was I got clipped.
15     That's the only thing I didn't say true.
16 EXAMINATION BY MR. BLACKWELL:
17     Q.  So I'm asking you specifically --
18     A.  I'm telling you.
19     Q.  -- with respect to --
20         Sir, please listen to me.
21     MS. HAWKINS:
22         Jesus fucking Christ.
23 EXAMINATION BY MR. BLACKWELL:
24     Q.  Were all of the answers to the questions
25 that Mr. Tettleton asked you earlier truthful and

Page 436

1  accurate?
2      A.  Yes.
3      Q.  Were all of the answers to the questions
4  that I asked you earlier truthful and accurate?
5      A.  Yes.
6      Q.  Were all of the answers to the questions
7  that Mr. Kershaw asked you truthful and accurate?
8      A.  Yes.
9      Q.  Were all of the answers to the questions
10 that Mr. Thompson asked you truthful and accurate?
11     MS. HAWKINS:
12         Yes or no, Jeremy.
13     THE WITNESS:
14         I got to have time to answer questions.  I
15     got to have time, because I feel like he's
16     playing on my time just asking me questions.
17     MS. HAWKINS:
18         Jeremy, he's asking you if every answer
19     you gave was truthful and accurate.
20     THE WITNESS:
21         Yes.  Yes.
22     MS. HAWKINS:
23         That's it.
24 EXAMINATION BY MR. BLACKWELL:
25     Q.  So if -- So --

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 437

1    MS. HAWKINS:
2        Next question.
3    EXAMINATION BY MR. BLACKWELL:
4        Q.  -- if your answers to --
5    MS. HAWKINS:
6        It's like pulling teeth.
7    EXAMINATION BY MR. BLACKWELL:
8        Q.  If your answers changed, would that
9    indicate to you that some of them were not truthful
10   or accurate?
11       A.  No.
12       Q.  So you -- you can -- you can be truthful
13   and accurate in two different ways about the same
14   question?
15       A.  If I don't understand it.
16       Q.  So your understanding of the question
17   denotes whether or not your answers are truthful?
18       A.  Can you re-ask that question?
19       Q.  I mean, true -- being true or not is
20   pretty definitive; is it not, sir?
21       A.  But it's not a lie that I fell.
22       Q.  I'm not asking you that.  I'm asking
23   you -- The truth is the truth, right?  There ain't
24   -- There ain't versions of the truth.  It's either
25   true or it ain't.

Page 438

1        A.  Correct.
2        Q.  Is that correct?
3        A.  Correct.
4        Q.  And so you can't -- there can't be two
5    versions of --
6        A.  Come on.
7        Q.  -- the truth, can there?
8        A.  Come on with you.  Come on.  Come on.
9        Q.  There can't be two versions of the truth,
10   can there?
11       A.  No, sir.
12   MR. BLACKWELL:
13       Thank you.  That's all the questions I
14       have.
15   MR. SCHILLAGE:
16       Mr. Lee, you've got --
17       Does anyone have any follow-ups?
18   MR. TETTLETON:
19       (Shaking head.)
20   MR. SCHILLAGE:
21       Mr. Lee, you've got the right to read and
22       sign or do you -- I don't know if your lawyers
23       gave you that instruction.
24       Jessica, do I need to give it to him real
25       quick or you got it?

Page 439

1    MS. HAWKINS:
2        No.  We got it.
3    MR. SCHILLAGE:
4        Okay.  Just let Madam Court Reporter know
5    if you'd like to read and sign or waive.
6    MS. HAWKINS:
7        We're going to waive.
8    VIDEOGRAPHER:
9        We're all good?
10   MR. SCHILLAGE:
11       (Indicating thumb up.)
12   VIDEOGRAPHER:
13       All right.  This is the conclusion of the
14   videotaped deposition.  We are going off the
15   record.  The time is now 7:20.

Page 440

REPORTER'S PAGE

1
2    I, Toni T. Conner, Certified Court Reporter in
3    and for the State of Louisiana, the officer, as
4    defined in Rule 28 of the Federal Rules of Civil
5    Procedure and/or Article 1434(B) of the Louisiana
6    Code of Civil Procedure, before whom this
7    proceeding was taken, do hereby state on the
8    record:
9        That due to the interaction in the spontaneous
10   discourse of this proceeding, dashes (--) have been
11   used to indicate pauses, changes in thought, and/or
12   talkovers; that same is the proper method for a
13   Court Reporter's transcription of proceeding, and
14   that the dashes (--) do not indicate that words or
15   phrases have been left out of this transcript;
16       That any words and/or names which could not be
17   verified through reference material have been
18   denoted with the phrase "(spelled phonetically)."
19

Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89

Page 441

```
 1          REPORTER'S CERTIFICATE
 2
 3        This certification is valid only for a
       transcript accompanied by my original signature and
       original required seal on this page.
 4        I, TONI T. CONNER, Certified Court Reporter in
       and for the State of Louisiana, as the officer
 5     before whom this testimony was administered, do
       hereby certify that JEREMY TRAMAINE LEE, after
 6     having been duly sworn by me upon authority of R.S.
       37:2554, did testify as hereinbefore set forth in
 7     the foregoing 440 pages;
          That this testimony was reported by me in the
 8     stenotype reporting method, was prepared and
       transcribed by me or under my personal direction
 9     and supervision, and is a true and correct
       transcript to the best of my ability and
10     understanding;
          That the foregoing transcript has been
11     prepared in compliance with transcript format
       guidelines required by statute or by the Rules of
12     the Louisiana Certified Shorthand Reporter Board,
       and that I am informed about the complete
13     arrangement for deposition services, that I have
       acted in compliance with the prohibition on
14     contractual relationships as defined by the
       Louisiana Code of Civil Procedure Article 1434 and
15     in rules and advisory opinions of the Board;
          That I have no actual knowledge of any
16     prohibited employment or contractual relationship,
       direct or indirect, between a court reporting firm
17     and any party litigant in this matter, nor is there
       any such relationship between myself and a party
18     litigant in this matter;
          That I am not of counsel, not related to
19     counsel or the parties herein, nor am I otherwise
       interested in the outcome of this matter.
20
21
22     _____
       TONI T. CONNER - #85138
23     CERTIFIED COURT REPORTER
24
25     4th day of August, 2025
```



Electronically signed by Toni Conner (501-190-381-9495)                    2f67950e-8c04-4061-959b-7823204c7c89